UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SUE MI TERRY,<br><br>Defendant. | **SEALED INDICTMENT**<br><br>24 Cr.<br><br>**2 4 CRIM 427** |

The Grand Jury charges:

## INTRODUCTION

1. For more than a decade, SUE MI TERRY, the defendant, who previously served as an employee of the Central Intelligence Agency ("CIA") and as a senior official of the White House National Security Council ("NSC"), has worked as an agent of the Government of the Republic of Korea ("ROK"), also known as South Korea. At the direction of ROK Government officials, TERRY advocated ROK policy positions, including in published articles and during media appearances, disclosed nonpublic U.S. Government information to ROK intelligence officers, and facilitated access for ROK Government officials to U.S. Government officials. In return for these actions, ROK intelligence officers provided TERRY with luxury goods, high-priced dinners, and more than $37,000 in covert funding for a public policy program focusing on Korean affairs that TERRY controlled. Despite engaging in extensive activities for and at the direction of ROK Government officials, and notwithstanding her knowledge of the foreign-agent registration requirement, TERRY never registered as a foreign agent with the Attorney General, as required by law.

2. As she admitted in a voluntary interview with the Federal Bureau of Investigation ("FBI"), SUE MI TERRY, the defendant, also was a valuable "source" of information for the ROK

National Intelligence Service ("ROK NIS"), the primary intelligence agency for the ROK. For example, as described in more detail below, in or about June 2022, TERRY participated in a private, off-the-record group meeting with the U.S. Secretary of State regarding the U.S. Government's policy towards North Korea. Immediately after the meeting, TERRY met her primary ROK NIS point of contact, or "handler," and passed him detailed handwritten notes from that meeting. Weeks later, at the request of her handler, TERRY hosted a happy hour for Congressional staff under the auspices of the policy institute, or "think tank," where TERRY worked.[1] TERRY's handler attended the happy hour – which was paid for by the ROK NIS – posing as a diplomat, and mingling with Congressional staff without disclosing that he was a ROK intelligence officer.

  3.  The ROK Government repeatedly rewarded SUE MI TERRY, the defendant, for her services. TERRY's ROK NIS handlers gifted her, among other things, a $2,845 Dolce & Gabbana coat, a $2,950 Bottega Veneta handbag, and a $3,450 Louis Vuitton handbag. They took TERRY to meals at upscale seafood restaurants, sushi restaurants, and multiple restaurants with Michelin stars. They also offered to provide TERRY approximately $37,000, worked with her to devise a plan to mask the true source of those funds, and deposited the funds into an unrestricted "gift" account that TERRY controlled at the think tank where she worked. And ROK Government officials paid TERRY on multiple occasions to write articles in both the U.S. and Korean press conveying ROK Government-provided positions and phrases.

---

[1] A "think tank," or policy institute, is a research institute that provides expertise and insight concerning topics such as global affairs to policymakers and the public through research, analysis, and scholarship. Think tanks, including those for which Terry worked, often present themselves as independent sources of expertise.

4.  On at least three occasions between 2016 and 2022, SUE MI TERRY, the defendant, testified before the U.S. House of Representatives regarding the U.S. Government's Korean policy. Each time, TERRY had to complete "Truth in Testimony" disclosure forms, which required TERRY to answer whether she was an "active registrant under the Foreign Agents Registration Act (FARA)." Each time, TERRY correctly answered that she was not an active registrant, demonstrating, among other things, TERRY's awareness of FARA and FARA's registration requirement. During this time period, TERRY was, in fact, acting as an agent of the ROK without having registered with the Attorney General. As a result, Congress did not have the opportunity to fairly evaluate TERRY's testimony in light of her longstanding efforts for the ROK Government and its intelligence service.

