UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SUE MI TERRY,<br><br>                            *Defendant*. | 24 Cr. 427 (LGS)<br><br>**DECLARATION OF DR. SUE MI TERRY IN SUPPORT OF PRETRIAL MOTIONS** |

Pursuant to 28 U.S.C. § 1746, I, Dr. Sue Mi Terry, do hereby state and declare as follows:

1. I am a citizen of the United States. I was born in South Korea, formally known as the Republic of Korea ("ROK"), but became a naturalized U.S. citizen in 1985 after coming here in December 1981 at the age of 12. At the time that I became a U.S. citizen, I surrendered and never reacquired South Korean citizenship.

2. On June 5, 2023, over a year prior to my arrest, FBI agents came to my home and questioned me extensively. They did not inform me of my right to remain silent or my right to have an attorney present.

3. On that day, at roughly 8:40 a.m., the doorbell of my apartment in Manhattan rang. My partner had just left for the gym, and I was home alone. At the door were three FBI agents: a white, middle-aged man, who appeared to be the lead; a younger Korean American man; and a woman. The agents showed me their credentials and said they would like to come in and speak with me. I came to learn that the middle-aged male agent was a supervisory special agent ("SSA").

4. At the time, I was in my pajamas and was not even wearing a bra. I was very self-conscious about that. I asked the agents if I could change out of my pajamas. They did not

permit me to change or even put on a bra, even though my bedroom was only a few steps away. Instead, the agents entered my apartment, told me that we needed to talk and ordered me to sit down. I interpreted their words and tone to mean that it was urgent, and that they had authority over me.

5. At first, the agents were vague about why they needed to speak with me. They said they had some questions that they needed my help to answer. The FBI SSA indicated that other law enforcement officers were present outside the apartment and that they knew that they had about an hour before my partner returned from the gym. Initially, their questions and statements led me to believe that another person was the focus of their inquiry.

6. The agents sat me down at my dining room table, and the FBI SSA began to ask me questions. He asked whether I remembered the last time the FBI came to my home. I thought they were referring to an inquiry about a People's Liberation Army ("PLA") representative I had met years ago after meeting him at a Korea Society event to interview him about China-North Korea relations. When that event happened, the FBI showed up immediately thereafter to ask what we had discussed. I asked the FBI SSA if he was referring to the PLA official episode. He said no, and said that they were there to discuss my relationship with the South Korean intelligence service ("NIS"). I then asked if they were in my apartment to investigate me and if I needed a lawyer. The FBI SSA did not answer that question but said that the agents were conducting a counterintelligence operation and continued to emphasize that they had some questions they needed answered and that I needed to cooperate.

7. With three FBI agents in my apartment preventing me from putting on undergarments and changing into proper clothing, and aggressively demanding to speak with me, I did not feel free to refuse them. I felt as if I were being taken prisoner in my own apartment.

8. Sitting at my dining room table, the FBI SSA asked if I was in contact with the South Korean NIS station chief in Washington. I said yes. He asked me the name of the station chief. I provided his last name but said that I didn't remember his full name. The FBI SSA got angry that I didn't know his full name—he was incredulous, and, raising his voice, asked how I could not know his name. I responded that I never called him by his full name. I then spoke in Korean to the Korean American FBI agent, pleading with him to explain to his colleague that in Korean culture, you don't really use full names, you use surnames only. The FBI SSA then gave me the NIS station chief's full name and I told him that I recognized his name. He then showed pictures of me with the NIS station chief and his predecessor.

9. After they had been in my apartment for roughly an hour, the FBI SSA told me that the outside law enforcement personnel had notified him that my partner was coming back from the gym. They seemed concerned by this development. The FBI SSA told me that they only had a few minutes before my partner arrived, and that I had to leave my apartment right away and go with them to a hotel room that they had reserved. I protested that I had a 10:00 a.m. weekly meeting that I must attend, but the FBI SSA forcefully insisted I go with them, saying it was very important. I felt I had no choice but to follow the directives the FBI agents gave me. I asked what to tell my partner. The FBI SSA told me to tell him that the agents were there seeking my help on a matter relating to North Korea.

