# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

v.

**SUE MI TERRY**,

          Defendant.

No. 24-cr-00427-LGS

**BRIEF OF PROPOSED AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT**

Gabriel Rottman (*pro hac vice*)
  *Counsel of Record for Amicus Curiae*
Mara Gassmann*
Allyson Veile*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
grottman@rcfp.org

*Of counsel

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENT ................................................................... i

TABLE OF AUTHORITIES......................................................................................... iii

INTEREST OF AMICUS CURIAE ............................................................................. 1

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.     Applying FARA to interactions with foreign sources and other journalistic activity
       would chill newsgathering and not serve the public interest. ............................................. 3

II.    Were FARA triggered by routine journalistic activity, it would raise several
       constitutional concerns............................................................................................... 7

       A.     FARA is susceptible to politicized and selective enforcement. ............................ 7

       B.     Were it applicable to protected journalistic activity, FARA would also be
              unconstitutionally overbroad. ............................................................................. 10

       C.     The government and courts have historically been cautious in enforcing
              FARA against the press. ..................................................................................... 11

CONCLUSION.......................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s):

**Cases:**

*Att'y Gen. v. Irish N. Aid Comm.*,
  668 F.2d 159 (2d Cir. 1982) ........................................................................ 11, 12

*Att'y Gen. v. Irish People, Inc.*,
  796 F.2d 520 (D.C. Cir. 1986) ................................................................. 4, 11, 14

*Clark v. Martinez*,
  543 U.S. 371 (2005) ..................................................................................... 12

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ....................................................................................... 5

*Grosjean v. American Press Co.*,
  297 U.S. 233 (1936) ....................................................................................... 7

*Johnson v. United States*,
  576 U.S. 591 (2015) ....................................................................................... 9

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ....................................................................................... 9

*Meese v. Keene*,
  481 U.S. 465 (1987) ....................................................................................... 6

*Michele Amoruso E Figli v. Fisheries Dev. Corp.*,
  499 F. Supp. 1074 (S.D.N.Y. 1980) ................................................................. 4

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ....................................................................................... 3

*Skilling v. United States*,
  561 U.S. 358 (2010) ..................................................................................... 12

*United States v. Kozminski*,
  487 U.S. 931 (1988) ..................................................................................... 12

*United States v. McGoff*,
  831 F.2d 1071 (D.C. Cir. 1987) ..................................................................... 14

*United States v. Peace Info. Ctr.*,
  97 F. Supp. 255 (D.D.C 1951) ....................................................................... 11

*United States v. Stevens*,
  559 U.S. 460 (2010) ..................................................................................... 11

*Viereck v. United States*,
    318 U.S. 236 (1943).............................................................................................. 11

*Virginia v. Hicks*,
    539 U.S. 113 (2003).............................................................................................. 11

**Statutes:**

22 U.S.C. § 611 *et seq*...............................................................................................*passim*

Act to amend Foreign Agents Registration Act,
    Pub. L. No. 77-532, 56 Stat. 248 (1942).............................................................. 12

Act to amend Foreign Agents Registration Act,
    Pub. L. No. 89-486, 80 Stat. 244 (1966).......................................................... 12, 13

**Other Authorities:**

Alexandra Ellerbeck and Avi Asher-Schapiro, *Everything to Know About FARA, and Why
    It Shouldn't Be Used Against the Press*, Columbia Journalism Rev. (June 11, 2018)............ 10

Andrew Lanham, *When W. E. B. Du Bois Was "Un-American"*, Bos. Rev. (Jan. 13, 2017) ....... 12

Austin Ramzy & Chris Buckley, *'Absolutely No Mercy': Leaked Files Expose How China
    Organized Mass Detentions of Muslims*, N.Y. Times (Nov. 16, 2019) .................................... 5

*Axel Springer Completes Acquisition of POLITICO*, Axel Springer (Oct. 19, 2021) ............... 8, 9

Carmen Molina Acosta, *Where Are the Key Panama Papers Figures, Seven Years Later?*,
    International Consortium of Investigative Journalists (Apr. 3, 2023) ...................................... 5

