UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 24 Cr. 427 (LGS) |
| SUE MI TERRY, | |
| Defendant. | |

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT SUE MI TERRY'S PRETRIAL MOTIONS**

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Kyle A. Wirshba
Samuel Adelsberg
Alexander Li
Chelsea L. Scism
Assistant United States Attorneys
     *Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ......................................................................................................................... 3

    I.      There Is No Basis to Dismiss the Indictment ................................................... 3

          A.      FARA Is Not Limited to Agents of "Malign" Foreign Governments ............. 3

          B.      Count Two States a Willful Violation of FARA ............................................... 4

          C.      FARA Is Not Facially Vague ............................................................................ 10

          D.      FARA's Definitions of "Political Activities" and "Political Consultant" Are Not Vague As Applied To This Case ................................. 18

          E.      Count Two (Substantive Violation of FARA) Is Not Duplicitous ................ 24

          F.      Count One (Conspiracy to Violate FARA) Is Neither Duplicitous Nor Otherwise Deficient ................................................................................. 29

    II.     Terry Is Not Entitled to a Bill of Particulars ................................................... 30

          A.      Applicable Law .................................................................................................. 31

          B.      Discussion .......................................................................................................... 31

    III.   Terry's Statements to Law Enforcement Should Not Be Suppressed ........................ 35

          A.      The Non-Custodial Interview ........................................................................... 35

          B.      Applicable Law .................................................................................................. 39

          C.      Discussion .......................................................................................................... 40

CONCLUSION ..................................................................................................................... 50

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## Cases

*Arnett v. Kennedy,*
    416 U.S. 134 (1974)..................................................................................................... 14

*Att'y Gen. of U.S. v. Covington & Burling,*
    411 F. Supp. 371 (D.D.C. 1976) ............................................................................ 16, 17

*Att'y Gen. of U.S. v. Irish N. Aid Comm. (INAC I),*
    530 F. Supp. 241 (S.D.N.Y. 1981) .............................................................................. 13

*Att'y Gen. of U.S. v. Irish N. Aid Comm. (INAC II),*
    *668 F.2d 159 (*2d Cir. 1982) ........................................................................... 13, 15, 16

*Att'y Gen. of U.S. v. Irish People, Inc.,*
    684 F.2d 928 (D.C. Cir. 1982) ..................................................................................... 13

*Att'y Gen. of U.S. v. Irish People, Inc.,*
    796 F.2d 520 (D.C. Cir. 1986) ..................................................................................... 13

*Att'y Gen. of United States v. Wynn* (*Wynn I*),
    636 F. Supp. 3d 96 (D.D.C. 2022) .................................................................... 26, 27, 28

*Att'y Gen. of United States v. Wynn (Wynn II),*
    *104* F.4th 348 (D.C. Cir. 2024) ................................................................................... 26

*Beckwith v. United States,*
    425 U.S. 341 (1976).................................................................................................... 41

*Berkemer v. McCarty,*
    468 U.S. 420 (1984)........................................................................................ 39, 46, 50

*Bryan v. United States,*
    524 U.S. 184 (1998).................................................................................................... 10

*Buckley v. Valeo,*
    424 U.S. 1 (1976)....................................................................................................... 14

*Burrus v. Vegliante,*
    336 F.3d 82 (2d Cir. 2003) ......................................................................................... 14

*Campaneria v. Reid,*
    891 F.2d 1014 (2d Cir. 1989) ..................................................................................... 43

*Cheek v. United States,*
    498 U.S. 192 (1991) .................................................................................. 10

*Copeland v. Vance,*
    893 F.3d 101 (2d Cir. 2018) ...................................................................... 11

*Davis v. United States,*
    512 U.S. 452 (1994) .................................................................................. 43

*Diaz v. Senkowski,*
    76 F.3d 61 (2d Cir. 1996) .................................................................... 40, 43

*diLeo v. Greenfield,*
    541 F.2d 949 (2d Cir. 1976) ................................................................ 20, 21

*Farrell v. Burke,*
    449 F.3d 470 (2d Cir. 2006) ............................................... 11, 12, 19, 21

*Freeman v. HSBC Holdings PLC,*
    57 F.4th 66 (2d Cir. 2023) ........................................................................ 29

*Gardiner v. Incorp. Vill. of Endicott,*
    50 F.3d 151 (2d Cir. 1995) ........................................................................ 45

*Griffin v. United States,*
    502 U.S. 46 (1991) ...................................................................................... 8

*Hamling v. United States,*
    418 U.S. 87 (1974) .................................................................................. 5, 7

*Herrera v. Capra,*
    No. 19 Civ. 5321 (LGS), 2020 WL 6263635 ......................................... 40

*Hyde v. United States,*
    225 U.S. 347 (1912) .................................................................................. 28

*Mannix v. Phillips,*
    619 F.3d 187 (2d Cir. 2010) ...................................................................... 19

*Meese v. Keene,*
    481 U.S. 465 (1987) ....................................................................... 4, 12, 23

*Miranda v. Arizona,*
    384 U.S. 436 (1966) .................................................................................. 39

*Parker v. Levy,*
    417 U.S. 733 (1974) .................................................................................. 20

*Ratzlaf v. United States,*
    510 U.S. 135 (1994) ........................................................................................................... 10

*Reynolds v. Quiros,*
    25 F.4th 72 (2d Cir. 2022) ................................................................................................ 11

*Stansbury v. California,*
    511 U.S. 318 (1994) .................................................................................................... 39, 48

*Thibodeau v. Portuondo,*
    486 F.3d 61 (2d Cir. 2007) ............................................................................................ 21, 22

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
    413 U.S. 548 (1973) ........................................................................................................... 14

*United States v. Adames,*
    878 F.2d 1374 (11th Cir. 1989) ......................................................................................... 10

*United States v. Adelglass,*
    No. 20 Cr. 605 (JSR), 2022 WL 6763791 (S.D.N.Y. Oct. 11, 2022) ...................................... 20

*United States v. Alexander,*
    No. 16 Cr. 141 (CR), 2018 WL 1891307 (D. Vt. Apr. 19, 2018) ........................................... 46

*United States v. Alfonso,*
    143 F.3d 772 (2d Cir. 1998) ............................................................................................... 9

*United States v. Aracri,*
    968 F.2d 1512 (2d Cir. 1992) ....................................................................................... 25, 30

*United States v. Avenatti,*
    No. 19 Cr. 373 (PGG), 2020 WL 70951 (S.D.N.Y. Jan. 6, 2020) ........................................... 20

*United States v. Badmus,*
    325 F.3d 133 (2d Cir. 2003) ........................................................................................ 41, 45

*United States v. Belcher,*
    No. 96 Cr. (BSJ), 1997 WL 35495 (S.D.N.Y. Jan. 29, 1997) ................................................ 46

*United States v. Berry-Ortemond,*
    713 F. App'x 247 (5th Cir. 2017) ....................................................................................... 15

*United States v. Brown,*
    No. 13 Cr. 345 (LGS), 2014 WL 4473372 (S.D.N.Y. Sept. 10, 2014) ..................................... 5

*United States v. Burden,*
    934 F.3d 675 (D.C. Cir. 2019) ........................................................................................... 10

*United States v. Butt*,
    2019 WL 479117 (S.D.N.Y. Feb. 7, 2019) .................................................................. 47

*United States v. Caban*,
    No. 17 Cr. 426 (LGS), 2017 WL 4990653 (S.D.N.Y. Oct. 30, 2017) ................................. 5, 31

*United States v. Carroll*,
    No. 19 Cr. 545 (CM), 2020 WL 1862446 (S.D.N.Y. Apr. 14, 2020) ..................................... 32

*United States v. Castellano*,
    610 F. Supp. 1359 (S.D.N.Y. 1985) ...................................................................... 25

*United States v. Chambers*,
    No. 17 Cr. 396 (WHP), 2018 WL 1726239 (S.D.N.Y. Apr. 9, 2018) ...................................... 9

*United States v. Concord Mgmt. & Consulting LLC*,
    385 F. Supp. 3d 69 (D.D.C. 2019) .................................................................. 33, 34

*United States v. Dawkins*,
    999 F.3d 767 (2d Cir. 2021) ............................................................................. 6, 7

*United States v. Eisenberg*,
    No. 23 Cr. 10 (AS), 2023 WL 8720295 (S.D.N.Y. Dec. 18, 2023) ....................................... 20

*United States v. Eppolito*,
    543 F.3d 25 (2d Cir. 2008) ............................................................................... 29

*United States v. Familetti*,
    878 F.3d 53 (2d Cir. 2017) ............................................................................... 41

*United States v. Faux*,
    828 F.3d 130 (2d Cir. 2016) .......................................................................... 41, 49

*United States v. FNU LNU*,
    653 F.3d 144 (2d Cir. 2011) .......................................................................... 39, 40

*United States v. Greenberg*,
    No. 21 Cr. 92 (AJN), 2022 WL 827304 (S.D.N.Y. Mar. 9, 2022) ........................................ 25

*United States v. Halloran*,
    821 F.3d 321 (2d Cir. 2016) ............................................................................. 19

*United States v. Heatley*,
    994 F. Supp. 483 (S.D.N.Y. 1998) ...................................................................... 32

*United States v. Helbrans*,
    547 F. Supp. 3d 409 (S.D.N.Y. 2021) .................................................................. 34

*United States v. Henry*,
   888 F.3d 589 (2d Cir. 2018) ................................................................. 10

*United States v. Ho*,
   984 F.3d 191 (2d Cir. 2020) ................................................................... 8

*United States v. Houtar*,
   980 F.3d 268 (2d Cir. 2020) ................................................................. 19

*United States v. Jasper*,
   No. 00 Cr. 825 (PKL), 2003 WL 21709447 (S.D.N.Y. July 23, 2003) ................................. 17

*United States v. Kinzler*,
   55 F.3d 70 (2d Cir. 1995) ................................................................... 15

*United States v. Kosinski*,
   976 F.3d 135 (2d Cir. 2020) ................................................................. 10

*United States v. Lasky*,
   967 F. Supp. 749 (E.D.N.Y. 1997) ............................................................. 8

*United States v. Law*,
   No. 16 Cr. 676 (LGS), 2017 WL 1435746 (S.D.N.Y. Apr. 21, 2017) ............................. 6, 32

*United States v. Leonelli*,
   428 F. Supp. 880 (S.D.N.Y. 1977) ........................................................... 32

*United States v. Lifshitz*,
   No. 03 Cr. 572 (LAP), 2004 WL 2072468 n.9 (S.D.N.Y. Sept. 15, 2004) ...................... 48, 50

*United States v. Liu*,
   No. 19 Cr. 804 (VEC), 2022 WL 443846 (S.D.N.Y. Feb. 14, 2022) ............................... 20

*United States v. Lobo*,
   No. 15 Cr. 174 (LGS), 2017 WL 1102660 (S.D.N.Y. Mar. 22, 2017) ............................. 32

*United States v. Love*,
   859 F. Supp. 725 (S.D.N.Y. 1994) ........................................................... 31

*United States v. Mandell*,
   710 F. Supp. 2d 368 (S.D.N.Y. 2010) ........................................................ 31

*United States v. Mattice*,
   186 F.3d 219 (2d Cir. 1999) ................................................................. 10

*United States v. McDonough*,
   56 F.3d 381 (2d Cir. 1995) ................................................................... 8

*United States v. McGoff*,
    831 F.2d 1071 (D.C. Cir. 1987) ................................................................. 26, 27, 28

*United States v. Michel* (*Michel I*),
    No. 19 Cr. 148 (CKK), 2022 WL 4182342 (D.D.C. Sept. 13, 2022) .................... 12, 13, 24, 27

*United States v. Michel* (*Michel II*),
    No. 19 Cr. 148 (CKK), 2023 WL 2388501 (D.D.C. Mar. 6, 2023) .................................... 9, 10

*United States v. Michel* (*Michel III*),
    No. 19 Cr. 148 (CKK), 2023 WL 7140431 (D.D.C. Apr. 14, 2023) ....................................... 10

*United States v. Mitchell*,
    966 F.2d 92 (2d Cir. 1992) ................................................................................ passim

*United States v. Mussaleen*,
    35 F.3d 692 (2d Cir. 1994) ..................................................................................... 44

*United States v. Nachamie*,
    101 F. Supp. 2d 134 (S.D.N.Y. 2000) ....................................................................... 30

*United States v. Nat'l Dairy Prods. Corp.*,
    372 U.S. 29 (1963) ................................................................................................. 12

*United States v. Newton*,
    369 F.3d 659 (2d Cir. 2004) ............................................................................... 42, 48

*United States v. Ohle*,
    678 F. Supp. 2d 215 (S.D.N.Y. 2010) ................................................................... 25, 28

*United States v. Palase*,
    No. 11 Cr. 413 (SLT), 2014 WL 6802560 (E.D.N.Y. Dec. 2, 2014) ...................................... 49

*United States v. Paracha*,
    No. 03 Cr. 1187 (SHS), 2004 WL 1900336 (S.D.N.Y. Aug. 24, 2004) ........................... 48, 49

*United States v. Perryman*,
    881 F. Supp. 2d 427 (E.D.N.Y. 2012) ....................................................................... 32

*United States v. Peterson*,
    100 F.3d 7 (2d Cir. 1996) ...................................................................................... 45

*United States v. Phillips*,
    690 F. Supp. 3d 268 (S.D.N.Y. 2023) ........................................................................ 5, 6

*United States v. Pichardo*,
    No. 92 Cr. 354 (RPP), 1992 WL 249964 (S.D.N.Y. Sept. 22, 1992) ..................................... 42

*United States v. Pugh,*
    No. 15 Cr. 116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) ........................... 5, 8, 22

*United States v. Rafiekian,*
    991 F.3d 529 (4th Cir. 2021) ............................................................................. 18

