UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 24 Cr. 427 (LGS) |
| v. | |
| SUE MI TERRY, | |
| Defendant. | |

**POST-HEARING MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT SUE MI TERRY'S MOTION TO SUPPRESS CERTAIN STATEMENTS**

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Kyle A. Wirshba
Samuel Adelsberg
Chelsea L. Scism
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

FACTS .............................................................................................................................. 1

    I.      The FBI Planned for a Voluntary Interview and Subsequent Search ........................... 2

    II.     The Defendant Invited the Interview Team Into Her Home ........................................ 3

    III.   The Defendant Agreed to Continue the Interview at a Hotel Suite .............................. 6

    IV.   The Defendant Asked to Change Her Clothes and Was Permitted to Do So .............. 7

    V.     Mr. Boot Returned to the Apartment ......................................................................... 8

    VI.   The Defendant and the Interview Team Left Her Apartment to Continue the
           Interview at the Hotel Suite ........................................................................................ 9

    VII.  The Defendant Joined a Work Zoom Call ............................................................... 11

    VIII. The Interview Continued in the Hotel Suite ............................................................. 11

    IX.   The Defendant Consented to a Search of Her Apartment ........................................ 13

    X.     The Defendant Chose to Continue the Interview at a Third Location: LPQ ............. 14

    XI.   The Defendant Chose to Continue the Interview at a Fourth Location: a Hotel
           Lobby ......................................................................................................................... 14

ARGUMENT ................................................................................................................. 15

    I.      The Defendant Was Not in Custody ......................................................................... 15

           A.      Applicable Law ............................................................................................. 15

           B.      Discussion ..................................................................................................... 16

    II.     The Defendant's Will Was Not Overborne .............................................................. 36

           A.      Applicable Law ............................................................................................. 36

            B.      Discussion ..................................................................................................... 37

CONCLUSION ............................................................................................................... 43

## TABLE OF AUTHORITIES

*Beckwith v. United States*, 425 U.S. 341 (1976) .......................................................... 18

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ................................................... 15, 20, 35

*Brady v. Maryland,* 373 U.S. 83 (1963) ........................................................... 22

*Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989) ............................................ 17, 25

*Diaz v. Senkowski*, 76 F.3d 61 (2d Cir. 1996).................................................... 38

*Frazier v. Cupp*, 394 U.S. 731 (1969) ............................................................. 22

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) ................................................... 22

*Herrera v. Capra*, No. 19 Civ. 5321 (LGS), 2020 WL 6263635 (S.D.N.Y. 2020)..................... 39

*Hopkins v. Cockrell*, 325 F.3d 579 (5th Cir. 2003) ............................................ 42

*Miranda v. Arizona,* 384 U.S. 436 (1966) ................................................... passim

*Stansbury v. California*, 511 U.S. 318 (1994) ................................................. 15

*United States v. Alexander*, No. 16 Cr. 141 (CR), 2018 WL 1891307 (D. Vt. 2018) ................ 28

*United States v. Al-Marri,* 230 F.Supp.2d 535 (S.D.N.Y. 2002)................................... 2

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991)....................................... 41, 42

*United States v. Austin*, 729 F. Supp. 3d 396 (S.D.N.Y. 2024) ................................. 25

*United States v. Badmus*, 325 F.3d 133 (2d Cir. 2003) ................................... 17, 18, 33

*United States v. Belcher*, No. 96 Cr. 789 (BSJ), 1997 WL 35495 (S.D.N.Y. 1997) .................. 27

*United States v. Butt*, No. 18 Cr. 87 (NSR), 2019 WL 479117 (S.D.N.Y. 2019)...................... 26

*United States v. Camacho*, 674 F. Supp. 118 (S.D.N.Y. 1987).................................. 34

*United States v. Capers*, 627 F.3d 470 (2d Cir. 2010)........................................ 20

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001)......................................... 22

*United States v. Corbett*, 750 F.3d 245 (2d Cir. 2014) ....................................... 37

*United States v. Cota,* 953 F.2d 753 (2d Cir. 1992)................................... 28, 30, 32, 33

*United States v. Duvall*, 537 F.2d 15 (2d Cir. 1976) ......................................... 42

*United States v. Familetti*, 878 F.3d 53 (2d Cir. 2017)................................................ 28, 30, 31, 32

*United States v. Faux*, 828 F.3d 130 (2d Cir. 2016) .............................................................. passim

*United States v. FNU LNU*, 653 F.3d 144 (2d Cir. 2011)............................................................ 16

*United States v. Haak*, 884 F.3d 400 (2d Cir. 2018)............................................................ 37, 40

*United States v. Hallford*, 280 F. Supp. 3d 170 (D.D.C. 2017) ...................................................... 29

*United States v. Kostin*, No. 24 Cr. 91 (GHW), 2025 WL 1504409 (S.D.N.Y. 2025)........... 20, 39

*United States v. Kourani*, 6 F.4th 345 (2d Cir. 2021)............................................................ 37, 38

*United States v. Levinson*, 790 F. Supp. 1477 (D. Nev. 1992) ...................................................... 34

*United States v. Major*, 912 F. Supp. 90 (S.D.N.Y. 1996) ........................................................ 39

*United States v. Male Juv.*, 121 F.3d 34 (2d Cir. 1997).................................................... 22, 40, 42

*United States v. Mastroianni*, No. 20cr.575 (PMH), 2022 WL 17404783 (S.D.N.Y. 2022). 28, 41

*United States v. Mitchell*, 966 F.2d 92 (2d Cir. 1992) .................................................. 15, 16, 18, 37

*United States v. Mussaleen*, 35 F.3d 692 (2d Cir. 1994) .............................................................. 25

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) ...................................................... 18, 21, 29

*United States v. Okwumabua*, 828 F.2d 950 (2d Cir. 1987) ........................................................ 38, 43

*United States v. Osman*, No. 23 Cr. 97 (MKB), 2024 WL 579716 (E.D.N.Y. 2024) .................... 6

*United States v. Paracha*, No. 03 Cr. 1197 (SHS), 2004 WL 1900336 (S.D.N.Y. 2004)........... 24

*United States v. Paulino*, No. 12 Cr. 799, 2013 WL 2237532 (S.D.N.Y. 2013) ........................... 2

*United States v. Peterson*, 100 F.3d 7 (2d Cir. 1996) ............................................................ 17

*United States v. Pichardo*, No. 92 Cr. 354 (RPP), 1992 WL 249964 (S.D.N.Y. 1992)......... 29, 33

*United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011)............................................................ 38

*United States v. Rakowski*, 714 F. Supp. 1324 (D. Vt. 1987) ...................................................... 19

*United States v. Rogers*, No. 99 Cr. 710 (CM), 2000 WL 101235 (S.D.N.Y. 2000) .................... 32

*United States v. Ross*, 719 F.2d 615 (2d Cir. 1983)........................................................ 30

*United States v. Ruggles*, 70 F.3d 262 (2d Cir. 1995) .............................................................. 38

*United States v. Rutledge*, 900 F.2d 1127 (7th Cir. 1990) .................................................. 22, 41, 43

*United States v. Sawinski*, No. 00 Cr. 49 (RPP), 2000 WL 1357491 (S.D.N.Y. 2000) ......... 26, 40

*United States v. Schaefer*, 859 F. Supp. 2d 397 (E.D.N.Y. 2012) .......................................... 19, 20

*United States v. Serlin*, 707 F.2d 953 (7th Cir. 1983) .................................................... 40

*United States v. Shvartsman*, 722 F. Supp. 3d 276 (S.D.N.Y. 2024). ......................................... 37

*United States v. Simmonds*, 641 Fed. App'x 99 (2d Cir. 2016) ........................................ 20

*United States v. Tartaglione*, No. 16 Cr. 832 (KMK), 2023 WL 2237903 (S.D.N.Y. 2023). 26, 27

*United States v. Titemore*, 437 F.3d 251 (2d Cir. 2006) ........................................... 25

*United States v. Vado*, 87 F. Supp. 3d 472 (S.D.N.Y. 2015) ........................................... 18

*United States v. Valerio*, 765 Fed. App'x 562 (2d Cir. 2019) ................................................. 18, 28

*United States v. Wang*, No. 21 Cr. 6108 (FPG), 2024 WL 2286257 (W.D.N.Y. 2024).............. 24

*United States v. Wang*, No. 23 Cr. 118-3 (AT), 2024 WL 1717998 (S.D.N.Y. 2024) ................... 2

*United States v. Wilson*, 901 F. Supp. 172 (S.D.N.Y. 1995) ........................................ 25

*United States v. Zerbo*, No. 98 CR. 1344 (SAS), 1999 WL 804129 (S.D.N.Y. 1999)............... 18

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) .................................................... 15, 21

## PRELIMINARY STATEMENT

The Government respectfully submits this post-hearing brief in opposition to defendant Sue Mi Terry's ("Dr. Terry" or "the defendant") motion to suppress statements the defendant made to law enforcement on June 5, 2023.[1] The defendant's motion falls far short of establishing that those statements were made while she was in custody or that her statements were coerced in violation of her due process rights. To the contrary, the Government's evidence at the hearing established that the defendant invited the interviewing agents into her home, was repeatedly advised that the interview was voluntary, agreed to accompany the agents to three different additional locations, was allowed to use her phone during the interview, and was provided food and beverages. In the face of that record, the defendant attempts to divert the Court's focus from the relevant standard—whether a reasonable person in her position would have believed they were in custody and made such statements voluntarily—and instead emphasizes portions of the record that are not material to the Court's analysis and do not warrant suppressing her statements. The defendant focuses on these distractions because the live testimony of two FBI agents directly contravenes her own perjurious affidavit. Once the focus returns, as it must, to the defendant, the evidence before the Court about what the defendant actually experienced proves that a reasonable person in the defendant's position would not have felt she was in custody during her voluntary interview and her will was not overborne.

## FACTS

Two Supervisory Special Agents ("SSA") testified at the January 28, 2026 hearing (the "Hearing"). SSA ███████ L ("Agent-L") and SSA ███████ C ("Agent-C

---

[1] The Government previously addressed some of the defendant's arguments in its opposition to the defendant's February 26, 2025 motion to suppress, and those arguments are incorporated by reference herein. (*See* Dkt. 52).

██████") of the Federal Bureau of Investigation ("FBI") testified as to their recollection of their voluntary interview with the defendant on June 5, 2023 (the "Interview"). Both testified consistently and truthfully. The defendant, who submitted an affidavit contradicted by the defendant's live testimony, did not testify. The Court should therefore afford greater weight to the live testimony of the agents, which is summarized below. *See, e.g.*, *United States v. Wang*, No. 23 Cr. 118-3 (AT), 2024 WL 1717998, at *4 (S.D.N.Y. Apr. 22, 2024) ("Courts give greater weight to witness testimony, which was subject to cross examination . . . even where an adversary has submitted an affidavit or declaration if the witness testimony is found to be credible."); *United States v. Paulino*, No. 12 Cr. 799, 2013 WL 2237532, at *4 (S.D.N.Y. May 21, 2013) (placing greater weight on live testimony of law enforcement witnesses than defendant's declaration); *United States v. Al-Marri*, 230 F.Supp.2d 535, 539 (S.D.N.Y. 2002) ("[T]his Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to [defendant's] version of the facts.").[2] The defendant elected not to call any witnesses.

