UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>SUE MI TERRY,<br>Defendant. | 24 Crim. 427 (LGS)<br><br>**OPINION & ORDER** |

LORNA G. SCHOFIELD, District Judge:

Defendant Sue Mi Terry filed a motion to suppress statements she made to agents of the Federal Bureau of Investigation ("FBI") on June 5, 2023. For the reasons below, the motion is denied.

## I. BACKGROUND

Based on the parties' submissions and an evidentiary hearing, including an assessment of the credibility of witnesses, the Court makes the following findings of fact relevant to the disposition of Defendant's motion. The issues are whether Defendant, who was not given *Miranda* warnings, was in custody and made the statements voluntarily.

### A. Commencement of Interview

On the morning of June 5, 2023, a team of FBI agents entered Defendant's apartment building and knocked on her apartment door. When Defendant opened the door, three agents (the "Agents") were just outside the door. Two other agents were also present in or near the stairwell. All agents were wearing plain clothes. The three interviewing Agents stated that they were FBI agents and told Defendant that they would like to speak with her privately. Defendant

said that she was in her pajamas and asked the Agents how long the interview would take, to which the Agents responded "something to the effect of not that long."

Defendant allowed the Agents into her apartment and directed them to her dining room table. Defendant, who was wearing pajamas, felt self-conscious and sat with her arms wrapped around her chest. The Agents informed Defendant that the interview was voluntary and that she was free to end the interview and direct the Agents to leave her apartment at any time. The Agents also provided a candor warning, advising Defendant that it was important that she provide truthful information and that lying to federal agents is a crime punishable under 18 U.S.C. § 1001. Defendant asked the Agents whether they were investigating her and whether she needed a lawyer. The Agents replied that they could not advise Defendant on whether she needed a lawyer and stated that they were conducting a counterintelligence operation.

During this portion of the interview, the Agents asked Defendant a series of questions about her contacts with an officer of the Republic of Korea National Intelligence Service ("NIS"). One of the Agents raised his voice and used hand gestures to express incredulity at Defendant's responses on this topic.

After approximately one hour, FBI personnel outside the apartment texted the Agents that Defendant's domestic partner was returning to the apartment, and that the New York Police Department ("NYPD") would "block the building res[idence] entrance and escort [her partner] once he is back." The Agents then asked Defendant whether her partner would be returning soon, and she said that he would. The Agents advised Defendant that the interview would continue at a nearby hotel. The Agents also advised her that it was voluntary whether or not to continue the interview at the hotel.

Defendant then asked if she could change out of pajamas. The Agents asked Defendant to leave her phone on the dining room table and for a female agent to accompany Defendant as she changed. The female agent went with Defendant to her bedroom, where the agent instructed Defendant not to make any sudden movements or reach into drawers to grab her belongings; instead, the agent asked to be shown where Defendant's clothing was so that the agent could place the needed clothing on the bed. The female agent told Defendant that she (the agent) had accompanied Defendant while she changed for the safety of both the agent and Defendant.

Meanwhile, NYPD officers wearing NYPD jackets escorted Defendant's partner into the apartment. He was visibly alarmed and asked Defendant if she was okay, to which she replied that she was okay. Defendant and the Agents then left the apartment and walked to a nearby hotel to continue the interview. On the walk, the Agents asked Defendant to place her phone in a Faraday bag, which blocks cellular signals. Defendant agreed to do so.

**B. Interview Continues at Hotel**

Once they arrived at the hotel, Defendant and the Agents went to a suite that the FBI had previously reserved. The Agents again told Defendant that the interview was voluntary, that she was free to end it at any time and that the hotel room door was unlocked. The Agents also offered and brought Defendant food and beverages.

Shortly after arriving at the hotel, Defendant informed the Agents that she had a pre-scheduled work Zoom meeting. Defendant asked to take the call in the hallway. The Agents stated that Defendant could instead take the call in the suite. The Agents removed Defendant's phone from the Faraday bag and allowed her to take the call from the bedroom in the suite on speakerphone with the door open, while the Agents were in an adjacent room. The call lasted approximately ten minutes.

After the Zoom call ended, the Agents interviewed Defendant at the hotel for approximately three and a half hours. At points throughout the interview, one of the Agents again raised his voice at Defendant, stating that they were dissatisfied with her answers and she was not being sufficiently forthcoming. Defendant took one break during the questioning. The break lasted approximately ten minutes, during which the female agent escorted Defendant to the bathroom and waited for her outside the door.