### BACKGROUND ON CERTAIN RELEVANT INDIVIDUALS

5.  SUE MI TERRY, the defendant, is a naturalized U.S. citizen who was born in Seoul, South Korea and raised in Virginia and Hawaii. She holds a Ph.D. in International Relations. From in or about 2001 to in or about 2011, TERRY served in a series of positions in the U.S. Government, including as an analyst on East Asian issues for the CIA, as the Director for Korea, Japan, and Oceanic Affairs for the NSC, and as the Deputy National Intelligence Officer for East Asia at the National Intelligence Council. Since leaving government service in or about 2011, TERRY has worked at academic institutions and think tanks in New York City and Washington, D.C., including a think tank based in New York City ("Think Tank-1") and two think tanks based in Washington, D.C. ("Think Tank-2" and "Think Tank-3"). Each of these organizations presents itself as an independent policy and research organization. During the period relevant to this Indictment, TERRY made media appearances, published articles, hosted conferences, and testified before Congress as a policy expert specializing in, among other things, South Korea, North Korea, and various broader regional issues impacting Asia.

6.  From in or about June 2013 to in or about 2016, an ROK Government official not named herein ("NIS Handler-1") served as a Minister for the ROK Mission to the United Nations in Manhattan, New York. In this position, NIS Handler-1 posed as a diplomat. As set forth below, however, SUE MI TERRY, the defendant, identified NIS Handler-1 as an intelligence officer for the ROK NIS, operating in the United States under diplomatic cover. As described in more detail below, TERRY met with NIS Handler-1 on multiple occasions and, through NIS Handler-1, deepened her relationship with the ROK NIS.

7.  From in or about August 2017 to in or about August 2020, an ROK Government official not named herein ("NIS Handler-2") served as a Minister Counselor for the ROK Embassy in the United States in Washington, D.C. Like NIS Handler-1, NIS Handler-2 posed as a diplomat. As set forth below, however, SUE MI TERRY, the defendant, identified NIS Handler-2 as the acting ROK NIS Chief of Station, meaning he was the highest-ranking ROK intelligence officer stationed at the ROK Embassy. As described in more detail below, TERRY met with NIS Handler-2 on multiple occasions, and NIS Handler-2 requested that TERRY take specific actions for the benefit of the ROK NIS.

8.  An ROK Government official not named herein ("NIS Handler-3") succeeded NIS Handler-2 as a Minister Counselor for the ROK Embassy in the United States in Washington, D.C., serving in that position from in or about August 2020 to in or about July 2023. As set forth below, SUE MI TERRY, the defendant, identified NIS Handler-3 as the ROK NIS Chief of Station, the highest-ranking ROK intelligence official at the ROK Embassy. As described in more detail below, TERRY met with NIS Handler-3 on multiple occasions, and NIS Handler-3 requested that TERRY take specific actions for the benefit of the ROK NIS.

## BACKGROUND ON THE FOREIGN AGENTS REGISTRATION ACT

9. The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, is a registration and disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General if he or she is engaging, directly or through another person, in certain types of conduct, such as political activities, political consulting, public relations, or publicity activities, for or in the interest of the foreign principal. FARA registrations are made to the Foreign Agents Registration Act Unit ("FARA Unit") of the Department of Justice's National Security Division. It is a crime to knowingly and willfully fail to register when required under FARA.

10. The purpose of FARA is to prevent covert influence by foreign principals, which include, as relevant here, the government of a foreign country. Proper registration under the statute allows the U.S. Government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals in light of their status as foreign agents. Among other things, FARA registration reveals the identity of the foreign principal on whose behalf the registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and any political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal. FARA registration statements are publicly accessible on the website of the FARA Unit.

11. Public and private audiences rely on the truthful disclosure of foreign agents under FARA. For example, witnesses who testify before the U.S. House of Representatives must complete a "Truth in Testimony" disclosure form that asks, among other things, whether the witness is an active registrant under FARA. As set forth below, SUE MI TERRY, the defendant, answered this question in the negative when she testified on Korean affairs before Congress in

5

2016, 2017, and 2022. In acting as a foreign agent without registering with the Attorney General and without disclosing her status as a foreign agent, TERRY portrayed herself as unbiased and independent, preventing Congress and the American public from fairly evaluating TERRY's testimony as the testimony of an agent of the ROK Government.