10. My partner then walked into the apartment, escorted by two uniformed and armed New York Police Department ("NYPD") officers. I later learned that the NYPD officers had been waiting to intercept him in the building lobby, and attempted to prevent him from entering his own apartment. Once my partner was inside, the FBI SSA introduced himself to my partner and flashed his badge. My partner asked to examine it more closely, but the FBI SSA would not

allow him to do so. The armed NYPD officers then waited in the doorway where I could see them. As instructed by the SSA, I told my partner that the agents were there to investigate a matter related to North Korea.

11. Before leaving my apartment, the FBI agents finally allowed me to change out of my pajamas and put on a bra, but only if the female agent accompanied me to my bedroom to watch me change. It was clear to me that they didn't want me left alone. I was frightened and did not feel as if I had a choice to refuse the FBI demand that the agent watch me undress. The whole situation was demeaning because I didn't have a bra on, and I had to change my clothes and undergarments in front of a stranger.

12. My partner and I were only able to exchange a few words as I left. As I was being led away by the FBI, my partner asked if I was okay or if I needed help. He was visibly alarmed and later told me he wondered if, given the heavy law enforcement presence in our apartment, I needed a lawyer. Feeling like I had no choice but to go with the agents, I lied and said that I was fine and not to worry.

13. I then left my apartment with the FBI agents. They walked me to a hotel a few blocks away, surrounding me on all sides for the entire walk over. The agents then brought me to a one-bedroom suite they had reserved.

14. Once in the hotel room, I reiterated to the agents that I had a 10:00 a.m. Zoom work call that I had to lead, and asked if I could step outside the room to handle the meeting. Instead of allowing me to take the call in private, the agents told me I could not leave the room and made me conduct the Zoom call in front of them while they listened.

15. By the time my call ended, I had been surrounded and directed by the FBI agents for approximately an hour and a half. They then began a three hour stretch of aggressive

questioning, during which the female agent sporadically took handwritten notes, and sometimes no notes at all. I saw no indication that the agents were otherwise recording the conversation. The FBI SSA asked me about a number of specific incidents, accusing me both implicitly and explicitly of taking particular actions and positions because I had been directed to by South Korean officials. I consistently said that was false.

16. For example, the FBI SSA accused me of including information that was fed to me by NIS in an article for *Foreign Affairs* and a Capital Cable broadcast (a biweekly show I co-hosted on YouTube). I explained that I view NIS as a source of information to inform my own professional analysis, and that, while I talk to many sources for my work, I did not include in my reporting any particular details NIS shared with me—such as a widely available poll showing that 71% of South Koreans favored getting nuclear weapons or the need to form a nuclear consultative group—because I was directed to do so by a source. My views as reflected in the pieces the FBI SSA mentioned are well-known and consistent, and I told him that.

17. The FBI SSA also suggested that I wrote a *Foreign Affairs* article on a limited arms-control proposal for North Korea at NIS instigation because that proposal was supposedly at odds with my normal opposition to sweeping denuclearization negotiations. I responded by saying that the article was initiated by my co-author, who wrote the first draft. I told the agents I have the emails to prove it. I also told them that this article has a nuanced position on arms control despite the title, and many other experts in the field already advocate similar proposals. The FBI SSA became defensive and told me that this was not a First Amendment issue and that they were not telling me what to say.

18. As the day wore on, the FBI SSA repeatedly emphasized that if I agreed with his statements and insinuations, it would clear up a big misunderstanding and this could all be over.

On more than one occasion, the FBI SSA stepped outside the hotel room, purportedly to call his supervisors only to return and tell me that I needed to say more because I was not being forthcoming, needed to come clean, and was not sorry enough. The FBI SSA kept insisting, over and over again, that I needed to state that I was under the "direction" or "control" of the NIS and all this would be over. At various times, he told me I was close to saying what he and his supervisors needed to hear but was not quite there yet. I nonetheless repeatedly told the truth: That I was neither under the "direction" or "control" of the NIS or the South Korean government.