*Criminal Enforcement*, Caplin & Drysdale................................................................................... 13

Dep't of Just., *The Scope of Agency Under FARA* (May 2020) .................................................. 13

*Editorial Writing*, The Pulitzer Prizes (last visited Mar. 5, 2025) .................................................. 4

Face the Nation, *Nikita Khrushchev on Face the Nation in 1957*, YouTube (June 1, 2017)......... 6

H.R. Rep. No. 1470, 89th Cong. 2d Sess. (1966) ...................................................................... 13

Linh Nguyen, *Fortune Magazine's New Owner Is Member Of Thailand's Richest Family*,
    Forbes (Nov. 9, 2018) ............................................................................................................. 8

Michael J. Borden, *The Role of Financial Journalists in Corporate Governance*, 12
    Fordham J. Corp. & Fin. L. 311 (2007) .................................................................................. 4

Nick Robinson, *"Foreign Agents" in an Interconnected World: FARA and the
    Weaponization of Transparency*, 69 Duke L. J. 1075 (2020)................................. 9, 10, 13, 14

iv

Nick Robinson, *FARA Is a Catchall Statute—and That's a Problem*, Lawfare (Jan. 22, 2025) ........................................................................................................................ 8

Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938 (1945) ............................... 12

*Reporters' Relationships with Sources*, 53 Neiman Rep. No. 3 (1999) .......................................... 4

Stephen J. Adler, *Fostering a Culture of Newsroom Independence*, Colum. J. Rev. (Feb. 20, 2025) ...................................................................................................................... 6

*The Role of Reporters' Judgment*, 53 Neiman Rep. No. 3 (1999) .................................................. 4

William E. Lee, *Deep Background: Journalists, Sources, and the Perils of Leaking*, 57 Am. U. L. Rev. 1453 (2008) ........................................................................................ 4

**Regulatory Materials:**

28 C.F.R. § 5.100(b) (2007) ......................................................................................... 13

Administration and Enforcement of Foreign Agents Registration Act of 1938, As Amended, 32 Fed. Reg. 6362, Order 376–67 (Apr. 22, 1967) ............................................... 13

Amending and Clarifying Foreign Agents Registration Act Regulations, 90 Fed. Reg. 40 (Jan. 2, 2025) .................................................................................................................. 9

Adv. Op., Dep't of Just. (July 13, 2018) .......................................................................... 9

## INTEREST OF AMICUS CURIAE

Proposed amicus curiae is the Reporters Committee for Freedom of the Press (the "Reporters Committee" or "amicus"), an unincorporated nonprofit association founded by leading journalists and media lawyers that advocates on behalf of the First Amendment rights of the press. Amicus has an interest in ensuring that the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq*., is not enforced or interpreted in a manner that hinders or dissuades the press from gathering and reporting news and information. Amicus writes to underscore the potentially wide-ranging implications of this prosecution for the free flow of information to the public.

## INTRODUCTION

When passed in the lead up to World War II, FARA's purpose was to regulate foreign agents who disseminate "propaganda" by requiring them to register with the U.S. government. But the current text of the law sweeps more broadly. Under FARA, an agent is any person who acts at the "request" of a foreign principal, which is defined as any person or entity domiciled overseas, and "in the interests of such foreign principal." 22 U.S.C. § 611(c)(1)(i). By its plain terms, FARA can be read to apply to the kind of newsgathering, reporting, and commentary on which the public relies for ideas and information. For example, a journalist who receives a story tip from any foreign entity or person and writes that story would technically trigger FARA's registration obligation—and criminal exposure—by acting at the "request" of a "foreign principal." If enforced in this way—the way the government in this prosecution of Sue Mi Terry ("Terry") seeks—it could require many journalists to choose between registration or criminal prosecution for engaging in First Amendment protected activity. While the law carves out a subset of news organizations from the definition of agent of a foreign principal, *id.* § 611(d), the narrow exemption applies "solely by virtue of any bona fide news or journalistic activities,"

1

leaving what qualifies as "bona fide" up to the discretion of the enforcer or a court.  In short, what began as a transparency statute to tamp down on wartime propaganda operations has now, because of its textual sweep, the potential to become closer to an outright licensing statute of the press—one that would be poison for a professional who, unlike a lawyer or public relations consultant on retainer and taking instructions from a client, relies on both actual and perceived autonomy to survive.