*United States v. Rajaratnam,*
    736 F. Supp. 2d 683 (S.D.N.Y. 2010) .............................................................. 26, 29

*United States v. Ramirez,*
    609 F.3d 495 (2d Cir. 2010) ............................................................................. 31

*United States v. Raphael,*
    No. 24 Cr. 339 (LGS), 2024 WL 4691024 (S.D.N.Y. Nov. 6, 2024) ..................................... 40

*United States v. Reed,*
    114 F.3d 1067 (10th Cir. 1997) ......................................................................... 20

*United States v. Rigas,*
    258 F. Supp. 2d 299 (S.D.N.Y. 2003) .................................................................. 34

*United States v. Rittweger,*
    259 F. Supp. 2d 275 (S.D.N.Y. 2003) .............................................................. 32, 34

*United States v. Rivera,*
    No. 16 Cr. 175 (LGS), 2017 WL 1843302 (S.D.N.Y. May 8, 2017) ........................................ 34

*United States v. Rogers,*
    No. 99 Cr. 710 (CM), 2000 WL 101235 (S.D.N.Y. Jan. 27, 2000) ................................... 45, 47

*United States v. Romazko,*
    253 F.3d 757 (2d Cir. 2001) ............................................................................. 50

*United States v. Rudaj,*
    390 F. Supp. 2d 395 (S.D.N.Y. 2005) .................................................................. 42

*United States v. Salmonese,*
    352 F.3d 608 (2d Cir. 2003) .............................................................................. 8

*United States v. Sampson,*
    898 F.3d 270 (2d Cir. 2018) .............................................................................. 6

*United States v. Santillan,*
    902 F.3d 49 (2d Cir. 2018) .............................................................................. 49

*United States v. Sattar,*
    272 F. Supp. 2d 348 (S.D.N.Y. 2003) ................................................................ 22, 23

*United States v. Sattar*,
  314 F. Supp. 2d 279 (S.D.N.Y. 2004) ....................................................... 23

*United States v. Sawinski*,
  No. 00 Cr. 49 (RPP), 2000 WL 1357491 (S.D.N.Y. Sept. 20, 2000) ........................................ 44

*United States v. Schaefer*,
  859 F. Supp. 2d 397 (E.D.N.Y. 2012) ....................................................... 46

*United States v. Shkreli*,
  No. 15 Cr. 637 (KAM), 2016 WL 8711065 (E.D.N.Y. Dec. 16, 2016) ................................. 32

*United States v. Shvartsman*,
  722 F. Supp. 3d 276 (S.D.N.Y. 2024) ....................................................... 20

*United States v. Solomonyan*,
  451 F. Supp. 2d 626 (S.D.N.Y. 2006) ....................................................... 9

*United States v. Soteriou*,
  No. 12 Cr. 39 (CR), 2012 WL 5426440 (D. Vt. Nov. 7, 2012) ................................. 49

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) ....................................................... 4

*United States v. Stringer*,
  730 F.3d 120 (2d Cir. 2013) ....................................................... 5, 6, 30

*United States v. Sturdivant*,
  244 F.3d 71 (2d Cir. 2001) ....................................................... 25

*United States v. Tartaglione*,
  No. 16 Cr. 832 (KMK), 2023 WL 2237903 (S.D.N.Y. Feb. 27, 2023) ................................. 44

*United States v. Titemore*,
  437 F.3d 251 (2d Cir. 2006) ....................................................... 44, 49

*United States v. Walsh*,
  194 F.3d 37 (2d Cir. 1999) ....................................................... 25, 31

*United States v. Wedd*,
  993 F.3d 104 (2d Cir. 2021) ....................................................... 6, 7, 30

*United States v. Wedd*,
  No. 15 Cr. 616 (KBF), 2016 WL 1055737 (S.D.N.Y. Mar. 10, 2016) ................................. 32

*United States v. Weld*,
  2016 WL 1055737 (S.D.N.Y. Mar. 10, 2016) ....................................................... 32

*United States v. Whitehead*,
    22 Cr. 692 (LGS), 2023 WL 3934667 (S.D.N.Y. June 9, 2023) .............................................. 49

*United States v. Whitehead*,
    No. 22 Cr. 692 (LGS), 2024 WL 4872733 (S.D.N.Y. Nov. 22, 2024) ....................................... 17

*United States v. Williams*,
    553 U.S. 285 (2008) ............................................................................................... 11, 12, 18

*United States v. Wilson*,
    901 F. Supp. 172 (S.D.N.Y. 1995) ...................................................................................... 44

*United States v. Zhang*,
    833 F. Supp. 1010 (S.D.N.Y. 1993) ...................................................................................... 8

*Wong Tai v. United States*,
    273 U.S. 77 (1927) ............................................................................................................ 31

*Yarborough v. Alvarado*,
    541 U.S. 652 (2004) .......................................................................................................... 39

## Statutes

22 U.S.C. § 2278 ........................................................................................................... 10

22 U.S.C. § 611 ...................................................................................................... passim

22 U.S.C. § 612 ........................................................................................................ 3, 27

22 U.S.C. § 613 ........................................................................................................... 16

22 U.S.C. § 618 ..................................................................................................... 8, 26, 27

Lobbying Disclosure Act of 1995, Pub. L. No. 104-65, 109 Stat. 691 (1995) ............................ 13

## Regulations

28 C.F.R. § 5.2 ......................................................................................................... 13, 14

## Other Authorities

3 Am. Jur. 2d Agency § 25 .............................................................................................. 28

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Sue Mi Terry's motions seeking: (1) to dismiss the Indictment; (2) a bill of particulars; and (3) to suppress her statements to the Federal Bureau of Investigation ("FBI") during a voluntary interview at her home and nearby places.[1] (Dkt. 40 ("Mem.")).

*First*, as explained below, the Court should deny Terry's motion to dismiss because:

(1) the text of the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, is not limited to agents of "malign" foreign governments;

(2) the Indictment sufficiently alleges conspiratorial and substantive violations of FARA by tracking the text of the statutes, and Terry's request for a "heightened standard" of willfulness is an issue to be raised in connection with proposed jury instructions and a charge conference, not a motion to dismiss;

(3) Terry's facial vagueness challenge is barred by uniform precedent, including from the Supreme Court, that FARA is constitutional;

(4) Terry's as-applied vagueness challenge is premature because the Indictment does not substitute for the full evidentiary record at trial, and is meritless in any event because Terry's unregistered activities go to the core of what FARA prohibits;

(5) the substantive FARA count is not duplicitous because the failure to register when required, and Terry's factual challenge to the duration and continuity of her unregistered activities, cannot be resolved on a motion to dismiss; and

(6) the conspiratorial FARA count is neither duplicitous nor otherwise deficient because whether the conspirators possessed the requisite knowledge or intent, and whether there was one conspiracy or multiple conspiracies, are for the jury to decide.

*Second*, the Court should deny Terry's motion for a bill of particulars because the 31-page speaking Indictment and extensive discovery have provided Terry with adequate notice of the charges so that she can prepare for trial.

---

[1] Pursuant to the Court's March 6, 2025 order, (Dkt. 49), the Government will file its classified opposition to Terry's motion to suppress and for disclosure of materials related to the Foreign Intelligence Surveillance Act on or before June 17, 2025.

*Finally*, the Court should deny Terry's motion to suppress her statements to FBI agents during an interview at her home and at a nearby hotel and café — without a hearing — because even accepting Terry's allegations as true (which they are not), Terry was not in custody.

## BACKGROUND

As alleged in the Indictment, Terry, who previously served as an employee of the Central Intelligence Agency ("CIA") and as a senior official of the White House National Security Council, worked for more than a decade as an unregistered agent of the Government of the Republic of Korea ("ROK"), also known as South Korea. (Indictment ("Ind."), Dkt. 2 ¶ 1). By her own admission, Terry was a valuable "source" for the ROK National Intelligence Service ("ROK NIS"), the primary intelligence agency for the ROK. (Ind. ¶¶ 2, 53). Over the years, Terry engaged in numerous unregistered activities at the direction of the ROK Government, including:

- Terry published magazine articles purporting to convey her own independent views about Korea policy, but, in truth, the ROK Government paid her and gave her specific talking points. (*See* Ind. ¶¶ 12–13, 39–44, 48–51, 56).

- Terry attempted to provide ROK Government officials with access to incoming U.S. presidential administration officials, including someone widely reported to be an incoming senior national security official and someone else whom Terry believed was a finalist for another national security position. (*See* Ind. ¶¶ 16–18).

- Terry arranged a private meeting with the Director of the ROK NIS and, among others, a senior official from the U.S. Department of Defense and a former CIA official, at which the Director of the ROK NIS gave remarks on North Korea policy. (*See* Ind. ¶¶ 20–23).

- Terry participated in an off-the-record, small group meeting with the U.S. Secretary of State regarding U.S. policy towards North Korea; met with her ROK NIS handler prior to the meeting; and, immediately after the meeting ended, got into an ROK diplomatic vehicle and gave her NIS ROK handler two pages of handwritten notes to photograph in the back seat of the car. (*See* Ind. ¶¶ 32–33, 54).

- Terry shared with her ROK NIS handler the details of a meeting she had with the U.S. Ambassador to Japan. (*See* Ind. ¶ 56).

- Terry organized a happy hour for Congressional staffers that was nominally hosted by the ROK Embassy in the United States, but, in truth, was funded and attended by her ROK NIS handler and other ROK intelligence officers who gained the opportunity to identify,

evaluate, and potentially recruit Congressional staff to whom they did not otherwise have access.  (*See* Ind. ¶¶ 34–37, 55).

In return, the ROK Government handsomely rewarded Terry with designer purses and clothing, high-priced dinners at upscale restaurants, and tens of thousands of dollars in covert funding for the think tanks where Terry worked.  (*See* Ind. ¶¶ 1–3, 20, 24–25, 27, 29–31, 35, 38, 44, 47, 58).  Terry was repeatedly reminded of her FARA reporting obligations but never registered as a foreign agent with the Attorney General.  (*See* Ind. ¶¶ 60–61).

On July 15, 2024, a grand jury in the Southern District of New York returned the two-count Indictment against Terry.  Count One charges Terry with conspiracy to violate FARA, in violation of 18 U.S.C. § 371.  Count Two charges Terry with failure to register under FARA, in violation of 22 U.S.C. §§ 612(a) and 618(a)(1) and 18 U.S.C. § 2.

## ARGUMENT

### I.  There Is No Basis to Dismiss the Indictment

#### A.    FARA Is Not Limited to Agents of "Malign" Foreign Governments

Declaring that she is "the first and only defendant to be criminally charged for allegedly acting on behalf of the government of one of the United States' closest democratic allies," (Mem. 15), Terry argues that her "prosecution is flatly inconsistent with FARA's well-established purpose," (Mem. 15), which she says is the "[d]isclosure of *[m]align* [f]oreign [i]nfluence," (Mem. 12 (emphasis added)).  As an initial matter, Terry is wrong to assume that FARA applies only to agents of "malign" foreign governments, or that agents of "democratic" foreign governments are exempt.  FARA's registration requirement applies to any "agent of a foreign principal," 22 U.S.C. § 612(a), and the law defines "foreign principal" to include "a government of a foreign country" without exception for any country, *id.* § 611(b)(1).  As the Supreme Court has explained, FARA's "registration requirement . . . appl[ies] equally to agents of friendly, neutral, and unfriendly

governments." *Meese v. Keene*, 481 U.S. 465, 469–70 (1987).[2]  Thus, for example, "the New York office of the [National Film Board of Canada] has been registered as a foreign agent since 1947 because it is an agency of the Canadian government," *id.* at 470, notwithstanding that Canada — like South Korea — is a democratic government and a longstanding ally of the United States. There is nothing novel about prosecuting Terry for acting as an unregistered agent of a foreign government, regardless of what the identity of that foreign government may be.

In all events, Terry does not explain the legal significance of her argument.  Terry points out that the Government could have chosen to enforce FARA against her civilly instead of criminally, (Mem. 14), but "[t]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate," *United States v. Stewart*, 590 F.3d 93, 122 (2d Cir. 2009).  To the extent that Terry suggests her supposedly "first-of-its kind prosecution" is improper, her objection seems to be based upon her view of her own importance to global affairs.  (Mem. 2 ("[T]he government has sidelined a staunch advocate for U.S. interests in Asia during a time of significant upheaval.")).  That is not a legal defect in the Indictment or this prosecution.

### B.    Count Two States a Willful Violation of FARA

Terry argues that the Indictment is deficient because:  (1) her activities did not require registration under FARA, (Mem. 16–21); and (2) the Indictment does not allege the "heightened standard" of willfulness that she demands, (Mem. 21–25).  Terry's brief — which presents more like a motion for summary judgment — fundamentally misunderstands the pleading standard for an indictment.  The Indictment tracks the text of the charged statutes and is therefore sufficient.

---

[2] Unless otherwise specified, all quotations omit internal quotation marks, citations, ellipses, and prior alterations.

To the extent that Terry argues the Court should adopt her preferred standard of willfulness, such an argument will not be properly before the Court until the requests to charge and charging conference in connection with proposed jury instructions. It is also wrong on the merits.

### 1.    Applicable Law

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." "An indictment is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013). Accordingly, "[t]he Second Circuit has consistently upheld indictments that do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Caban*, No. 17 Cr. 426 (LGS), 2017 WL 4990653, at *1 (S.D.N.Y. Oct. 30, 2017) (emphasis removed). And because "the various component parts" of a defined term "need not be alleged in the indictment in order to . . . adequately inform petitioners of the charges against them," *Hamling v. United States*, 418 U.S. 87, 119 (1974), "an indictment need not plead statutory definitions," *United States v. Pugh*, No. 15 Cr. 116 (NGG), 2015 WL 9450598, at *13 (E.D.N.Y. Dec. 21, 2015) (collecting cases).