## I. **The FBI Planned for a Voluntary Interview and Subsequent Search**

The FBI planned to conduct a "voluntary noncustodial interview" of the defendant. (Tr. 104:15-17 (Agent-C██████ Direct); Tr. 6:3-17 (Agent-L Direct)).[3] At the Hearing, Agent-C████████ described this type of interview as follows: "It means the individual is not under arrest, is not investigatively detained. It's voluntary. They are free to leave at any time. They can decline the interview right at the beginning. They can decline the interview at any point; they are free to do

---

[2] Unless otherwise specified, all quotations omit internal quotation marks, citations, ellipses, and prior alterations.

[3] "Tr." refers to the Hearing transcript.

so. It's voluntary." (Tr. 104:18-23 (Agent-C Direct)). In the event the defendant consented to the Interview, the FBI planned to execute a search of her apartment after the Interview concluded, either pursuant to the defendant's consent, or pursuant to previously obtained search warrants for her residence and person, to include electronic devices. (Tr. 106:8-13 (Agent-C Direct); Tr. 6:23-7:3 (Agent-L Direct)). In the event the defendant declined to participate in the Interview, the FBI planned to proceed directly to the execution of the search. (Tr. 106:8-13 (Agent-C Direct); Tr. 6:3-11, 7:4-10 (Agent-L Direct)).

## II.   The Defendant Invited the Interview Team Into Her Home

On June 5, 2023, at approximately 8:40 a.m., Agent-C    Agent-L    and Agent-Y ("the Interview Team") approached the defendant's door, each wearing a suit with no visible FBI markings, and each with no firearms visible on their person.[4] (Tr. 10:10-11:17 (Agent-L Direct)). Apart from the Interview Team, there were at most two additional FBI agents in the stairwell that could have been visible from the defendant's doorway, who likewise wore plainclothes without any visible FBI markings or visible firearms.[5] (Tr. 14:21-16:1 (Agent-L Direct); *see also* Tr. 113:10-13 (Agent-C Direct) (did not believe other members of law enforcement apart from Interview Team were visible from the front door of the defendant's apartment)).

The Interview Team knocked on the defendant's door, announced themselves as FBI agents, and displayed their credentials for the defendant's review. (Tr. 13:5-13, 14:6-13 (Agent-L Direct); Tr. 113:14-21 (Agent-C Direct)). Agent-C then asked if the defendant "would like to participate in an interview." (Tr. 14:14-20 (Agent-L Direct); *see also* Tr. 113:14-17

---

[4] Agent-L testified that it was possible that Agent-C concealed firearm left "an imprint on [his] suit jacket." (Tr. 56:22-57:4 (Agent-L Cross)).

[5] These agents were present to assist with executing the search in the event the defendant declined to be interviewed. (Tr. 16:21-17:7 (Agent-L Direct)).

(Agent-C    Direct) ("I knocked and introduced myself as FBI and [said] that we would like to speak privately.")). The Interview Team advised the defendant that only Agent-C        , Agent-L    and Agent-Y    would be conducting the Interview. (Tr. 16:2-7 (Agent-L Direct)). The defendant opened her door all the way and gestured for the agents to come into her apartment. (Tr. 113:18-21 (Agent-C    Direct); Tr. 16:8-10 (Agent-L Direct)). The defendant remarked that "she was still in her pajamas," asked how long the interview would take, and Agent-C        told her something like "not that long."[6] (Tr. 113:22-114:2 (Agent-C    Direct)). The defendant did not ask to change her clothing at that point. (Tr. 17:21-24 (Agent-L Direct)).

Rather, the defendant directed the Interview Team to sit at her dining room table—a location she chose—and the defendant sat in a seat she selected. (Tr. 19:16-18, 20:5-12, 21:7-8 (Agent-L Direct); Tr. 114:3-10 (Agent-C    Direct); GX 106, GX 107). Before asking any questions, the Interview Team advised the defendant that the Interview was voluntary. (Tr. 21:16-19 (Agent-L Direct)). Specifically:

> We said to Dr. Terry that the interview was voluntary, she was free
> to end it at any time, we were free to take a break, and although at
> that point I was sitting at her dining room table, although we are in

---

[6] The defendant cites DX 20 and DX 21 for her editorialized proposition that she was "dressed in revealing silk pajamas with a slit up the outer leg to her thigh and was not wearing a bra." (Br. 4). The defendant both mischaracterizes the pajamas pictured in DX 20 and DX 21 and proceeds as though the record reflects that this is in fact what she wore during the Interview. It does not. Agent-L testified that DX 20—a photo showing a woman in an oversized t-shirt and long pants— showed clothing that "appear[ed] to be very similar" to what Dr. Terry wore during the Interview. (Tr. 59:9-13 (Agent-L Direct)). When shown DX 21—a photograph depicting a pant leg with a slit to the calf, not the thigh—Agent-L confirmed that Dr. Terry wore "long pajamas" but was "not sure if these are exactly the same pajamas." (Tr. 59:16-21 (Agent-L Cross)). Agent-C was not even asked at the Hearing if the defendant wore the pajamas shown in DX 20 and DX 21. Agent-C        testified that he could not tell whether the defendant was wearing a bra, and Agent-L    was not asked this question. (Tr. 176:17-19 (Agent-C    Cross)). It is also not true that the defendant "immediately and explicitly noted to the agents her state of undress" when they entered her apartment. (Br. 4). Rather, the defendant stated she was in her pajamas and asked how long this would take. (Tr. 176:6-9 (Agent-C    Cross)). Even taking the defendant's word that she wore the outfit in DX 20—which is not in the record—that hardly qualifies as a "state of undress."

your residence, the door is right there and you could tell us to leave
at any time.

(Tr: 114:11-17 (Agent-C      Direct)). The Interview Team reminded the defendant about the

voluntary nature of the Interview approximately 20 times throughout the day. (Tr. 22:10-16 (Agent-L

Direct)). The defendant was also given a candor warning, explaining that 18 U.S.C. § 1001 makes

it a crime to lie to a federal officer, that any information the defendant provided "should be as

truthful and honest as possible," and that "if she was uncertain about the answer of a question, she

could stop at any time; it was just important that she was truthful." (Tr. 114:18-115:3 (Agent-C

Direct); Tr. 21:20-22:7 (Agent-L Direct)).

        At one point during the interview at her residence, the defendant asked if she needed a

lawyer. (Tr. 24:12-14 (Agent-L Direct)). The Interview Team advised the defendant that they "could

not provide legal guidance, but if she chose to seek and retain counsel, that was her decision."

(Tr. 24:14-17 (Agent-L Direct); Tr. 93:13-94:2 (Agent-L Cross) (recalls defendant being told "that if

she wanted a lawyer[,] she could have one"); *see also* Tr. 116:17-25, 133:8-24 (Agent-C      Direct);

Tr. 157:15-158:2 (Agent-C   Cross) ("I recall saying, We can't give you legal advice; this is a

counterintelligence investigation.")).[7] The defendant elected to continue the Interview and did not

request to speak with an attorney. (Tr. 24:23-25 (Agent-L Direct); 117:1-8 (Agent-C      Direct)).

---

[7] In her briefing, the defendant ignores the Hearing testimony about what the Interview Team told
her when she asked if she needed a lawyer and exclusively relies on the FBI's report of their
interview ("302"). (Br. 7). The defendant relies on the veracity of her cherry-picked parts of the
302, which she perceives to benefit her, and attacks the veracity of other parts of the 302, which
she claims are false and misleading. (*See, e.g.*, Def. Ex. A; Br. 3 n.2 ("Throughout this brief, we
tally . . . (ii) the material omissions from the 302 ('Omission #').").). The defendant cannot have it
both ways. The agents endeavored to make the 302 "as complete as possible," (Tr. 202:11-13
(Agent-C   Cross)), but as Agent-L      testified, the 302 did not document "every single thing
that happened in the [I]nterview," there were "things [she] remember[ed] that were not
documented," and she testified "based on her independent recollection of events." (Tr. 100:7-18
(Agent-L Redirect)). It is Agent-L      's and Agent-C         's live testimony of their recollection

(*continued on next page*)

III.    **The Defendant Agreed to Continue the Interview at a Hotel Suite**

Shortly thereafter, Agents ██████ and █ learned from FBI surveillance that the defendant's partner, Mr. Max Boot, was returning to the defendant's residence. (Tr. 117:15-18 (Agent-C Direct); GX 103 at 6-7). The agents then asked Dr. Terry if they should expect Mr. Boot's return to the residence any time soon, to which she replied that he would return "any minute." (Tr. 117:19-23 (Agent-C Direct); (Tr. 25:7-13 (Agent-L Direct)). At that point, the defendant became tense and concerned, the cadence of her voice picked up, and she glanced at the front door and her phone. (Tr. 25:14-21 (Agent-L Direct); Tr. 117:22-23 (Agent-C Direct)). The Interview Team then offered to continue the Interview with the defendant at a nearby hotel suite, and she was reminded again that the Interview was voluntary. (Tr. 25:22-26:10 (Agent-L Direct); Tr. 117:24-118:5 (Agent-C Direct)).[8]

The defendant asked what she should tell Mr. Boot about why the FBI was present. (Tr. 26:13-16 (Agent-L Direct); Tr. 118:6-9 (Agent-C Direct)). After soliciting ██████

---

of events that the Government relies on herein. *See, e.g.*, *Wang*, 2024 WL 1717998, at *4 ("Courts give greater weight to witness testimony, which was subject to cross examination . . . even where an adversary has submitted an affidavit or declaration if the witness testimony is found to be credible."); *United States v. Osman*, No. 23 Cr. 97 (MKB), 2024 WL 579716, at *6 (E.D.N.Y. Feb. 13, 2024) ("Consistent with other courts, the Court affords greater weight to the live testimony from the witnesses presented at the hearing and subjected to cross-examination.") (collecting cases).

[8] The defendant misleadingly claims that Agent-L testified that "Dr. Terry was 'advised that' (not asked if) the interview would continue at a second location." (Br. 11 (citing Tr. 28:4-7)). But Agent-L clearly testified that "We *offered* Dr. Terry, if she would like to continue the voluntary interview, that we had secured another location that was close by, in walking distance, *if she would like to* continue the conversation." (Tr. 25:22-26:1 (Agent-L Direct) (emphasis added)). Agent-L later used the shorthand term "advised" to refer to this offer she previously testified about when the Court asked Agent-L at what point in the Interview the defendant asked to change her clothes. (Tr. 28:4-7 (Agent-L Direct) ("Q: When during the interview was it that she mentioned changing her clothes? A: When we advised that we would go to the second location, which would be outside of her residence.")).

█Agent-C█'s help coming up with an excuse, the defendant decided to tell Mr. Boot that she was needed by the agents for a national security matter related to North Korea. (Tr. 26:21-24 (█Agent-L█ Direct); Tr. 118:10-17 (█Agent-C█ Direct)). At no point did the Interview Team indicate to the defendant that this was in fact the reason for the Interview, and at no point did the Interview Team direct the defendant to lie to her husband. (Tr. 26:17-20 (█Agent-L█ Direct) ("The interview team responded that we were there to speak to Dr. Terry, and she was free to tell him whatever she liked."); Tr. 26:25-27:5 (█Agent-L█ Direct); Tr. 118:18-20 (█Agent-C█ Direct)).