Also at the hotel, the Agents asked Defendant to show them messages between her and an NIS contact. Defendant agreed to show them the messages but declined to let the Agents keep the phone. The Agents then revealed that they had search warrants for Defendant's property and took her phone pursuant to the warrants. When the Agents informed Defendant that they had warrants, she told them that serving the warrants was "sneaky." Defendant again asked whether she needed a lawyer, to which the Agents responded that they could not give legal advice but wanted "to understand how far [Defendant's NIS contact] would go in his actions."

Shortly thereafter, the Agents asked Defendant to consent to a search of her apartment, and she agreed. The Agents permitted Defendant to call her partner and her son using speakerphone and temporarily returned her phone for this purpose. The Agents and Defendant then walked back to her apartment together. Once at the apartment, Defendant changed into gym clothes while being monitored by a female agent. Defendant told the Agents that she was going to go to the gym, purchase a new phone and meet her partner and son. She then left the apartment. At that point, Defendant had been with the Agents for approximately five hours.

Later that evening, one of the Agents contacted Defendant and stated that the Agents had some paperwork for her and wanted to ask additional questions. Two of the Agents who previously had interviewed Defendant, and one additional agent, met Defendant at a restaurant

near her apartment. The Agents again informed Defendant that the interview was voluntary. The Agents interviewed Defendant for approximately one hour and then continued the interview at a nearby hotel for an unstated period of time. The Agents once more informed Defendant that the interview was voluntary. The Agents questioned Defendant again regarding topics already covered during the day. The interview concluded that evening.

### C. Evidentiary Hearing

On July 16, 2024, roughly one year after the June 5 interview, Defendant was arrested on a two-count Indictment charging a violation of the Foreign Agents Registration Act ("FARA") and conspiracy to violate the same. Defendant moves to suppress statements she made on June 5, 2023.

On January 28, 2026, an evidentiary hearing was held. The Government called two of the Agents as witnesses and marked ten exhibits as evidence. Defendant cross-examined the Government witnesses and marked sixty-nine exhibits but did not call any witnesses. Defendant previously had filed two declarations describing the June 5, 2023, events in support of her pre-trial motions.

## II. *MIRANDA*

Defendant's motion to suppress statements on the basis of *Miranda v. Arizona*, 384 U.S. 436 (1966), is denied because a reasonable person in Defendant's position would not have felt that her freedom of movement had been curtailed to the degree of a formal arrest.

**A. Legal Standard**

"[N]o evidence obtained as a result of interrogation can be used against a defendant" who was in custody and not read *Miranda* warnings.[1] *United States v. Pence*, 172 F.4th 213, 217 (2d Cir. 2026). "A person must both be in custody and subject to interrogation for *Miranda* safeguards to apply." *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017). The Government does not contest that Defendant was subject to interrogation or that the Agents did not provide *Miranda* warnings.

"Determining whether an individual is in custody is an objective inquiry that asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018). "Although both elements are required, the second is the ultimate inquiry because a free-to-leave inquiry reveals only whether the person questioned was seized." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016). Considerations relevant to the second inquiry include: "(1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." *United States v. Jabar*, 19 F.4th 66, 83 (2d Cir. 2021).

The custody analysis is based on the totality of the circumstances. *See Pence*, 172 F.4th at 218. "An individual's subjective belief about his or her status generally does not bear on the

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

custody analysis." *Faux*, 828 F.3d at 135. Nor does an officer's knowledge or beliefs regarding the individual's status, unless the officer conveyed them to the individual being questioned and they would "affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* "Although coercive pressure is *Miranda*'s underlying concern, custody remains the touchstone for application of its warning requirement . . . because any interview of one suspected of a crime by a police officer will have coercive aspects to it . . . ." *Pence*, 172 F.4th at 217-18.

**B. Discussion**

The record does not support the conclusion that Defendant was "in custody," as outlined above, on June 5, 2023. Among other things, Defendant traveled to two hotels and a restaurant to continue discussions with the Agents. At each location, the Agents informed Defendant that the interview was voluntary and that she was free to end the interview at any time. Under these circumstances, a reasonable person would not have felt that her freedom of action was curtailed to the degree of a formal arrest.

**1. Defendant's Ability to End Interview**

Two of the Agents credibly testified that they repeatedly informed Defendant that the interview was voluntary and that she was free to end the interview at any time. "Such advice, while not dispositive, is probative in assessing the extent to which a reasonable person would understand any restraints on his freedom." *Familetti*, 878 F.3d at 60; *see Pence*, 172 F.4th at 220 (holding that the defendant was not in custody when agents informed him that he was "not under arrest" and "under no obligation to talk to" the agents). These statements weigh against finding that Defendant was in custody.