### TERRY'S UNREGISTERED ACTIVITIES FOR THE REPUBLIC OF KOREA

#### 2013–2014: TERRY Meets and Accepts Funding From ROK Government Officials, and Is Warned by the FBI

12.  In or about 2013, SUE MI TERRY, the defendant, repeatedly met and communicated with NIS Handler-1. For example: In or about mid-August 2013, NIS Handler-1 and TERRY arranged over email to have lunch at a sushi restaurant in Manhattan.[2] A few weeks later, in or about October 2013, TERRY asked NIS Handler-1 for "thoughts/material" on the role of women for the peace and unification of the Korean Peninsula in advance of a speech she intended to give at an upcoming event involving female Korea experts. In response, NIS Handler-1 provided TERRY with an outline of a speech on the topic. On or about December 18, 2013, NIS Handler-1 picked up TERRY in Manhattan in a vehicle with diplomatic plates registered to the ROK Mission to the United Nations.

13.  In or about April 2014, SUE MI TERRY, the defendant, told a colleague that the ROK Government was paying TERRY to write an article that would be published in the upcoming issue of an influential magazine published by Think Tank-1 ("Magazine-1"). In or about June 2014, TERRY told this colleague that TERRY had signed a contract with the ROK Ministry of

---

[2] All statements and writings described in this Indictment are presented in substance and in part, and all oral statements are based on draft transcripts and summaries. Some of the statements and writings described in this Indictment were partially or entirely in Korean. All such statements and writings are presented based on draft English translations.

6

Foreign Affairs ("ROK MFA") to write the article. Shortly thereafter, on or about June 18, 2014, TERRY published an article in Magazine-1 titled "A Korea Whole and Free: Why Unifying the Peninsula Won't Be So Bad After All." TERRY noted in the article byline that she was a "former analyst at the CIA" and a "Senior Research Scholar" at an academic institution, but she did not disclose that she had been paid by the ROK Government to write the article.

14. In or about November 2014, SUE MI TERRY, the defendant, participated in a voluntary interview with FBI agents in Manhattan. When asked about her contact with ROK NIS officers, TERRY became visibly nervous, changed her speech pattern, and began to stutter and shift in her seat. TERRY admitted to meeting an individual she understood to work for the ROK NIS but initially claimed that she could not recall his name. After some time, TERRY correctly identified the surname of NIS Handler-1. The interviewing FBI agents told TERRY that because of her status within the Korean policy expert community, the ROK NIS might try to approach her again, including by offering to covertly pay for conferences regarding Korea policy. TERRY responded that she was glad to have contact with the FBI should such a situation arise.

### September 2016: TERRY Testifies Before Congress and Affirms She Is Not Registered Under FARA

15. As she would in 2017 and 2022, on or about September 14, 2016, SUE MI TERRY, the defendant, testified before the U.S. House of Representatives Committee on Foreign Affairs, Subcommittee on Asia and the Pacific. The topic of the hearing was "North Korea's Perpetual Provocations: Another Dangerous, Escalatory Nuclear Test." In connection with her Congressional testimony, as required by the Rules of the House of Representatives, TERRY signed a "Truth in Testimony" disclosure form, in which she was asked the question: "Are you an active registrant under the Foreign Agents Registration Act (FARA)?" In response to this question, TERRY checked "No."

### December 2016: TERRY Attempts to Provide ROK Government Officials with Access to Incoming U.S. Presidential Administration Officials

16. As described in more detail below, in or about mid-December 2016, SUE MI TERRY, the defendant, exchanged text messages with a ROK MFA official ("ROK Official-1") describing TERRY's efforts to facilitate access on behalf of the ROK Government to an individual ("Incoming U.S. Official-1"), who at the time was widely reported to be a senior national security official for the incoming Presidential administration. TERRY also attempted to contact another individual ("Incoming U.S. Official-2"), whom TERRY described to ROK Official-1 as a finalist for another senior national security position for the incoming Presidential administration.