19. The FBI SSA repeatedly became visibly angry and threatening. When discussing a dinner that I attended with two NIS officials, he raised his voice and accused me of taking part in a handoff of an asset. I denied this was the case. I told the agents this was just a routine meeting with one outgoing official introducing me to his successor. At another point, when discussing an event that I organized for congressional staffers in 2022, he again seemed very angry and scolded me for allowing an NIS official to take part in the event, and he accused me of facilitating a recruiting opportunity. He said this was like "bringing the wolf in"—his words, not mine. I was confused as to why the agents were so concerned by my professional activities—activities that I in no way tried to hide. I was intimidated but denied this accusation. I told them the truth—that I had set up the "happy hour" for congressional staff simply so that they would leave my "masterclass" on a good note and give the program positive reviews.

20. After hours of answering the same questions, I was exhausted and feeling worn down. Hoping to assuage the agents, I acknowledged that certain things I did looked bad. I also said that I was bad and terrible. At times, I said this sarcastically and with a tone of exasperation, because the FBI SSA kept badgering me and saying that if only I would adopt his

nefarious characterization of my prior contacts with South Korean officials, it would clear up this big misunderstanding and I would be able to continue with my normal activities, including very important upcoming professional trips to South Korea and London that the agents already knew about. Nevertheless, I still did not adopt their language or characterizations of my contacts with South Korean officials.

21. Over the course of the day, I was repeatedly accused of acting pursuant to the direction and control of the South Korean government and NIS. Notwithstanding the immense pressure to agree with the agents, I repeatedly pushed back against their accusations about my conduct being under NIS control, and told them that everyone knows that no one can direct, control, or order me.

22. Over and over, the agents asked me about the same events. And over and over, I denied having any sort of agency relationship with NIS or the South Korean government. I told the agents that I often opposed South Korean foreign policy and even pointed out that the South Korean government complained to a think tank about hiring me in 2017.

23. After over three hours of questioning at the hotel, and after first asking that I voluntarily hand over my phone, the agents served me with search warrants for my apartment and my cell phone. I asked the agents why they hadn't told me that they had a search warrant before questioning me for hours, and I again asked if I should have a lawyer with me. The agents refused to answer my question and instead said something about how they needed to understand what NIS would do.

24. I realized that I needed to tell my family to avoid the apartment while it was being searched by the agents. I asked if I could call my son. The agents directed me to make the call using speakerphone, so that they could listen. I told my son that I would meet him in the

neighborhood outside of the apartment, and that he should not go home after school for reasons I would explain later. I then called my partner, also on speakerphone, and told him to leave our apartment.

25. At approximately 1:30 p.m., the officers directed me to return to my apartment with them so that they could execute the search warrant. I did as I was told, and then at around 1:50 p.m., also as directed, I left my apartment while the agents searched it. I then went to a Verizon store to purchase a new iPhone.

26. At roughly 6:00 p.m., the agents called me, saying that they had more questions and directed me to meet them at a café. I did as I was told, but finding the café to be near closing, the agents insisted that I go with them to the lobby of the same hotel where they had interrogated me earlier. I complied, because I did not feel free to refuse.

27. The FBI SSA told me that I still had not been forthcoming enough earlier, and said that I needed to admit that I had acted subject to NIS control following a group meeting I had attended with the Secretary of State. I felt like I was being pushed to use a word that the agents wanted me to use, but one I didn't believe to be truthful or accurate. But as I had done earlier, I denied being controlled by anyone, much less by NIS.

28. At one point, I asked the agents if they would get me fired from my job. They did not answer. I asked what they wanted me to do. The FBI SSA told me (then only 53 years old) that I needed to retire, end my career, and never work in a think tank again.

29. At the end of the long day of interrogation, the FBI agents told me to meet them again the next day and promised that at that point they would return my personal and work computers, which they had confiscated.

30. Nothing about my experience with the FBI felt voluntary. To the contrary, I felt compelled to speak with them on threat of force and intimidation. Never once did I feel free to prevent them from entering the apartment, ask them to leave the apartment, leave the hotel, or end the interrogation. At the outset, I was denied even the right to put on proper clothing and undergarments; and when I expressly asked to step outside their presence, my request was denied. The agents never told me I had a right to remain silent or to a lawyer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 25, 2025
              New York, NY

By: _____
     Dr. Sue Mi Terry