Despite its facial breadth and vague language, FARA has largely avoided constitutional scrutiny, in part because criminal prosecution under the statute has been rare.  FARA has not been used to prosecute the press in the modern era.  But as the Terry indictment illustrates, that may be attributable to prosecutorial grace, not any inherent limitation in the broad statutory text. Several of the allegations in the indictment that Terry challenges here are materially indistinguishable from opinion journalism, including allegations that Terry cultivated sources within the South Korean government, asked those sources for information, and published op-eds and made media appearances based on that information.  Sealed & Redacted Indictment, ECF No. 2 ¶¶ 1, 3, 13; Indictment Part 2, ECF No. 2-1 ¶¶ 39–42, 48–51.  If such allegations may form the basis for a prosecution, the possibility that FARA could extend to traditional journalism increases.

Accordingly, amicus offers two points in support of Terry's motion to dismiss the indictment on First Amendment grounds.

First, journalists routinely engage in activity that closely resembles what is alleged in the Terry indictment, up to and including acting at the "request" of foreign sources to disseminate information that the foreign source believes could impact U.S. policymaking.  To the extent FARA can reach that activity, it could chill newsgathering both through direct enforcement

against journalists, and by putting sources in fear that their disclosure of information could trigger registration requirements or criminal exposure under FARA. It is therefore essential that FARA be enforced and interpreted narrowly, in line with historical practice where enforcers and courts have been careful not to sweep in journalistic activity.

Second, the fact that FARA can be deployed against activities including source cultivation and reporting based on information gleaned from such sources raises the distinct possibility of selective enforcement, a hallmark of unconstitutional vagueness. *See Nieves v. Bartlett*, 587 U.S. 391, 406–07 (2019) (expressing concerns about selective enforcement of generally applicable statutes against those engaged in First Amendment activity in the context of arrests). Relatedly, expanding enforcement of FARA to cover journalistic activity would render the statute overbroad under the First Amendment.

## ARGUMENT

### I.     Applying FARA to interactions with foreign sources and other journalistic activity would chill newsgathering and not serve the public interest.

The government has charged Terry with violations of FARA based on alleged activities that look a lot like source cultivation, the receipt and dissemination of information from sources, and the use of editorial discretion. ECF No. 2 ¶¶ 1, 3, 13; ECF No. 2-1 ¶¶ 39–42, 48–51. Specifically, the indictment alleges that Terry met a South Korean official for dinner where she was "presented" with "talking points on North Korean policy," which she then "repeated in media appearances and in an article" published in a magazine. ECF No. 2-1 at ¶¶ 39–42. To insinuate this was nefarious, the indictment frames the official as her "[h]andler" who "dictated" the "talking points" to her, evidenced by her texting them to herself. *Id.* The indictment goes on to allege that Terry texted a South Korean official a list of questions, which were then answered, and that Terry later published an article that was "broadly consistent with the responses" by the

official.  *Id.* ¶¶ 48–49.[1]  With respect to the conspiracy count, four of the sixteen alleged overt

acts in support of the conspiracy relate directly to the publication of articles in newspapers and

magazines.  *See id.* ¶¶ 64(b), 64(l), 64(o), 64(p).

Journalists—including journalists whose work focuses on opinion, commentary, and

analysis—cultivate sources and rely on those sources to report information in the public interest.