"[T]here is no such thing as a motion for summary judgment in a criminal case." *United States v. Brown*, No. 13 Cr. 345 (LGS), 2014 WL 4473372, at *4 (S.D.N.Y. Sept. 10, 2014). "It is not the function of an indictment to inform the defendant of the evidence or the facts which the Government will use to prove its case." *United States v. Phillips*, 690 F. Supp. 3d 268, 277 (S.D.N.Y. 2023). Nor is a defendant "entitled to obtain a preview of the government's evidence before trial or to learn the legal theory upon which the government will proceed," either through the indictment or through a bill of particulars. *Id.*; *see also infra* Section II (discussing motion for

bill of particulars).  That is because "at the indictment stage," the Court does not "evaluate the adequacy of the facts to satisfy the elements of the charged offense."  *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021).  "That is something we do after trial."  *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021).

The only "exception to the rule that a court cannot test the sufficiency of the government's evidence on a Rule 12(b) motion," *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018), is when "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," *United States v. Law*, No. 16 Cr. 676 (LGS), 2017 WL 1435746, at *1 (S.D.N.Y. Apr. 21, 2017).  "A speaking indictment alone does not satisfy the 'full proffer' requirement; the government must proffer *all* of its evidence."  *Phillips*, 690 F. Supp. 3d at 278. Where, as here, the Government has not elected to proffer all its evidence, the "district court lacks the authority to *require* the government, before trial, to make such a presentation as this could effectively force a summary judgment-like motion on the government."  *Wedd*, 993 F.3d at 121.

## 2.    Discussion

The Indictment meets the pleading standard of Rule 7 because it "track[s] the language of the statute[s] charged and state[s] the time and place (in approximate terms) of the alleged crime[s]."  *Stringer*, 730 F.3d at 124.  The Indictment contains a narrative (or "speaking") section describing some of Terry's unregistered activities for the ROK Government over more than a decade.  (Ind. ¶¶ 1–61).  Though robust, these speaking allegations do not purport to detail all the evidence the Government will offer at trial.  The Indictment also contains statutory allegations that, for each count, accurately track the text of the cited criminal statutes and provide an approximate time period and location.  (Ind. ¶¶ 62–66).  That is all the law requires.

Terry argues that various factual allegations in the narrative section of the Indictment did not "trigger[] her obligation to register under FARA."  (Mem. 16–21).  That is precisely the kind

of sufficiency challenge that may not be brought on a motion to dismiss an indictment. *See, e.g.*, *Dawkins*, 999 F.3d at 779–80 (observing that the "speaking indictment" provided "more than enough background to inform the defendants of when and where the offense conduct took place," and rejecting argument that the district court should have "require[d] additional showings for someone to be an 'agent,' and for activities to be part of a university's 'business,'" to state a bribery violation under 18 U.S.C. § 666(a)(2)); *Wedd*, 993 F.3d at 121 (rejecting argument that the district court should have examined whether "the specific conduct referenced" in the indictment "involve[d] a use of 'a means of identification' for purposes of [18 U.S.C. §] 1028A").

The only purported "failure to track the language of the statute" that Terry identifies is that the Indictment does not state "which statutory qualifying activity under 22 U.S.C. § 611(c)(1)(i)–(iv) could even apply to the allegations of 'facilitate[ing] access' to U.S. government officials." (Mem. 17). To be clear, 22 U.S.C. § 611(c)(1)(i)–(iv) is not the provision of FARA setting forth the criminal offense of failing to register — that is 22 U.S.C. §§ 618(a)(1) and 612(a) — but is instead a portion of the statutory definition of "agent of a foreign principal." Count One of the Indictment alleges that Terry conspired to "knowingly and willfully act as an *agent of a foreign principal*, namely, the Government of the Republic of Korea, without registering with the Attorney General," (Ind. ¶ 63 (emphasis added)), and Count Two alleges she "knowingly and willfully acted and caused others to act as an *agent of a foreign principal*, namely, the Government of the Republic of Korea, without registering with the Attorney General," (Ind. ¶ 66 (emphasis added)). Because "agent of a foreign principal," 22 U.S.C. § 611(c), is a "legal term of art" with a defined meaning, *Hamling*, 418 U.S. at 118, the Government was not required to parrot it in the Indictment.[3] *See*

---

[3] Nor was the Government required to specify which parts of the statutory definition of "agent of a foreign principal" Terry met. (*See* Mem. 17). By incorporating the defined term "agent of a

(*continued on next page*)

*Pugh*, 2015 WL 9450598, at *13 ("The failure to reference or expressly cite the text of a definitional provision of an offense in an indictment count does not render that count insufficient or warrant its dismissal.").

Terry next argues that the Indictment "fails to allege that she willfully violated" her duty to register under FARA. (Mem. 21). This is incorrect: The Indictment alleges that Terry conspired to "knowingly and willfully" act as an unregistered agent of the ROK Government, (Ind. ¶ 63 (Count One)), and that she "knowingly and willfully" acted and caused others to act as an unregistered agent of the ROK Government, (Ind. ¶ 66 (Count Two)).

Terry finally argues that the Court should interpret willfulness under FARA, *see* 22 U.S.C. § 618(a)(1) (making it unlawful to "willfully" fail to register when required), to require that she "had actual knowledge of her alleged duty to register and that she intentionally violated that

---

foreign principal," the Government put Terry on notice that she should prepare for all the "various means of committing [the] statutory offense," *Griffin v. United States*, 502 U.S. 46, 51 (1991) (recognizing the "regular practice for prosecutors to charge conjunctively"); *see also United States v. Ho*, 984 F.3d 191, 211 (2d Cir. 2020) ("Our case law . . . upholds the practice of pleading in the conjunctive without requiring that the government prove all possibilities at trial."). Pleading in the conjunctive is not only permissible but encouraged "to inform the accused fully of the charges," and "[a] conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged." *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995); *cf. United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) ("[W]here a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment.").

To the extent that Terry demands that the Government identify "which statutory qualifying activity under 22 U.S.C. § 611(c)(1)(i)–(iv) could even apply," (Mem. 17; *see also* Mem. 30), she is improperly "requesting that the government's legal theory be set forth in the indictment," *United States v. Lasky*, 967 F. Supp. 749, 753 (E.D.N.Y. 1997). "[T]he government's specific legal theory is not necessary to be pled in an indictment." *Id.*; *see also United States v. Zhang*, 833 F. Supp. 1010, 1020 (S.D.N.Y. 1993) ("There is no requirement that the Government reveal its precise legal theory of the fraudulent statements by identifying [in the indictment] which components of these declared prices are false."). The Government nevertheless notes that the Indictment identified four non-exhaustive definitions of "agent of a foreign principal" that are particularly salient here: "political activities, political consulting, public relations, [and] publicity activities." (Ind. ¶ 9 (referencing 22 U.S.C. § 611(c)(1)(i) and (ii)).

specific duty." (Mem. 24). Terry then says the Indictment should be dismissed because it does not contain an allegation matching this "heightened standard." (Mem. 21–22). Terry's argument is misplaced for two reasons. It is misplaced first because the definition of willfulness is a matter for the requests to charge and charging conference, not a motion to dismiss. *See United States v. Solomonyan*, 451 F. Supp. 2d 626, 640 n.3 (S.D.N.Y. 2006) (denying request for a jury instruction in a motion to dismiss as "premature" and "reserv[ing] resolution of the issue until the charging conference at trial"); *United States v. Chambers*, No. 17 Cr. 396 (WHP), 2018 WL 1726239, at *1 (S.D.N.Y. Apr. 9, 2018) (denying motion to dismiss because the indictment "adequately track[ed] the statutory language of § 666" and the question of whether the Supreme Court's "interpretation of an 'official act' applies to the § 666 count case is premature"). Terry's argument is also misplaced because even if the Court were to adopt Terry's proposed standard of willfulness, "the sufficiency of the evidence" to satisfy that standard "is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998).

Though the Court need not, and should not, consider the issue at this stage, Terry's argument that FARA requires actual knowledge of the registration requirement is meritless. One case has squarely considered the issue: *United States v. Michel* (*Michel II*), No. 19 Cr. 148 (CKK), 2023 WL 2388501 (D.D.C. Mar. 6, 2023). Tellingly, Terry does not cite it. In *Michel II*, Judge Kollar-Kotelly rejected the argument — identical to Terry's here — that "the Government must demonstrate that Defendant had actual knowledge of the specific criminal statute to show willfulness" under FARA. *Id.* at *7 n.6. Instead, Judge Kollar-Kotelly held that "willfully" in the FARA context means exactly what the Supreme Court held that term generally means in the criminal context: "[A] person acts 'willfully' when they 'act[] with knowledge that [their] conduct

was unlawful.'" *Id.* (quoting *Bryan v. United States*, 524 U.S. 184, 191–92 (1998)).[4]  As Judge Kollar-Kotelly held, unlike cases requiring knowledge of a specific statutory provision where the "provision itself is fairly abstruse and a reporting omission is not inherently malign, . . . FARA and similar statutes are not just about paperwork; their object is to ensure that no person acts to advance the interests of a foreign government or principal within the United States unless the public has been properly notified of his or her allegiance." *Id.*  That analysis — together with "the traditional rule that ignorance of the law is no excuse," *Bryan*, 524 U.S. at 196 — disposes of the handful of inapposite[5] cases that Terry cites, (Mem. 22–24).

### C.    FARA Is Not Facially Vague

Terry argues that "criminal prosecutions for violating FARA's registration requirement are facially unconstitutional under the First and Fourteenth Amendment's void for vagueness

---

[4] *Michel II* resolved certain motions *in limine*.  In a subsequent opinion, Judge Kollar-Kotelly rejected Michel's objection to the draft jury charge on the same ground.  *See United States v. Michel* (*Michel III*), No. 19 Cr. 148 (CKK), 2023 WL 7140431, at *2 (D.D.C. Apr. 14, 2023); *see also United States v. Michel*, 19 Cr. 148 (CKK), Dkt. 290, at 75 (jury charge as given).

[5] For example, Terry cites the Eleventh Circuit's interpretation of "willfulness" under the Arms Export Control Act ("AECA"), 22 U.S.C. § 2278, in *United States v. Adames*, 878 F.2d 1374 (11th Cir. 1989).  (Mem. 23–24).  That case predates the Supreme Court's 1998 ruling in *Bryan*, and the Second Circuit has expressly held that under *Bryan*, "the heightened definition of willfulness applicable to 'highly technical statutes' does not apply" to the AECA.  *United States v. Henry*, 888 F.3d 589, 599 (2d Cir. 2018).  The Second Circuit observed in *Henry* that the cases relied upon by Henry (and Terry here) "concern tax and financial regulation statutes so complicated and non-intuitive that one might violate them without actually understanding that his conduct was illegal." *Id.* (distinguishing *Ratzlaf v. United States*, 510 U.S. 135 (1994) and *Cheek v. United States*, 498 U.S. 192 (1991)); *accord United States v. Burden*, 934 F.3d 675, 156–59 (D.C. Cir. 2019) (agreeing there is no heightened definition of willfulness for the AECA and observing that the Supreme Court "has required proof that a defendant know which law he was breaking in only two contexts: criminal tax evasion, and currency structuring").  Terry repeats her mistake by citing *United States v. Mattice*, (Mem. 24), a case where the "willfulness" provision at issue was "borrowed from the tax statutes that make willful failure to collect or pay taxes a Federal crime." 186 F.3d 219, 225 (2d Cir. 1999).  The Second Circuit has emphasized that outside the context of highly technical statutes like "the Internal Revenue Code," the *Bryan* "definition of willfulness is generally applicable."  *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020).

doctrine." (Mem. 25). Terry does not identify a single precedential or persuasive case holding that FARA — a law approaching 100 years old — is unconstitutional, either facially or as applied. And the Government is aware of none. Indeed, an unbroken cascade of cases at every level of the judiciary has upheld FARA against constitutional challenges, including challenges brought under the First Amendment. This Court should do the same.

### 1.    Applicable Law

"[U]nder the Due Process Clause, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Reynolds v. Quiros*, 25 F.4th 72, 96 (2d Cir. 2022). A vagueness challenge may be brought facially or as-applied to the facts of the case. An as-applied challenge "asserts that a law cannot constitutionally be applied to the challenger's individual circumstances." *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018). A facial challenge, by contrast, asserts that the "statute is so fatally indefinite that it cannot constitutionally be applied to anyone." *Id.* "Although ordinarily a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," the Supreme Court has "relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008).

As a threshold matter, a facial vagueness challenge based on First Amendment concerns "may go forward only if the challenged regulation reaches a substantial amount of constitutionally protected conduct." *Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006). Put differently, the challenged law must "have a substantial chilling effect on protected conduct" to warrant facial review. *Id.* at 497. Even when reaching the merits of a vagueness challenge, however, the

Supreme Court has cautioned that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304; *see also United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").

### 2.    Discussion

Terry's facial challenge to FARA fails at the threshold because the Supreme Court has already held that FARA "places no burden on protected expression." *Keene*, 481 U.S. at 480. "The statute itself neither prohibits nor censors the dissemination of advocacy materials by agents of foreign principals." *Id.* at 478. Instead, FARA simply requires "the disseminators of such material to make additional disclosures that would better enable the public to evaluate the import" of that material. *Id.* at 480. Because FARA "do[es] not penalize *speech*, but rather the lack of registration," *United States v. Michel* (*Michel I*), No. 19 Cr. 148 (CKK), 2022 WL 4182342, at *5 (D.D.C. Sept. 13, 2022), FARA "places no burden on protected expression," *Keene*, 481 U.S. at 480. FARA therefore cannot "have a substantial chilling effect on protected conduct," *Farrell*, 449 F.3d at 496, and facial review for vagueness is unavailable.