## IV.    **The Defendant Asked to Change Her Clothes and Was Permitted to Do So**

The defendant then asked, for the first time, if she could change her clothes. (Tr. 27:20-28:12 (█Agent-L█ Direct); (Tr. 118:21-119:2 (█Agent-C█ Direct)). The Interview Team said that was fine, and asked the defendant to leave her cell phone behind in the dining room when she went to change.[9] (Tr. 28:10-22 (█Agent-L█ Direct); Tr. 119:3-7 (█Agent-C█ Direct)). The defendant agreed to do so, asked the agents not to touch her phone, and the agents agreed, and did not do so. (Tr. 29:3-9 (█Agent-L█ Direct)). █Agent-L█ accompanied the defendant to change.[10] (Tr. 29:10-12 (█Agent-L█

---

[9] The purpose of this request was to prevent the destruction of any electronic evidence, which the FBI had a search warrant to seize. (Tr. 28:17-22 (█Agent-L█ Direct); Tr. 119:8-11 (█Agent-C█ Direct)).

[10] The defendant suggests that █Agent-L█'s justification for remaining with the defendant while the defendant changed was insufficient, citing only to █Agent-L█'s testimony about her experience during an arrest when a person concealed a knife that was not discovered until he was processed at the jail, (Br. 12 (citing Tr. 67:17-68:4)), and ignoring the testimony that █Agent-L█'s actions were consistent with standard FBI practice that protects both the agents and the individual, (*see, e.g.*, Tr. 29:13-30:6 (█Agent-L█ Direct) ("We have seen, when individuals are presented with information that may be negative, either to the reputation or relationships, that there is a possibility that they may try to harm themselves. So, again, in order to protect not only the agents in the residence, but Dr. Terry as well, I escorted her while she changed her clothing."); Tr. 119:12-25 (█Agent-C█ Direct) ("For agent safety, because we had not cleared the apartment, we didn't a hundred percent know if anyone else was in the apartment, as well as with prominent individuals, white-collar-type matters, these types of instances, there could be a risk for self-harm, so it was for Dr. Terry's safety as well, but we did not have a specific understanding if there was a self-harm concern.")).

Direct)). The male agents could not see the defendant while she changed, and ████████ turned towards the wall and could only see the defendant from her peripheral vision. (Tr. 31:5-18, 32:1-7 (████ Direct); Tr. 120:6-8 (████████ Direct)).

## V.    Mr. Boot Returned to the Apartment

While the defendant was changing, Mr. Boot returned to the apartment, accompanied by two to three NYPD officers, who did not have visible firearms and were wearing plainclothes and NYPD jackets.[11] (Tr. 32:20-34:11 (████ Direct); Tr. 120:9-20 (████████ Direct)). Mr. Boot asked what was going on in the apartment, and ████████ displayed his credentials and introduced himself. (Tr. 120:21-121:6 (████████ Direct)). At that point, while Mr. Boot was closely examining ████████'s and ████'s credentials in the dining room, the defendant and ████████ emerged from the defendant's bedroom. (Tr. 32:20-33:6 (████ Direct); 120:23-121:1 (████████ Direct)). The NYPD officers were standing in the entryway and at the doorway of the residence. (Tr. 33:7-24 (████ Direct)). ████████ told the NYPD officers their help was not needed and that they could go ahead and leave.[12] (Tr. 120:23-121:6

---

[11] The defendant continues to allege that the NYPD officers were armed, (Br. 12), but this is not in the record, (*see* Tr. 34:4-5 (████ Direct) ("Q: What, if any, firearms did they display? A: None."); 120:9–23 (████████ Direct) ("Q: Do you remember what those officers were wearing? A: They were wearing plain clothes, concealed firearms, probably, and a jacket that said NYPD on it. Q: When you say concealed firearms, probably, why do you say that? A: I don't know that for sure. I did not see firearms.")). The defendant now claims there were three NYPD officers in her home, which is inconsistent with her affidavit in which she claimed there were two. (*Compare* Br. 12 *with* Def. Aff. ¶ 10).

[12] Defense counsel's cross-examination of the FBI agents at the Hearing focused on whether the agents employed a "ruse" involving the NYPD to enter the defendant's apartment. (Tr. 99:1–10 (████ Redirect); (Tr. 112:10-18 (████████ Direct)). The Interview Team did not—they knocked on her door, announced themselves as FBI, and she invited them inside. (*See, e.g.*, Tr. 99:11-13 (████ Redirect)).

(Agent-C         Direct)). In total, the NYPD officers were in the entryway of the defendant's apartment for one minute or less. (Tr. 121:7-9 (Agent-C         Direct)).

    After the NYPD officers left, Mr. Boot asked the defendant if she was ok, and she said she was fine. (Tr. 34:12-15 (Agent-L Direct); Tr. 121:10-15 (Agent-C         Direct)). As she planned, the defendant also told Mr. Boot that she was needed by the FBI for a national security matter related to North Korea. (Tr. 121:12-15 (Agent-C         Direct); *see also* Tr. 34:16-21 (Agent-L Direct ("I believe she stated because of North Korea potentially hacking her device.")). At no point did the defendant request to speak privately with Mr. Boot, nor did Mr. Boot request to speak privately with the defendant. (Tr. 34:25-35:5 (Agent-L Direct); Tr. 121:16-21 (Agent-C         Direct)).

## VI.  The Defendant and the Interview Team Left Her Apartment to Continue the Interview at the Hotel Suite

    The defendant then motioned towards her door and started moving out of her apartment, and the Interview Team followed her lead. (Tr. 35:6-11 (Agent-L Direct); Tr. 121:22-122:1 (Agent-C         Direct)). The defendant walked approximately four blocks with the agents to the suite the agents had reserved at a boutique hotel on the Upper West Side and made small talk with Agent-C         on the way, discussing how lovely the neighborhood was and that Zabar's was only a few blocks away.[13] (Tr. 35:12-15, 38:22-39:11 (Agent-L Direct); Tr. 122:19-123:2 (Agent-C         Direct)). During the walk, at the Interview Team's request, the defendant agreed to store her phone

---

[13] Faced with the credible and uncontroversial testimony that during the walk to the hotel suite, the defendant and Agent-C         walked in a pair, and Agents L     and Y     walked in a pair sufficiently far behind them that Agent-L     could not hear the defendant's and Agent's C     's conversation (Tr. 37:13-38:1 (Agent-L Direct); Tr. 122:12-18 (Agent-C     Direct)), the defendant now says that when she told the Court in a sworn affidavit that she was "surround[ed] . . . on all sides for the entire walk over" by the agents (Def. Aff. ¶ 13), she did not mean it literally, now preferring to describe it as simply "feeling 'surrounded'." (*See* Br. 13 n.15).

in a Faraday bag, which she carried herself, to block the emissions of its signal and prevent remote wiping. (Tr. 35:23-37:8 (Agent-L Direct); (Tr. 122:2-11 (Agent-C    Direct)).

After arriving at the hotel suite, pictured below, the Interview Team offered that the defendant could sit where she pleased, and she chose to sit on the couch, facing the door. (Tr. 39:15-41:15 (Agent-L Direct); Tr. 123:10-15 (Agent-C    Direct)).



The Interview Team reminded the defendant, "[J]ust like at the residence, this is a voluntary interview, you're free to end it at any time, we are free to stop at any time, take a pause, and the hotel front door is unlocked." (Tr. 123:16-23 (Agent-C    Direct); *see also* Tr. 39:12-14, (Agent-L Direct)). After the defendant was offered food and beverages and she ordered a skim milk latte, but declined food, Agent-Y brought her the skim milk latte, a water, and an almond croissant. (Tr. 42:12-24 (Agent-L Direct); Tr. 123:24-124:7 (Agent-C    Direct)). After that, the Interview continued.

10

## VII.    The Defendant Joined a Work Zoom Call

Approximately 10 minutes later, the defendant paused the Interview to take a work-related Zoom call on her cellphone, which she removed from the Faraday bag to use. (Tr. 41:16-23, 42:25-43:8 (Agent-L Direct); GX 103 at 10). The defendant told the Interview Team that "she could take the phone call in the hallway," and, in response, the Interview Team "offered, if she wanted to, she could take the Zoom call in the suite if she liked."[14] (Tr. 43:11-17 (Agent-L Direct)). The defendant opted to take the Zoom call while walking around the hotel suite, starting in the bedroom and transitioning to the living room. (Tr. 43:24-44:3 (Agent-L Direct)). The defendant did not reiterate her request to take the Zoom call in the hallway, and at no point did the Interview Team deny the defendant's request to take the Zoom call in the hallway. (Tr. 43:18-23 (Agent-L Direct)).

## VIII.    The Interview Continued in the Hotel Suite

Following the defendant's Zoom call, the Interview resumed. (Tr. 44:11-12 (Agent-L Direct)). In total, the Interview in the hotel suite lasted for approximately three and a half hours. (Tr. 44:13-15 (Agent-L Direct)).

During the entirety of the Interview, no member of law enforcement ever told the defendant that she was required to answer their questions, and no member of law enforcement ever told the defendant that she had to cooperate with the FBI. (Tr. 25:1-6 (Agent-L Direct)). Contrary to the defendant's false allegations in her affidavit, Agent-C , the lead interviewer, never became visibly angry and threatening (Def. Aff. ¶ 19); never told the defendant that if she agreed she was under the direction or control of the Korean National Intelligence Service ("NIS"), this would all be over (Def. Aff. ¶ 18); never told the defendant that if she adopted his characterizations, it would

---

[14] Agent-C testified that the Interview Team "offered for her to take her phone and to take that Zoom call here in the suite," and that the defendant did not ask to leave the room to take the call. (Tr. 124:8-17 (Agent-C Direct)).

clear up a big misunderstanding and she could continue with her normal activities (Def. Aff. ¶¶ 18, 20); never told the defendant that she was close to saying what his supervisors needed to hear, but was not quite there yet (Def. Aff. ¶ 18); and never told the defendant that she needed to retire, end her career, and never work again in a think tank (Def. Aff. ¶ 28). (Tr. 45:13-46:8 (Agent-L Direct); Tr. 125:2-19, 137:11-21 (Agent-C Direct). At no point in the Interview did any member of the Interview Team yell or shout at the defendant. (Tr. 24:6-11 (Agent-L Direct)). Indeed, the only person who yelled that day was the defendant, when she exclaimed on two different occasions, "Sue was a bad girl!"[15] (Tr. 46:9-20 (Agent-L Direct); 125:20-126:7 (Agent-C Direct)).

Towards the end of the Interview in the hotel suite, the defendant was served with a search warrant for her cellphone. (Tr. 46:21-47:1 (Agent-L Direct); Tr. 126:13-24 (Agent-C Direct)). At that point, the defendant called Agent-C "sneaky" and asked for the second time if she needed an attorney. (Tr. 47:2-9 (Agent-L Direct); Tr. 126:25-127:7 (Agent-C Direct)). In

---

[15] The defendant conflates yelling or shouting—which Agent-C never did—with raising or elevating the tone of his voice. (Br. 15 n.17). Agent-L testified that both Agent-C and the defendant raised their voices at times during the interview, but that there "[w]as a difference in the way that they raised their voices." (Tr. 98:6-13 (Agent-L Redirect)). Agent-L explained:

> Q:    What do you mean by that?
> A:    In two specific instances, at the latter part of the interview, Dr. Terry elevated her voice that was higher and stronger than we had previously experienced or witnessed throughout the course of the interview.
> Q:    And those two instances, would you say that Dr. Terry was yelling or shouting?
> A:    I believe that it would be a yell or a shout because the tone was no longer speaking or animated.
> Q:    At any point did Special Agent-C yell or shout at Dr. Terry?
> A:    No.