Defendant argues that the Agents' actions belie their statements that the interview was voluntary and that she was free to end the interview. These arguments are unpersuasive. First, Defendant argues that the Agents conveyed that she was not free to leave in several ways: for example, by stating that that they were investigating a matter of national security urgency and that the interview would not take long, and by not permitting her to change her clothing although Defendant was "wearing only revealing silk pajamas and no bra" -- i.e., clothing in which she "reasonably would not feel free to leave her own apartment." But the apartment was hers, and nothing in the record suggests she could not have ended the interview by asking the Agents to leave. These factors do not compel a finding of custody. *See United States v. Smith*, No. 25 Crim. 4, 2025 WL 1122647, at *6 (S.D.N.Y. Apr. 16, 2025) (concluding that defendant was "free to leave" based on agents' statements that he was free to leave and could decline to answer questions, although defendant was interviewed in his apartment, initially unclothed and briefly restrained).

Defendant further argues that her freedom of movement was restricted, despite the Agents' statements otherwise, because one of the Agents supervised Defendant while she changed and stood outside the restroom door while Defendant was using the restroom. These arguments are unpersuasive because a reasonable person would understand, as the Agents informed Defendant, that these restraints on her movement were to assure the safety of all involved. This understanding would have been reenforced by the female agent's instruction that Defendant not take anything from the drawers and instead identify the necessary clothing.

These facts are analogous to those in *Faux*. There, the Second Circuit concluded that an interrogation in the defendant's home was not custodial, even though she was "not permitted to move freely about her home during the two-hour interrogation" and "agents accompanied her to

the bathroom and to her bedroom to fetch" clothing. *Faux*, 828 F.3d at 137. The Second Circuit stated that "[a] reasonable person" would understand these restrictions on the defendant's movement to be a "sensible precaution" given the ongoing search. *Id.* The Second Circuit arrived at that conclusion even though, unlike here, the agents in that case did not tell the defendant "the reason she was being shadowed." *Id.* Here, a reasonable person similarly would have understood the Agents' restrictions to be a "sensible precaution" to assure the safety of all involved. *Id.* In light of these restrictions, Defendant "may have been seized [i.e., restrained], but not every seizure amounts to custody." *Id.*

Defendant also argues that, when she asked to step outside of the hotel room to take a Zoom call, the Agents denied her request, which demonstrates she was not free to end the encounter. The record does not support Defendant's characterization. The record reflects that Defendant asked to take the call outside of the room, and that instead of responding directly, the Agents said that she could take the call inside the room. The record does not reflect that Defendant sought to end the interview at this point, or that the Agents denied a request to leave the room for the purpose of ending the interview. Thus, the Agents did not "affirmatively convey the message that the defendant is not free to leave," and this exchange does not render the interview custodial. *Familetti*, 878 F.3d at 60; *see Jabar*, 19 F.4th at 84 (holding no custody where the defendant neither "attempted to terminate the interview [n]or was prevented from doing so").

Defendant also argues that she was not actually free to end the encounter because the Agents planned to execute a search if she chose to end the interview. This argument is unpersuasive, first, because "an officer's knowledge or beliefs" are relevant to the custody analysis only to the extent they were conveyed to a defendant. *Faux*, 828 F.3d at 135. The

record reflects that the Agents informed Defendant of their intent to execute a warrant to Defendant only when the interview was nearly concluded. When they did inform Defendant that they had a warrant, both Agents credibly testified that Defendant said that the agent serving the warrant was "sneaky," suggesting she did not know about it until then. Second, when the Agents did eventually execute a search, Defendant did not feel constrained to stay and left the apartment to buy a new phone, meet her partner and son and go to the gym.

Finally, Defendant argues that the Agents' statements that the interview was voluntary and Defendant was free to leave were undermined by the Agents' statements of national security urgency. In arguing that the Agents conveyed national security urgency, Defendant primarily relies on her declaration and statements in an "interview plan" that the Agents used during the interview. However, the agent leading the interview testified that he did not recall using the referenced statements in the interview plan, although he did acknowledge conveying urgency to Defendant because the Agents "only had a limited time to speak about this before we have to make some decisions." Even to the extent that the Agents did convey national security urgency to Defendant, these statements did not "affirmatively convey the message that the defendant is not free to leave." *Familetti*, 878 F.3d at 60. The Agents' statements that the interview was voluntary and that Defendant was free to end the interview at any time weigh strongly against a finding of custody.[2]

---

[2] The Government argues, based on the hearing testimony and the FD-302 Report drafted after the June 5 interview, that Defendant at one point "snapped" at one of the Agents for being overly repetitive in informing her that the interview was voluntary. Defendant contends that this exchange was "not initiated by the FBI [Agent] telling me that my participation in the interrogation was 'voluntary,' but rather by his repeated attempts to put words in my mouth." Regardless of which account is credited, a reasonable person would have understood that participation in the interview was voluntary in light of the totality of the circumstances.