17. On or about December 16, 2016, ROK Official-1 texted SUE MI TERRY, the defendant, "I don't have an answer to my request to meet with [Incoming U.S. Official-1], do you know her well?" TERRY responded, "Thank you. I know her but not that well. I doubt I have much influence over her decision making! Did you want me to try anyway? Could you then send me details? Exact request, bio, etc?" ROK Official-1 replied that ROK Official-1 would email TERRY information about the ROK diplomat who hoped to meet with Incoming U.S. Official-1, adding that ROK Official-1 had been unsuccessful in contacting Incoming U.S. Official-1 "but Seoul" – the capital of the ROK – "wants me to try till the end." TERRY acknowledged receipt of ROK Official-1's email, writing: "Got it. Sending now and will let you know if I hear anything back. If not, it might be because she's not ready to meet foreign officials yet and start discussing foreign issues! She might not be ready 'substantively.' Will try anyway."

18. On or about December 18, 2016, ROK Official-1 wrote TERRY that a senior ROK MFA official "asked you to stress the following points to [Incoming U.S. Official-1], if you happens [sic] to meet her tonight." TERRY responded, "Yes, but as I told you, she said she will 'turn it over to folks who handle S. Korea.'" TERRY continued, "But as I told you, she might not

8

be 'ready' to talk substance. I will try to talk to her if I get to see her tonight. If she doesn't show up at the party, there's not much else I can do. Will let you know if I hear back from [Incoming U.S. Official-2], who is rumored to be a finalist to cover Asia from the NSC." Later that evening, ROK Official-1 followed up with TERRY, writing, "sorry for late night next [sic]. Have you met [Incoming U.S. Official-1]? Delegation wonders." Terry replied, "Every republican who is who was [sic] at the party but [Incoming U.S. Official-1] was not there."

19.  Less than two months later, on or about February 7, 2017, SUE MI TERRY, the defendant, again testified before the U.S. House of Representatives Committee on Foreign Affairs. The topic of the hearing was "Countering the North Korean Threat: New Steps in U.S. Policy." In connection with her Congressional testimony, TERRY again signed a "Truth in Testimony" disclosure form, in which she was asked the question: "Are you an active registrant under the Foreign Agents Registration Act (FARA)?" TERRY again checked "No."

### 2018–2019: TERRY Provides ROK Intelligence Officers with Access to U.S. National Security Officials and Is Rewarded with Luxury Goods

20.  As described in further detail below, in late 2018 and early 2019, SUE MI TERRY, the defendant, arranged a private meeting in Washington, D.C. at the request of NIS Handler-2, whom TERRY contemporaneously described to Think Tank-2 as a ROK intelligence officer. The meeting was held under the auspices of Think Tank-2, where TERRY was then employed, and was attended by, among others, the Director of the ROK NIS, a senior official from the U.S. Department of Defense, and a former senior CIA official. Afterward, NIS Handler-2 thanked TERRY for organizing the meeting and, months later, gifted TERRY a $2,845 designer coat and a $2,950 designer handbag.

21.  On or about December 28, 2018, SUE MI TERRY, the defendant, spoke by phone with NIS Handler-2. That same day, TERRY emailed the head of Think Tank-2 that she had "just

received a call from the South Korean National Intelligence Service" because the Director of the ROK NIS was traveling to Washington, D.C. and wanted to have "an intimate roundtable" at Think Tank-2. Later that day, NIS Handler-2 texted TERRY a list of former U.S. Government officials who NIS Handler-2 suggested he hoped to attend the roundtable. Over the course of the next two weeks, TERRY and NIS Handler-2 continued to discuss potential attendees by text message, and NIS Handler-2 noted to TERRY that he was relaying the names of potential attendees to Seoul for review and approval. For example, on or about January 6, 2019, NIS Handler-2 texted TERRY that "I reported the list of candidates that we shared. Seoul said it looks good." TERRY responded, in part, "Let me know who else to invite."