*See, e.g.*, *Editorial Writing*, The Pulitzer Prizes (last visited Mar. 5, 2025), https://www.pulitzer.o

rg/prize-winners-by-category/214; *Reporters' Relationships with Sources*, 53 Neiman Rep. No. 3

at 10–12 (1999), https://perma.cc/822K-3PQG (discussing mechanics of regular source

cultivation efforts); William E. Lee, *Deep Background: Journalists, Sources, and the Perils of

Leaking*, 57 Am. U. L. Rev. 1453, 1518 (2008) (journalists are "master[s]" at building

relationships with government officials); Michael J. Borden, *The Role of Financial Journalists in

Corporate Governance*, 12 Fordham J. Corp. & Fin. L. 311, 329–31 (2007) (sources inside

institutions play an important role in "funneling" stories to journalists).  Further, simply because

a source persuades an opinion journalist to hold the same opinion as the source does not mean

that the journalist is expressing that opinion at the direction of the source.  *See, e.g.*, *The Role of

Reporters' Judgment*, 53 Neiman Rep. No. 3, at 15–16 (1999), https://perma.cc/822K-3PQG

(discussing reliance on sources and importance of journalistic independence).  A reporter's

ability to cultivate relationships with sources, evaluate the information they provide, and publish

---

[1]    The government also alleges Terry accepted gifts and meals from persons in the South
Korean government.  While receipt of gifts from a source may be an ethical question for
journalists, it does not meaningfully alter the analysis of whether criminal prosecution under
FARA is appropriate.  Indeed, the acceptance of funding is not dispositive of "agency" under
FARA.  *See Michele Amoruso E Figli v. Fisheries Dev. Corp.*, 499 F. Supp. 1074, 1082 (S.D.N.Y.
1980) ("Even the receipt of a bona fide subsidy from a foreign source does not render the
recipient an agent of that source as long as the recipient is not subject to foreign direction or
control."); *Att'y Gen. v. Irish People, Inc.*, 796 F.2d 520, 524 (D.C. Cir. 1986) (same).

it when it is newsworthy is a public good, because "in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975).

Reporting on foreign affairs takes many different forms. Some reporting involves synthesizing and disseminating information provided by foreign sources seeking to change or influence foreign policy in the U.S. and abroad. For example, in 2019, the *New York Times* reported on China's treatment of ethnic minorities based on documents provided by a source who the *Times* described as "a member of the Chinese political establishment who requested anonymity and expressed hope that their disclosure would prevent party leaders, including Mr. Xi, from escaping culpability for the mass detentions." Austin Ramzy & Chris Buckley, *'Absolutely No Mercy': Leaked Files Expose How China Organized Mass Detentions of Muslims*, N.Y. Times (Nov. 16, 2019), https://perma.cc/X2UF-CYDS. Other reporting requires the exchange of information between international and domestic journalists and news organizations. For example, in 2016, an anonymous source leaked a cache of documents from a law firm headquartered in Panama that revealed information about the business dealings of public officials and figures around the world. The source sent these "Panama Papers" to a German newspaper, which shared them with the International Consortium of Investigative Journalists, a U.S.-based organization. The ICIJ then facilitated information sharing and reporting by a number of other outlets, all of which led to wide-ranging enforcement activity and legal reforms. *See* Carmen Molina Acosta, *Where Are the Key Panama Papers Figures, Seven Years Later?*, International Consortium of Investigative Journalists (Apr. 3, 2023), https://perma.cc/RQ7Z-EYGL. And still other reporting involves conveying the statements and

opinions professed by foreign officials—including those of U.S. adversaries.  *See* Face the

Nation, *Nikita Khrushchev on Face the Nation in 1957*, YouTube (June 1, 2017), https://yout

u.be/XAG6D73gttA?si=8R1C1TkR-ZTYvl9c.