This conclusion is in accord not only with the Supreme Court's reasoning in *Keene*, but also with the entire corpus of FARA case law. Until 2022, "no defendant ha[d] ever challenged FARA's registration requirement on vagueness grounds." *Michel I*, 2022 WL 4182342, at *5. That is no accident. Throughout the 87-year history of FARA, the courts have rejected every constitutional attack on the law, including under the First Amendment. *See, e.g.*, *Keene*, 481 U.S. at 477–85 (rejecting First Amendment challenge to statutory designation of a category of materials

under FARA as "political propaganda");[6] *Att'y Gen. of U.S. v. Irish People, Inc.*, 796 F.2d 520, 526 (D.C. Cir. 1986) (rejecting claim of selective enforcement of FARA based on protected expression and noting that "the enforcement of the FARA for the purposes expressed in the statute does not infringe the exercise of constitutional rights"); *Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 935 n.23 (D.C. Cir. 1982) (collecting cases for the observation that FARA "has been on the books for over 40 years, and cases involving it have been before the federal courts at every level . . . without there ever being a holding of unconstitutionality"); *Att'y Gen. of U.S. v. Irish N. Aid Comm.* (*INAC I*), 530 F. Supp. 241, 253 (S.D.N.Y. 1981) (rejecting as-applied First Amendment challenge to FARA and noting that "[t]he facial validity of the Act has previously been upheld against first amendment challenge"), *aff'd*, *INAC II*, 668 F.2d 159 (2d Cir. 1982).

"In short, it is well settled that FARA is constitutional." *Michel I*, 2022 WL 4182342, at *4. Terry does not cite a single case to the contrary. Because FARA places no burden on expressive activity, the Court should not reach the merits of Terry's facial vagueness challenge.

\* \* \*

If the Court nevertheless considers Terry's facial vagueness arguments, the Court should reject them.

*First*, Terry argues that the Government's advisory-opinion process, which enables "[a]ny present or prospective agent of a foreign principal" to inquire with the Department of Justice as to whether registration under FARA is required on particular facts, 28 C.F.R. § 5.2(a), "concede[s] that FARA . . . fails to provide individuals and organizations with fair notice of what conduct requires registration," (Mem. 26). As Terry admits, however, (Mem. 26 n.31), these advisory

---

[6] Congress later amended FARA to replace the term "political propaganda" with "informational materials." Lobbying Disclosure Act of 1995, Pub. L. No. 104-65, § 9, 109 Stat. 691, 699–700 (1995) (codified as amended at 22 U.S.C. § 614).

opinions do not purport to interpret FARA, and their availability therefore concedes no ambiguity in the statute. Instead, the advisory-opinion process provides requesters "a statement of the present *enforcement* intentions of the Department of Justice under the Act with respect" to a proposed transaction or course of conduct based on an individualized set of proffered facts. 28 C.F.R. § 5.2(a) (emphasis added). An advisory opinion thus functions as a safe-harbor letter. Had Terry sought an advisory opinion during the decade-plus that she covertly worked for the ROK Government, she would have been entitled to rely upon the opinion to the extent that her disclosures were accurate and complete. 28 C.F.R. § 5.2(k). Her decision to forgo an advisory opinion undercuts her claim that she lacked notice; it certainly does not enhance her claim.

Indeed, Terry's attack on the advisory-opinion process turns the vagueness doctrine on its head. In considering First Amendment challenges, the Supreme Court has said that the availability of advisory opinions from a regulator *alleviates* any vagueness concerns. *See Buckley v. Valeo*, 424 U.S. 1, 41 n.47 (1976) (suggesting that vagueness problems with campaign finance law could be alleviated by advisory opinions by Federal Election Commission, if process were available to all subject to criminal sanction under the law); *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) (rejecting vagueness challenge to civil service law because, among other reasons, the agency's "Office of General Counsel is available to counsel employees who seek advice on the interpretation of the Act and its regulations"); *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973) (rejecting vagueness challenge to Hatch Act because, among other reasons, there was an advisory-opinion process). The Second Circuit has similarly relied upon the availability of advisory opinions in rejecting a vagueness challenge to the current version of the Hatch Act. *Burrus v. Vegliante*, 336 F.3d 82, 91 (2d Cir. 2003). In short, the availability of advisory opinions puts FARA on even firmer constitutional footing, not less.

14

*Second*, Terry argues that FARA's definition of "agent of a foreign principal" is vague because "an ordinary person of reasonable intelligence reviewing the Indictment could not reasonably determine whether the alleged conduct would have triggered the obligation to register under FARA, which until recently was rarely enforced." (Mem. 27). This is an as-applied challenge, not a facial one.[7] (*See infra* Section I.D.1 (discussing standard of review for as-applied vagueness challenges, which are typically premature at the pleading stage). Regardless, it is difficult to ascertain what exactly Terry finds vague in the detailed, multi-part definition of "agent of a foreign principal." *See* 22 U.S.C. § 611(c). Terry suggests in passing that the word "direction" in the phrase "under the direction or control[] of a foreign principal" is ambiguous, (Mem. 27 & n.32 (referencing 22 U.S.C. § 611(c)(1)), but the word "direction" is a common word with a common meaning. *See, e.g.*, *United States v. Berry-Ortemond*, 713 F. App'x 247, 251 (5th Cir. 2017) (holding that "the word 'direction' within 'at the direction of Probation', is to be interpreted by its common meaning" and citing Black's Law Dictionary for the definition of "direct" as "to move on a particular course" or "to guide").

Terry also quotes the Second Circuit's observation in *INAC II* that "'[t]he exact perimeters of a 'request' under [FARA] are difficult to locate.'" (Mem. 27 (quoting 668 F.2d at 161)). But Terry omits the next sentence of the opinion, which makes plain that FARA is not facially vague:

> The exact perimeters of a "request" under the Act are difficult to locate, falling somewhere between a command and a plea. **Despite this uncertainty, the surrounding circumstances will normally provide sufficient indication as to whether a "request" by a "foreign principal" requires the recipient to register as an**

---

[7] Terry's complaint that her prosecution under FARA is "[n]ovel," (Mem. 12), is both inaccurate and irrelevant to her vagueness challenge. *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help Lida's cause, for it is immaterial that there is no litigated fact pattern precisely in point.").

> **"agent."**   For example, it is important to ascertain whether those requested to act were identified with specificity by the principal.

*INAC II*, 668 F.2d at 161 (emphasis added).  Here, for example, it borders on the absurd to suggest that "an ordinary person of reasonable intelligence," (Mem. 27), lacked sufficient indication that planning with an ROK intelligence officer to attend an off-the-record meeting with the U.S. Secretary of State, meet the ROK intelligence officer in a ROK diplomatic vehicle, and then share handwritten notes from the meeting with the ROK intelligence officer in the back seat of the ROK car would trigger the requirement to register under FARA.  (*See* Ind. ¶¶ 32–33, 54).

*Third*, Terry argues that the statutory FARA exemption for persons engaging in "other activities not serving predominantly a foreign interest," 22 U.S.C. § 613(d), is vague because the exemption "could plausibly apply to every activity alleged in the Indictment because each one served to advance Dr. Terry's personal and professional goals," (Mem. 27).  Again, this is a premature as-applied challenge, not a facial challenge.  And again, even on the merits, the objection falls apart when the statutory exception is quoted in full:

> Any person engaging or agreeing to engage **only** (1) in private and nonpolitical activities in furtherance of the bona fide trade or commerce of such foreign principal; or (2) in **other** activities not serving **predominantly** a foreign interest . . . .

22 U.S.C. § 613(d) (emphases added).  The full quotation makes clear that the exemption in subsection (d)(2) for "other activities not serving predominantly a foreign interest" is to be read in conjunction with the exemption in subsection (d)(1) for "bona fide trade or commerce."  Like activities in furtherance of bona fide trade or commerce, the exemption in subsection (d)(2) refers to conduct that — while it may have a foreign nexus — does not have as its primary end the service of the foreign principal.  The full quotation also makes clear that the exemptions in Section 613(d) are "limited to situations where the agent is engaged '*only*' in those particular activities."  *Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371, 374 (D.D.C. 1976) (emphasis added)

(quoting 22 U.S.C. § 613(d)).  Thus, even if Terry engaged in some activity that was exempt under Section 613(d), she would still be required to "include in [her] registration statement a description of these otherwise exempt legal activities" so long as she engaged in any activity that did require registration under FARA.  *Id.*  There is no dispute that Terry never registered at all.

*Fourth*, Terry declares that FARA's definitions of "political activities" and "political consult[ing]" are "overly broad and vague."  (Mem. 27).  Terry does not bother to explain what she believes is vague about the term "political activities," which is defined at length in the statute. *See* 22 U.S.C. § 611(o).  Neither the Government nor the Court should "invent a specific argument . . . where defense counsel has not proffered one."[8]  *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 21709447, at *2 (S.D.N.Y. July 23, 2003), *aff'd*, 104 F. App'x 781 (2d Cir. 2004).  As for the definition of "political consultant,"[9] Terry simply asserts that the term "could be read to sweep up any exchange of information with a foreigner about domestic or international politics." (Mem. 27).  That is not so.  Under FARA, a "political consultant" is not an "agent of a foreign principal" unless she acts "for or in the interests of such foreign principal," *and* has the requisite agent-principal relationship (*i.e.*, by acting as "an agent, representative, employee, or servant, or . . . in any other capacity at the order, request, or under the direction or control" of the foreign principal).  22 U.S.C. § 611(c)(1)(ii).

---

[8] Should Terry advance a new argument on reply, the Court should decline to consider it because the Government will have no opportunity to respond.  *See United States v. Whitehead*, No. 22 Cr. 692 (LGS), 2024 WL 4872733, at *1 (S.D.N.Y. Nov. 22, 2024) ("[C]ourts generally do not consider arguments raised in reply for the first time.").  In the alternative, the Government would respectfully request leave to file a sur-reply addressing any new arguments Terry raises on reply.

[9] FARA defines "political consultant" to mean "any person who engages in informing or advising any other person with reference to the domestic or foreign policies of the United States or the political or public interest, policies, or relations of a foreign country or of a foreign political party." 22 U.S.C. § 611(p).

Whether a person has the requisite agent-principal relationship and is acting as a "political consultant" "for or in the interests of [the] foreign principal" is of course a fact-intensive determination, and close cases are imaginable because the relationship between foreign principals and unregistered agents is often shrouded by design. *Cf. United States v. Rafiekian*, 991 F.3d 529, 545 (4th Cir. 2021) ("Savvy operatives cover their tracks."). But as the Supreme Court has explained, it is a "mistake" to believe that "the mere fact that close cases can be envisioned renders a statute vague." *Williams*, 553 U.S. at 305. Close cases are "addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id.* at 306. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* Here, like in *Williams*, it is a "clear question[] of fact" susceptible to a "true-or-false determination," *id.*, whether a person is acting as "an agent, representative, employee, or servant, or . . . in any other capacity at the order, request, or under the direction or control" of a foreign principal, 22 U.S.C. § 611(c)(1). Similarly, it is a clear question of fact whether a person is "informing or advising . . . with reference to the domestic or foreign policies of the United States or the political or public interest, policies, or relations of a foreign country or of a foreign political party," *id.* § 611(p), "for or in the interests of [the] foreign principal," *id.* § 611(c)(1)(ii). Terry is free to argue to the jury that the evidence of her activities does not meet these statutory standards. But that is a question of proof, not of constitutionality.

### D.    FARA's Definitions of "Political Activities" and "Political Consultant" Are Not Vague As Applied To This Case

In addition to her facial challenge, Terry also argues that FARA — and specifically its definitions of "political activities" and "political consultant" — are vague as applied to the facts

of this case.[10]  (Mem. 30–32).  Because the facts of this case have not yet been fully developed, the Court should, consistent with the law and practice in this District, deny Terry's as-applied vagueness challenge as premature.  Should the Court reach the merits at this stage, it should deny Terry's challenge because FARA put her on fair notice that her unregistered activities as an agent of the ROK Government were unlawful, and because her unregistered activities fell within the core of what FARA prohibits.

### 1.    Applicable Law

"When the challenge is vagueness 'as-applied', there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it."  *Farrell*, 449 F.3d at 486.  "Under the fair notice prong, a court must determine whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016).  "The arbitrary enforcement prong requires that a statute give minimal guidelines to law enforcement authorities, so as not to permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections."  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010).  At bottom, "the vagueness issue on an as-applied challenge is not whether the statute's reach is clear in every application, but whether it is clear as applied to the defendant's conduct."  *United States v. Houtar*, 980 F.3d 268, 276 (2d Cir. 2020).  "One to whose conduct a

---

[10] Terry asserts that "the only two qualifying activities under FARA that could possibly apply to [her] activities alleged in the Indictment" are "political activities" and "political consult[ing]." (Mem. 30).  At a minimum, however, her conduct also implicates the statutory definitions of "public-relations counsel" and "publicity agent."  22 U.S.C. § 611(g), (h); (*see also* Ind. ¶ 9).

statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974).

Because "[a]n implicit requirement of the vagueness test is that it must be clear what the defendant did," courts in this District typically defer as-applied vagueness challenges until after a full evidentiary record is developed at trial. *United States v. Shvartsman*, 722 F. Supp. 3d 276, 299 (S.D.N.Y. 2024) (Liman, J.); *accord, e.g.*, *United States v. Eisenberg*, No. 23 Cr. 10 (AS), 2023 WL 8720295, at *6–7 (S.D.N.Y. Dec. 18, 2023); *accord, e.g.*, *United States v. Adelglass*, No. 20 Cr. 605 (JSR), 2022 WL 6763791, at *3 (S.D.N.Y. Oct. 11, 2022); *United States v. Liu*, No. 19 Cr. 804 (VEC), 2022 WL 443846, at *4 (S.D.N.Y. Feb. 14, 2022); *United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2020 WL 70951, at *9 (S.D.N.Y. Jan. 6, 2020).