(Tr. 98:14-25 (Agent-L Redirect)).

response, the Interview Team told the defendant they could not answer that question for her and could not give her legal advice. (Tr. 127:8-10 (Agent-C ▮▮▮ Direct); *see also* Tr. 47:10-13 (Agent-L Direct) ("The interview team advised her that we could not answer that question for her, but she was welcome to pursue and retain counsel if she felt she needed it.")). The defendant elected to continue the Interview. (Tr. 47:14-15 (Agent-L Direct); (Tr. 127:13-14 (Agent-C ▮▮▮ Direct)).

## IX.    **The Defendant Consented to a Search of Her Apartment**

Shortly thereafter, the defendant consented to a search of her apartment, filled out a consent to search form, walked with the agents back to her home, and toured them around her apartment, identifying for them the gifts she had received from NIS and her electronic devices. (Tr. 48:4-24, 49:24-50:3 (Agent-L Direct); Tr. 127:15-128:3 (Agent-C ▮▮▮ Direct)). Before returning to her apartment, the agents permitted the defendant to call Mr. Boot and her son on her own cellphone using speakerphone.[16] (Tr. 128:4-13 (Agent-C ▮▮▮ Direct)). The defendant falsely told Mr. Boot "that the FBI was going to sweep the apartment for bugs because North Korea potentially hacked [her]." (Tr. 128:4-13 (Agent-C ▮▮▮ Direct)). At her apartment, the defendant changed into gym clothes and left the agents at her home to execute the search while she went to the gym, bought a new cellphone, and met up with her husband and son.[17] (Tr. 50:4-20 (Agent-L Direct); Tr. 129:12-25 (Agent-C ▮▮▮ Direct)).

After the defendant left, Agent-C ▮▮▮ received a phone call from Mr. Boot, apparently still under the misimpression provided by the defendant that the Interview Team was sweeping

---

[16] The defendant complains that these calls were "agent-monitored," (Br. 17), but neglects to acknowledge that she was permitted to make such calls on her own cellphone, even after the agents had lawfully seized it pursuant to a search warrant, and even after it was no longer in her legal custody. (*See* Tr. 99:14-100:2 (Agent-L Redirect); Tr. 128:4-129:2 (Agent-C ▮▮▮ Direct)).

[17] Consistent with standard FBI practice, Agent-L ▮▮▮ accompanied the defendant to change this time too. (Tr. 50:4-13 (Agent-L Direct)).

their home for bugs, thanking him for their efforts in the "sweep." (Tr. 130:4-11 (Agent-C

Direct)).

## X.  **The Defendant Chose to Continue the Interview at a Third Location: LPQ**

More than five hours later, Agent-C and the defendant spoke by phone.
(Tr. 135:24-136:2 (Agent-C Direct); GX 103 at 30; GX 104 at 1). Agent-C told the
defendant that he had some paperwork for her and wanted to ask a few follow-up questions, and
she agreed to meet again. (Tr. 135:21-136:4 (Agent-C Direct)). Agent-C , Agent-Y
the defendant, and another agent (not Agent-L ) met "[o]utside on the sidewalk patio" of a café
near the defendant's apartment known as LPQ. (Tr. 135:21-136:16 (Agent-C Direct)). Once
again, before starting the interview, the agents told the defendant, "[T]his interview is voluntary,
you can stop it at any time, we can pause at any time, your choice." (Tr. 136:17-21 (Agent-C
Direct)). After about an hour, the LPQ staff closed the sidewalk seating and Agent-C
offered for the Interview to continue, "if the defendant wished," nearby on the same block at a
hotel lobby. (Tr. 137:22-138:18 (Agent-C Direct)).

## XI.  **The Defendant Chose to Continue the Interview at a Fourth Location: a Hotel Lobby**

The defendant agreed, and on the walk, offered to show the agents a message on her phone.
(Tr. 138:19-25 (Agent-C Direct)). Once again, in the hotel lobby, Agent-C told the
defendant that the Interview was voluntary "[j]ust like last time," and that she could end it at any
point. (Tr. 139:7-10 (Agent-C Direct)). The defendant responded to these reminders by
mimicking Agent-C 's manner of speech about "voluntariness" and commenting that his
spouse must be "really annoyed" with him because he is "very repetitive." (Tr. 139:11-22
(Agent-C Direct)).

14

## ARGUMENT

The Government's evidence at the Hearing, including the FBI agents' testimony, established that the defendant's statements, made voluntarily throughout the day, should not be suppressed. A reasonable person in the defendant's position—who invited the Interview Team into her home, agreed to continue the Interview at various locations throughout the day, and was advised approximately 20 times about the voluntary nature of the Interview—would have believed she could end the Interview at any time. The defendant was not in custody and *Miranda* warnings were not required. Similarly, and contrary to the defendant's arguments made for the first time after the Hearing, the defendant's statements were made voluntarily and her due process rights were not violated. The defendant's motion should be denied.

## I.   The Defendant Was Not in Custody

### A.    Applicable Law

"It is settled that a prosecution may not use incriminating statements obtained from a defendant during a custodial interrogation unless it demonstrates that, prior to any questioning, the defendant was" given a *Miranda* warning, *i.e.*, that he was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *United States v. Mitchell*, 966 F.2d 92, 97-98 (2d Cir. 1992); *see Miranda v. Arizona*, 384 U.S. 436 (1966). "*Miranda* warnings are not required, however, when the defendant is not in custody." *Mitchell*, 966 F.2d at 98; *cf. Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest.").

"The test used in determining whether a defendant was in custody is an objective one." *Mitchell*, 966 F.2d at 98; *see Stansbury v. California*, 511 U.S. 318, 323 (1994). The central issue is whether, under the totality of the circumstances, "a reasonable person [would] have felt he or

she was not at liberty to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004). In making that determination, courts may consider, among other factors: (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; (6) "whether officers told the suspect he was free to leave or under suspicion"; and (7) whether law enforcement "confiscated [the defendant's] travel documents." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). "To look only at any single factor would be inconsistent with *Miranda*'s role as a protection against coercion," because the *Miranda* "rule exists to temper the 'potentiality for compulsion' that exists when an individual is 'cut off from the outside world' and subjected to 'incommunicado interrogation . . . in a police-dominated atmosphere.'" *Id.* at 154 (quoting *Miranda*, 384 U.S. at 457, 445). "Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not custodial unless the authorities affirmatively convey the message that the defendant is not free to leave." *Mitchell*, 966 F.2d at 98 (collecting cases).

   **B.   Discussion**

   Over the course of a one-day Interview that the defendant knew full well was voluntary and understood that she could terminate at any time—as any reasonable person in her position would—the defendant opted to keep talking, in the hopes that she could talk her way out of whatever trouble she might be in. Now, the defendant attempts to paint the Interview as a coercive and intimidating custodial interrogation, but the defendant's motion falls far short, ignoring the record in this case in the context of well-established case law.

16

1.    **A Reasonable Person in the Defendant's Position Would Have Felt Free to Leave or End the Interview**

A reasonable person in the defendant's position would not have believed they were in custody because none of the hallmarks of coercion that courts typically rely on were present during the Interview. The agents did not wear uniforms, never drew firearms, never placed the defendant in handcuffs, never confiscated travel documents, and never said anything that would cause the defendant believe she was required to answer questions or could not end the interview. To the contrary, the uncontroverted evidence at the hearing was that the Interview Team repeatedly told the defendant the interview was voluntary, that she could end the interview, and that she was free to leave or ask the agents to leave.[18] (Tr. 21:16-19 (Agent-L Direct); 107:20-25, 108:15-24, 114:11-17 (Agent-C Direct)). The Interview Team gave that advisement not just once, but *approximately 20 times*. (Tr. 22:10-16 (Agent-L Direct)). While "there is no requirement that an officer affirmatively advise [the interviewee] that he is free to leave or terminate the interview," *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996), courts weigh such warnings—particularly when truthful—heavily in favor of a non-custodial environment, *see, e.g.*, *United States v. Badmus*, 325 F.3d 133, 39 (2d Cir. 2003) ("[G]iven the district court's factual findings—and in particular its finding that the agents informed the defendant and his wife that they were not under arrest and could ask the agents to leave at any time . . . we find that a reasonable person would have understood that he or she was not in custody."); *Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989) (declining to find that statements were made in custody because "the officers had not physically or verbally indicated to [defendant] that he was not free to leave"); *cf. United States v.*

---

[18] That the Interview Team planned to execute a search warrant if the defendant terminated the Interview does not change this analysis. The defendant did not know, and a reasonable person in her position could not have known, that fact and it is therefore immaterial.

*Faux*, 828 F.3d 130, 134 (2d Cir. 2016) (defendant was not in custody even though law enforcement officers "never specifically informed [her] that her participation was voluntary, that she did not have to answer questions, or that she was free to leave").

In addition to the lack of indicia of coercion that courts normally look to, the particular circumstances of the defendant's interactions with law enforcement confirm she was not in custody. To start, the defendant's initial invitation of the Interview team into her apartment strongly supports her lack of custody. *See United States v. Zerbo*, No. 98 CR. 1344 (SAS), 1999 WL 804129, at *8 (S.D.N.Y. Oct. 8, 1999) (finding no custody where the defendant "invited the agents into his home and was informed by the agents that he could stop answering questions at any time"). At approximately 8:40 in the morning, the Interview Team, dressed in plainclothes with firearms concealed, knocked on the defendant's door, displayed their FBI credentials, and asked if she "would like to participate in an interview." (Tr. 10:10-11:17, 14:10-17 (Agent-L Direct); *see also* Tr. 113:14-21 (Agent-C Direct)). The defendant invited the Interview Team inside and directed them to sit at her dining room table—a location she chose—and the defendant sat in a seat she selected. (Tr. 16:8-10, 19:16-18, 20: 5-12, 21:7-8 (Agent-L Direct); Tr. 114:3-10 (Agent-C Direct)). Where, as here, there is no formal arrest, "courts rarely conclude . . . that a suspect questioned in her own home is in custody" for *Miranda* purposes. *Faux*, 828 F.3d at 135-36 (despite presence of over a dozen agents, defendant was not in custody when "questioned in the familiar surroundings of her home . . . seated at her own dining room table"); *see United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) ("[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); *United States v. Vado*, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) ("Only in extreme or unusual circumstances have courts

18

held that suspects interrogated in their homes were restricted to a degree comparable to that of an individual placed under formal arrest.").[19]