**2. Remaining Factors**

In addition to the Agents' repeated statements that the interview was voluntary, several other factors support the conclusion that Defendant was not in custody. First, the Agents were in plain clothes, and their firearms were not drawn, each of which weighs against a finding of custody. *See Pence*, 172 F.4th at 218 (holding no custody where firearms were holstered during questioning); *Faux*, 828 F.3d at 139 (similar). Second, Defendant was never placed in handcuffs or other restraints, nor did the Agents state that she was under arrest. *See Pence*, 172 F.4th at 218. Together, these factors weigh against custody.

Defendant argues that the substantial armed law enforcement presence favors a finding of custody. Specifically, Defendant notes that, in addition to the Agents conducting the interview, two other agents were positioned on the stairwell landing outside the apartment, and three armed NYPD officers entered her apartment with her domestic partner while she was changing. However, even with this law enforcement presence and crediting Defendant's assertion that all law enforcement personnel she encountered were armed, analogous case law establishes that a significant law enforcement presence does not tip the scale in favor of custody given the other circumstances here. *See Pence*, 172 F.4th at 220 (holding no custody where fourteen law enforcement agents entered the defendant's home with firearms drawn); *Faux*, 828 F.3d at 136 (holding no custody when "about a dozen" agents executed a warrant at the defendant's home).

Defendant points to other factors that she contends demonstrate that her freedom was curtailed to the degree of a formal arrest. These factors do not override the factors weighing against custody. Defendant argues that the five-hour duration of the interview favors custody. This factor is not dispositive here -- particularly given the Agents' statements that Defendant was free to end the interview at any time. *See Pence*, 172 F.4th at 219 (holding no custody when

defendant was "questioned for more than an hour and a half," including because the defendant "was given a choice about whether to speak with the agents at all"); *Faux*, 828 F.3d at 139 (holding no custody for two-hour interview where the defendant "was never told that she was *not* free to leave"). Here, as in those cases, the duration of the interview does not override the other factors.

Defendant argues that the multiple locations of the interview -- Defendant's dining room table, two hotels near her apartment and a restaurant -- favor custody because they are all private locations in which she was isolated. These locations either cut against custody or do not outweigh the other factors supporting custody. Interviews in "the familiar surroundings of [a defendant's] own home" are generally not viewed as custodial. *Faux*, 828 F.3d at 138; *accord Smith*, 2025 WL 1122647 at *6. And while an interview's taking place "in a closed room, out of public view" weighs in favor of custody, that factor is not dispositive. *United States v. FNU LNU*, 653 F.3d 144, 155 (2d Cir. 2011) (holding no custody).

Defendant argues that she did not volunteer for the interview, which favors custody. The fact that the Agents initiated the interview is not dispositive here. An interview is not custodial merely because law enforcement initiates the contact. *See Pence*, 172 F.4th at 220 (holding no custody where law enforcement appeared at defendant's home to execute a warrant); *Familetti*, 878 F.3d at 56 (similar).

Finally, Defendant contends that the aggressive tone and nature of the questioning favors custody. The record does reflect that, on at least two occasions, one of the Agents raised his voice at Defendant and expressed incredulity at her responses. The Agents also presented Defendant with documents reflecting that she had been the subject of surveillance. Although this factor "deserves some weight . . . it does not tip the scale in [Defendant's] favor." *Pence*, 172

F.4th at 219. In *Pence*, FBI agents elicited a confession after showing inculpatory evidence to the un-Mirandized defendant. *Id.* at 220. The Second Circuit held that this interview technique did not tip the scales in favor of finding custody in light of other factors, including the agents' statements that the defendant was not under arrest. *Id.* Similarly, in *United States v. Simmonds*, 641 F. App'x 99 (2d Cir. 2016) (summary order), an unreported case that is persuasive here, the Second Circuit held that a defendant was not in custody despite factual findings that an officer "accused [the defendant] of lying, confronted him with evidence of his guilt, and advised him that it was in his best interest to be honest." *Id.* at 103.

Defendant's *Miranda* arguments fail because a reasonable person would not have considered themselves to be in custody tantamount to an arrest on June 5. Because Defendant was not in custody, Defendant's arguments that the Agents engaged in an impermissible two-step interrogation need not be addressed.