22. On or about January 8, 2019, NIS Handler-2 texted SUE MI TERRY, the defendant, that he hoped to pay a "courtesy call" to the head of Think Tank-2 together with TERRY. Referencing NIS Handler-2's position as a senior ROK intelligence officer, TERRY asked, "Acting chief of station is the title?" In response, NIS Handler-2 told TERRY to use his diplomatic cover, writing: "Minister-counselor is my official title. Use that title please. I will explain my role if I meet him." That day, as requested by NIS Handler-2, TERRY emailed the head of Think Tank-2 that "the person I've been working with is [NIS Handler-2] Minister-Counselor (Acting COS),"[3] who "said he would like to pay you a 5 min courtesy call this week if you have time."

23. On or about January 15, 2019, Think Tank-2 hosted the private meeting that SUE MI TERRY, the defendant, organized at NIS Handler-2's request. In addition to the Director of the ROK NIS, other ROK NIS officials attended the meeting, together with several current and

---

[3] The name written in the email by TERRY appears to be that of NIS Handler-2, using an Anglicized given name and the same Korean surname, who held the diplomatic position of "Minister Counselor" at the ROK Embassy to the United States.

10

former senior U.S. national security officials. The U.S. attendees included a high-level U.S. Department of Defense official and a former high-ranking U.S. intelligence official, who later told FBI agents that he considered the meeting to be highly abnormal and could not think of another instance in which he was invited to a think tank to meet a current head of a foreign intelligence service. At the meeting, the Director of the ROK NIS delivered remarks to the U.S. officials on North Korea policy, including the relationship between the leaders of the United States and North Korea. After the meeting, NIS Handler-2 texted TERRY that the meeting was "very good" and thanked TERRY for her "efforts to organize the event."

24. On or about November 13, 2019, NIS Handler-2 purchased a $2,845 Dolce & Gabbana coat for SUE MI TERRY, the defendant, from a store in Chevy Chase, Maryland. The purchase was charged to NIS Handler-2's credit card – and, consistent with NIS Handler-2's diplomatic status, was charged no sales tax – but was registered in the store's files to the account of TERRY. On or about November 15, 2019, TERRY returned the $2,845 Dolce & Gabbana coat and purchased a $4,100 Christian Dior coat, paying the difference.

25. Also on or about November 13, 2019, NIS Handler-2 purchased a $2,950 Bottega Veneta handbag for SUE MI TERRY, the defendant, from a store in Washington, D.C. As with the Dolce & Gabbana coat, the Bottega Veneta handbag was charged to NIS Handler-2's credit card. Store surveillance footage, shown below, recorded NIS Handler-2 (whose face has been blurred) at a cash register paying for the handbag alongside TERRY, and TERRY walking away from the cash register carrying the purchased handbag.

*NIS Handler-2 Purchases the Designer Handbag for TERRY*



**2020–2022: TERRY Facilitates Another Meeting for the ROK Government and Is Rewarded with More Luxury Goods and Meals**

26. As described in more detail below, in or about August 2020, NIS Handler-3, NIS Handler-2's successor at the ROK Embassy in the United States, took over NIS Handler-2's responsibilities as the primary ROK NIS handler for SUE MI TERRY, the defendant. TERRY thereafter organized a private virtual workshop attended by U.S. Government officials, non-government leaders, and ROK Government officials, including NIS Handler-3. NIS Handler-3 then purchased luxury goods and meals, including a $3,450 designer handbag, for TERRY.

27. In or about August 2020, NIS Handler-2 completed his three-year assignment as "Minister Counselor" for the ROK Embassy in the United States in Washington, D.C. NIS Handler-3 replaced him in the position. During this transition period, on or about August 12, 2020, SUE MI TERRY, the defendant, had dinner with NIS Handler-2 and NIS Handler-3 at an upscale

Greek restaurant in Manhattan. After NIS Handler-2 paid the restaurant bill, TERRY, NIS Handler-2, and NIS Handler-3 traveled by taxi to a bar. TERRY later left the bar carrying a gray gift bag, which NIS Handler-2 and NIS Handler-3 had brought into the Greek restaurant earlier that evening. NIS Handler-3 paid the bar tab. A photograph of TERRY, NIS Handler-2, and NIS Handler-3 (whose face has been blurred) at the restaurant is shown below.

*TERRY Transitions Handlers from NIS Handler-2 to NIS Handler-3*



28. On or about November 30 and December 1, 2020, SUE MI TERRY, the defendant, hosted a private, invitation-only virtual workshop titled, "The Outlook for North Korea's Economy Post-Pandemic." The workshop was again hosted by Think Tank-2. Participants included senior leaders at private companies, non-profit organizations, think tanks, academic institutions, ROK government officials, and U.S. Government officials with responsibilities for North Korea. NIS Handler-3 was among the ROK government officials in attendance. Like NIS Handler-2, NIS

13

Handler-3 used his nominal title of "Minister-Counselor" at the ROK Embassy rather than a title reflecting his position as a ROK intelligence officer.

29. On or about April 16, 2021, NIS Handler-3 used his credit card to purchase a $3,450 Louis Vuitton handbag for SUE MI TERRY, the defendant, from a store in Washington, D.C. Store surveillance footage, shown below, recorded NIS Handler-3 (whose face has been blurred) at a cash register paying for the handbag alongside TERRY.

*NIS Handler-3 Purchases Another Designer Handbag for TERRY*



*TERRY and NIS Handler-3 Leave with the Designer Handbag*



30.     On or about April 16, 2021, after purchasing the Louis Vuitton handbag, NIS Handler-3 and SUE MI TERRY, the defendant, left the store together and entered a vehicle with diplomatic license plates registered to ROK Embassy, as shown above. TERRY and NIS Handler-3 then dined at a sushi restaurant in Washington, D.C. At the restaurant, TERRY and NIS Handler-3 discussed, among other things, TERRY's close relationship with a senior State Department official with responsibilities covering Korean affairs who had previously served in senior roles at the CIA and at the National Intelligence Council. After NIS Handler-3 paid the restaurant bill, TERRY and NIS Handler-3 traveled to a hotel bar, where they had drinks on the roof and NIS Handler-3 again paid the tab. NIS Handler-3 then dropped TERRY off at a residence in Washington, D.C.

31.     Between in or about May 2021 and in or about May 2022, SUE MI TERRY, the defendant, continued to dine with NIS Handler-3 at upscale restaurants. For example, on or about

May 6, 2021, TERRY and NIS Handler-3 had dinner at a Michelin-star sushi restaurant in Washington, D.C. On or about October 14, 2021, and November 1, 2021, TERRY and NIS Handler-3 shared meals at other sushi restaurants in Washington, D.C. On or about February 11, 2022 and May 1, 2022, TERRY and NIS Handler-3 had lunch at an upscale Italian seafood restaurant in Washington, D.C. On or about May 6, 2021, prior to TERRY's dinner with NIS Handler-3, TERRY was observed carrying the Louis Vuitton handbag that NIS Handler-3 had purchased for her.

### June 2022: TERRY Provides an ROK Intelligence Officer with Notes of a Private Group Meeting with the U.S. Secretary of State

32. On or about June 17, 2022, SUE MI TERRY, the defendant, attended a private group meeting with the U.S. Secretary of State at the Department of State building in Washington, D.C. The meeting, which lasted approximately one hour, was organized by State Department officials to provide the U.S. Secretary of State with an opportunity to engage with policy experts on North Korean issues in a discreet setting. The only attendees at the meeting were the Secretary of State, senior State Department staff, and five Korean policy experts invited by the State Department, one of whom was TERRY. The meeting was "off the record," meaning the experts were expected not to disclose the details of the meeting to external parties, including foreign governments.

33. Immediately after the event ended, NIS Handler-3 picked up SUE MI TERRY, the defendant, in a car with diplomatic plates registered to the ROK Embassy. While in the ROK car, NIS Handler-3 photographed two pages of handwritten notes that TERRY brought from her meeting with the U.S. Secretary of State. The notes were written on the letterhead of Think Tank-2, where TERRY had recently worked. Redacted copies of the photographs are shown below,