Journalism is a fundamentally different enterprise than the typical target of FARA, the

strategy consultant or public affairs professional who works on retainer and in a fiduciary

relationship with a foreign client.  For journalists, independence, both perceived and real, is

essential to one's credibility.  *See* Stephen J. Adler, *Fostering a Culture of Newsroom*

*Independence*, Colum. J. Rev. (Feb. 20, 2025), https://perma.cc/63SX-L8CQ.  In that sense,

deploying FARA to force registration and labeling under penalty of criminal sanction poses a

unique and acute threat to press freedom.  Not only would journalists face pressures to avoid

reporting that could trigger scrutiny from the FARA Unit, but even the intimation of foreign

influence would fatally undermine the trustworthiness of the journalism in the eyes of the reader,

listener, or viewer.[2]  And that concern illustrates the insidiousness of deploying FARA against

journalistic activity.  Were it applied to require journalists to register or face criminal penalties, it

would operate much like a licensing regime: either one registers and labels one's reporting

accordingly, or one faces criminal prosecution, and the effective silencing of the reporting.  And

government licensing of the press is not just antithetical to the First Amendment, but one of the

corrupting aspects of English colonial rule that drove the Founders to adopt the Press Clause in

---

[2]     For this reason, *Meese v. Keene*, 481 U.S. 465 (1987), would not apply in a case
involving FARA's application based on interactions between journalists or news organizations
and foreign principals.  In *Keene*, the Supreme Court rejected a pre-enforcement challenge to
FARA's labeling requirements by a third-party who sought to display films by a registered agent
without their attendant labels because the statute's prior designation of such materials as
"political propaganda" was not "pejorative."  *Id.* at 480–81.  That case says nothing about
whether FARA's could constitutionally be applied to punish or deter speech simply because the
government feels that speech aligns too closely with the views of a foreign speaker.  And that is
exactly what the government seeks to do here.

the first place. *See Grosjean v. American Press Co.*, 297 U.S. 233, 246–48 (1936) (surveying history of crown licensing).

In sum, the application of FARA to the cultivation of source relationships and the dissemination of information gathered through those relationships could chill foreign affairs reporting on matters of public concern, such as the manifestly newsworthy reporting noted above regarding human rights abuses, financial misconduct, and war. It could dissuade journalists and news organizations from reporting for fear of direct enforcement, and sources concerned about triggering registration obligations or prosecution for failure to register will not come forward. It is therefore essential that FARA be applied narrowly.

## II.     Were FARA triggered by routine journalistic activity, it would raise several constitutional concerns.

As detailed above, FARA is, textually, an exemplar of a broad and vague statute. Read literally and in isolation, it could apply to the collection and dissemination by the press of newsworthy information from foreign sources. And the vagueness in the law poses a particular risk of selective enforcement, were the statute to be deployed in line with its expansive phrasing. Historically, however, it has not been interpreted in that manner and it is essential that it continue to be narrowly applied to avoid these constitutional concerns.

### A.     FARA is susceptible to politicized and selective enforcement.

FARA is sweeping in its language. It applies to any "agent of a foreign principal," defined in relevant part as a person or entity who engages in covered activities at "the order, request, or under the direction or control, of a foreign principal . . . ." 22 U.S.C. § 611(c). The term "agent" in the statute is not restricted by traditional definitions of agency. *Id*. Rather, an agent is any person who acts at the "request" of a foreign principal "in the interests of such foreign principal." *Id.* § 611(c)(1)(i). And "foreign principal" isn't limited to foreign

governments or even quasi-state actors; it expressly includes any person or entity domiciled

overseas, *id.* § 611(b), ranging from the Saudi Arabian government to a private business in

Mexico to, as has been observed, "one's grandmother in Canada," Nick Robinson, *FARA Is a*

*Catchall Statute—and That's a Problem*, Lawfare (Jan. 22, 2025), https://perma.cc/2ZWD-

CF2R.

Furthermore, the statutory definition of the conduct covered could be read to encompass

most journalism, including opinion journalism. Specifically, covered activities include "political

activities" or acting as a "publicity agent" whenever those activities are "for or in the interests of

such foreign principal." 22 U.S.C. § 611(c). These terms are, in turn, broadly defined to include

virtually any speech on matters of public concern. A "publicity agent" is any person "who

engages directly or indirectly in the publication or dissemination of . . . information or matter of

any kind." *Id.* § 611(h). "Political activities" means "any activity that the person engaging in

[the activity] believes will, or that the person intends [the activity] to, in any way influence" the

U.S. government or "any section of the public" with reference to the "domestic or foreign

policies" of the U.S. or the "political or public interests, policies, or relations of a government of

a foreign country or a foreign political party." *Id.* § 611(o).

FARA's exemptions do not cure these defects. The law has a nominal media exemption,

which provides that domestic "news or press service[s] or association[s]" do not need to register

"solely by virtue of any bona fide news or journalistic activities." *Id.* § 611(d). This exemption

applies only to those media organizations that are 80 percent or more beneficially owned by U.S.

citizens and that restrict their officers and directors to U.S. citizens. *Id.* It is a standard few

media companies with international backing could meet. *See, e.g.*, Linh Nguyen, *Fortune*

*Magazine's New Owner Is Member Of Thailand's Richest Family*, Forbes (Nov. 9, 2018),

https://perma.cc/36Q2-YYZA; *Axel Springer Completes Acquisition of POLITICO*, Axel

Springer (Oct. 19, 2021), http://perma.cc/8CT8-Y7BL.  Moreover, what constitutes a "bona fide"

journalistic activity is undefined.  Others have noted the uncertainty "particularly for nonprofits,

media organizations, and public officials" created by FARA's sweep and textual ambiguity.  *See*

Nick Robinson, *"Foreign Agents" in an Interconnected World: FARA and the Weaponization of

Transparency*, 69 Duke L. J. 1075, 1081 (2020).

It is well settled that a statute is void for vagueness if it is "so vague that it fails to give

ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary

enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citation omitted).  Vague

laws are particularly offensive to the First Amendment because they "entrust lawmaking to the

moment-to-moment judgment of the policeman on his beat," thereby furnishing a "a convenient

tool for harsh and discriminatory enforcement by local prosecuting officials, against particular

groups deemed to merit their displeasure."  *Kolender v. Lawson*, 461 U.S. 352, 360 (1983)

(cleaned up).  Unless narrowed in its application, FARA is such a law.  That FARA fails to

provide fair notice is demonstrated by the fact that would-be-registrants, including media

organizations, are often funneled to DOJ's advisory opinion process for a definitive answer on

whether they must register.  *See, e.g.*, Amending and Clarifying Foreign Agents Registration Act

Regulations, 90 Fed. Reg. 40, 42 (Jan. 2, 2025), (declining to adopt a narrowing interpretation of

agency and asserting agency "is a fact-intensive exercise better suited to the advisory-opinion

process"); Adv. Op., Dep't of Just. (July 13, 2018), https://perma.cc/72J3-6KY4 (seeking advice

on whether media organization was required to register relating to editorial by foreign official).

This kind of structure, in which a speaker is in practice required to ask permission before

speaking under threat of criminal penalties, is, again, uncomfortably close to a press licensing regime.

And FARA's history does indeed feature politicized enforcement efforts aimed at stifling the advocacy of disfavored ideas. *See generally* Robinson, *supra*, at 1116–30 (discussing politically motivated enforcement efforts against civil rights activist W.E.B. Du Bois and Peace Information Center, environmental non-profits, and certain foreign media). More recently, U.S. officials have called for or threatened FARA investigations of foreign-owned media and explicitly cited coverage perceived as unfavorable as grounds. *See, e.g.*, Alexandra Ellerbeck and Avi Asher-Schapiro, *Everything to Know About FARA, and Why It Shouldn't Be Used Against the Press*, Columbia Journalism Rev. (June 11, 2018), https://perma.cc/4Y4V-N7P8 ("In a rare show of bipartisan unity, three Democratic congressmen joined with 16 GOP lawmakers" to complain of Al Jazeera's "troubling record of 'anti-American' coverage" and to "make an unusual request of the Department of Justice" to investigate it under FARA).

Finally, an unusual feature of FARA, were it interpreted to apply to journalists who gather and distribute information gleaned from "foreign principals," is that it could operate not just as a content-based regulation of speech, but a regulation based on viewpoint. That is, FARA is triggered by covered activities "for or in the interest of" a foreign principal. *See* 22 U.S.C. § 611(c)(1)(i)–(iv). Thus, publishing an editorial piece consistent with the views expressed by a foreign official could trigger the law's application, while an editorial in opposition to those views would not. Indeed, many of the allegations in the Terry indictment appear to be predicated on that theory. *See* ECF No. 2 ¶¶ 1, 3, 13; ECF No. 2-1 ¶¶ 39–42, 48–51. That feature of FARA underscores the potential for politicized and selective enforcement in the law.

B.      **Were it applicable to protected journalistic activity, FARA would also be unconstitutionally overbroad.**

Applying FARA to traditional journalism would also render FARA overbroad.  Under the doctrine of First Amendment overbreadth, a law may be "invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotations omitted).  "[T]he threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).  This is because "many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* (internal citation omitted).  Prosecuting those involved in the dissemination of speech based on their journalistic activities has the potential to chill a substantial amount of speech on matters of public concern, as discussed above in Section I.

C.      **The government and courts have historically been cautious in enforcing FARA against the press.**

Despite its textual sweep, for most of FARA's history the law has evaded close constitutional scrutiny.  This is in large part because courts have construed FARA narrowly to avoid applying it to news organizations, absent clear indicators of control by a foreign principal. *See Irish People, Inc.*, 796 F.2d at 523–24 (avoiding First Amendment challenge by recognizing selective prosecution defense and construing FARA not to apply based on simple intermingling of staff or agreement with editorial views of a foreign principal); *United States v. Peace Info. Ctr.*, 97 F. Supp. 255, 263 (D.D.C 1951) (avoiding First Amendment challenge by construing FARA as "relat[ing] to practicing a vocation as an agent of a foreign principal, rather than to

making a public speech"); *see also Viereck v. United States*, 318 U.S. 236, 244 (1943) (finding

FARA inapplicable to activities "not on behalf of . . . foreign principals"); *Att'y Gen. v. Irish N.*

*Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982) (explaining "request" as used in the statute is "not

to be understood in its most precatory sense").[3]

It is also because criminal prosecution under the statute has been relatively rare for most

of the statute's lifespan, though it was deployed that way during World War II.  During the war,

the statute was frequently used to suppress speech by those deemed "enemy aliens," including in

cases implicating press activities.[4]  After the war, as noted, the statute was used to prosecute civil

rights activist W.E.B. Du Bois and an advocacy organization he chaired for distributing anti-

nuclear literature.  Andrew Lanham, *When W. E. B. Du Bois Was "Un-American"*, Bos. Rev.

(Jan. 13, 2017), https://perma.cc/7Y6Z-NA7Z.  Congress, however, added the carve-out for

"bona fide" journalistic activity in 1942, nominally sparing U.S. journalists and outlets from the

law's application, although that exemption has never been litigated.  Act to amend Foreign

Agents Registration Act, Pub. L. No. 77-532, 56 Stat. 248, 250 (1942).

---

[3]     In light of these narrowing constructions, the Court need not reach the constitutional
issues presented by this case if it resolves this motion by finding that the indictment exceeds
FARA—as construed consistent with the First Amendment—and dismissing it on that basis.
When one of two "plausible statutory constructions" of a federal statute "would raise a multitude
of constitutional problems, the other should prevail." *Clark v. Martinez*, 543 U.S. 371, 380–81
(2005).  And when faced with potentially vague and overly broad federal criminal statutes, courts
have consistently construed them narrowly to avoid the constitutional issue.  *See, e.g.*, *Skilling v.*
*United States*, 561 U.S. 358, 405–06, 410–11 (2010); *United States v. Kozminski*, 487 U.S. 931,
949–50, 952 (1988).

[4]     For example, during the war, the statute was used to prosecute and imprison a German-
American novelist and poet, to facilitate a prisoner exchange of German news service employees
for Americans, and to intern a naturalized Italian-American who distributed a "pro-Fascist"
weekly.  *See* Report of the Attorney General to the Congress of the United States on the
Administration of the Foreign Agents Registration Act of 1938 at 534–36, 540 (1945),
https://perma.cc/GR7Z-7SUW (discussing *Viereck*, *Zapp et al.*, and *Trombetta*).

In 1966, Congress again responded to concerns over the statute's breadth and revised it to narrow its definition of agency. *See* Act to amend Foreign Agents Registration Act, Pub. L. No. 89-486, 80 Stat. 244 (1966). At the time, Congress explained that it intended this change to clarify that the law would no longer apply to "persons who are not, in fact, agents of foreign principals but whose acts may incidentally be of benefit to foreign interests, even though such acts are part of the normal exercise of those persons' own rights of free speech, petition, or assembly." H.R. Rep. No. 1470, 89th Cong. 2d Sess. 5–6 (1966). Following these amendments, the DOJ adopted implementing regulations that defined "control or any of its variants" as used in the statute to denote "the possession or the exercise of the power, directly or indirectly, to determine the policies or the activities of a person, whether through the ownership of voting rights, by contract, or otherwise." *Compare* 28 C.F.R. § 5.100(b) (2007), *with* Administration and Enforcement of Foreign Agents Registration Act of 1938, As Amended, 32 Fed. Reg. 6362, Order 376–67 (Apr. 22, 1967), https://perma.cc/GZB6-S8TG. In other words, even though the text of the statute is more expansive, the DOJ has interpreted the statute to require "some degree of authority over the agent" by the foreign principal for there to be an agency relationship. Dep't of Just., *The Scope of Agency Under FARA*, at 2 (May 2020), https://perma.cc/M6AS-LRWF. Thus, at its discretion, DOJ interprets FARA to "not require registration simply because a person expresses views that are favorable to or coincide with the interests of a foreign country or a foreign person." *Id*. at 1.

With this limited interpretation of FARA's scope, from 1966 to 2015, the DOJ only brought seven criminal prosecutions and seventeen civil enforcement actions. *See* Nick Robinson, *supra*, at 1077. During this time, there were no instances of speakers being criminally prosecuted for engaging in traditionally journalistic conduct, such as newsgathering, cultivation

13

of sources, or reporting.  *See Criminal Enforcement*, Caplin & Drysdale, https://perma.cc/3CZT-R62S (summarizing significant criminal prosecutions).  In the rare instances where enforcement efforts were directed towards the press, the dissemination of news was not the predicate.  Thus, in the only criminal prosecution involving the press, a newspaper publisher was prosecuted not for his newsgathering, but for allegedly working with the South African government to acquire several media companies with South African funds.  *See United States v. McGoff*, 831 F.2d 1071, 1072 (D.C. Cir. 1987).  And in the one civil enforcement action directly involving a newspaper, the D.C. Circuit narrowly construed the term "agent of a foreign principal" to avoid applying FARA to journalistic activities.  *See Irish People, Inc.*, 796 F.2d at 524.

Since 2016, however, the DOJ has taken a more aggressive posture in enforcing FARA. *See* Robinson, *supra*, at 1079 (observing recent uptick in FARA prosecutions following the investigation into Russian interference in the 2016 election).  And now with the factual allegations in the Terry indictment that cover the cultivation of sources, receipt of information from those sources, and the publication of commentary based on that information, the Justice Department has taken FARA criminal enforcement too close to an uncomfortable edge vis-à-vis the press.  It is imperative that FARA be applied narrowly by the Court to avoid the myriad First Amendment problems that would arise if FARA were given its literal textual sweep.

**CONCLUSION**

For these reasons, amicus respectfully urges the Court to grant Defendant's Motion to Dismiss.

14

DATED: March 5, 2025

Respectfully submitted,

*/s/ Gabriel Rottman*

Gabriel Rottman (*pro hac vice*)
  *Counsel of Record for Amicus Curiae*
Mara Gassmann*
Allyson Veile*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
grottman@rcfp.org

*Of Counsel