### 2.    Discussion

Consistent with the law and common practice of this District, the Court should deny Terry's as-applied challenge as premature. Whether FARA put Terry on fair notice that her conduct was criminal, and whether FARA clearly applied to her conduct, depends upon "the actual conduct of the actor." *diLeo v. Greenfield*, 541 F.2d 949, 953 (2d Cir. 1976). To be sure, the Indictment sets forth a robust factual summary. But even a 31-page summary is not a full exposition of the Government's proof. It is for this reason that the Tenth Circuit has held that such a "fact intensive analysis" as an as-applied vagueness challenge "should be based *only* on the facts as they emerge at trial." *United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997) (emphasis added).

Should the Court reach the merits of Terry's as-applied challenge to FARA at the motion to dismiss stage, rather than based on the facts as they emerge at trial, it should reject the challenge. Terry speculates that the Government will advance at trial "the broadest possible reading" of the statutory terms "political consultant" and "political activities," and then describes hypothetical consequences to these hypothetical constructions. (Mem. 31–32). This argument fundamentally

misunderstands the as-applied vagueness analysis. "The test of a statute's vagueness for due process purposes is to be made with respect to the actual conduct of the actor who attacks the statute" — "and not with respect to hypothetical situations at the periphery of the statute's scope or with respect to the conduct of other parties who might not be forewarned by the broad language." *diLeo*, 541 F.2d at 953. The question is not whether FARA's "reach is clear in every application, but whether it is clear as applied to the defendant's conduct." *Houtar*, 980 at 276.

There can be no serious doubt that a "person of ordinary intelligence" would, for example, have a "reasonable opportunity to know," *Farrell*, 449 F.3d at 486, that coordinating with a South Korean intelligence officer to pass notes of an off-the-record conversation on North Korean issues with the U.S. Secretary of State, (Ind. ¶¶ 32–33, 54), would (1) be at the "request . . . of a foreign principal," and therefore create or continue an agent-principal relationship, 22 U.S.C. § 611(c)(1); (2) inform the recipient with respect to U.S. policy, and therefore constitute "political consult[ing]," *id.* § 611(p); and (3) be "for or in the interests of" the ROK Government, *id.* § 611(c)(1)(ii), and therefore require advance registration under the law. Nor can there be any serious doubt that Terry's unregistered transmission of this information to the ROK NIS in the back of a ROK diplomatic vehicle, (Ind. ¶ 33) — one month after her think tank program received $11,000 in covert funding from the ROK NIS, (Ind. ¶ 35) — "falls within the core of the statute's prohibition." *Thibodeau v. Portuondo*, 486 F.3d 61, 67–68 (2d Cir. 2007).

Nor can there be any serious doubt that a "person of ordinary intelligence" would, for example, have a "reasonable opportunity to know," *Farrell*, 449 F.3d at 486, that hosting a happy hour for Congressional staffers at the request of a ROK intelligence officer, (Ind. ¶ 55), and then inviting ROK intelligence officers to attend the happy hour and mingle with Congressional staffers while posing as diplomats, (Ind. ¶¶ 37, 55), would (1) be at the "request . . . of a foreign principal,"

and therefore create or continue an agent-principal relationship, 22 U.S.C. § 611(c)(1); (2) influence U.S. Government officials with respect to U.S. policy, and therefore constitute "political activities," 22 U.S.C. § 611(o); and (3) be "for or in the interests of" the ROK Government, 22 U.S.C. § 611(c)(1)(i), and therefore require advance registration under the law.  Nor can there be any serious doubt that secretly inserting ROK intelligence officers into a social gathering of Congressional staffers, without advance registration as an agent of the ROK Government, "falls within the core of the statute's prohibition." *Thibodeau*, 486 F.3d at 67–68.  Terry argues that the Indictment does not specifically allege that she had the subjective "belie[f]" or "inten[t]" to influence the U.S. Government with reference to U.S. policy, (Mem. 31),[11] but it abandons common sense to think that Terry, a former CIA employee and senior White House official, could believe that ROK intelligence officers would wish to secretly mingle with Congressional staffers for any other reason than to influence the U.S. Government on matters of policy.

The case upon which Terry relies, *United States v. Sattar*, 272 F. Supp. 2d 348 (S.D.N.Y. 2003), is inapposite.  (*See* Mem. 30–31).  In *Sattar*, Judge Koetl found 18 U.S.C. § 2339B, which prohibits the provision of material support to a foreign terrorist organization ("FTO"), vague as applied to the defendants' alleged supply of "communications equipment" and "personnel."  272 F. Supp. at 356–61.  As to "communications equipment," Judge Koeltl found that the indictment sought to criminalize the "mere use" — as opposed to the physical transfer — of "phones and other means of communication," which could not have been reasonably anticipated from the text of the statute.  *Id.* at 258.  As to "personnel," Judge Koeltl expressed concern that the statute could be

---

[11] The Government was not required to plead Terry's belief or intent because that is part of the statutory definition of "political activities," 22 U.S.C. § 611(o), which in turn is part of the statutory definition of "agent of a foreign principal," *id.* § 611(c)(1)(i).  "[T]he longstanding rule [is] that an indictment need not plead statutory definitions." *Pugh*, 2015 WL 9450598, at *13.

applied to prosecute the defendants for "mere membership in an FTO," which is constitutionally protected, and that one of the defendants, who was an attorney, lacked sufficient notice as to how she, "acting as an agent of her client, an alleged leader of an FTO, could avoid being subject to criminal prosecution." *Id.* at 359. Judge Koeltl noted that the conduct alleged in *Sattar* did not fall within the "hard core" of the statute, such as "a person who provides himself or herself as a soldier in the army of an FTO," *id.*, which might otherwise defeat a vagueness challenge.

This case is unlike *Sattar*. *First*, as Judge Koeltl later explained, his concern with Section "2339B's ban on providing personnel to a [FTO] could trench upon associational and expressive freedoms — including pure advocacy — protected by the First Amendment." *United States v. Sattar*, 314 F. Supp. 2d 279, 300 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). Here, there is no First Amendment concern because the Supreme Court has already held that FARA, which criminalizes only the failure to register when required, "places no burden on protected expression." *Keene*, 481 U.S. at 480; *see also supra* Section I.C (discussing First Amendment precedent). *Second*, unlike "the facts charged in the [*Sattar*] Indictment in which various defendants are accused of having participated in the [mere] use of communications equipment," 272 F. Supp. 2d at 358, the facts charged in this case go to the "hard core" of FARA, *id.* at 359. Terry's charged conduct — such as her attendance at a meeting with the U.S. Secretary of State as an unregistered agent of the ROK Government, followed by her covert passing of notes of the meeting to a ROK intelligence officer in the back of a ROK diplomatic car, (Ind. ¶¶ 32–33, 54), or her failure to register before hosting a happy hour to provide ROK intelligence officers access to Congressional staffers, (Ind. ¶¶ 37, 55), all in exchange for that foreign intelligence service's provision of luxury goods, high-priced dinners, and more than $37,000 in covert funding for a public policy program Terry controlled, (Ind. ¶ 3) — clearly falls within FARA's scope.

Far more relevant authority is *Michel I* — a case that Terry tellingly does not cite, despite it being the only case to squarely consider a vagueness challenge to FARA.  In *Michel I*, Judge Kollar-Kotelly observed at the outset that "[a]s a practical matter, any constitutional challenge to the FARA statute is foreclosed by binding [D.C.] Circuit precedent" holding FARA constitutional. 2022 WL 4182342, at *4.  Exercising her discretion to consider the merits of Michel's vagueness challenge nonetheless, Judge Kollar-Kotelly found that FARA "is, and has been since its inception, straightforward and sufficiently precise."  *Id.* at *5.  Judge Kollar-Kotelly rejected Michel's suggestion that he was "being prosecuted" for his artistic activities, pointing out that "the key actus reus" of the statute "is not 'engaging in political activities' but rather the omission of failing to register." *Id.*  Terry's mistake is similar:  She is not being prosecuted for what she euphemistically calls "sharing details of her exchanges with other Korea experts and U.S. government officials with her contacts from South Korea" or "her efforts to connect her professional contacts with one another." (Mem. 31).  She is being prosecuted for *failing to register* while acting, again and again over a period of more than 10 years, as an agent of the ROK Government.  Because "FARA criminalizes, in clear terms, failure to register in advance of engaging in the delineated political activities," the statute "clearly proscribe[s] political advocacy at the behest of a foreign official, [and] any vagueness challenge must fail.  *Michel I*, 2022 WL 4182342 at *5–6.

### E.    Count Two (Substantive Violation of FARA) Is Not Duplicitous

Terry argues that Count Two is duplicitous because the Indictment "fails to allege any activities that Dr. Terry undertook on behalf of the South Korean government . . . between June 2014 and December 2016, and between December 2016 and late 2018."  (Mem. 32).  "During those gaps," Terry argues, she "could not have been under an ongoing obligation to register as a foreign agent because she was not engaging in any conduct that could plausibly require registration under FARA." (Mem. 32).  Terry is wrong.  She is wrong because FARA is a continuing offense,

and so any purported "gaps" in her activities for the ROK Government are immaterial so long as she has not registered — which she never did. She is also wrong because the Indictment plainly alleges that she violated FARA "[f]rom at least in or about 2013 to at least in or about June 2023," (Ind. ¶ 66), and the case law makes clear that any factual challenge to the duration or continuity of her activity cannot be resolved by the Court at this stage.

### 1.    Applicable Law

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count . . . and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). "An apparently illegal joinder of offenses may be proper because the allegations in a particular count constitute a 'continuing offense,'" which is an offense that "by its nature or by its terms is a single, ongoing crime." *United States v. Castellano*, 610 F. Supp. 1359, 1408 (S.D.N.Y. 1985). More generally, "under the law of this Circuit, acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).

"In a pretrial motion to dismiss a count as duplicitous, the Court considers only the indictment on its face." *United States v. Greenberg*, No. 21 Cr. 92 (AJN), 2022 WL 827304, at *11 (S.D.N.Y. Mar. 9, 2022). Where an indictment is not duplicitous on its face, "courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous." *United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010). This is because a reviewing court may consider "the record as a whole," including evidence at trial, "in determining whether an indictment is in fact multiplicitous or duplicitous." *United States v. Walsh*, 194 F.3d 37, 46 (2d Cir. 1999). So long as "a jury could find some set of facts" that demonstrate a single offense, "dismissal on duplicity

grounds is unjustified . . . prior to the presentation of the government's case at trial." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 689 (S.D.N.Y. 2010).

### 2. Discussion

FARA expressly provides that the failure to register when required is a continuing offense. 22 U.S.C. § 618(e) ("Failure to file any such registration statement or supplements thereto as is required by either section 612(a) or section 612(b) of this title shall be considered a continuing offense for as long as such failure exists, notwithstanding any statute of limitation or other statute to the contrary."). Only three cases appear to have addressed the question of when a FARA continuing offense ends — or, put another way, when the statute of limitations begins to run. *First*, in 1987, a two-judge majority of a D.C. Circuit panel held that "the statute of limitations for failing to register under FARA begins to run from the last day that an individual acts as an agent of a foreign principal." *United States v. McGoff*, 831 F.2d 1071, 1096 (D.C. Cir. 1987). Judge Bork dissented, arguing that "under the explicit language of [FARA,] McGoff's offense continues until he registers." *Id.* at 1097. *Second*, thirty-five years after *McGoff*, Judge Boasberg independently analyzed the text of FARA (in the context of a civil enforcement action) and agreed with Judge Bork that the statute of limitations "never start[s] running as long as the person has not registered." *Att'y Gen. of United States v. Wynn* (*Wynn I*), 636 F. Supp. 3d 96, 101–02 (D.D.C. 2022), *aff'd*, *Wynn II*, 104 F.4th 348 (D.C. Cir. 2024). Nevertheless, Judge Boasberg dismissed the enforcement action because he was "bound to apply the statute as interpreted by the D.C. Circuit." *Id.* at 107. *Third*, a unanimous panel of the D.C. Circuit affirmed Judge Boasberg's dismissal, emphasizing that it too was bound by circuit precedent in *McGoff*. *Wynn II*, 104 F.4th at 352, 355.

Whether the Court adopts the holding of the panel majority in *McGoff*, or the reasoning underlying Judge Bork's and Judge Boasberg's opinions, Count Two is not duplicitous.

As an initial matter, unlike the D.C. courts, this Court is not bound by *McGoff*. As Judge Boasberg explained in his careful opinion, the continuing offense described in Section 618(e) is the failure to register as required under Section 612(a). *Wynn I*, 636 F. Supp. 3d at 101–02. And the "more natural" and "more sensible" reading of Section 612(a) is that "registration as an agent is retroactively required even after the termination of an agency relationship." *Id.* (analyzing 22 U.S.C. § 612(a), which provides in relevant part that "[t]he obligation of an agent of a foreign principal to file a registration statement shall, after the tenth day of his becoming such agent, continue from day to day, and termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal"). Despite acknowledging that this "might appear the more natural reading" of the text, the majority in *McGoff* declined to adopt it, in part because it was "reluctant" to "virtually eliminate the statute of limitations for failure to file under FARA." 831 F.2d at 1083, 1093. But the statute of limitations is eliminated only insofar as the agent never registers. There is nothing strange about that result in the context of FARA, where the "key actus reus" is not the agent's activity for the foreign principal but rather his failure to register. *Michel I*, 2022 WL 4182342, at *5. And Congress expressly made that failure to register a continuing offense in 22 U.S.C. § 618(e).

If the Court agrees with Judge Boasberg and Judge Bork that under the plain text of FARA, Terry's violation of FARA continued until she registered (which she never did), then Terry's duplicity challenge is at an end. Any purported "gaps of time" in her activities for the ROK Government, (Mem. 32), are irrelevant because Terry's FARA violation — that is, her failure to register — continued throughout those purported gaps.

But even if the Court adopts the holding of the panel majority in *McGoff*, Count Two is not duplicitous. In both *McGoff* and *Wynn*, the agency relationship terminated years before the cases

27

were brought.  *See McGoff*, 831 F.2d at 1072 (criminal information filed seven years after agency relationship ended); *Wynn I*, 636 F. Supp. 3d at 100–01 (civil enforcement action brought five years after agency relationship ended).  Here, by contrast, "the last day" that Terry "act[ed] as an agent of a foreign principal," *McGoff*, 831 F.2d at 1096, was in June 2023.  (*See* Ind. ¶¶ 53–59).  Terry assumes that each of the purported "gaps of time" in the narrative portion of the Indictment terminated her relationship with the ROK Government, such that she effectively ended and then restarted a new "period[] . . . of possible FARA activity."  (Mem. 32).  But there is no requirement — in agency law, criminal law, or the FARA context — that an agent perform work for a principal every single minute of every day in order for the agency relationship to endure.  *See* 3 Am. Jur. 2d Agency § 25 ("When once shown to have existed, an agency relationship will be presumed to have continued in the absence of anything to show its termination.").  As the Supreme Court observed more than a century ago in the context of conspiracy, a defendant, "[h]aving joined in an unlawful scheme, having constituted agents for its performance," the law will presume the "scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose." *Hyde v. United States*, 225 U.S. 347, 369 (1912).  Accordingly, even under *McGoff*, Terry's FARA violation continued throughout the period charged in Count Two.

If the Court does not reject Terry's duplicity motion on the ground that FARA is a continuing offense, it should deny the motion as premature.  Count Two is not duplicitous on its face because it alleges that Terry violated FARA "[f]rom at least in or about 2013 to at least in or about June 2023."  (Ind. ¶ 66).  The existence and duration of any supposed "gaps" of unregistered activity in that period — whatever their legal significance — is a question of fact.  *Cf. Ohle*, 678 F. Supp. at 222 ("If the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury.").

28

Put differently, whether Terry engaged in a single or multiple schemes to violate FARA, or whether she violated FARA during one period or three, cannot be determined by the Court without a full evidentiary record.   Because "a jury could find some set of facts" demonstrating that Terry violated FARA through the charged period of 2013 to June 2023,[12] "dismissal on duplicity grounds [would be] unjustified" at this stage.  *Rajaratnam*, 736 F. Supp. 2d at 689.

### F.    Count One (Conspiracy to Violate FARA) Is Neither Duplicitous Nor Otherwise Deficient

Recycling the preceding argument, Terry cursorily argues that Count One is also "duplicitous in that it improperly joins any potential conspiracy between Dr. Terry and South Korean NIS with any potential conspiracy between Dr. Terry and South Korean MFA [Ministry of Foreign Affairs], thereby alleging multiple separate and distinct conspiracies in a single count." (Mem. 34).  This argument makes no sense:  Terry conspired to act as an agent of the ROK Government, (Ind. ¶ 63), and the ROK NIS and the ROK MFA are both arms of the ROK Government.  It plainly follows that Terry, the ROK NIS officials, and the ROK MFA officials "agreed to participate in what [each] knew to be a collective venture directed toward a common goal." *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008).  Terry complains that "there is not a single allegation that the NIS officers ever interacted with the MFA officials or communicated with each other about Dr. Terry," (Mem. 34), but "there is no requirement that each member of a conspiracy conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member," *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 78 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023).  And, in any

---

[12] Indeed, the fact that Terry transitioned NIS handlers when they completed their terms of diplomatic cover in the United States, (Ind. ¶ 27), strongly supports the inference that Terry continued her unregistered activities for the ROK Government throughout any purported "gaps."

event, "[w]hether the government has proved a single conspiracy or has instead proved multiple

other independent conspiracies is a question of fact for a properly instructed jury." *Aracri*, 968

F.2d at 1519.  "Applying this principle, courts in this district have denied pre-trial motions to

dismiss conspiracy counts as duplicitous." *United States v. Nachamie*, 101 F. Supp. 2d 134, 153

(S.D.N.Y. 2000).  The Court should do so here.

Finally, Terry argues that Count One fails to state an offense because "[t]here is no

allegation that . . . the NIS officers or the South Korean MFA officials . . . were ever aware of the

obligation for persons like Dr. Terry to disclose their status as foreign agents to the government,

let alone that they agreed that Dr. Terry should evade it."  (Mem. 33).  As discussed above, actual

knowledge of FARA is not required under the *Bryan* standard of willfulness.  But regardless of

the legal standard, the factual question of whether the conspirators had the requisite knowledge or

intent cannot be decided on a motion to dismiss.  *Wedd*, 993 F.3d at 121 ("At the indictment stage,

we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense.").  All

that is required to plead an offense is that the indictment "track the language of the statute charged

and state the time and place (in approximate terms) of the alleged crime."  *Stringer*, 730 F.3d at

124.  The charging language of Count One meets this standard, (Ind. ¶¶ 62–64), and so the motion

to dismiss must be denied.

## II.    <u>Terry Is Not Entitled to a Bill of Particulars</u>

Terry moves for a bill of particulars seeking:  (1) each of Terry's alleged acts that required

registration under FARA, and the Government's legal theory for each such act, and (2) the

identities of Terry's co-conspirators.  (Mem. 36, 39).  This information is either beyond the scope

of a bill of particulars or has already been provided in the Indictment and in the extensive discovery

produced in this case (including a substantial quantity of witness statements for anticipated

Government witnesses).  In addition, Terry will receive trial exhibits, a witness list, and additional

Jencks Act material reasonably in advance of trial. Terry is not entitled to a bill of particulars under well-established law, and her request should therefore be denied.

### A.    Applicable Law

Federal Rule of Criminal Procedure 7(f) authorizes the Court to direct the Government to file a bill of particulars. A bill of particulars is not, however, a "discovery device and should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense." *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010). Rather, the sole purpose of a bill of particulars is to furnish facts that are necessary to apprise a defendant of the charges against her with sufficient precision to (i) enable her to prepare her defense, (ii) avoid unfair surprise at trial, and (iii) preclude a second prosecution for the same offense. *See Wong Tai v. United States*, 273 U.S. 77, 80–82 (1927); *United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010).

"A bill of particulars is required only where the charges . . . are so general that they do not advise the defendant of the specific acts of which he is accused." *Caban*, 2017 WL 4990653, at *3. Furthermore, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Walsh*, 194 F.3d at 47. "The crucial question is whether the information sought is *necessary*, not whether it is *helpful*." *United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y. 1994).

### B.    Discussion

Terry moves to compel the Government, in the form of a bill of particulars, to provide detailed information to which she is not entitled concerning the ways in which the Government intends to prove its case. Terry, like every defendant, is entitled to sufficient information to understand the charges against her, to prepare a defense, and to protect against double jeopardy. The Government has already provided that information, and much more, in the 31-page Indictment

alleging 16 overt acts, and in the extensive and organized discovery, which includes, among other materials, at least ten search warrant affidavits; voluminous FBI reports and records; recorded phone calls and other conversations featuring or otherwise discussing Terry; electronic data, including emails and documents obtained from Terry's prior employers, and extractions of Terry's electronic devices and iCloud account; and surveillance photographs and videos.

Courts routinely deny motions for bills of particulars where, as here, the charging instrument is a speaking indictment. *See, e.g.*, *United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446, at *6 (S.D.N.Y. Apr. 14, 2020) (finding "no basis for a bill of particulars" where "[t]he charges against the defendants are explained in detail in a lengthy speaking indictment, and the charges track the language of the applicable statutes while stating the time and place in approximate terms of the charged conspiracy"); *accord, e.g.*, *United States v. Shkreli*, No. 15 Cr. 637 (KAM), 2016 WL 8711065, at *5 (E.D.N.Y. Dec. 16, 2016); *United States v. Wedd*, No. 15 Cr. 616 (KBF), 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016).  The Government's production of voluminous and itemized discovery is another reason to deny Terry's motion for a bill of particulars. *See, e.g.*, *United States v. Lobo*, No. 15 Cr. 174 (LGS), 2017 WL 1102660, at *2 (S.D.N.Y. Mar. 22, 2017); *Law*, 2017 WL 1435746, at *2–3; *United States v. Heatley*, 994 F. Supp. 483, 488 (S.D.N.Y. 1998).

It is well established that the "law does not impose upon the government an obligation to preview its case or expose its legal theory," *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and consistent with that principle, "courts generally deny requests for bills of particulars concerning the wheres, when, and with whoms of the crime." *United States v. Perryman*, 881 F. Supp. 2d 427, 430 (E.D.N.Y. 2012); *accord United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003).  Still, Terry seeks granular particularity as to which of her

actions violate which qualifying activities requiring registration under FARA, and she leans heavily on *United States v. Concord Management & Consulting LLC*, 385 F. Supp. 3d 69 (D.D.C. 2019) to do so.  (Mem. at 36–37).

*Concord Management* is inapposite.  There, sixteen defendants, three of which were Russian corporate entities (including the movant Concord Management), were charged in an eight-count indictment alleging, among other charges, a *Klein* conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  *See* Indictment, No. 18 Cr. 32 (DLF), Dkt. 1 (D.D.C. Feb. 16, 2018).  Unlike here, those defendants were neither charged with a substantive violation of FARA nor a conspiracy to violate FARA.  *Id.*  Rather, FARA was relevant insofar as the object of the *Klein* conspiracy was to impair, obstruct, and defeat "the lawful functions of the Federal Election Commission, the U.S. Department of Justice, and the U.S. Department of State in administering federal requirements for disclosure of foreign involvement in certain domestic activities," and the Department of Justice administers FARA.  *Id.* ¶¶ 9, 26.

In ordering the Government to provide only some of the defendant's numerous requested particulars, the court highlighted a number of unique circumstances, none of which exist in this case.  Those circumstances included:  (1) the case involved three "foreign corporate defendants," one of which employed hundreds of people in support of the conspiratorial objective; (2) the conspiracy targeted three separate U.S. agencies; (3) the conspiracy "was carried out largely on foreign soil by at least thirteen individuals who are beyond the jurisdiction" of the court; (4) the court "restricted access to the vast majority" of the discovery at the Government's request; (5) as Russian nationals, the defendants may have "had no duty to disclose" their "Russian identities and affiliations" under FARA "in the first place," and as such, "the specific laws — and underlying conduct — that triggered such a duty are critical"; and (6) "the indictment does not cite the specific

statutory and regulatory disclosure requirements that the defendants violated." *Concord Management*, 385 F. Supp. 3d at 75, 78.  Indeed, the FARA statute was cited nowhere in the indictment, and FARA itself was referenced in just one of the indictment's paragraphs.

This case is far simpler.  Terry is charged only with substantive and conspiratorial violations of FARA, and the relevant statutes are cited in the Indictment.  She is a U.S. citizen, not a foreign entity.  She has no co-defendants.  And she and her counsel have had full access to the discovery in this case.  Simply stated, the unique and complicating facts of *Concord Management* are not present here.  Terry's motion for a bill of particulars identifying the Government's "legal theories" and precise "manner in which it will attempt to prove the charges," *Rittweger*, 259 F. Supp. 2d at 291, is far beyond the scope of a bill of particulars and should be denied.

Terry also moves for a bill of particulars identifying each of her co-conspirators by name. (Mem. 39).  This too should be denied.  "It is well-established that the Government is not required to disclose the identities or statements of co-conspirators."  *United States v. Helbrans*, 547 F. Supp. 3d 409, 438 (S.D.N.Y. 2021); *see also United States v. Rivera*, No. 16 Cr. 175 (LGS), 2017 WL 1843302, at *3 (S.D.N.Y. May 8, 2017).

The discovery and the detailed Indictment — which include, among other things, the names of Terry's ROK NIS handlers described in the Indictment — easily satisfy the requirement that the defendant have adequate notice of the charges and the evidence to enable her to prepare for trial and avoid unfair surprise.  Further, the Government will follow its customary practice of marking and producing trial exhibits in advance of trial, which will serve as another safeguard ensuring that the defendant has an adequate opportunity to prepare her defense.  *See United States v. Rigas*, 258 F. Supp. 2d 299, 305–06 (S.D.N.Y. 2003) (pretrial disclosure of trial exhibits can be

factor supporting denial of request for bill of particulars).  Terry's motion for a bill of particulars should therefore be denied.

## III.    Terry's Statements to Law Enforcement Should Not Be Suppressed

Terry seeks suppression of inculpatory statements she made during a voluntary interview with FBI agents, including her admission that she was a "source" for the ROK NIS.  (Ind. ¶ 53).  In support of her claim that she was in custody during the interview, Terry filed a declaration containing numerous self-serving falsehoods.  As detailed below, the FBI's reports, drafted by the three agents present at the interview shortly thereafter, confirm that the interview was voluntary and non-custodial.  Indeed, at one point in the interview (as discussed below), Terry mocked one of the FBI agents for repeatedly reminding her that the interview was voluntary, declaring that the agent's spouse must be annoyed by his repetitive nature.  No hearing is required because even accepting *arguendo* Terry's statements as true, her allegations, coupled with the undisputed facts and relevant case law, show that she participated in a non-custodial interview.  Suppression therefore is not warranted.

### A.    The Non-Custodial Interview

As detailed in the FBI's reports totaling 37 pages (the "Reports"), three FBI agents (the "Agents") — who wore business suits and had their firearms concealed — conducted a voluntary interview of Terry at her home, at a nearby hotel, and at a nearby café (the "Interview").[13]

---

[13] The FBI reports are attached hereto as Exhibits A, B, and C.  Exhibit A covers the portions of the Interview at the defendant's home and at the hotel.  Exhibit B covers the portion of the Interview during the walk from the hotel back to the defendant's apartment and was written by only one FBI agent because the others were not within hearing distance of the defendant during this walk.  Exhibit C covers the portion of the Interview at the café and was drafted by the three agents present, one of whom is a different agent than was present during the Exhibit A portion of the Interview.

At approximately 8:40 a.m., Terry gave permission for the Agents to enter her home and directed the Agents to sit at her dining room table. (Ex. A at 1). The Agents identified themselves and informed Terry that the Interview was voluntary and that she was free to instruct the Agents to leave her home at any time. (*Id.*). After answering many of the Agents' questions concerning Terry's contacts with intelligence officers from the ROK NIS, Terry asked the Agents if she needed a lawyer or if she was in trouble. (*Id.* at 6). The Agents told Terry that they were conducting a counterintelligence investigation and could not give Terry advice on seeking a lawyer. (*Id.*). Terry continued speaking with the Agents.

After some time, the Agents asked Terry if her partner would be returning home soon, and Terry said he would be home "any minute." (*Id.* at 7). The Agents offered to continue interviewing Terry at a nearby hotel suite and said that continuing the Interview was voluntary. (*Id.*). Terry said that she was concerned with how to explain to her partner why the FBI was in their home and why she was leaving with the Agents, and she asked the Agents for suggestions on what to tell her partner. (*Id.*). After conferring with the Agents, Terry said that she would tell her partner that the FBI needed her for a national security matter related to being hacked by North Korea (the "North Korea Ruse"). (*Id.*). She agreed to continue the Interview at the hotel and changed clothes. (*Id.*).

While Terry changed clothes, her partner and three New York City Police Department ("NYPD") officers wearing NYPD jackets, without firearms displayed, entered the apartment. (*Id.*). The Agents identified themselves and showed their credentials to Terry's partner. (*Id.* at 8). Terry conveyed the North Korea Ruse to her partner and said that she would be leaving with the Agents for an unspecified period of time. (*Id.*).

At approximately 9:42 a.m., Terry and the Agents left Terry's home and walked for approximately five minutes to the nearby hotel, engaging in small talk on the way.[14]  (*Id*.).  Upon arriving at the hotel suite, the Agents advised Terry that she was free to select her preferred seat within the suite, that the suite's door was unlocked, and that she was free to leave at any time. (*Id*.).  The Agents offered Terry coffee, water, and food.  (*Id*. at 9).  Terry refused food but requested water and a skim milk latte.  (*Id*.).  An Agent got Terry those beverages, as well as an almond croissant.  (*Id*.).

Terry informed the Agents that she had to attend a pre-scheduled Zoom meeting at 10:00 a.m.  (*Id*. at 10).  The Agents told Terry that she was free to conduct the Zoom meeting in the suite, and she did so until approximately 10:08 a.m.  (*Id*.).  Thereafter, Terry continued the Interview with the Agents.  (*Id*. at 10–11).

At approximately 11:55 a.m., following a ten-minute bathroom break, the Agents requested Terry's consent to search her phone, and she refused.  (*Id*. at 22).  The Agents reminded Terry that the Interview was voluntary and she was free to leave at any time.  (*Id*. at 22–23).  Terry chose to continue the Interview.  At one point, Terry offered to show the Agents her messages with NIS Handler-3 on the encrypted messaging application Signal, and the Agents photographed those messages on her phone.  (*Id*. at 26).  After some time, the Agents asked to review the Signal messages again, and Terry provided them with her unlocked phone.  (*Id*. at 28).  At that point, the Agents provided Terry with a warrant to search her person, including her phone.  (*Id*.).  Terry asked again if she needed a lawyer, and the Agents advised that they could not answer this question

---

[14] After leaving Terry's apartment, NYPD officers were not observable for the rest of the Interview.  (*Id*. at 8).

or give her legal advice on seeking a lawyer. (*Id.*). The Agents asked for Terry's phone passcode, and she provided it. (*Id.*). The Interview continued.

The Agents asked for Terry's consent to search her apartment, and she consented. (*Id.* at 29). Terry asked the Agents for a plausible excuse as to why the FBI needed to search her apartment because her partner did not know about her relationship with NIS Handler-3. (*Id.*). Terry called her son, and then her partner, on speakerphone. (*Id.*). Terry told her partner to immediately vacate the apartment because the FBI needed to sweep it for a "bug." (*Id.*).

At approximately 1:30 p.m., Terry walked the Agents back to her apartment, opened the door for them, and escorted them around. (*Id.*). Terry placed a desktop computer, two laptops, and an iPad on her desk; connected them to a power supply; and wrote their passwords on a sticky note. (*Id.* at 30). Terry retrieved from her closets the designer bags and jacket gifted to her or otherwise funded by NIS Handler-2 and NIS Handler-3. (*Id.*). Terry left the Agents at her apartment and departed to meet her partner at a store at approximately 1:50 p.m. (*Id.*).

At approximately 7:05 p.m., Terry met the Agents at the outdoor seating area of a café near her apartment to continue the Interview. (Ex. C at 1). The agents again reminded Terry that the Interview was voluntary and that she was free to leave at any time. (*Id.*). Terry confirmed that she understood. (*Id.*). At some point, the café closed, and Terry agreed to continue the Interview in the lobby of a hotel down the street. (*Id.* at 4). An Agent told Terry that the Interview continued to be voluntary and that she was free to leave at any time. (*Id.*). Terry mimicked that Agent's manner of speech and said that she knew the Interview was voluntary. (*Id.*). Terry further told the Agent that the Agent need not be so repetitive, and that the Agent's spouse must be frustrated with the Agent's tendency to be repetitive. (*Id.*). Terry continued speaking with the Agents until the Interview concluded that evening.

### B.    Applicable Law

"It is settled that a prosecution may not use incriminating statements obtained from a defendant during a custodial interrogation unless it demonstrates that, prior to any questioning, the defendant was" given a *Miranda* warning, *i.e.*, that he was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *United States v. Mitchell*, 966 F.2d 92, 97–98 (2d Cir. 1992); *see Miranda v. Arizona*, 384 U.S. 436 (1966). "*Miranda* warnings are not required, however, when the defendant is not in custody." *Mitchell*, 966 F.2d at 98; *cf. Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("It is settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest").

"The test used in determining whether a defendant was in custody is an objective one." *Mitchell*, 966 F.2d at 98; *see Stansbury v. California*, 511 U.S. 318, 323 (1994). The central issue is whether, under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 663–65 (2004). In making that determination, courts may consider, among other factors: (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; (6) "whether officers told the suspect he was free to leave or under suspicion"; and (7) whether law enforcement "confiscated [the defendant's] travel documents." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). "To look only at any single factor would be inconsistent with *Miranda*'s role as a protection against coercion," because the *Miranda* "rule exists to temper the 'potentiality for compulsion' that exists when an individual is 'cut off from the outside world' and subjected to 'incommunicado interrogation . . . in a police-dominated

atmosphere.'" *Id.* at 154 (quoting *Miranda*, 384 U.S. at 457, 445).  "Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not custodial unless the authorities affirmatively convey the message that the defendant is not free to leave."  *Mitchell*, 966 F.2d at 98 (collecting cases).

### C.    Discussion

As evidenced by the lengthy and detailed Reports drafted shortly after the Interview, Terry's declaration (the "Declaration" or "Decl.") contains numerous misrepresentations and omissions about the Interview.  Nevertheless, even accepting all of Terry's allegations as true — which they are not — any reasonable person in her position would have known that she was not under arrest and was free to leave.[15]  And the undisputed facts — including that the FBI never displayed weapons, arrested, or handcuffed Terry — weigh heavily against a finding of custody.  Accordingly, there is no basis to suppress her statements, and the Court can and should deny Terry's motion without a hearing.  *See, e.g.*, *United States v. Raphael*, No. 24 Cr. 339 (LGS), 2024 WL 4691024, at *2–3 (S.D.N.Y. Nov. 6, 2024) (denying evidentiary hearing where defendant did not raise a contested issue of "material fact" that "would change the outcome of this motion").

---

[15] Despite characterizing the Interview as "coercive," (Mem. 39, 45), Terry makes no claim that her statements to the FBI were involuntary.  Nor could she.  *See, e.g.*, *Diaz v. Senkowski*, 76 F.3d 61, 62–66 (2d Cir. 1996) (statements voluntary where defendant was interrogated for four hours and there was no evidence that he was denied food, bathroom access, or sleep and he was not beaten, otherwise abused, or handcuffed); *Herrera v. Capra*, No. 19 Civ. 5321 (LGS), 2020 WL 6263635, at * (S.D.N.Y. Oct. 23, 2020) (statements voluntary where defendant was questioned for 17 hours beginning at 10:50 p.m. in a police precinct, but had several two-hour intervals when he was alone and could have slept).

In her motion, Terry relies on eleven assertions[16] to claim that she was subject to a custodial interrogation. None of them, taken alone or in totality, warrant a hearing let alone suppression.

*First*, Terry claims that the Agents rang her doorbell at 8:40 a.m. when she was home alone, displayed their credentials, asked to come inside to speak with her, and she then let them inside her home. (Decl. ¶ 3). Terry alleges that the Agents "ordered" her to sit down at her dining room table and told her that they "needed to talk" to her. (Decl. ¶¶ 4, 6). Communicating a purported order to sit, and the need to talk, in an interviewee's own home does not render the Interview custodial under Second Circuit law. Compare these assertions, for example, to those in a case where the Second Circuit found there was no custodial interrogation when the defendant was pushed against the wall by nine federal agents in his home and temporarily handcuffed during an "extreme panic attack." *United States v. Familetti*, 878 F.3d 53, 56, 60–62 (2d Cir. 2017). That is because in the absence of a formal arrest, "courts rarely conclude . . . that a suspect questioned in her own home is in custody" for *Miranda* purposes. *United States v. Faux*, 828 F.3d 130, 135–36 (2d Cir. 2016) (despite presence of over a dozen agents, defendant was not in custody when "questioned in the familiar surroundings of her home . . . seated at her own dining room table"); *see also Beckwith v. United States*, 425 U.S. 341, 345–47 (1976) (no *Miranda* warnings required where interview was conducted at 8:00 a.m. at dining room table in private home); *Mitchell*, 966 F.2d at 98–99 (no *Miranda* warnings required where defendant invited agents into his home and was "cooperative," and there was no speech or action that could reasonably be taken as "intimidating, coercive, or restricting [defendant's] freedom of action"); *United States v. Badmus*, 325 F.3d 133, 138–39 (2d Cir. 2003) (no *Miranda* warnings required because, although defendant

---

[16] The Government has disputed, below the line, a number of Terry's allegations. That is no concession as to any of her other allegations, which, solely for the purposes of this argument, the Government takes as true.

was asked to stay seated in his living room during execution of a search, interview was conducted in his home and agents repeatedly told him he was not under arrest).

*Second*, Terry alleges that when she let the Agents into her apartment, she was in her "pajamas and was not even wearing a bra," and that the Agents did not permit her to change clothes. (Decl. ¶ 4). That Terry spoke to the Agents while wearing the same clothing she chose to wear when she opened the door to her apartment is not material to whether the Interview was custodial. *See United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) ("The fact that [the defendant] was in his home also renders less significant, for purposes of determining his custodial status, that he was in his underwear while detained. This was simply how [the defendant] had presented himself when he answered the officers' knock at the apartment door."); *United States v. Pichardo*, No. 92 Cr. 354 (RPP), 1992 WL 249964, at *6–7 (S.D.N.Y. Sept. 22, 1992) (no custody when male suspect wearing only bikini underwear was initially forced to the floor at gunpoint, then questioned a few minutes later). The facts here paint decidedly less custodial circumstances than those present in *Newton* and *Pichardo*, and, unlike the defendants in those cases, Terry was *not* questioned while wearing only her underwear.

*Third*, Terry claims that when the Agents "finally" allowed her to change out of her pajamas and put on a bra, the "female agent" accompanied her to her bedroom and watched her change. (Decl. ¶ 11). Terry does not allege that she was questioned while she was changing. In the context of an arrest — which this was not — "[t]he Second Circuit has long recognized that an arresting officer has a duty to ensure that an arrestee is sufficiently dressed before removing her from her residence." *United States v. Rudaj*, 390 F. Supp. 2d 395, 401 (S.D.N.Y. 2005)). However, agents have "no duty to let [a defendant] or his family go . . . unaccompanied to get the clothing." *Id*. at 402. To the contrary, law enforcement is "constitutionally permitted to, and

indeed foolish not to, accompany whoever went [to get the clothing] to ensure that she did not destroy evidence while there or return . . . with a weapon." *Id*. Although Terry was not in custody, the same logic applies here. Nothing about the female agent's presence when Terry changed is improper; nor did this routine law enforcement step somehow convert a voluntary Interview into a custodial interrogation.

*Fourth*, Terry claims that she asked the Agents if they were investigating her and if she needed a lawyer, that the Agents did not answer the question about whether she needed a lawyer, but that they told her they were conducting a counterintelligence operation. (Decl. ¶¶ 6, 23). Even when a suspect is in custody — and Terry was not — law enforcement has no obligation to cease questioning when the interviewee says he "*might* want a lawyer." *Davis v. United States*, 512 U.S. 452, 462 (1994) ("Maybe I should talk to a lawyer" was not a request for counsel); *see also Diaz*, 76 F.3d at 63, 65–66 ("Do you think I need a lawyer?" was not an assertion of right to counsel). "Unless the suspect actually requests an attorney, questioning may continue." *Davis*, 512 U.S. at 462. Notably, Terry makes no claim that her Sixth Amendment right to counsel was violated in any way, and she cites no authority for the proposition that the Agents' lack of response to her question about whether she needed a lawyer is even relevant to — much less demonstrative of — whether an interview is custodial.

*Fifth*, Terry alleges that after an hour of questioning, the Agents "forcefully insisted" that she "had to leave [her] apartment right away and go with them to a hotel room that they had reserved."[17] (Decl. ¶ 9). The Agents' so-called forceful insistence, without more, that Terry

---

[17] To the contrary, the Reports reflect that after Terry told the Agents that her partner would be home "any minute," the Agents offered to continue the Interview at a nearby hotel and again reminded Terry that continuing the Interview was voluntary. (Ex. A at 7). Nevertheless, even accepting as true Terry's account of the Interview, it was not custodial.

continue the Interview in a new location — especially one that was not a police station or other area within law enforcement control — did not transform a voluntary interview into a custodial one.  *See, e.g.*, *Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989) (defendant not in custody where law enforcement "ordered" him into a hotel elevator but did not "physically or verbally indicate[] . . . that he was not free to leave"); *United States v. Mussaleen*, 35 F.3d 692, 697 (2d Cir. 1994) (defendant not in custody when he left his house with detectives and went to a police station at their request); *United States v. Titemore*, 437 F.3d 251, 260 (2d Cir. 2006) ("easily" dispensing with *Miranda* claim after officer "asked [the defendant] to step outside to talk with him" because defendant was never placed under arrest or restrained in any way); *United States v. Wilson*, 901 F. Supp. 172, 174–75 (S.D.N.Y. 1995) (interview "conducted during ordinary business hours in a commercial, as opposed to government, premises" was not custodial); *United States v. Sawinski*, No. 00 Cr. 49 (RPP), 2000 WL 1357491, at *4 (S.D.N.Y. Sept. 20, 2000) (interview was non-custodial because, among other reasons, defendant was allowed to "walk alongside" law enforcement to location of interview).

Terry cites *United States v. Tartaglione*, No. 16 Cr. 832 (KMK), 2023 WL 2237903, at *16–18 (S.D.N.Y. Feb. 27, 2023) for the proposition that a suspect is in custody when investigators employ "a ruse to compel defendant to leave his home and come out to the public road."  (Mem. 44).  The custodial interrogation in *Tartaglione* bears absolutely no resemblance to the Interview here.  In *Tartaglione*, police physically stepped between the defendant and his wife in order to cut off their communication; police asked the defendant to park his vehicle so that he would come out to the road; once the defendant exited his vehicle, four armed officers surrounded him and boxed him in; two officers patted down the defendant, asked if he had any weapons, and took both of his

cellphones; and police directed the defendant to get into their car, drove him to the station, and placed him in a small, windowless interview room. *Tartaglione*, 2023 WL 2237903, at \*16–17.

*Sixth*, Terry claims that before she left for the hotel with the Agents, she saw two "armed NYPD officers" in the doorway of her apartment.[18]  (Decl. ¶ 10).  But "the mere presence" of officers, "(two of whom were positioned well in the background) — unaccompanied by any coercive tactics or objectively intimidating behavior — cannot reasonably be depicted as so overwhelming in itself as to have overborne [a defendant's] volition." *United States v. Rogers*, No. 99 Cr. 710 (CM), 2000 WL 101235, at \*11 (S.D.N.Y. Jan. 27, 2000); *see also Badmus*, 325 F.3d at 139 (defendant not in custody notwithstanding "that the agents did have (holstered) guns, which may have been visible").

*Seventh*, Terry alleges that once she arrived at the hotel, the Agents "never told her directly that she could leave the hotel."[19]  (Mem. 44).  "For an interviewee to feel free to leave, however, there is no requirement that an officer affirmatively advise him that he is free to leave or terminate the interview."  *United States v. Peterson*, 100 F.3d 7,10 (2d Cir. 1996); *see also Gardiner v. Incorp. Vill. of Endicott*, 50 F.3d 151, 155 (2d Cir. 1995); *cf. Mitchell*, 966 F.2d at 98.

*Eighth*, and relatedly, Terry acknowledges that the Agents permitted her to take a 10:00 a.m. Zoom work call during the Interview but alleges the Agents "told [her] [she] could not leave

---

[18] The Reports reflect that the NYPD officers did not have their firearms displayed.  (Ex. A at 7).  Terry says she "*later learned*" that the NYPD officers intercepted her partner in the lobby of their building and "attempted to prevent him from entering his own apartment," (Decl. ¶ 10 (emphasis added)), but these allegations — even if true — are entirely immaterial to whether a reasonable person in Terry's position would have felt free to terminate the Interview, since Terry did not know these purported facts at the time she elected to continue the Interview.

[19] This is false.  As reflected in the Reports, upon arriving at the hotel, the Agents advised Terry that she could choose her own seat within the hotel suite, that the door was unlocked, and that she was free to leave at any time.  (Ex. A at 8).  Nevertheless, even assuming Terry's allegations are true here, the law makes clear that what she describes does not amount to a custodial interrogation.

the room and made [her] conduct the Zoom call in front of them while they listened." (Decl. ¶ 14).

"[T]here is no absolute constitutional right to a telephone call during police questioning, even after

an arrest (which did not occur here)." *United States v. Schaefer*, 859 F. Supp. 2d 397, 408

(E.D.N.Y. 2012). The fact that Terry was able to join a work-related Zoom call during her

Interview is itself illustrative of the fact that she was not in custody and that her freedoms clearly

were not "curtailed to a degree associated with formal arrest." *Berkemer*, 468 U.S. at 440. That

the Agents purportedly asked Terry to take the Zoom call in the hotel suite in their presence was

not a directive that she could not leave, but rather, was a statement that if she wished to make a

Zoom call in the middle of the Interview, the Agents would remain present. There are "valid law

enforcement reasons, including safety concerns, for not allowing an interviewee to make phone

calls to unknown individuals during an interview." *Schaefer*, 859 F. Supp. 2d at 408. Here, those

valid law enforcement reasons included the fact that the Agents had a judicially authorized warrant

to search the phone that Terry was going to use for the Zoom call. To let the phone out of the

Agents' sight would have given Terry the opportunity to delete its contents and destroy evidence.

*Ninth*, while arguing that the Agents "clearly and intentionally cut Dr. Terry off from her

family and prevented her from communicating freely," Terry concedes that the Agents permitted

her to call her son and her partner when she asked to do so, albeit using speakerphone. (Mem. 45;

Decl. ¶ 24). That Terry made phone calls during the Interview undercuts her claim of being in

custody. *See, e.g.*, *United States v. Belcher*, No. 96 Cr. 789 (BSJ), 1997 WL 35495, at *2

(S.D.N.Y. Jan. 29, 1997) (defendant's ability "to make numerous phone calls" was indicative of

lack of custody); *United States v. Alexander*, No. 16 Cr. 141 (CR), 2018 WL 1891307, at *6 (D.

Vt. Apr. 19, 2018) (similar). And, as with the Zoom call, the use of speakerphone does not

transform the Interview into a custodial interrogation. Rather, the Agents were preparing to search

Terry's apartment and had valid law enforcement reasons — including officer safety and preventing the destruction of evidence — for listening to Terry's calls with her family members who had access to that apartment.  In straining to frame speakerphone calls as "extreme measures to ensure Dr. Terry was within the agents' control," Terry points to *Tartaglione* and *United States v. Butt*, No. 18 Cr. 87 (NSR), 2019 WL 479117 (S.D.N.Y. Feb. 7, 2019), (Mem. 45), but like *Tartaglione*, *Butt* is inapposite.  There, the court found that a defendant was in custody where 16 law enforcement officers entered and immediately began spreading throughout his home to execute a search warrant; the defendant was separated from his wife and directed to the living room; and after officers located firearms, they jeered that they "hit the motherload" and gave each other high-fives.  *Butt*, 2019 WL 479117, at *13.  These facts bear no resemblance to the Interview here, where Terry was not cut off from the outside world in any way, but instead opted to accompany the Agents to a nearby hotel, told her partner she was fine and that he should not worry, and paused the Interview to speak with her colleagues on Zoom and her family by phone.

*Tenth*, Terry claims the "lead agent raised his voice with her on numerous occasions, appeared to be visibly angry with her, and threatened her career."[20]  (Mem. 44).  Even if this were true, it would not render the Interview a custodial interrogation.  *See, e.g.*, *Mitchell*, 966 F.2d at 98 (an "interview [that] grew heated at times" was not "reasonably" taken as restricting a suspect's freedom).  Terry also alleges that the Agents told her the Interview was "very important."  (Decl. ¶ 9).  Statements of this sort likewise do not indicate custody.  *See, e.g.*, *Rogers*, 2000 WL 101235,

---

[20] As reflected in the Reports, it was Terry, not the Agents, who raised her voice during the Interview.  (*See* Ex. A at 26 ("TERRY then yelled, 'OKAY FINE, SUE WAS A BAD GIRL.'"); Ex. C at 3 ("TERRY again became animated and raised her voice."); Ex. C at 4 ("TERRY snapped at Agents that she knew the interview was voluntary and mimicked Agent's manner of speech. TERRY stated that Agent need not be so repetitive and that Agent's spouse was likely frustrated with Agent's tendency to be repetitive.")).  Even so, accepting Terry's account as true, the Interview was not a custodial interrogation.

at *11 ("Police officers do not ordinarily solicit information from individuals with respect to investigative matters that they deem 'insignificant'" and if police characterization of the "significance" of an investigative inquiry "points to coercion, it would be difficult to envision any police-citizen encounter that would not cross the line into seizure").

*Finally*, Terry takes issue with the Interview lasting "more than five hours." (Mem. 44). But this is not dispositive of custody, either. *See, e.g.*, *United States v. Paracha*, No. 03 Cr. 1187 (SHS), 2004 WL 1900336, at *8 (S.D.N.Y. Aug. 24, 2004), *aff'd*, 313 Fed. App'x 347 (2d Cir.) (seven-hour overnight interview at FBI building was not custodial).

*   *   *

Terry strives mightily to characterize the Interview as a custodial interrogation, but much of her Declaration recites her subjective — and on this motion, irrelevant — interpretation of events: "I interpreted . . . ," (Decl. ¶ 4); "I felt . . . ," (*id*. ¶ 7); "I was frightened," (*id*. ¶ 11); ". . . I did not feel free to refuse," (*id*. ¶ 26); "I felt compelled . . . ," (*id*. ¶ 30); "Never once did I feel free . . . ," (*id*.). Whether a person is in custody for purposes of *Miranda* "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323; *see also Newton*, 369 F.3d at 671 ("The test for custody is an objective one"); *United States v. Lifshitz*, No. 03 Cr. 572 (LAP), 2004 WL 2072468, at *7 n.9 (S.D.N.Y. Sept. 15, 2004) ("[T]he defendant's subjective intent is not relevant here.").

The objective — and undisputed — circumstances of the Interview make clear that it was not a custodial one, and that a reasonable person in Terry's position would have felt at liberty to terminate it. Terry was not placed under arrest; she was not handcuffed or physically restrained in any way; she was not patted down; she was not separated from her electronic devices; she was not

48

prevented from communicating with the outside world; she was not transported anywhere in a law enforcement vehicle; she was not interviewed in a police station; her travel documents were not confiscated; she was not surrounded by a large number of law enforcement officers; and law enforcement never drew their weapons. *See, e.g.*, *Titemore*, 437 F.3d at 260 ("[The defendant], however, was never placed under arrest, nor restrained in any way."); *United States v. Santillan*, 902 F.3d 49, 61 (2d Cir. 2018) (interview non-custodial where defendant was "never handcuffed" and officer "never . . . displayed a weapon"); *United States v. Whitehead*, 22 Cr. 692 (LGS), 2023 WL 3934667, at *3 (S.D.N.Y. June 9, 2023) (similar); *United States v. Palase*, No. 11 Cr. 413 (SLT), 2014 WL 6802560, at *7 (E.D.N.Y. Dec. 2, 2014) ("[T]he fact that the defendants were not arrested until one month later weighs heavily in favor of finding the interviews non-custodial."); *United States v. Soteriou*, No. 12 Cr. 39 (CR), 2012 WL 5426440, at *6 (D. Vt. Nov. 7, 2012) (similar).

To the contrary, by Terry's own account, she was interviewed by three[21] Agents with no visible firearms, first in her home, second at a nearby hotel, and third at a public café where she voluntarily met the Agents *more than four hours after she left them*. (Decl. ¶¶ 25–26). *See Paracha*, 2004 WL 1900336, at *8 (defendant's "willingness to continue the conversation . . . indicates that he did not experience a significant constraint on his freedom"). Terry describes how her partner was allowed to enter their apartment during the Interview and speak with her, asking her if she was okay and if she needed help, and Terry told him she was fine. (Decl. ¶¶ 10, 12). After walking to the hotel with the Agents, Terry joined a work-related Zoom meeting, called her son, and called her partner. (Decl. ¶¶ 13–14, 24). Indeed, every time Terry wanted to make a call,

---

[21] As noted above, one of the Agents present for the home and hotel portions of the Interview was replaced by a different agent for the café portion of the Interview.

she did so.  When the Agents searched her apartment, Terry freely went to a store.  (Decl. ¶ 25). Terry does not even assert that at any point she asked to terminate the Interview.  *See, e.g.*, *Faux*, 828 F.3d at 139 (no custody where defendant "did not seek to end the encounter, or to leave the house" during questioning); *Lifshitz*, 2004 WL 2072468, at *7 (no custody where defendant did not indicate he wanted to terminate the questioning); *cf. United States v. Romazko*, 253 F.3d 757, 760–61 (2d Cir. 2001) (defendant in custody where she asked to leave at least five times, but was told that she could not).  These facts are plainly inconsistent with the notion that Terry's freedom was so curtailed as to be akin to a "formal arrest."  *Berkemer*, 468 U.S. at 440.

The Court should deny Terry's motion to suppress without a hearing.

## CONCLUSION

For the foregoing reasons, Terry's pretrial motions should be denied.

Dated:  New York, New York
         March 19, 2025

                                        Respectfully submitted,

                                        MATTHEW PODOLSKY
                                        Acting United States Attorney


                             By:    ___s/_____
                                        Kyle A. Wirshba
                                        Samuel Adelsberg
                                        Alexander Li
                                        Chelsea L. Scism
                                        Assistant United States Attorneys
                                        212-637-2493 / -2494 / -2265 / -2105