After arriving at the hotel suite following a brief walk and small-talk, (Tr. 35:12-15, 37:13-23, 38:22-39:11 (Agent-L Direct); Tr. 122:19-25 (Agent-C Direct)), the Interview Team *again* reminded the defendant that the Interview was voluntary and she was free to stop it at any time, and served the defendant water, a skim milk latte, and an almond croissant. (Tr. 42:12-24 (Agent-L Direct); Tr. 123:24-124:7 (Agent-C Direct)). The defendant's subsequent Zoom call in the hotel suite a few minutes later is only further evidence that she was free to leave. Though the defendant initially suggested she could take the call outside, the defendant took the agents up on their offer for her to take it in the hotel suite. (Tr. 43:11-23 (Agent-L Direct); Tr. 124:8-17 (Agent-C Direct)). Then, instead of taking advantage of the relative privacy of the bedroom, the defendant opted to walk around the suite during the call, moving from the bedroom to the living room. (Tr. 43:24-44:3 (Agent-L Direct)). "[T]here is no absolute constitutional right to a telephone call during police questioning, even after an arrest (which did not occur here)." *United States v. Schaefer*, 859 F. Supp. 2d 397, 408 (E.D.N.Y. 2012) (consent to search was voluntarily given even where law enforcement refused to allow defendant to call his brother during the search). The fact that the

---

[19] *See also Beckwith v. United States*, 425 U.S. 341, 345–47 (1976) (no *Miranda* warnings required where interview was conducted at 8:00 a.m. at dining room table in private home); *Mitchell*, 966 F.2d at 98–99 (no *Miranda* warnings required where defendant invited agents into his home and was "cooperative," and there was no speech or action that could reasonably be taken as intimidating, coercive, or restricting defendant's freedom of action); *United States v. Valerio*, 765 Fed. App'x 562, 565-66 (2d Cir. 2019) (no custody where twelve officers executed search, then questioned defendant at his dining room table and gave him a cup of water upon request); *Badmus*, 325 F.3d at 138–39 (no *Miranda* warnings required because, although defendant was asked to stay seated in his living room during execution of a search, interview was conducted in his home and agents repeatedly told him he was not under arrest); *United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. 1987) ("Lower courts . . . almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers.") (collecting cases).

defendant was able to join a work-related Zoom call during her Interview further demonstrates that she was not in custody and that her freedoms clearly were not "curtailed to a degree associated with formal arrest."[20] *Berkemer*, 468 U.S. at 440; *see also United States v. Belcher*, No. 96 Cr. 789 (BSJ), 1997 WL 35495, at *2 (S.D.N.Y. Jan. 29, 1997) (defendant's ability "to make numerous phone calls" was indicative of lack of custody).

The defendant chose to participate in the Interview not only at her apartment and the hotel suite, but at two additional locations later in the evening.[21] When the defendant again met up with FBI on a "sidewalk patio" near her apartment, more than five hours after leaving them, reuniting with her husband, and buying a new cellphone (from which she could have called a lawyer if she

---

[20] That the agents offered for the defendant to take the Zoom call in the hotel suite in their presence was not a directive that she could not leave, but rather, was a statement that if she wished to make a Zoom call in the middle of the Interview, the agents would remain present. There are "valid law enforcement reasons, including safety concerns, for not allowing an interviewee to make phone calls to unknown individuals during an interview." *Schaefer*, 859 F. Supp. 2d at 408. Here, those valid law enforcement reasons included the fact that the agents had a judicially authorized warrant to search the phone that the defendant was going to use for the Zoom call. To let the phone out of the agents' sight would have given the defendant the opportunity to delete its contents and destroy evidence.

[21] The defendant's brief concludes by arguing that the evening portion of the Interview "was a paradigmatic 'two-step interrogation,'" (Br. 30), but the defendant misunderstands a basic feature of the two-step interrogation strategy: it is one "designed to elicit a post-*Miranda* waiver and confession after the defendant had already confessed before he was given *Miranda* warnings." *United States v. Capers*, 627 F.3d 470, 475 (2d Cir. 2010); *see also id.* at 477 ("[W]e must address whether the officers employed a deliberate, two-step strategy, predicated upon violating *Miranda* . . . ."); *United States v. Kostin*, No. 24 Cr. 91 (GHW), 2025 WL 1504409, at *29 (S.D.N.Y. May 27, 2025) (describing two-step interrogation strategy as one in which "officers intentionally violate *Miranda* in the first interview, then provide *Miranda* warnings and re-ask the questions"). There were no pre-*Miranda* and post-*Miranda* phases in the defendant's Interview, because at no point was the defendant under arrest and *Mirandized* in the first place. *See, e.g.*, *United States v. Simmonds*, 641 Fed. App'x 99, 101 (2d Cir. 2016) (declining to reach defendant's two-step interrogation argument because he "was not in custody before Agent Destito provided him a *Miranda* warning."). That the agents did not *Mirandize* the defendant at the outset of the evening portion of the Interview is itself evidence that there was no *Miranda* violation they sought to correct.

so chose), she agreed *again* to continue the Interview. (Tr. 135:21-136:16; GX 103 at 30; GX 104 at 1). And yet again, the agents told the defendant: "this interview is voluntary, you can stop it at any time, we can pause at any time, your choice." (Tr. 136:17-21 (Agent-C ████ Direct)). After about an hour, she agreed to relocate again to a hotel lobby, and Agent-C ██████ told the defendant *yet again* that the Interview was voluntary "[j]ust like last time." (Tr. 139:7-10 (Agent-C █████ Direct)). By that point, the defendant had had enough of the agents' reminders that the Interview was voluntary. It had been made so plain to her, so many times throughout the day, that she "kind of tensed up" and "started mimicking" Agent-C ████████ and his manner of speech about voluntariness, going so far as to say that his "spouse must be really annoyed with [him] because [he is] very repetitive." (Tr. 139:11-22 (Agent-C █████ Direct)). Even though an "individual's subjective belief about his or her status generally does not bear on the custody analysis," *Faux*, 828 F.3d at 135, it is telling that the defendant had been told the interview was voluntary *so many times* that she snapped at her interviewer for reminding her again.

It is difficult to conceive of a law enforcement interview with more indicia of voluntariness than the Interview of the defendant—there were no handcuffs, no guns, no uniformed police, no arrests, and there were well over a dozen reminders of voluntariness, bespoke coffee orders, the ability to make any phone calls the defendant requested, and optional relocations to pleasant venues in the defendant's own neighborhood. Under the totality of these circumstances, "a reasonable person [would not] have felt . . . she was not at liberty to terminate the interrogation and leave." *Yarborough*, 541 U.S. at 663.

## 2. The Defendant's Arguments Are Unpersuasive

The defendant's brief primarily raises arguments about circumstances that were not known to the defendant at the time of the Interview and which are completely irrelevant to the issues here. *See Newton*, 369 F.3d at 675 ("*Miranda*'s focus is on the facts known to the seized suspect.")

21

(cited at Br. 18). The defendant, for example, spends significant time analyzing the document the FBI agents prepared in advance of the Interview and brought with them,[22] an agent's ambitions to move to headquarters, and the activities of agents and NYPD officers whom the defendant never saw, but does not cite any case law supporting how those topics are relevant to her motion to suppress. The defendant similarly spends significant time counting the "lies" to the defendant, but never grapples with the widely accepted principle permitting law enforcement to lie. *See, e.g.*, *Frazier v. Cupp*, 394 U.S. 731, 737-39 (1969) (no error in admission of defendant's confession where it was procured after police misrepresented statements that co-defendant had made, falsely conveying that co-defendant had already confessed); *United States v. Male Juv.*, 121 F.3d 34, 41-42 (2d Cir. 1997) (confession voluntary where police informed 16-year-old juvenile robbery suspect that "he was just there for information gathering purposes," told defendant and his mother that he was not in trouble, and promised defendant that "no matter what he said to me, that he was going to be allowed to leave that evening"); *Green v. Scully*, 850 F.2d 894, 901-04 (2d Cir. 1988) (false promises of psychiatric help, coupled with police misrepresentations that they had enough evidence to arrest the defendant and a detective's reference to the electric chair "did not overbear the defendant's will and bring about his confession"); *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) ("The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible.").

---

[22] The defendant summarily claims that the "Ask Tell Make" interview preparation document is *Brady*, but this is plainly not so. (Br. 5 n.8). The notion that a document prepared by agents in advance of an interview, enumerating potential questions and topics to cover in that interview, is "material either to guilt or punishment" strains credulity. *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). In any event, as the defendant concedes, she was provided with the "Ask Tell Make" document in advance of the Hearing and was provided with one such version eight days before the one-day Hearing. (Lewin Decl. ¶¶ 2-4).

Ultimately, much of the defendant's brief is focused on the defendant's apparent belief that she was somehow entitled to not just to be free to leave, but also to be treated a certain way during the Interview. Her brief insists that the Interview Team should have scheduled her interview in advance, (Br. 20 (criticizing the Interview Team's choice not to "schedule an interview in advance")); the Interview Team should not have entered her apartment despite being invited in because they should have inferred that the defendant seemed uncomfortable in the clothes she was wearing, (Br. 20 ("wearing only revealing silk pajamas and no bra, Dr. Terry reasonably would not feel free to leave her own apartment")); the Interview Team, contrary to FBI standard practice, should have told the defendant she was the target of their criminal investigation, (Br. 7 (arguing agents "deceived her about the criminal nature of the investigation")); and the Interview Team should have let her know that if she declined the interview, they intended to execute warrants that would take significant time, (Br. 4 ("Armed with search warrants for Dr. Terry's person, devices, and apartment, [Agent-C▮▮▮▮▮▮] falsely responded, 'it won't take long.'")). But interviewees are not entitled to have their interviews scheduled, to wear clothes of their choice, to be informed they are the target of a criminal investigation, or to know that agents later intend to conduct a search. If anything, the defendant's proclaimed entitlements, when contrasted with decisions of courts across the country, reveal a wide gap between how this defendant believes she should have been treated by law enforcement investigating her, and the "reasonable person" at issue in every other non-custodial interrogation across the country. Setting aside the defendant's atmospheric allegations that have little to do with whether she was in custody under the relevant standard, she makes seven arguments in support of her claim that she was entitled to *Miranda* warnings. None are persuasive on their own or in combination.

23

*First*, the defendant argues that the duration of the Interview favors custody. It does not. The defendant avers that the defendant's Interview lasted five hours. (Br. 18-19). But that length elides the reality that the Interview was divided up with breaks and with multiple changes in location.[23] In reality, the defendant agreed to participate in an interview at her home for approximately one hour, and then an interview at a hotel suite for approximately three and a half hours. (Tr. 11:15-17 (Agent-L Direct) (arrived at defendant's apartment at approximately 8:40 a.m.); GX 103 at 8 (departed defendant's apartment at approximately 9:42 a.m. and walk to hotel was approximately five minutes); GX 103 at 29 (departed hotel at approximately 1:30 p.m. and entered defendant's apartment at approximately 1:39 p.m.); Tr. 44:13-15 (Agent-L Direct) (hotel suite interview lasted approximately over three and a half hours)). In between those interviews, the defendant changed clothes, Mr. Boot arrived home, the defendant walked with the agents several blocks to the hotel suite, she took a work call for approximately nine minutes, (GX 103 at 10), she took a restroom break for approximately ten minutes, (GX 103 at 22), she called Mr. Boot and one of her children, and she walked back to her apartment with the agents. The length of the two parts of the Interview—one hour and under four hours—are comparable to, or shorter than, those courts have found to not indicate custody. *See, e.g.*, *United States v. Paracha*, No. 03 Cr. 1197 (SHS), 2004 WL 1900336, at *8 (S.D.N.Y. Aug. 24, 2004), *aff'd*, 313 Fed. App'x 347 (2d Cir. 2008) (seven-hour overnight interview at FBI building was not custodial); *United States v. Wang*, No. 21 Cr. 6108 (FPG), 2024 WL 2286257 at *3-*4, *7 (W.D.N.Y. May 21, 2024) (six-hour interview by

---

[23] The defendant's analysis excludes the "evening phase" of the Interview (Br. 19), when the defendant chose to meet up with the agents *again*—over five hours after she left the agents earlier in the day, went to the gym, bought a new cellphone, and met up with Mr. Boot—at which point she opted to continue the Interview at two different locations, and told Agent-C that he was being repetitive when he reminded her the Interview was voluntary. (Tr. 50:14-22 (Agent-L Direct); Tr. 129:16-25, 135:21-136:6, 137:22-139:25 (Agent-C Direct); GX 103 at 30; GX 104 at 1).

five or six FBI agents, some of whom "appeared to be armed," in windowless conference room at defendant's workplace with additional office security standing near the door not custodial); *United States v. Austin*, 729 F. Supp. 3d 396, 407-08 (S.D.N.Y. 2024) (length of questioning at defendant's home "two separate times—one for just over one hour and the second for fifty-three minutes" weighed against a finding of custody). To the contrary, even accepting the defendant's characterization of the Interview as lasting five straight hours, the defendant cites no authority for the proposition that this interview length compels a finding that she was in custody.

*Second*, the defendant argues that the Interview's many locations warrant a finding that she was in custody.[24] The defendant, however, was interviewed in public and private spaces—traveling between them on New York City sidewalks in broad daylight without any restraints or physical contact by the Interview Team. Such walks, moreover, were not in some secluded area, but in the defendant's own busy Manhattan neighborhood where she could have entered any number of local businesses or, indeed, returned to her home a short walk away. The Interview Team's invitation that the defendant continue the Interview in a new location—especially one that was not a police station or other area within law enforcement control—did not transform a voluntary interview into a custodial one. *See, e.g.*, *Campaneria*, 891 F.2d at 1020 n.1 (defendant not in custody where law enforcement "ordered" him into a hotel elevator but did not "physically or verbally indicate[] . . . that he was not free to leave"); *United States v. Mussaleen*, 35 F.3d 692, 697 (2d Cir. 1994) (defendant not in custody when he left his house with detectives and went to a police station at their request); *United States v. Titemore*, 437 F.3d 251, 260 (2d Cir. 2006) ("easily" dispensing with *Miranda* claim after officer "asked [the defendant] to step outside to talk

---

[24] The defendant again ignores the evening portion of the Interview, as she must. An interview on an early summer night on the "sidewalk patio" of an Upper West Side café is hardly consistent with being in custody. (Tr. 136:5-16 (Agent-C   Direct)).

with him" because defendant was never placed under arrest or restrained in any way); *United States v. Wilson*, 901 F. Supp. 172, 174-75 (S.D.N.Y. 1995) (interview "conducted during ordinary business hours in a commercial, as opposed to government, premises" was not custodial); *United States v. Sawinski*, No. 00 Cr. 49 (RPP), 2000 WL 1357491, at *4 (S.D.N.Y. Sept. 20, 2000) (interview was non-custodial because, among other reasons, defendant was allowed to "walk alongside" law enforcement to location of interview).

While the defendant asserts that she was in custody because the Interview Team intentionally isolated her, finding a time to interview her while she was home alone, (Br. 19-20), the defendant in fact repeatedly conveyed to the Interview Team throughout the day her preference to keep knowledge of the Interview from Mr. Boot. For example, the defendant: (i) elected to go to the hotel suite instead of staying in her home; (ii) sought the Interview Team's assistance in concocting a story to keep Mr. Boot from finding out why she was with them and why they were searching her house (even once she had been served with two search warrants); and (iii) kept lying to Mr. Boot about what was happening once she left the agents, reflected by Mr. Boot's call to the Interview Team to thank them for conducting what he understood was a search for bugs, as opposed to pursuant to a search warrant, (*compare* Tr.130:9-11 (Agent-C Direct) *with* Tr. 128:8-13 (Agent-C Direct)).[25] Moreover, the cases the defendant cites evinces how far these facts are from those where suppression is appropriate. (Br. 19-20 (citing *United States v. Butt*, No. 18 Cr.

---

[25] Indeed, when Mr. Boot arrived at the apartment during the first portion of the Interview, the defendant did not run to him and ask for help, she did not ask him to call an attorney, and she did not even ask to speak with him privately. (Tr. 34:25-35:5 (Agent-L Direct); Tr. 121:16-21 (Agent-C Direct)). Instead, when Mr. Boot asked if she was ok, she told him something like, "it's ok, it's fine," said she needed to go speak with the FBI, and lied to him about the reason why. (Tr. 34:12-21 (Agent-L Direct); Tr. 121:11-15 (Agent-C Direct)). And it was the defendant—not the Interview Team—who decided it was time to leave her apartment and relocate, as she motioned towards her door and led the Interview team out of her apartment. (Tr. 35:6-11 (Agent-L Direct); Tr. 121:22-122:1 (Agent-C Direct)).

87 (NSR), 2019 WL 479117 (S.D.N.Y. Feb. 7, 2019); *United States v. Tartaglione*, No. 16 Cr. 832 (KMK), 2023 WL 2237903, at *16-18 (S.D.N.Y. Feb. 27, 2023))). In *Butt*,

> The undisputed evidence reflected that on December 13, 2017, within 10-15 minutes of [executing a search warrant and] entering Butt's house under the rouse of discussing family law matters, about 16 law enforcement officers deriving from four different agencies entered Butt's home and immediately began spreading through the home to execute the search warrant. Butt was separated from his wife and directed to his living room, where he remained throughout the search with Agent Solek at his side the entire time—often asking questions and taking pedigree information from him. Butt did not have his cell phone and was not told that he was free to leave, call an attorney, or that he could refrain from answering questions. Further, officers located firearms quickly, within 10-15 minutes of the search beginning, and Butt testified that he heard them jeering that they "hit the motherload" and saw agents giving each other high fives, and at that point, he knew that he was going to be arrested. Additionally, multiple agents . . . testified that, at that point, they felt that the Defendant was no longer free to leave or that his fate was sealed.

2019 WL 479117, at *13. And in *Tartaglione*, police physically stepped between the defendant and his wife in order to cut off their communication; police asked the defendant to park his vehicle so that he would come out to the road; once the defendant exited his vehicle, four armed officers surrounded him and boxed him in; two officers patted down the defendant, asked if he had any weapons, and took both of his cellphones; and police directed the defendant to get into their car, drove him to the station, and placed him in a small, windowless interview room. 2023 WL 2237903, at *16-17. The custodial interrogation in these cases bears absolutely no resemblance to the Interview here, where the defendant chose to continue speaking with the FBI at multiple locations throughout the day, had an opportunity to speak with her partner but insisted she was fine and led the FBI out of her apartment, was given a skim milk latte and an almond croissant even after she refused food, and was free to take a Zoom call during the interview and free to call her partner and child even after her cellphone was lawfully seized pursuant to a search warrant.

27

*See, e.g.*, *Belcher*, 1997 WL 35495, at *2 (defendant's ability "to make numerous phone calls" was indicative of lack of custody); *United States v. Alexander*, No. 16 Cr. 141 (CR), 2018 WL 1891307, at *6 (D. Vt. Apr. 19, 2018) (similar).

*Third*, the defendant argues that "the fact that Dr. Terry did not volunteer for the Interview favors custody." (Br. 20). The defendant appears to take issue with the FBI's failure to offer the defendant the opportunity to schedule the interview at a time of her convenience. But that is plainly not required. The Interview Team knocked on the defendant's front door at 8:40 am and asked if the defendant "would like to participate in an interview," (Tr. 14:14-17 (Agent-L Direct)); nothing about those circumstances suggests that the defendant was in custody. Indeed, so holding would contravene the many, many cases during which voluntary interviews are conducted without advanced warning to a defendant, let alone the commonly accepted voluntary interview of a premises' resident following the execution of a search warrant. *See, e.g.*, *Faux*, 828 F.3d at 136-139; *United States v. Familetti*, 878 F.3d 53, 56 (2d Cir. 2017); *United States v. Cota*, 953 F.2d 753, 756, 758-60 (2d Cir. 1992); *Valerio*, 765 Fed. App'x at 565-66; *United States v. Mastroianna*, No. 20 Cr. 575 (PMH), 2022 WL 17404783, at *5 (S.D.N.Y. Dec. 2, 2022). The defendant could have rejected the agents' request to speak; in fact, FBI had planned for that contingency and expected to execute a search warrant if they were not permitted inside—but they were.

*Fourth*, the defendant argues that her movements were restrained, despite the casual walks between interview locations and despite the repeated advisements of voluntariness and her ability to terminate the Interview at any time. In support of that argument, the defendant relies on (i) her repeated, false claim that the agents did not permit her to change; (ii) the agents' accompanying her to change and go to the restroom; and (iii) a mischaracterization of the record regarding her

Zoom call. As described below, it is clear that these examples do not amount to restraint, let alone a finding that the defendant was in custody.

The record is clear that the first and only time the defendant asked to change her clothes, she was permitted to do so. (Tr. 27:20-28:8 (Agent-1 Direct)). The defendant makes much of her purportedly "revealing silk pajamas"—that, according to her own exhibit DX 20, amount to an oversized t-shirt and long pants—and compares her attire to that of the defendant in *United States v. Hallford* who was "wearing nothing (i.e., not even underwear) but his open-backed hospital gown." (Br. 20 (quoting *United States v. Hallford*, 280 F. Supp. 3d 170, 182 (D.D.C. 2017), *aff'd* 756 F. App'x 1 (D.C. Cir. 2018))). Even without the omitted aggravating fact that the defendant in *Hallford* was photographed by agents in his naked state, it is plain just how far afield this case is from what happened there. 280 F. Supp. 3d at 182. In any event, in this Circuit, the fact that the defendant wore pajamas when she invited the agents into her home for the Interview is not material to whether it was custodial. *See Newton*, 369 F.3d at 675 ("The fact that [the defendant] was in his home also renders less significant, for purposes of determining his custodial status, that he was in his underwear while detained. This was simply how [the defendant] had presented himself when he answered the officers' knock at the apartment door."); *United States v. Pichardo*, No. 92 Cr. 354 (RPP), 1992 WL 249964, at *6-7 (S.D.N.Y. Sept. 22, 1992) (no custody when male defendant wearing only bikini underwear was initially forced to the floor at gunpoint, then questioned a few minutes later). The facts here present far less custodial circumstances than those in *Newton* and *Pichardo*, and, unlike the defendants in those cases, the defendant was *not* questioned while wearing only her underwear.

Moreover, the agents advised the defendant why they needed to accompany her if she intended to move to other rooms in her home or the hotel where they could not see her: for her

safety and their safety. These instances occurred, however, only after repeatedly saying that the interview could end at any time and the agents could leave at any time. If she wished the interview to end, or for agents to leave, she could have said so. Nothing about Agent-L 's presence, facing the wall, when the defendant changed is improper; nor did this routine law enforcement step somehow convert a voluntary interview into a custodial interrogation. No reasonable person in the defendant's position would think she was in custody under those circumstances—especially where the defendant was told that she was being accompanied for safety reasons, and was not left to wonder if she was being accompanied because she was under arrest. *See, e.g.*, *Faux*, 828 F.3d at 137 (defendant not permitted to move freely about her home, agents accompanied her to the bathroom and to her bedroom to fetch a sweater, and defendant "was not told the reason she was being shadowed," but this nevertheless "did not amount to custody"); *United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) ("The mere fact that Ross was told he would be accompanied by an IRS agent when he moved about the restaurant did not place him in custody within the meaning of *Miranda* . . . .").

The defendant also argues that she was restrained during the Interview because she "was not permitted to step outside the suite to participate in a work call." (Br. 21). But that was not the testimony at the Hearing. Instead, Agent-L testified that while the defendant suggested she could take her Zoom call in the hallway, the agents then "offered, if she wanted to, she could take the Zoom call in the suite if she liked." (Tr. 43:11-17 (Agent-L Direct)). The defendant accepted that suggestion without reiterating the possibility of going into the hallway. (Tr. 43:18-20 (Agent-L Direct); *see also* Tr.43:21-23 ("Q. At what, if any, time did the interview team deny Dr. Terry's request to take the call in the hallway? A. At no point." (Agent-L Direct)). This testimony is a far cry from the defendant's dramatization that she "was not permitted to step outside the suite to

participate in a work call" and "was instead directed to take the call in the suite." (Br. 21). The defendant was not restrained.

*Fifth*, the defendant argues that the law enforcement presence outside her apartment favors custody. In doing so, the defendant seeks to tally up all law enforcement officers who the defendant could have seen that morning—a total of eight—from which she argues, "[w]ith agents stationed right outside, a reasonable person would not feel free to leave or terminate the interview." (Br. 21-22). In the first instance, that total number of officers pales in comparison to the number of armed officers present for other non-custodial interviews. *See, e.g.*, *Familetti*, 878 F.3d at 56, 60-62 (no custodial interrogation when defendant was pushed against the wall by nine federal agents in his home and temporarily handcuffed during an "extreme panic attack"); *Faux*, 828 F.3d at 135-36 (despite presence of over a dozen agents from three federal agencies, defendant was not in custody).

But more vitally, it misses the context. During the interview at her apartment, the defendant saw at most five FBI agents, and possibly as few as the three that entered her apartment and sat at her table. To end that Interview, she merely needed to ask the agents to leave, not leave herself, and so there is limited relevance to the fact that there were two additional agents standing outside. By the time the defendant became aware of NYPD presence, she was getting ready to leave her apartment to go to the hotel suite. Notably, those two to three NYPD officers were standing in the entryway of the defendant's apartment for *one minute or less* (Tr. 33:12-24 (Agent-L Direct); Tr. 120:12-14, 121:7-9 (Agent-C Direct)), and no portion of the Interview was conducted in their presence. (Tr. 35:18-20 (Agent-L Direct)). Indeed, "[t]he mere presence" of officers, "(two of whom were positioned well in the background)—unaccompanied by any coercive tactics or objectively intimidating behavior—cannot reasonably be depicted as so overwhelming in itself as

to have overborne [a defendant's] volition." *United States v. Rogers*, No. 99 Cr. 710 (CM), 2000 WL 101235, at *11 (S.D.N.Y. Jan. 27, 2000). Upon leaving her apartment, there were no law enforcement officers visible, and there were none at the hotel, other than the Interview Team. (Tr. 37:9-12, 38:4-6 (Agent-L Direct)). In other words, the defendant made no statements between seeing the NYPD officers, and walking several blocks, entering a new location, and being reappraised of her right to end the interview or leave the hotel room, where no NYPD officers or FBI agents were outside. The defendant's knowledge of a few NYPD officers outside her apartment, which she gained only at the very end of her interview in the apartment, is hardly a basis to find she was in custody at the hotel suite. In these new circumstances, any potential coercive indicia at the defendant's apartment—for which there were none—was no longer relevant. *See, e.g.*, *Familetti*, 878 F.3d at 56 (finding the defendant not in custody despite, upon initial entry to his apartment, "two agents were needed to restrain [the defendant], push him against the wall, and temporarily handcuff him," because he was later taken to another room, the handcuffs were removed, and he told he was not under arrest); *Cota*, 953 F.2d at 756, 758-60 (finding that a defendant who had been stopped, held briefly at gunpoint, and briefly handcuffed, and who voluntarily agreed to accompany an officer to the sheriff's station for questioning was not in custody).

The defendant also argues that the fact that "[e]very member of law enforcement . . . [she] encountered was armed" counsels in favor of a finding of custody. (Br. 22). Setting aside the fact that this is an incorrect statement of the record, *see infra*, the defendant ignores a critical fact: at most, only one agent's firearm *may* have been partially visible to her during the Interview. (Tr. 56:22-57:4 (Agent-L Cross) (testifying that it was possible that Agent-C 's concealed firearm left "an imprint on [his] suit jacket")). This possibility does not transform a voluntary interview into a custodial one. *See, e.g.*, *Cota*, 953 F.2d at 756, 758-59 (finding no custody where

defendant was initially held at gunpoint); *Badmus*, 325 F.3d at 139 (defendant not in custody notwithstanding "that the agents did have (holstered) guns, which may have been visible"); *Pichardo*, 1992 WL 249964, at *6-7 (no custody when defendant male suspect wearing only bikini underwear was initially forced to the floor at gunpoint).

*Sixth*, the defendant argues that the agents' "statements and actions concerning whether Dr. Terry was free to leave suggest custody." (Br. 22). As an initial matter, the defendant was forced to acknowledge that the defendant was repeatedly warned that she was free to leave, ask the agents to leave, and end the interviews, (Br. 22)—to the point where she felt comfortable ridiculing her supposed intimidator, Agent-C ████████, about how repetitive he had been in advising her of that right (*see* Tr. 139:7-25 (Agent-C ███████ Direct)). Nonetheless, she argues that the Interview Team's indications of urgency favor custody, despite their direct and repeated advisements of the voluntary nature of the interview.[26] (Br. 22-23). In support, the defendant's brief cites, not testimony from the Hearing, but lines from the document prepared by Agent-C ███████ in advance of the Interview.[27] (Br. 23). Though defense counsel had ample opportunity to ask Agents L████ and C██████ about those portions of the document during cross-examination at the Hearing, neither testified to that language in fact being uttered during the Interview with the defendant.

Moreover, the cases cited by the defendant stand for the opposite proposition in the context of the instant case. (*See* Br. 22-23 (citing *Ceballos*, 812 F.2d at 48; *United States v. Camacho*, 674

---

[26] The defendant also reiterates her misleading claims about being denied the ability to change and take her Zoom call outside. Those arguments are addressed *supra*.

[27] The defendant characterizes this document as a "script" despite Agent-C ███████'s unequivocal testimony that it was not. (Tr. 207:18-22 (Agent-C ██████ Direct) ("Q: [W]as this a script that you intended to follow? A: No.")).

F. Supp. 118, 123 (S.D.N.Y. 1987); *United States v. Levinson*, 790 F. Supp. 1477, 1480 (D. Nev. 1992))). In each case cited by the defendant, law enforcement officers never informed the interviewees that they were free to leave. *See Ceballos*, 812 F.2d at 48 ("The agents did not tell Adames that he was free not to accompany them, a statement that would have dispelled the impression already conveyed that he was obliged to go with them."); *Camacho*, 674 F. Supp. at 123 ("[T]he inspectors never told Camacho that he was free to leave."); *Levinson*, 790 F. Supp. at 1480 ("[T]he testimony is clear that at no time prior to the conclusion of the interviews were the defendants told they were free to leave.")). This difference is dispositive; as the Second Circuit said in *Ceballos*, "Though an explanation of the right not to accompany agents for questioning is not a legal requirement to establish voluntary agreement to be questioned, such an explanation, credibly given, would normally serve the interests of law enforcement officials by defeating any claim that custody has begun." 812 F.2d at 48. Unlike in the cases cited by the defendant, therefore, Agent █ and C█████'s many, many explicit warnings that the interview was voluntary and that the defendant was free to leave "defeat[] any claim that custody ha[d] begun." *Id.*

And *finally*, the defendant argues that the Interview Team's "accusatory and urgent tone" favors a finding of custody. (Br. 23-24). But neither the testimony nor the caselaw supports this conclusion. In asserting that Agent-C████ "emphasized urgency," (Br. 4), the defendant only cites Agent-C████'s testimony that he could not recall whether he told the defendant "we need to speak to you, we are coming to you as discreetly as possible, . . . this must be addressed immediately," and that it was "possible that [he] did, possible [he] didn't." (Tr. 178:8-16 (Agent-C████ Cross)). The defendant also fixates on Agent-C████'s "incredulous" reaction to some of the defendant's responses during the Interview, but ignores what Agent-C████ did to express his incredulity:

Q:    Can you give an example of what you mean by he seemed incredulous?

A:    He asked: How is this possible? What do you mean? And he used hand gestures and maybe the infliction of his tone.

Q:    At what point of the interview, if any, did Special Agent-C █████████ yell or shout at Dr. Terry?

A:    At no point.

(Tr. 24:2-11 (Agent-L Direct)). There is nothing remotely improper about a law enforcement agent expressing disbelief at a subject's misstatements, omissions, and lies in response to his questions—something that, as the defendant was advised at the outset of the Interview, can itself be a new federal crime. *See* 18 U.S.C. § 1001; (Tr. 114:18-24 (Agent-C Direct)). The defendant also makes much of whether Agent-C █████████ "personally felt urgency" to complete the Interview (Br. 5 n.7), but Agent-C █████████'s own feelings about the timing of when he conducted the Interview have absolutely no relevance to what a reasonable person in the defendant's position perceived during the Interview itself. *See Berkemer*, 468 U.S. at 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time."). Even setting aside the factual basis for the defendant's allegation that Agent-C █████████ had at times an improper tone, the defendant cites no cases in which a court relied on an accusatory or urgent tone in finding that a defendant was in custody. It is unsurprising that the interview was accusatory—the defendant kept minimizing about her relationship with foreign intelligence officers—and it is unclear how to square the purported sense of urgency with repeated instruction that the interview could end at the defendant's direction, irrespective of whether she chose to answer the agents' purportedly urgent questions. This argument, like the others, does not tip the balance to custody.

Because a reasonable person in the defendant's position would have felt able to leave the interview or end it at her own discretion, the defendant was not in custody and her statements should not be suppressed.

## II.    The Defendant's Will Was Not Overborne

For the first time in her post-Hearing briefing, the defendant argues that her statements should be suppressed because her due process rights were violated. (Br. 25-30). The Court should reject this late-breaking, last-ditch effort to preclude her incriminating statements. The totality of the circumstances—including the defendant's background, the conditions of the Interview, and the conduct of law enforcement officials—do not indicate in any way that the defendant's will was overborne. Moreover, to the extent the defendant argues that her statements should be suppressed because the Interview Team's "trickery and deception" about the nature of the interview fooled her into being comfortable confessing, (*see* Br. 26-28), the Court should also reject that argument. The Interview Team truthfully informed the defendant that they were conducting a counterintelligence investigation and also, at the outset, warned the defendant about the criminal consequences of lying to federal law enforcement. Moreover, in making this argument alongside her custody claim, the defendant attempts to have it both ways, arguing both that she was entitled to *Miranda* warnings because she believed she was under arrest, and that her due process rights were violated because the Interview Team's questioning discounted the possibility of criminal consequences.

### A.    Applicable Law

"Incriminating statements made in non-custodial settings are inadmissible if the statements were not made voluntarily—that is, if the defendant's 'will was overborne.'" *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021) (quoting *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014)). "When questioned by law enforcement, many individuals—law respecting or not—

36

will feel that they cannot decline to answer without repercussions. But the Fifth Amendment is not violated whenever a person feels pressure to speak; rather, to amount to compulsion, that pressure must overcome the resistance of the suspect such that his will is overborne." *United States v. Shvartsman*, 722 F. Supp. 3d 276, 322 (S.D.N.Y. 2024). Where a defendant claims involuntariness premised on "trickery and deception, [a defendant] must produce clear and convincing evidence that the [government] agents affirmatively misled [him] as to the true nature of [their] investigation." *Mitchell*, 966 F.2d at 100. "But deception alone is insufficient to show an incriminating statement was involuntary. Rather, the Court must examine the 'totality of the circumstances.'" *Shvartsman*, 722 F. Supp. 3d at 321; *see also United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) ("[A] finding that police conduct is false, misleading, or intended to trick and cajole the defendant into confessing does not necessarily render the confession involuntary."). Courts in this Circuit "evaluate voluntariness based on the 'totality of the circumstances,' including "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Kourani*, 6 F.4th at 351-52.

   **B.    Discussion**

   The defendant has failed to make a colorable due process claim. The defendant's characteristics, the conditions of the Interview, and the conduct of law enforcement officials all support that the defendant's statements were voluntarily made during multiple interviews in which she made incriminating statements.

   To start, the defendant's background—including her education, life, and work experience—strongly weigh against a finding that her will was overborne during the Interview. The defendant holds a doctorate and spent much of her career in government positions with the intelligence community, culminating in a position at the White House on the National Security

Council.[28] During her government positions, and in her career afterwards, the defendant interacted with high-level government employees, such as Secretary of State Blinken, who far outranked the FBI agents who arrived on her doorstep. She has testified before Congress. The defendant is a well-educated, sophisticated, former intelligence official. Her background thus counsels against a finding that her will was overborne. *See Kourani*, 6 F.4th at 352 (relying, in finding will not overborne, that the defendant "was an adult who had graduated from college and who held a master's degree in business administration"); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) (noting the defendant "has earned a doctorate degree in economics" in finding that his will was not overborne); *see also United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (considering defendant's familiarity with police questioning and "maturity, education [and] intelligence" in finding his statements voluntary).

Similarly, the conditions of interrogation and the conduct of law enforcement officials also do not suggest the defendant's will was overborne. Without again detailing those conditions and that conduct, which are analyzed in depth *supra*, "there is no evidence the defendant was subject to any type of coercion by [the agents]. [S]he was never threatened physically or psychologically abused in any manner, or made any type of promises such that [the defendant's] will was overborne." *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011); *see also Kourani*, 6 F.4th at 352 ("[T]he conduct of the FBI agents was not coercive. The agents were dressed in business-casual attire and did not display firearms."); *Diaz v. Senkowski*, 76 F.3d 61, 62-66 (2d Cir. 1996) (statements voluntary where defendant was interrogated for four hours and there was no evidence that he was denied food, bathroom access, or sleep and he was not beaten, otherwise abused, or

---

[28] In her motion to suppress, the defendant describes herself as "a widely respect foreign policy expert, a prolific writer, a fiercely independent thinker, [and] a go-to breaking news analyst . . . ." (Dkt. 40 at 1).

handcuffed); *Herrera v. Capra*, No. 19 Civ. 5321 (LGS), 2020 WL 6263635, at * (S.D.N.Y. Oct. 23, 2020) (statements voluntary where defendant was questioned for 17 hours beginning at 10:50 p.m. in a police precinct, but had several two-hour intervals when he was alone and could have slept). Indeed, courts have routinely found that a defendant's will is not overborn even when the defendant is physically restrained, *see, e.g.*, *Kostin*, 2025 WL 1504409, at *29 (admitting statements despite the defendant, during questioning, being "handcuffed in an uncomfortable position"), which is a far cry from the conditions here where the defendant was unrestrained during interviews in her home, a hotel suite, a restaurant's outdoor seating, and a hotel lobby.

The defendant also argues her will was overborne because of the Interview Team's "trickery and deception," a reference to cases in which the defendant is fooled into believing that their statements are "not the sort of statement that could be used against [them] in court," such as those in which an officer "assured [a] suspect that their conversation was confidential." (Br. 27-28 (internal citations and quotation marks omitted)). The defendant argues that the Interview Team's references to a counterintelligence investigation constituted such trickery, that the agents implicitly told "Dr. Terry that this is not a criminal investigation," and thus that her admissions were "not the sort of statement that could be used against Dr. Terry in court." (Br. 28). This suggestion is absurd.

*First*, the defendant, at the very outset of the interview, was warned about the criminal consequences that could result if she was not truthful with the Interview Team. In particular, the Interview Team explained "that there is a federal law, 18 U.S.C. § 1001, that made it a crime to lie to a federal officer, that includes misstatements and omissions." (Tr. 114:18-115:3 (Agent-C Direct); *see also* Tr. 21:20-22:7 (noting that at the start of the interview "[w]e provided a candor warning") (Agent-L Direct)). This is not a case, therefore, contrary to the defendant's contention,

where "the government agents somehow misled defendant into believing that [s]he could choose to speak without consequences, thus denying him any rational choice of whether to waive his rights and confess." *United States v. Male Juv.*, 121 F.3d at 41. *Cf. Haak*, 884 F.3d at 402 (statements voluntary where police told defendant "I'm not looking to mess with you, I'm not looking to come after you" and that he was not among the "number one targets").

    *Second*, the Interview Team's statements about a counterintelligence investigation, while not mentioning that the defendant was also the target of a criminal investigation, were, in fact, true. *See Sawinski*, 2000 WL 1357491, at *5 (noting, in the suppression due to deception context, "a true statement cannot be equated with affirmative deceit" (quoting *United States v. Serlin*, 707 F.2d 953, 957 (7th Cir. 1983)). Agent-C testified on cross-examination about his role in the FBI's counterintelligence division, (Tr. 102:24-103:4), and this Court has rejected defense motions related to the Foreign Intelligence Surveillance Act, (Dkt. 73), a statute under which the Government recognizes the defendant as an "aggrieved party" in this case, (*see* Dkt. 11). These true statements, which at most "deemphasized, but did not misrepresent, the criminal nature of the inquiry does not render [a defendant's] statements involuntary." *Mastroianni*, 2022 WL 17404783, at *7. Indeed, "[f]ar from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits not exceeded here." *Rutledge*, 900 F.2d at 1131.

    *Third*, the defendant's background and affidavit stand in stark contrast with the possibility that she would not have realized her statements could have been used against her in any criminal proceeding. *See, e.g.*, *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) ("Trickery does not make it impossible *per se* to find that a defendant voluntarily waived his rights. For example, the facts could reveal that the suspect was knowledgeable about *Miranda* waivers in federal court,

and therefore highly unlikely to be tricked by an agent's statements."). As a highly educated, former longstanding government employee, any suggestion that the defendant did not realize that her statements would not remain confidential with the FBI agents—without getting such assurances—defies logic. The defendant did not ask for assurances of confidentiality and the agents gave her none, because the defendant was trying to talk her way out of trouble, not oblivious to the trouble she might already be in. Moreover, in support of her *Miranda* claim, the defendant argues that the circumstances of the interview were equivalent to an arrest, a purely criminal consequence that a former intelligence official would know only becomes a part of a counterintelligence case where someone sufficiently crosses a line that their conduct becomes criminal—precisely what was being investigated here. The defendant cannot, simultaneously, have been so terrified of the FBI agents, their aggressive questioning, and their NYPD counterparts, that she was in custody (as if she was handcuffed or in prison) while also been so lulled into ease that she made admissions she never would have made if she knew her statements could be used in criminal investigations.

And *fourth*, the cases cited by the defendant highlight that the Interview Team's statements—even if it could be believed that they misled the defendant (which they did not)—fall far short of the affirmative misrepresentations required by the case law warranting suppression. In only one of the cases cited by the defendant did a court actually suppress a statement. In *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003), the Fifth Circuit held a statement involuntary where an officer assured the defendant of confidentiality, by saying "This is for me and you. This is for me. Okay. This ain't for nobody else." Moreover, in *Hopkins*, the defendant's confession came after eight failed interrogations and on his fifteenth day in solitary confinement, to a detective he personally knew, making the promises of confidentiality even more potent. *Id.* at 581-83. By

contrast, in this case, the Interview Team made no promises of confidentiality to the defendant, a sophisticated former White House employee who was not subjected to confinement, let alone solitary; to the contrary, the Interview Team warned about their potential use in criminal charges pursuant to 18 U.S.C. § 1001, (Tr. 114:18-115:3 (Agent-C    Direct)). Other cases in which courts have suppressed based on deception have similarly extreme facts not present here. *See, e.g.*, *United States v. Duvall*, 537 F.2d 15, 24 (2d Cir. 1976) (prosecutor's threat of unrealistic 100-year sentence was a major factor in the decision to suppression defendant's confession), *cert. denied*, 426 U.S. 950 (1976); *Anderson*, 929 F.2d at 100 (holding statements involuntary in light of "Supervising Agent Valentine candidly admitted he told Anderson three times to choose between having an attorney present during questioning, or cooperating with the government"); *cf. United States v. Major*, 912 F. Supp. 90, 96 (S.D.N.Y. 1996) (finding defendant's statements admissible notwithstanding officer's stating "that [the defendant] faced the rest of his life in prison," which the court characterized as "improper," "dramatic exaggeration," despite its ultimate holding).

In the balance of the cases cited by the defendant, the challenged statements were admitted despite alleged deception. In *Male Juv.*, the Second Circuit approved the admission of a statement of a 16-year-old juvenile who was once a government informant, despite the officer taking the statement's informing the defendant, after giving *Miranda* warnings, that "[the officer] was just there for information gathering purposes," "that [the defendant] was not in trouble," and "that [the defendant] could go home that night." 121 F.3d at 41. Similarly, in *Okwumabua*, the Second Circuit found an agent's identifying himself as "a member of the Inspector General's Office" of the General Services Administration was insufficiently misleading to render a statement involuntary, even though the agent "was not identified as a special agent nor was [the defendant] told that allegations of fraud or false statements were being investigated." 828 F.2d at 952-53. And

42

in *Rutledge*, the Seventh Circuit upheld the voluntariness of a statements made after the defendant

inquired "how it [anything he told the officers] would be used, and he was told that his cooperation

would be helpful." 900 F.2d at 1128-30.

The Interview Team, therefore, did not engage in the type of "trickery and deception" that

overbore the defendant's will and therefore made any of her statements involuntary.

### CONCLUSION

For the foregoing reasons, the defendant's motion to suppression should be denied.

Dated:  New York, New York
        February 19, 2026

                                                 Respectfully submitted,

                                                 JAY CLAYTON
                                                 United States Attorney

By:    _s/_____
               Kyle A. Wirshba
               Samuel Adelsberg
               Chelsea L. Scism
               Assistant United States Attorneys
               212-637-2493 / -2494 / -2105