## III. VOLUNTARINESS

Defendant also argues that her statements should be suppressed because the Agents overbore her will such that the statements were made involuntarily, in violation of due process. This argument is unavailing because the Agents did not coerce Defendant into making involuntary statements.

### A. Voluntariness Legal Standard

"Incriminating statements made in non-custodial settings are inadmissible if the statements were not made voluntarily -- that is, if the defendant's will was overborne." *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021). Statements are voluntary if they are "the product of an essentially free and unconstrained choice by their maker." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018). Courts "evaluate voluntariness based on the totality of the

circumstances, including (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Kourani*, 6 F.4th at 352.

"To prevail on a claim of involuntariness premised on trickery and deception, a defendant must produce clear and convincing evidence that the government agents affirmatively misled him as to the true nature of their investigation." *Id.* at 351. But "a finding that police conduct is false, misleading, or intended to trick and cajole the defendant into confessing does not necessarily render the confession involuntary." *Haak*, 884 F.3d at 409.

**B. Discussion**

Defendant primarily argues that her statements were involuntary because the Agents deceived her about the scope and nature of their investigation. Defendant also argues that the evidence supporting custody, discussed above, supports the conclusion that Defendant's statements were involuntary. These arguments fail because, assessing the totality of the circumstances, Defendant's will was not overborne by the Agents' conduct.

First, regarding the characteristics of the accused, Defendant is intelligent, well-educated and knowledgeable about sensitive matters involving foreign relations. Defendant has a Ph.D. in International Relations and has worked for the U.S. Government in various roles, including the Central Intelligence Agency, National Security Council and National Intelligence Council. Her education and professional experience weigh against the conclusion that Defendant's statements were involuntary. *See Kourani*, 6 F.4th at 352 (noting that the defendant's level of education, including a graduate degree, weighed against involuntariness).

Second, considering the conditions of the interview, as discussed above regarding Defendant's *Miranda* argument, some factors, such as the duration of the interview, weigh in favor of involuntariness. But other factors, including the Agents' repeated statements that the

interview was voluntary and that Defendant was free to end the interview at any time, weigh against the conclusion that Defendant's will was overborne.

Third, considering the Agents' conduct, the Agents may have misled Defendant about her status as a target of their investigation, but this omission did not render her statements involuntary. Twice, when Defendant asked the Agents whether she needed a lawyer, the Agents answered that they could not advise her on that issue and implied they were pursuing a counterintelligence investigation. The Agents' interview plan also includes statements that the Agents were "giving [her] a favor as former agency." Defendant could have interpreted these statements to mean that the Agents were not primarily conducting a criminal investigation targeting Defendant.

However, even assuming Defendant was misled in this manner, this implication is not sufficient to render Defendant's statements involuntary because misdirection about the scope of an investigation, without more, does not generally render statements involuntary. For example, in *United States v. Shvartsman*, 722 F. Supp. 3d 276 (S.D.N.Y. 2024), which is persuasive here, an officer employed a "ruse" to convince a defendant to provide his cell phone passcode so that FBI agents could search the phone. *Id.* at 322. The officer falsely told the defendant that he had been selected for a "routine" inspection in an airport customs line, when in fact, the purpose of the inspection was to facilitate the agents' search. *Id.* at 322-23. The court concluded that this concededly false reason did not render the defendant's statement involuntary because, although the officer "affirmatively misled" the defendant, this misdirection did not "overbear [the defendant's] will to resist and bring about a statement not freely self-determined." *Id.* at 323.

Additionally, the Agents' implications about the nature of their investigation were not false; one of the Agents credibly testified that their investigation was "dual tracked, as both

counterintelligence and criminal," meaning that it was not false to state that the Agents were conducting a counterintelligence investigation. That the Agents did not disclose the full scope or nature of their investigation or that Defendant was a subject, these omissions do not render Defendant's statements involuntary. *See United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) (holding statements voluntary when agent "deemphasized, but did not misrepresent, the criminal nature of the inquiry"); *see also Haak*, 884 F.3d at 412 (confession voluntary although officer stated he was "not looking to come after" the defendant, who was "not among the number one targets" of an investigation).

Assessing the totality of the circumstances, the record does not support the conclusion that Defendant's will was overborne such that her statements were made involuntarily.

## IV. CONCLUSION

For the reasons above, Defendant's motion to suppress is **DENIED**.

The parties shall maintain the exhibits submitted in connection with this motion for purposes of any appellate review.

Dated: August 20, 2026
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE