UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SUE MI TERRY,

*Defendant*.

24 Cr. 427 (LGS)

**Oral Argument Requested**

**DEFENDANT DR. SUE MI TERRY'S MOTIONS *IN LIMINE***

SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000

KKL LLP
350 Fifth Avenue, 77th Floor
New York, NY 10118
Telephone: (212) 390-9550

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000

JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: (212) 891-1600

*Attorneys for Dr. Sue Mi Terry*

# Table of Contents

PRELIMINARY STATEMENT ..... 1

LEGAL STANDARD ..... 3

I. THE COURT SHOULD EXCLUDE ARGUMENT OR EVIDENCE RELATED TO ESPIONAGE AND NATIONAL SECURITY ..... 3

A. BACKGROUND ..... 3

B. ARGUMENT ..... 4

1. Espionage Rhetoric Should Be Excluded ..... 4

2. Spycraft Evidence Should Be Excluded ..... 6

3. References to Counterintelligence Operations and the Scope of the Government's Investigation Should Be Excluded ..... 7

C. CONCLUSION ..... 8

II. THE COURT SHOULD PRECLUDE USE OF THE PHRASE "NONPUBLIC U.S. GOVERNMENT INFORMATION" AND IMPROPER ARGUMENT REGARDING THE PHRASE "OFF-THE-RECORD" ..... 8

A. BACKGROUND ..... 8

B. ARGUMENT ..... 10

1. References to "Nonpublic U.S. Government Information" Should Be Excluded ..... 10

2. The Court Should Preclude Any Suggestion That "Off-The-Record" Concerns Classified Information or Nondisclosure Obligations ..... 12

C. CONCLUSION ..... 13

III. THE COURT SHOULD REQUIRE THE GOVERNMENT TO PROFFER EVIDENCE IN SUPPORT OF THE CHARGED CONSPIRACY TO VIOLATE FARA ..... 13

A. BACKGROUND ..... 13

B. ARGUMENT ..... 14

C. CONCLUSION ..... 17

IV. THE COURT SHOULD REQUIRE THE GOVERNMENT TO IDENTIFY THE SPECIFIC CONDUCT IT CONTENDS WAS REGISTRABLE ACTIVITY ..................17

A. BACKGROUND ..................17

B. ARGUMENT ..................18

1. The Indictment Illustrates Why Pretrial Specification Is Necessary ..................18

2. The Current Posture of This Case and This Court's Trial-Management Authority Support Pretrial Specification ..................20

C. CONCLUSION ..................22

V. THE COURT SHOULD EXCLUDE OR LIMIT EVIDENCE OF PERSONAL GIFTS HAVING NO NEXUS TO ALLEGED FARA ACTIVITY ..................22

A. BACKGROUND ..................22

B. ARGUMENT ..................23

1. The Gifts Evidence Should Be Excluded Because It Bears No Connection Whatsoever to Any Section 611(c)(1) Activity ..................23

2. In the Alternative, the Court Should Limit the Form of the Gifts Evidence to Prevent Unfair Prejudice ..................26

C. CONCLUSION ..................27

VI. THE COURT SHOULD EXCLUDE OR LIMIT EVIDENCE CONCERNING EXPENSIVE MEALS AND DRINKS UNCONNECTED TO ANY ALLEGED FARA ACTIVITY ..................27

A. BACKGROUND ..................27

B. ARGUMENT ..................28

1. The Meals and Drinks Evidence Should Be Excluded Because It Bears No Nexus to Any Section 611(c)(1) Activity ..................28

2. If the Court Permits Evidence of the Meals and Drinks, It Should at a Minimum Exclude All References to Their Price or Prestige ..................30

C. CONCLUSION ..................31

VII. THE COURT SHOULD EXCLUDE EVIDENCE OF THE WILSON CENTER DONATIONS OR, IN THE ALTERNATIVE, PRECLUDE ANY SUGGESTION THAT THEY WERE PERSONAL GIFTS OR DIRECTED BY THE HIGHEST LEVELS OF THE SOUTH KOREAN GOVERNMENT ..................31

A. BACKGROUND ....................................................................................31

B. ARGUMENT ....................................................................................32

1. The Irrelevant Donations to the Wilson Center Should Be Excluded Entirely ....................................................................................32

2. The Government Should Be Precluded from Suggesting the Donations Were Personal Gifts or Compensation to Dr. Terry ..................33

3. The Government Should Also Be Precluded from Suggesting That the Donations Were Directed by the Highest Levels of the South Korean Government Absent Admissible Evidence Supporting That Claim ....................................................................................34

C. CONCLUSION ....................................................................................36

VIII. THE COURT SHOULD EXCLUDE UNFAIRLY PREJUDICIAL LANGUAGE FROM THE 2022 TRUTH IN TESTIMONY FORM ....................................................36

A. BACKGROUND ....................................................................................36

B. ARGUMENT ....................................................................................36

C. CONCLUSION ....................................................................................37

PRAYER FOR RELIEF ....................................................................................38

# Table of Authorities

**Page(s)**

**Cases**

*Arlio v. Lively*,
474 F.3d 46 (2d Cir. 2007) ........ 3

*Att'y Gen. of United States v. Wynn*,
104 F.4th 348 (D.C. Cir. 2024) ........ 20

*Bourjaily v. United States*,
483 U.S. 171 (1987) ........ 14, 15, 16

*Cheek v. United States*,
498 U.S. 192 (1991) ........ 5

*Michele Amoruso E Figli v. Fisheries Dev. Corp.*,
499 F. Supp. 1074 (S.D.N.Y. 1980) ........ 25

*Old Chief v. United States*,
519 U.S. 172 (1997) ........ *passim*

*United States ex rel. Haynes v. McKendrick*,
481 F.2d 152 (2d Cir. 1973) ........ 6

*Stryker Corp. v. Ridgeway*,
2016 WL 6584657 (W.D. Mich. Jan. 25, 2016) ........ 26

*United States v. Adelekan*,
567 F. Supp. 3d 459 (S.D.N.Y. 2021) ........ 16

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) ........ 15

*United States v. Calk*,
No. 19-cr-366 (S.D.N.Y. July 9, 2021) ........ 20

*United States v. Cassese*,
290 F. Supp. 2d 443 (S.D.N.Y. 2003) ........ 26

*United States v. Craig*,
401 F. Supp. 3d 49 (D.D.C. 2019) ........ 5

*United States v. Delvecchio*,
816 F.2d 859 (2d Cir. 1987) ........ 30

*United States v. Duncan*,
2019 WL 2210663 (S.D.N.Y. May 22, 2019) ....................7

*United States v. Gentile*,
2024 WL 2941849 (E.D.N.Y. June 11, 2024) ....................13

*United States v. Hardy*,
149 F.4th 1153 (10th Cir. 2025) ....................16

*United States v. Menendez*,
759 F. Supp. 3d 460 (S.D.N.Y. 2024)....................24, 25, 29

*United States v. Michel*,
2024 WL 1603362 (D.D.C. Apr. 12, 2024) ....................15

*United States v. Natelli*,
527 F.2d 311 (2d Cir. 1975)....................21

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006)....................26, 30, 37

*United States v. Rosenberg*,
109 F. Supp. 108 (S.D.N.Y. 1953) ....................5

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998)....................15

*United States v. Schiff*,
612 F.2d 73 (2d Cir. 1979)....................3

*United States v. Scop*,
846 F.2d 135 (2d Cir. 1988)....................10, 11

*United States v. Stahl*,
616 F.2d 30 (2d Cir. 1980)....................26, 30

*United States v. Sun*,
No. 24-cr-346 (E.D.N.Y.) .................... *passim*

*United States v. Tao*,
2022 WL 252019 (D. Kan. Jan. 27, 2022)....................5, 6, 11

*United States v. Tellier*,
83 F.3d 578 (2d Cir. 1996)....................15

*United States v. Torres*,
435 F. Supp. 3d 526 (S.D.N.Y. 2020)....................17

*United States v. Vidal*,
2024 WL 397630 (2d Cir. Feb. 2, 2024) .......... 16

*United States v. Young*,
470 U.S. 1 (1985) .......... 11

*United States v. Zuberi*,
No. 19-cr-642 (C.D. Cal. Oct. 22, 2019) .......... 25

*Viereck v. United States*,
318 U.S. 236 (1943) .......... 6

**Statutes**

18 U.S.C. § 794 .......... 4

18 U.S.C. § 798 .......... 4

18 U.S.C. § 1001 .......... 36

18 U.S.C. § 3500 .......... 14

22 U.S.C. § 611 .......... *passim*

22 U.S.C. § 612 .......... 10

22 U.S.C. § 613 .......... 17, 21

22 U.S.C. § 618 .......... 5, 10

50 U.S.C. § 851 .......... 4

**Rules**

Fed. R. Evid. 104 .......... 15, 16

Fed. R. Evid. 401 .......... *passim*

Fed. R. Evid. 402 .......... *passim*

Fed. R. Evid. 403 .......... *passim*

Fed. R. Evid. 404 .......... 36, 37

Fed. R. Evid. 602 .......... 35

Fed. R. Evid. 801 .......... 13, 14, 16

**Regulations**

28 C.F.R. § 5.2 ....................19

Amending and Clarifying Foreign Agents Registration Act Regulations, 90 Fed. Reg. 40 (proposed Jan. 2, 2025) (to be codified at 28 C.F.R. pt. 5) ....................19

**Other Authorities**

The Associated Press, *Statement of News Values and Principles*, https://perma.cc/L5NA-X43V ....................12

Chatham House, *Code of Conduct*, https://perma.cc/S2SS-9XTG ....................12

*Counterintelligence and Espionage*, FBI, https://perma.cc/GL8W-ZVC2 ....................8

Eric Tucker, Alanna Richer, Michael Kunzelman, *Ex-FBI Director James Comey indicted after Trump pushes for prosecution of longtime foe,* AP News (Sept. 25, 2025), https://perma.cc/PSZ8-4PWE ....................37

Jeremy Roebuck, *Key House Republican accuses Jack Smith of lying to Congress*, Wash. Post, (July 23, 2026), https://archive.is/U3X3V ....................37

Madeline Halpert, *Ex-CIA Analyst Charged with Spying for South Korea*, BBC (July 17, 2024), https://perma.cc/A6PS-YMP8 ....................6

Neil G. Ruiz et al., *Discrimination Experiences Shape Most Asian Americans' Lives,* Pew Rsch. Ctr. (Nov. 30, 2023), https://perma.cc/P5N8-JPHS ....................6

*Spy Speak Glossary*, CIA, https://perma.cc/7H5H-SVCS ....................4

Suki Kim, *The Strange Espionage Case of Sue Mi Terry*, New York Magazine (Aug. 14, 2025), https://perma.cc/FWX9-PYPX ....................6

## PRELIMINARY STATEMENT

Defendant Dr. Sue Mi Terry ("Dr. Terry") is charged with willfully failing to register under the Foreign Agents Registration Act ("FARA") and conspiring to do the same. Those are the only charges in this case. But the government does not want to try the narrow registration case it charged. Instead, it seeks to portray Dr. Terry as a spy, put her lifestyle on trial, and bury the actual charges under so much misleading, irrelevant, and inflammatory evidence that jurors will be left unable to discern which conduct they must evaluate or which alleged crimes they must adjudicate. This Court should draw the line.

From the Indictment onward, the government has pursued a deliberate strategy to recast this FARA prosecution as an espionage or national-security case. It invokes spy rhetoric, spycraft, and counterintelligence operations, *see infra* § I; deploys the misleading phrase "nonpublic U.S. Government information" to imply Dr. Terry disclosed classified material she never possessed, *see infra* § II; and employs the term "off-the-record" to fabricate legal nondisclosure obligations that did not exist, *see infra* § II. None of this has anything to do with whether Dr. Terry was required to register under FARA, and its purpose and effect are to mislead the jury and invite jurors to convict her based upon the suggestion of more severe crimes that the government did not charge.[1] Courts have rejected similar attempts to inject national-security overtones in analogous cases, and the same result is all the more warranted here, where the defendant is a leading scholar on the Korean Peninsula whose conduct at issue involves writing articles, attending conferences, and meeting with diplomats as a private citizen.

---

[1] Dr. Terry also seeks to preclude the government from introducing certain evidence referring to the separate, uncharged crime of making false statements to Congress. *See infra* § VIII.

The government also intends to introduce evidence—including out-of-court statements by Dr. Terry's alleged co-conspirators—that is admissible only upon a sufficient showing that a conspiracy existed. *See infra* § III. Yet the Indictment alleges no fact demonstrating that Dr. Terry agreed with anyone to evade FARA's registration requirement, and the government's voluminous discovery is equally devoid of such evidence. The government should therefore be required to proffer evidence of the alleged conspiracy before placing such evidence before the jury.

More fundamentally, the risk of misleading the jury extends to *how* it will be asked to evaluate the evidence. The government has never identified which of the sixteen overt acts in the Indictment it contends triggered a duty to register under FARA. Without that pretrial identification, the parties cannot meaningfully brief the relevant disputed questions of statutory interpretation, and the jury will lack a workable framework for distinguishing a decade of professional conduct from the specific acts that allegedly gave rise to the legal duty Dr. Terry is accused of willfully violating. This could result in a nonunanimous verdict in which no two jurors agree on what Dr. Terry actually did that required registration. *See infra* § IV. The government should be required to make that identification before trial begins.

Finally, the government's overreach extends to sweeping evidence about Dr. Terry's lifestyle, including luxury gifts and expensive meals at Michelin-starred restaurants, even though none of that evidence bears any connection to an activity enumerated under 22 U.S.C. § 611(c)(1). *See infra* §§ V-VI. The government wants the jury to recoil at the price of a handbag or a Michelin star rather than to decide the narrow registration question before it. And the government likewise seeks to mischaracterize institutional donations to the Woodrow Wilson International Center for Scholars ("Wilson Center") as personal gifts or compensation to Dr. Terry, which is demonstrably false. *See infra* § VII.

Unless this Court intervenes, the government will transform this narrow registration case into a sprawling trial about espionage and other uncharged and inadmissible conduct untethered to the offenses in the Indictment. The motions *in limine* that follow ask this Court to confine the government to the case it actually charged by excluding irrelevant, inflammatory, and misleading evidence and argument and by requiring the government to make pretrial identifications and proffers aimed at ensuring the jury can properly evaluate the evidence at trial.

## LEGAL STANDARD

Evidence is irrelevant and inadmissible if it "does not tend to prove a material fact." *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) (citation omitted); *see* Fed. R. Evid. 401, 402. "[E]ven relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Schiff*, 612 F.2d 73, 80 (2d Cir. 1979) (internal quotation marks and citation omitted); *see* Fed. R. Evid. 403.

## I. THE COURT SHOULD EXCLUDE ARGUMENT OR EVIDENCE RELATED TO ESPIONAGE AND NATIONAL SECURITY

### A. BACKGROUND

This is a FARA case, not an espionage prosecution. Dr. Terry is not charged with spying, mishandling classified or national-defense information, or otherwise compromising national security. Yet the Indictment and the government's filings are replete with references to (i) espionage rhetoric, (ii) alleged spycraft tactics, and (iii) counterintelligence operations, and the government has doubled down on this strategy by noticing a former CIA counterintelligence chief as a purported expert.[2] Espionage and national-security evidence, however, is irrelevant to Dr. Terry's alleged willful failure to register under FARA and conspiracy to commit the same, and that

---

[2] Dr. Terry moves to exclude James Olson's testimony in a separate *Daubert* motion. *See* ECF No. 121 ("Olson *Daubert* Motion"). Unless otherwise stated, "ECF No." refers to docket entries in this case.

alone warrants exclusion under Rules 401 and 402. Any marginal probative value is also substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury. Allowing the government to cloak this registration case in the trappings of espionage would invite conviction based on the inflammatory and false insinuation that Dr. Terry was a double agent, rather than proof of the charged offenses. Courts have repeatedly rejected the government's attempts to introduce espionage and national-security evidence in FARA and other non-espionage cases, and this Court should do the same.[3]

## B. ARGUMENT

### 1. Espionage Rhetoric Should Be Excluded

The Court should preclude all uses of espionage rhetoric as irrelevant and unfairly prejudicial. This case concerns Dr. Terry's alleged failure to file paperwork, not espionage or any offense implicating national security.[4] The government's repeated characterizations of South Korean officials as Dr. Terry's "handlers,"[5] ECF No. 2 ("Indictment" or "Ind.") (*passim*), and Dr. Terry as their "source," *id.* ¶¶ 2, 53, are not probative of whether her *actual* conduct amounted to (1) acting as an agent of a foreign principal and (2) failing to register under FARA, the core "actus reus" of a FARA violation, Order at 11, *United States v. Sun*, No. 24-cr-346 (E.D.N.Y. Nov. 3, 2025), Dkt. 238 ("*Sun* Motions *in Limine* Order," attached hereto as Exhibit A) (citation omitted). Nor does such terminology shed any light on the required mental state—that Dr. Terry knew of her

---

[3] While each category of evidence, rhetoric, and argument addressed in this motion independently warrants exclusion, the Court should also weigh the cumulative prejudicial effect.

[4] By contrast, the uncharged espionage and national-security statutes that the government's rhetoric evokes criminalize entirely different conduct. *See, e.g.*, 18 U.S.C. §§ 798(a) (unauthorized disclosure of classified information), 794(a) (delivery of national-defense information to aid foreign government); 50 U.S.C. § 851 (knowledge of espionage tactics of foreign government or political party and failure to register).

[5] The CIA defines "handler" as "the case officer who manages an agent." *See Spy Speak Glossary*, CIA, https://perma.cc/7H5H-SVCS (emphasis omitted).

FARA obligations and willfully violated or agreed to violate them. *See* 22 U.S.C. § 618(a)(1); ECF No. 72-1 (Jury Charge in *Sun*) at 53.[6]

Just as importantly, the government's use of spy rhetoric conveys harmful falsehoods about Dr. Terry, creating dangers of unfair prejudice and confusion that substantially outweigh any marginal probative value. Not only does espionage improperly assume the legal conclusion that Dr. Terry was an agent of South Korea, but it connotes treason—conduct far more serious than the alleged FARA violation here, which rests on Dr. Terry publishing articles, attending conferences, and meeting with diplomats. *Compare United States v. Rosenberg*, 109 F. Supp. 108, 110 (S.D.N.Y. 1953), *aff'd*, 204 F.2d 688 (2d Cir. 1953) (considering espionage "worse than murder"), *with United States v. Craig*, 401 F. Supp. 3d 49, 52 (D.D.C. 2019) ("Foreign 'agents' [in the context of FARA] are not spies—*what they do is legal*." (emphasis added)).

Accordingly, courts routinely reject the government's attempts to introduce espionage and national-security evidence in FARA and other non-espionage prosecutions. In *Sun*, the court excluded "national security rhetoric" from a FARA trial because "reference to espionage or spying would be inflammatory and unfairly prejudicial" and would improperly "shift focus" from the defendant's "failure to register" by "peppering 'the trial with national security overtones.'" *Sun* Motions *in Limine* Order at 11[7] (quoting *United States v. Tao*, 2022 WL 252019, at *6 (D. Kan.

[6] At trial, the *Sun* court instructed the jury that "[a] Defendant's conduct is not 'willful' if it was the result of negligence, inadvertence, mistake, or a good faith misunderstanding of the requirements of the law," referring to the standard set forth in *Cheek v. United States*, 498 U.S. 192, 201-04 (1991). ECF No. 72-1 at 53. Although the government has advanced a different view of the willfulness standard, *see* ECF No. 52 at 8-10, the Court need not resolve that disputed issue now because espionage rhetoric is irrelevant even under the government's proposed standard. *See* Olson *Daubert* Motion at 4 n.1.

[7] *Sun* involved more troubling allegations—forgery, visa fraud, and money laundering by an active government official at the behest of Chinese operatives. *See Sun*, 24-cr-346, Dkt. 4. If espionage rhetoric was irrelevant and unfairly prejudicial in that case, it is even more so here, where the alleged foreign principal is a close U.S. ally and the charges concern Dr. Terry's private academic and journalistic work.

Jan. 27, 2022) (excluding testimony about Chinese economic espionage as irrelevant and unfairly prejudicial in wire-fraud case)). The same rhetoric here would "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged"—namely, the uncharged offenses of spying or mishandling classified information. *Old Chief v. United States*, 519 U.S. 172, 180 (1997).[8] Espionage rhetoric could also cause the jury to improperly view Dr. Terry as inherently deceptive or dishonest.

The prejudice is especially acute because portraying Dr. Terry, who is Korean American, as a "source" who was "handled" by South Korean officials risks stoking anti-Asian stereotypes, nativism, and dual-loyalty assumptions. Courts have excluded similar evidence on similar grounds. *See Tao*, 2022 WL 252019, at *6 (excluding espionage evidence that risked "stoking" anti-Asian sentiment);[9] *Viereck v. United States*, 318 U.S. 236, 239, 248 (1943) (holding wartime appeals to "passion and prejudice" risked improper conviction of alleged agent of Germany); *see also United States ex rel. Haynes v. McKendrick*, 481 F.2d 152, 159-61 (2d Cir. 1973) (recognizing that the "[F]ifth [A]mendment's due process clause" prohibits "racially prejudicial statements by the prosecutor").

**2. Spycraft Evidence Should Be Excluded**

South Korean officials' alleged use of "spot and assess" recruitment methods, diplomatic cover, and other spycraft tactics is likewise irrelevant and unfairly prejudicial. Ind. ¶¶ 6-8, 12, 22,

---

[8] The danger of misleading the jury is not speculative, as public coverage of this case has *already* confused the nature of the charges against Dr. Terry. *See, e.g.*, Madeline Halpert, *Ex-CIA Analyst Charged with Spying for South Korea*, BBC (July 17, 2024), https://perma.cc/A6PS-YMP8; Suki Kim, *The Strange Espionage Case of Sue Mi Terry*, New York Magazine (Aug. 14, 2025), https://perma.cc/FWX9-PYPX.

[9] *See* Neil G. Ruiz et al., *Discrimination Experiences Shape Most Asian Americans' Lives*, Pew Rsch. Ctr. (Nov. 30, 2023), https://perma.cc/P5N8-JPHS ("78% of Asian adults have been treated as a foreigner.").

28, 30, 33, 37.[10] FARA asks whether Dr. Terry acted or agreed to act "at the order, request, or under the direction or control, of a foreign principal," 22 U.S.C. § 611(c)(1)—not how South Korean officials purportedly sought to "recruit" Dr. Terry, let alone recruit unaffiliated and uncharged congressional staffers or other third parties. Those officials' alleged efforts to ingratiate themselves with Dr. Terry may describe how the government believes the relationship developed, but they do not establish that she ever acted or agreed to act at an official's request or direction. Their intelligence tactics and recruitment objectives are likewise irrelevant to Dr. Terry's knowledge of her FARA obligations. And, critically, any marginal relevance is substantially outweighed by the risk that the jury will mistake this registration case for an espionage prosecution. *See supra* § I.B.1.

### 3. References to Counterintelligence Operations and the Scope of the Government's Investigation Should Be Excluded

The government should also be precluded from (i) calling its investigation a "counterintelligence"[11] operation, (ii) referencing its collection of evidence pursuant to the Foreign Intelligence Surveillance Act ("FISA"), or (iii) discussing the investigation's scope and the extraordinary resources devoted to it, which were wholly disproportionate to the charged registration offense. Neither the nature nor extent of the government's operations and investigation proves any element of the offense charged. *See United States v. Duncan*, 2019 WL 2210663, at *3 (S.D.N.Y. May 22, 2019) ("The length of the investigation, the investigative techniques used, and the fact that [the defendant] was not initially a target of the investigation are all irrelevant.").[12]

---

[10] Nothing in the government's discovery confirms that South Korean officials employed any such tactics.

[11] FBI agents misleadingly told Dr. Terry they were conducting a "counterintelligence" operation, rather than a criminal investigation, to elicit her cooperation. ECF No. 117 at 2, 15-16; *see* ECF No. 40 at 40.

[12] Indeed, the Court has characterized classified materials as irrelevant and unhelpful in denying their disclosure to the defense. *See* ECF No. 118 at 5.

Moreover, terms like "counterintelligence" and "FISA" evoke espionage and threats to national security[13] and, when coupled with evidence of the disproportionate resources devoted to investigating Dr. Terry, suggest that she is charged with conduct far more concerning—and fundamentally different—than the narrow FARA violation at issue. *See supra* §§ I.B.1-2; Fed. R. Evid. 403.

### C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court exclude espionage rhetoric, spycraft evidence, and references to counterintelligence operations and the scope of the government's investigation.

## II. THE COURT SHOULD PRECLUDE USE OF THE PHRASE "NONPUBLIC U.S. GOVERNMENT INFORMATION" AND IMPROPER ARGUMENT REGARDING THE PHRASE "OFF-THE-RECORD"

### A. BACKGROUND

Dr. Terry is charged with violating FARA, not with mishandling classified or otherwise protected information.[14] But the government's misleading or inaccurate use of technical terms to describe the information Dr. Terry allegedly shared will prevent lay jurors from understanding the difference. The Indictment and the government's filings contain references to Dr. Terry's alleged disclosures of "nonpublic U.S. Government information" and "off-the-record" information from meetings with diplomats and foreign-policy officials. As used by the government, these terms

---

[13] *See Counterintelligence and Espionage*, FBI, https://perma.cc/GL8W-ZVC2 ("The goals of the FBI's counterintelligence work are to … counter the activities of foreign spies.").

[14] Dr. Terry has also moved to preclude the government from referencing (i) espionage rhetoric, (ii) alleged spycraft tactics, and (iii) counterintelligence operations. *See supra* § I. While this motion is distinct in that it targets specific terminology the government has misused, it reflects the same underlying concern: together with the government's notice of a former CIA counterintelligence chief as a purported expert witness, *see* ECF No. 121, Ex. A, these choices evince a deliberate strategy to transform this FARA registration case into a de facto national-security prosecution.

connote serious nondisclosure obligations that are irrelevant to any element of the charged offenses.

Just as importantly, these phrases are confusing, misleading, and unfairly prejudicial. Jurors hearing the term "nonpublic U.S. Government information" will naturally think that the information is classified or otherwise protected. Jurors hearing the phrase "off-the-record"—as defined by the government—will think there is a legal obligation not to disclose information. Using these phrases invites the jury to judge Dr. Terry not on the narrow registration question before it, but on the false premise that she leaked restricted material that she never possessed or violated nondisclosure obligations that she never had. The prejudice is especially heightened here because these terms carry an imprimatur of official truth when they come from the mouth of the government, creating a substantial risk that the jury will automatically accept the government's improper characterizations of this evidence as authoritative.

Dr. Terry accordingly seeks an order precluding the government and its witnesses from (1) using the phrase "nonpublic U.S. Government information" or similar formulations to describe information Dr. Terry allegedly conveyed to South Korean officials; and (2) arguing or eliciting testimony that conflates the term "off-the-record" with classification, secrecy, or any legal obligation not to disclose. In the alternative, Dr. Terry requests that the Court instruct the jury that none of the information that Dr. Terry allegedly received or shared was classified or restricted by a legal nondisclosure obligation. Courts have granted similar relief to preclude the government from using misleading terminology at trial, and this Court should do the same.

## B. ARGUMENT

### 1. References to "Nonpublic U.S. Government Information" Should Be Excluded

The government should be precluded from characterizing information that Dr. Terry allegedly shared with South Korean officials as "nonpublic U.S. Government information" because the *type* of information that Dr. Terry allegedly disclosed—be it public or nonpublic—is irrelevant to the narrow FARA violation charged in this case. *See* 22 U.S.C. §§ 612(a), 618(a)(1); Fed. R. Evid. 401, 402. To the extent the government contends that the underlying fact that particular information had not been publicly disseminated is relevant, it can prove that fact directly. But the label "nonpublic U.S. Government information" or similar phrasing is not itself probative of any element of the charged offenses.

The risk of unfair prejudice, confusion, and misleading the jury substantially outweighs whatever incremental probative value the government's chosen terminology might have. *See* Fed. R. Evid. 403. By describing information as "nonpublic U.S. Government information," the government gives the phrase the appearance of a term of art—one that carries legal connotations concerning classification, handling, and disclosure obligations. Yet the government has identified no classification designation, statutory restriction, nondisclosure obligation, or any other legal protection applicable to the alleged information at issue or to Dr. Terry. Permitting the government to characterize the information as "nonpublic U.S. Government information" therefore risks inviting the jury to infer that Dr. Terry disclosed secret or protected government information when the evidence may establish, at most, that particular information had not been widely disseminated.

What's more, because the term "nonpublic U.S. Government information" is not "self-defining," allowing the government to use this term risks improperly substituting the government's characterization of this information for the jury's independent assessment of the facts. *United*

*States v. Scop*, 846 F.2d 135, 140-41 (2d Cir. 1988). And this terminology is particularly prejudicial because lay jurors are likely to accord the prosecution's characterization of the evidence the weight of governmental authority—especially where, as here, the *U.S. government itself* is declaring that certain information was "nonpublic *U.S. Government* information." *Cf. United States v. Young*, 470 U.S. 1, 18-19 (1985) (recognizing that statements from the prosecution "carr[y] … the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence").

The term "nonpublic U.S. Government information" also carries an additional danger: it unmistakably evokes prejudicial national-security overtones that have no legitimate role in determining whether Dr. Terry willfully violated FARA. Courts have blocked similar attempts to improperly "pepper[] 'the trial with national security overtones'" in analogous FARA and non-national-security cases. *Sun* Motions *in Limine* Order at 11 (citation omitted); *see* Nov. 12, 2025 Trial Transcript at 226, *Sun*, 24-cr-346 ("*Sun* Trial Transcript," attached hereto as Exhibit B) (ordering government witnesses not to use terms referring to national security because "it is not what the case is about"); *Tao*, 2022 WL 252019, at *6 (excluding expert testimony about Chinese economic espionage because "the government may not color the trial with national security overtones"). Allowing the government or its witnesses to use this phrase at trial could therefore improperly "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged"—namely, the uncharged offense of mishandling classified information rather than failing to file a registration form with the Attorney General. *Old Chief*, 519 U.S. at 180.

Precluding use of the term "nonpublic U.S. Government information" would not impair the government's ability to present its case in chief. The government can establish any marginally relevant factual proposition concerning public dissemination through neutral descriptions of the

evidence. *See id.* at 182-84. What it should not be permitted to do is substitute the undefined shorthand "nonpublic U.S. Government information" for proof of underlying facts.

### 2. The Court Should Preclude Any Suggestion That "Off-The-Record" Concerns Classified Information or Nondisclosure Obligations

The Court should also preclude the government from arguing or eliciting testimony suggesting that the phrase "off-the-record," a standard press attribution ground rule used in journalism and policy circles,[15] relates to classified or protected information or any nondisclosure obligation. The Indictment alleges that a June 17, 2022 meeting with the U.S. Secretary of State in which Dr. Terry participated "was 'off the record,' *meaning the experts were expected not to disclose the details of the meeting to external parties, including foreign governments*." Ind. ¶ 32 (emphasis added). But the government's definition directly conflicts with how journalists, think tanks, and political commentators define the term and how it is otherwise conventionally used.

The meeting's attribution and publication ground rules—and whether Dr. Terry violated those ground rules—do not tend to prove any element of the charged FARA violation, for similar reasons discussed above. *See supra* § II.B.1; Fed. R. Evid. 401, 402. Moreover, any minimal probative value the phrase "off-the-record" could have is substantially outweighed by the dangers of unfair prejudice and misleading the jury. *See* Fed. R. Evid. 403. Jurors have no independent frame of reference for attribution conventions, and the government's attempt to introduce a wholly new, more restrictive definition of "off-the-record" will only exacerbate the issue. Allowing the government to equate "off-the-record" with a duty of nondisclosure will falsely suggest that Dr.

---

[15] As the Associated Press defines it, an "[o]ff the record" designation means that "[t]he information cannot be used for publication." The Associated Press, *Statement of News Values and Principles* at 3, https://perma.cc/L5NA-X43V. Chatham House, a world-leading policy institute and the industry authority on think tank attribution rules, similarly defines "off the record" as information that "cannot be used for publication." Chatham House, *Code of Conduct*, https://perma.cc/S2SS-9XTG; *see also* ECF No. 123-3, Attachment A ("Declaration of Peter Bergen") ¶ 17.

Terry violated an obligation not to disclose information to any external party. Courts have excluded evidence where the risk of confusing the jury about legal obligations substantially outweighs any probative value in analogous cases. *See United States v. Gentile*, 2024 WL 2941849, at *2 (E.D.N.Y. June 11, 2024) (precluding evidence related to the "due diligence obligations" of investment professionals in securities-fraud case because "there is a substantial risk of confusion from introducing evidence of third parties' civil law obligations into a criminal case").

### C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court (i) exclude use of the phrase "nonpublic U.S. Government information" to describe information that Dr. Terry allegedly shared; and (ii) preclude argument or testimony conflating the term "off-the-record" with classification or an obligation not to disclose information. In the alternative, Dr. Terry requests that the Court instruct the jury that none of the information that Dr. Terry allegedly received or shared was classified or restricted by a legal nondisclosure obligation.

## III. THE COURT SHOULD REQUIRE THE GOVERNMENT TO PROFFER EVIDENCE IN SUPPORT OF THE CHARGED CONSPIRACY TO VIOLATE FARA

### A. BACKGROUND

Count One of the Indictment charges Dr. Terry with conspiring to violate FARA. *See* Ind. ¶¶ 62-64. The government has indicated that it intends to admit evidence at trial for which admission requires proof that a conspiracy existed, such as hearsay statements made by Dr. Terry's alleged co-conspirators, under Rule 801(d)(2)(E). But *nowhere* in the 31-page speaking indictment did the government allege *any* fact that shows an agreement between Dr. Terry and others to violate FARA, and the government's voluminous discovery productions are likewise bereft of any evidence to support such a charge. The Court should therefore require the government to proffer sufficient evidence of the alleged conspiracy before admitting these hearsay statements or any

other evidence for which admissibility depends on the conspiracy's existence. If the government cannot make that showing, the Court should preclude this evidence.

### B. ARGUMENT

The Court should require the government to proffer evidence to support its conspiracy charge before introducing evidence for which admission requires first proving a conspiracy, such as alleged co-conspirator statements under Rule 801(d)(2)(E), because the existing record contains no evidence of any conspiracy to keep Dr. Terry from registering under FARA.

The government has indicated that it will seek to admit out-of-court statements by alleged co-conspirators under Rule 801(d)(2)(E). *See, e.g.*, Ind. ¶¶ 44, 49. The Indictment suggests that the government intends to rely on statements made by South Korean government officials, including statements made entirely outside of Dr. Terry's presence. *See, e.g.*, *id.* ¶ 44 (statement by a South Korean National Intelligence Service ("NIS") official regarding a discussion with "Seoul" about providing funding to the Wilson Center); *id.* ¶ 49 (statement by South Korean official about discussions with other officials—a South Korean Ambassador and National Security Advisor—about Dr. Terry's writing). Beyond the Indictment, the government has also produced in discovery statements made by confidential human sources relaying conversations with South Korean officials about Dr. Terry. The defense expects that the government will seek to introduce these statements and others at trial.[16] Hearsay statements made by an alleged co-conspirator are admissible against a defendant provided that a conspiracy existed and such statements were made in furtherance of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E); *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

[16] The government has not yet produced prior witness statements pursuant to 18 U.S.C. § 3500. The defense reserves the right to supplement its motion to the extent such prior statements shed further light on the testimony that the government intends to elicit.

Before permitting the jury to consider alleged co-conspirator statements, the Court must find by a preponderance of the evidence that a conspiracy existed. *See United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (holding district court clearly erred when it "made no findings, by a preponderance of the evidence or otherwise, about the existence of a conspiracy"); *Bourjaily*, 483 U.S. at 175 (explaining that "the existence of a conspiracy and [the defendant's] involvement in it are preliminary questions of fact that, under Rule 104, must be resolved by the court"); *see also United States v. Tellier*, 83 F.3d 578, 580-81 (2d Cir. 1996) (reversing conviction where only evidence of conspiracy was hearsay statements made by alleged co-conspirator that were otherwise inadmissible).

Here, a pretrial proffer is necessary because the existing record does not contain evidence of any agreement between Dr. Terry and South Korean officials to prevent her from registering under FARA. To prove such a conspiracy, the government must show that Dr. Terry and her co-conspirators—apparently, "government officials in the Republic of Korea government," ECF No. 75 at 24—"agreed on the essential nature of the plan" to not register under FARA, and all had "some knowledge of the [conspiracy's] unlawful aims and objectives" of Dr. Terry not registering, *see United States v. Salameh*, 152 F.3d 88, 151 (2d Cir. 1998) (citation omitted); *see also United States v. Michel*, 2024 WL 1603362, at *17 (D.D.C. Apr. 12, 2024) (finding sufficient evidence of a FARA conspiracy where "there was a 'tacit or mutual understanding' between [the defendant] and [his co-conspirator] to not register under FARA so that their efforts on behalf of [China] would go undetected"). But the Indictment, touted by the government as a "road map as to what is the most important evidence in this case," does not contain a single allegation, implicit or explicit, regarding any agreement or mutual understanding whatsoever between Dr. Terry and any others concerning her registration under FARA. ECF No. 75 at 28; *see* ECF No. 97 at 4 (denying motion

for a bill of particulars and citing government's representations regarding "road map" provided in Indictment).

Outside of the Second Circuit, courts routinely hold preliminary hearings under Rule 104 to determine whether the government can prove the existence of a conspiracy. *See, e.g.*, *United States v. Hardy*, 149 F.4th 1153, 1160-61 (10th Cir. 2025). These hearings provide courts with the highest-quality evidence about the existence of a conspiracy and avoid the possibility of a mistrial if the government puts otherwise inadmissible hearsay before the jury and fails to carry its burden to prove the predicate conspiracy. Such a procedure, however, has not been expressly approved by the Second Circuit. In the absence of a preliminary hearing, the Court could avoid a mistrial by requiring the government to first offer its evidence about the existence of a conspiracy *before* permitting the government to introduce any co-conspirator statements. This approach is consistent with *Bourjaily*, which directs that "a court must be satisfied that the statement actually falls within the definition" of Rule 801(d)(2)(E) "[b]efore admitting a co-conspirator's statement." 483 U.S. at 175.

At a minimum, the Court should require a proffer from the government of evidence of the charged conspiracy. A court may admit co-conspirator statements on a conditional basis where it concludes that a proffer is sufficient "subject to connection" at trial and review of the trial evidence. *United States v. Vidal*, 2024 WL 397630, at *4 (2d Cir. Feb. 2, 2024) (summary order). This process has been deemed sufficient in other cases, and indeed, is the approach the government often affirmatively takes in criminal cases in this District. *See, e.g.*, *id.* (finding no error where "the trial evidence ultimately aligned with the [government's] proffer, demonstrating … that the challenged statements were made during the course and in furtherance of that conspiracy"); *United States v. Adelekan*, 567 F. Supp. 3d 459, 467-68 (S.D.N.Y. 2021) (provisionally granting

government's motion *in limine* to admit co-conspirator statements based on proffer); *United States v. Torres*, 435 F. Supp. 3d 526, 531-34 (S.D.N.Y. 2020) (same).

### C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court require the government to proffer evidence of a conspiracy to prevent Dr. Terry from registering under FARA before admitting evidence for which admission at trial requires proof of the conspiracy.

## IV. THE COURT SHOULD REQUIRE THE GOVERNMENT TO IDENTIFY THE SPECIFIC CONDUCT IT CONTENDS WAS REGISTRABLE ACTIVITY

### A. BACKGROUND

The Court should require the government, no later than October 5, 2026,[17] to identify the specific instances of conduct alleged in the Indictment that it will contend constituted enumerated activities under 22 U.S.C. § 611(c)(1)(i) or (ii) that triggered Dr. Terry's alleged duty to register. Without pretrial identification, the consequences for jury unanimity, verdict integrity, and appellate preservation are serious—and entirely avoidable. A person has no obligation to register under FARA—and commits no crime by failing to do so—unless she engages in one of the statute's enumerated activities. At issue in this specific case are "political activities," acting as a "public relations counsel," acting as a "publicity agent," or acting as a "political consultant." 22 U.S.C. § 611(c)(1)(i)-(ii). The Court recognized this key limitation in sustaining the Indictment. *See* ECF No. 86 at 4, 9-10. Yet the Indictment's sixteen overt acts encompass at least four fundamentally different types of conduct—only some of which could plausibly qualify as a Section 611(c)(1)(i) or (ii) activity.[18] *See* Ind. ¶ 64(a)-(p). Unless the government identifies before trial which acts it

[17] This date aligns with the Court's order requiring Dr. Terry to disclose her Section 613 exemption defenses by October 5, 2026. *See* ECF No. 114 ("August 13, 2026 Order") at 1-3; 22 U.S.C. § 613.

[18] The government represented to the Court that the sixteen overt acts are the most significant pieces of evidence in the entire case. *See* ECF No. 75 at 28-29.

contends are the registrable activities and which are offered for other purposes, the jury will be left to treat a decade of professional conduct as an undifferentiated mass, with no workable framework for determining what Dr. Terry actually did that required registration.

## B. ARGUMENT

### 1. The Indictment Illustrates Why Pretrial Specification Is Necessary

The government's own sixteen overt acts fall into at least four distinct categories of conduct, most of which have no connection to any Section 611(c)(1)(i) or (ii) activity:

| Category of Conduct | Overt Acts | Plausible § 611(c)(1)(i)-(ii) Activity |
|---|---|---|
| Publishing articles at the request of South Korean officials | (b), (*l* ), (o), (p) | Potentially: publicity agent, political activities, public relations counsel. |
| Providing South Korean officials access to U.S. officials or congressional staff | (c), (d), (g), (k), (m) | No readily apparent basis under existing precedent or pre-2025 DOJ guidance. *See infra* n.20. |
| Sharing information with South Korean officials | (j), (*l* ) (in part) | No readily apparent basis under existing precedent or pre-2025 DOJ guidance. |
| Receiving luxury goods, meals, or think-tank funding | (a), (e), (f), (h), (i), (n) | No readily apparent basis under existing precedent or pre-2025 DOJ guidance.[19] |

Only one category—publication—has a plausible home under the (i) or (ii) categories the government has chosen to pursue. For the remaining twelve overt acts, there is no readily apparent basis under existing precedent or pre-Indictment DOJ guidance for treating them as "political activities" as defined by Section 611(o) (which requires conduct intended to influence U.S. officials or the American public), as acting as a "publicity agent" as defined by Section 611(h) (which requires publication or dissemination), or as acting as a "public relations counsel" as

[19] Dr. Terry addresses the admissibility of this evidence in Sections V, VI, and VII. *See infra* §§ V-VII.

defined by Section 611(g) (which requires representing a principal in a public relations matter). And the government cannot salvage these acts by recasting them as "political consulting": throughout the entire period of alleged conduct (2013–2023), the Justice Department's own advisory opinions consistently limited that term to persons engaged in "political activities, as defined." Request for Advisory Op. Pursuant to 28 C.F.R. § 5.2 (Oct. 29, 2021), at 3-4 n.8 (citation omitted).[20] The government may of course advance its own interpretation of what these statutory categories encompass. But whatever reading it intends to pursue at trial, the defense and the Court are entitled to know beforehand, so that the Court can instruct the jury accurately and efficiently and the defense can prepare to respond.

Without this disclosure, the risk of a nonunanimous verdict is high. The jury must unanimously find that Dr. Terry engaged in at least one Section 611(c)(1)(i) or (ii) activity while willfully failing to register. But if the government presents all sixteen overt acts as an undifferentiated narrative of "acting as a foreign agent," Ind. ¶ 11, without specifying which acts it contends are registrable, one juror might treat organizing a think-tank roundtable (Overt Act (d)) as the registrable "political activity"; another might rely on the notes she allegedly shared after meeting the U.S. Secretary of State (Overt Act (j)); and a third might focus on the published articles alone. The result would be a verdict in which twelve jurors check "guilty" but no two agree on

[20] Notably, the DOJ's 2025 proposed rulemaking—asking whether "political consultant" should be limited to those who conduct "political activities"—was itself an acknowledgment that the term had never been authoritatively extended beyond that core meaning. *See* Amending and Clarifying Foreign Agents Registration Act Regulations, 90 Fed. Reg. 40 (proposed Jan. 2, 2025) (to be codified at 28 C.F.R. pt. 5). The conduct in this case spans 2013 through 2023. Throughout that entire period, no regulation, advisory opinion, or judicial decision gave "political consultant" a meaning broader than "political activities." If the government now contends that conduct falling outside the definition of "political activities" nonetheless constituted "political consulting," it is advancing a theory that did not exist during the period of alleged conduct, fatally undermining any claim that Dr. Terry "willfully" failed to register on that basis.

what Dr. Terry actually did that required registration. That is aggregation, not unanimity.[21] And it is precisely the duplicity problem Dr. Terry has previously identified. *See* ECF No. 40 at 32-34.

### 2. The Current Posture of This Case and This Court's Trial-Management Authority Support Pretrial Specification

At the indictment stage—when the defense was first reviewing the voluminous discovery in this case—the Court concluded that the Indictment and the government's representations sufficiently apprised Dr. Terry of the charges against her. *See* ECF No. 86 at 9-10.[22] The case is now in a materially different posture. With trial approaching, the government's position as to which alleged acts implicate which statutory categories must be sufficiently clear to permit the Court to address the governing legal standards and formulate appropriate jury instructions. The government should therefore be required to identify which overt acts it contends triggered Dr. Terry's duty to register and which statutory category applies to each. That is necessary both to permit orderly resolution of legal disputes before trial and to enable the Court to instruct the jury accurately.

The need for clarity arises before opening statements. This Court's general practice is to give substantive preliminary instructions explaining the elements of the charged offenses so that jurors can evaluate the evidence in light of the questions they ultimately will be asked to decide. *See, e.g.*, Order, *United States v. Calk*, No. 19-cr-366 (S.D.N.Y. July 9, 2021) (Schofield, J.), Dkt.

---

[21] FARA's five-year limitations period begins to run "when the agent ceases activities on behalf of the foreign principal." *Att'y Gen. of United States v. Wynn*, 104 F.4th 348, 352-53 (D.C. Cir. 2024) (citation omitted). If the jury is not told which specific acts the government contends are registrable—and which fall within the limitations period—there is a substantial risk jurors could base a conviction on conduct outside the limitations period that has no independent connection to any timely registrable activity. *See* ECF No. 60 at 7-9.

[22] The Court denied Dr. Terry's motion for a bill of particulars in part because the Indictment already identified the applicable qualifying activities, and because the government represented at oral argument that its "current intention [is] to prove the qualifying activities" listed in the Indictment—*i.e.*, only those under Section 611(c)(1)(i) and (ii). ECF No. 97 at 4-5.

252. Here, those instructions will need to explain the statutory meaning of "political activities," "public relations counsel," "publicity agent," and "political consultant." The final charge will likewise have to tell the jury how to evaluate the registrable-activity element and when unanimity is required. *See generally United States v. Natelli*, 527 F.2d 311, 325 (2d Cir. 1975) ("When there is more than one specification as a predicate for guilt, each dependent on particular evidence which is unrelated to the other, it would be sound practice to instruct the jury that they must be unanimous on a particular specification to convict."). The government's sixteen overt acts span materially different categories of conduct, each of which would require different evidence and different legal analysis to qualify as a registrable activity. Those issues should be identified and litigated before the jury hears the case, not for the first time at the charging conference or in summation.

This Court's August 13, 2026 Order reinforces that conclusion. *See* August 13, 2026 Order at 1-3; *supra* n.17. There, exercising its trial-management authority to avoid jury confusion, the Court required Dr. Terry to disclose her Section 613 exemption defenses by October 5, 2026. Although the Court concluded that Dr. Terry did not need the government's specific Section 611(c) theories to prepare those disclosures because the Section 613 exemptions are largely category-agnostic, *see* August 13, 2026 Order at 2-3, the specification sought here serves a different purpose: it is necessary to formulate the jury instructions, address unanimity, and prepare the defense on the registrable-activity element itself. The Court itself anticipated this need, noting that "[t]o the extent the Government's proof deviates from [its] representations, Defendant may request further relief as may be warranted at that time." *Id.* at 3. That opportunity is meaningful only if the government identifies before trial which acts it contends triggered Dr. Terry's registration duty and on what statutory bases. Otherwise, a new registrable-activity theory raised at summation or the final

charge conference would leave Dr. Terry without a meaningful opportunity to respond and the Court without focused briefing on a dispositive element of the substantive FARA charge.

### C. CONCLUSION

Dr. Terry respectfully requests that the Court order the government, by no later than October 5, 2026, to identify each specific episode of conduct alleged in the Indictment that the government contends constitutes an enumerated activity under Section 611(c)(1)(i) or (ii) that triggered a duty to register, and to specify which statutory category applies to each.

## V. THE COURT SHOULD EXCLUDE OR LIMIT EVIDENCE OF PERSONAL GIFTS HAVING NO NEXUS TO ALLEGED FARA ACTIVITY

### A. BACKGROUND

The Court should exclude, or alternatively limit, the government's evidence concerning the three personal gifts identified in the Indictment: a $2,845 Dolce & Gabbana coat, a $2,950 Bottega Veneta handbag, and a $3,450 Louis Vuitton handbag. *See* Ind. ¶¶ 24-25, 29, 64(e), (h). This evidence should be excluded in its entirety because the government likewise cannot establish any connection between the gifts and any activity covered by 22 U.S.C. § 611(c)(1). The Indictment and discovery confirm that the gifts were temporally remote from, and wholly untethered to, any alleged agency conduct. If the Court permits evidence of the gifts, however, it should strictly limit that evidence to prevent unfair prejudice. Most jurors do not routinely encounter designer handbags and coats costing thousands of dollars, and could react viscerally to the fact that Dr. Terry allegedly selected, accepted, or possessed such expensive items, allowing that negative personal judgment to color their assessment of the charged conduct. At most, the government should be permitted to state that Dr. Terry received designer items, without identifying their luxury brands or specific dollar values. If the gifts have any probative value (Dr. Terry maintains they do not), such value lies solely in the fact that they were given—not in their labels or price tags.

## B. ARGUMENT

### 1. The Gifts Evidence Should Be Excluded Because It Bears No Connection Whatsoever to Any Section 611(c)(1) Activity

Dr. Terry expects the government to argue at trial that she received personal gifts—a $2,845 Dolce & Gabbana coat, a $2,950 Bottega Veneta handbag, and a $3,450 Louis Vuitton handbag—in exchange for undertaking various Section 611(c)(1) activities on the South Korean government's behalf. *See* Ind. ¶¶ 24-25, 29, 64(e), (h). But neither the Indictment nor the discovery supports that claim. In *Sun*, Judge Cogan recently held that although "gifts and benefits" may be probative of bribery, they are "not probative of an agency relationship" under FARA absent a "connect[ion]" to conduct by the defendant "supporting the agency relationship." *Sun* Motions *in Limine* Order at 10 & n.2. Evidence of these gifts should be excluded because the government cannot "connect[]" them to any activity covered by 22 U.S.C. § 611(c)(1). *Id.* at 10.

The Indictment alleges sixteen overt acts in furtherance of a conspiracy to violate FARA, Ind. ¶ 64(a)-(p), and the first four—spanning December 2013 through January 2019—occurred before Dr. Terry received any personal gift, *id.* ¶ 64(a)-(d). Indeed, the government's chronology reveals that the gifts bear no factual or temporal connection to any alleged FARA activity.

On November 13, 2019, the first two gifts—the Dolce & Gabbana coat and the Bottega Veneta handbag—were allegedly purchased by a South Korean official. *See* Ind. ¶¶ 24-25, 64(e). The last alleged arguable Section 611(c)(1) activity before the gifts were purchased occurred *eleven months* prior in January 2019, when Dr. Terry allegedly organized a "private meeting" with "the Director of the [South Korean] NIS" and "current and former senior U.S. national security officials." *Id.* ¶ 64(d). The government does not allege, and the discovery does not show, that the South Korean official told Dr. Terry the gifts were compensation for the January 2019 meeting or any other action, or that Dr. Terry understood them to be. And the first alleged Section 611(c)(1)

activity *after* the gifts were purchased—Dr. Terry's hosting of a November–December 2020 virtual workshop—did not occur until *more than a year* later. *See id.* ¶ 64(g). Notably, the official who purchased those gifts was not involved with the November–December 2020 virtual workshop. An *eleven-month* gap before and a *thirteen-month* gap after any alleged FARA activity simply cannot establish the nexus between the gifts and any Section 611(c)(1) activity that FARA requires and *Sun* endorsed.

The third gift—a Louis Vuitton handbag purchased on April 16, 2021, by a different South Korean official—fares no better. *See* Ind. ¶¶ 29, 64(h). The last conduct that could even arguably be characterized as a Section 611(c)(1) activity before this gift—the November–December 2020 virtual workshop—occurred *four and a half months* earlier. *See id.* ¶ 64(g). And the next conduct that could arguably be characterized as a Section 611(c)(1) activity—Dr. Terry's alleged provision of notes to a South Korean official after she met the U.S. Secretary of State—did not occur until June 2022, over *fourteen months* after the third gift. *See id.* ¶ 64(j).

None of the three gifts is proximate to any alleged act of political activity, political consulting, or publicity on South Korea's behalf. That stands in stark contrast to *United States v. Menendez*, 759 F. Supp. 3d 460 (S.D.N.Y. 2024), where the court found ample evidence connecting items of value to conduct undertaken for a foreign principal. There, Senator Menendez agreed to perform official acts benefiting Egypt, including approving a $99 million arms sale and pressuring the U.S. Department of Agriculture ("USDA") to stop efforts that threatened an Egyptian-granted halal monopoly. *See id.* at 479-81. The benefits were correspondingly concrete and closely tied to that course of conduct: just *five days* after the defendant pressured the USDA, the intermediary placed the defendant's wife on the monopoly-holder's payroll at $120,000 per year. *See id.* at 481-84. The court concluded that this chronology supplied a "more than sufficient foundation" to infer

that Senator Menendez agreed to take official action in exchange for those benefits. *Id.* at 483. Here, by contrast, the Indictment identifies no comparable factual or temporal connection between any gift and any alleged Section 611(c)(1) activity.

Nor does the mere fact that the gifts had monetary value make them probative of an agency relationship. As the court instructed the jury in *Sun*, the government must prove that a foreign principal "established a particular course of conduct to be followed" and that the defendant "responded to and complied with that specified course of conduct," under circumstances "evinc[ing] some level of power by the principal over the agent or some sense of obligation on the part of the agent." ECF No. 72-1 at 51; *see Michele Amoruso E Figli v. Fisheries Dev. Corp.*, 499 F. Supp. 1074, 1082 (S.D.N.Y. 1980) ("Even the receipt of a bona fide subsidy from a foreign source does not render the recipient an agent of that source as long as the recipient is not subject to foreign direction or control."). There must be proof that gifts were presented with the expectation that a particular course of conduct would be followed—and that proof is entirely absent here. In FARA cases where payments have supported an inference of agency, the payments were tied to identified services: in *United States v. Zuberi*, the defendant negotiated an $8.5 million agreement with the government of Sri Lanka to conduct lobbying and public-relations efforts, pursuant to which Sri Lanka wired $6.5 million. *See* Information ¶¶ 72-86, 98-102, No. 19-cr-642 (C.D. Cal. Oct. 22, 2019), Dkt. 5, Ex. A. Here, the Indictment alleges three isolated gifts totaling $9,245, but identifies no service, request, directive, or course of conduct for which any gift was given. They are simply gifts—and, as *Sun* holds, gifts and benefits, "without more," are not probative of an agency relationship. *Sun* Motions *in Limine* Order at 10. Accordingly, the gifts are irrelevant to the alleged FARA agency relationship and should be excluded under Rules 401 and 402. *See* Fed. R. Evid. 401, 402.

**2. In the Alternative, the Court Should Limit the Form of the Gifts Evidence to Prevent Unfair Prejudice**

If the Court declines to exclude the gifts evidence entirely, it should preclude the government from introducing the gifts' specific prices and luxury brand names. The Second Circuit has recognized that evidence of "compensation, wealth, or lack thereof can unduly prejudice jury deliberations," and that the resulting prejudice may be addressed through "restrictions confining the government's references to that wealth." *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006); *see United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980) (reversing conviction where prosecution engaged in a "persistent appeal to class prejudice" by emphasizing the defendant's wealth and status); *United States v. Cassese*, 290 F. Supp. 2d 443, 457 (S.D.N.Y. 2003), *aff'd on other grounds*, 428 F.3d 92 (2d Cir. 2005) (granting defendant's motion for a new trial where "highly prejudicial and inflammatory evidence" concerning the defendant's "wealth, salary, and stock holdings … played into a bias against people of wealth").

Here, any legitimate probative value lies in the fact that gifts were given, not in whether the gifts bore a designer label or retailed for a particular amount. The specific danger of admitting brands names and dollar amounts is that many jurors may not routinely encounter designer handbags and coats costing thousands of dollars and will form negative impressions of Dr. Terry for allegedly selecting, accepting, or possessing such expensive items—an emotional reaction unrelated to whether she performed Section 611(c)(1) activity at a foreign principal's direction. Rule 403 requires that this marginal probative value be assessed in light of less prejudicial means of proving the same point. *See Old Chief*, 519 U.S. at 182-85. In *Stryker Corp. v. Ridgeway*, the court prohibited evidence identifying the makes and models of the defendant's cars or other details of his "extravagant lifestyle." 2016 WL 6584657, at *1 (W.D. Mich. Jan. 25, 2016). Similar narrowing is appropriate here: if the gifts are admitted at all (they should not be), the government

should be permitted to establish only that Dr. Terry received designer items, without identifying their luxury brands or specific prices.

### C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court: (1) preclude the government from introducing evidence of the gifts Dr. Terry received, as they have no nexus to any alleged FARA activity; or (2) in the alternative, limit the form of the gifts evidence to remove specific dollar amounts and luxury brand names to prevent unfair prejudice.

## VI. THE COURT SHOULD EXCLUDE OR LIMIT EVIDENCE CONCERNING EXPENSIVE MEALS AND DRINKS UNCONNECTED TO ANY ALLEGED FARA ACTIVITY

### A. BACKGROUND

The government should also be precluded from introducing evidence that Dr. Terry and South Korean officials met over expensive meals. The Indictment repeatedly highlights dinners, lunches, and drinks between Dr. Terry and South Korean officials—including "high-priced dinners" at "upscale" and Michelin-starred restaurants. Ind. ¶¶ 1, 3; *see id.* ¶¶ 27, 30, 31, 38. But the government cannot establish that these meals and drinks had any connection or nexus to conduct falling within the scope of 22 U.S.C. § 611(c)(1). If the Court nevertheless permits evidence that some meetings occurred over meals or drinks, it should, at minimum, prohibit the government from introducing the prices of the meals, identifying the restaurants, characterizing them as "high-priced," "upscale," "high-end," or otherwise luxurious, or referring to Michelin stars. Those details have no bearing on any element of the FARA charge and create a substantial risk that jurors will judge Dr. Terry based on perceived wealth, privilege, or lifestyle instead.

## B. ARGUMENT

### 1. The Meals and Drinks Evidence Should Be Excluded Because It Bears No Nexus to Any Section 611(c)(1) Activity

Evidence of the lunches, dinners, and drinks alleged in the Indictment should be excluded as irrelevant because the government cannot connect these meals—or any benefit supposedly conferred by them—to any conduct within the scope of 22 U.S.C. § 611(c)(1). *See Sun* Motions *in Limine* Order at 10 & n.2. The government does not even allege that South Korean officials paid for seven of the nine meals identified below, *see* Ind. ¶¶ 27, 30-31, 38, much less that any meal related to particular Section 611(c)(1) conduct by Dr. Terry. Nearly every alleged "high-end" meal was separated from the closest arguably covered conduct by months—not hours, days, or even weeks.[23]

| Date | Event | Temporal Gap |
|---|---|---|
| Aug. 12, 2020 | Dinner at "an upscale Greek restaurant in Manhattan." Ind. ¶ 27. | **Nineteen months** after Dr. Terry allegedly organized a private think-tank meeting with South Korean and U.S. officials in January 2019, *see* Ind. ¶ 64(d), and **three and a half months** before a virtual think-tank workshop hosted by Dr. Terry on November 30 and December 1, 2020, *see id.* ¶ 28. |
| Apr. 16, 2021 | Dinner at a sushi restaurant and drinks at a rooftop bar in Washington, D.C. *See* Ind. ¶ 30. | **Four and a half months** after the virtual think-tank workshop, *see* Ind. ¶ 28, and **fourteen months** before Dr. Terry allegedly provided notes of her meeting with the U.S. Secretary of State to South Korean officials in June 2022, *see id.* ¶ 64(j). |
| May 6, 2021 | "[D]inner at a Michelin-star sushi restaurant in Washington, D.C." Ind. ¶ 31. | **Five months** after the virtual workshop, *see* Ind. ¶ 28, and **thirteen months** before Dr. Terry's alleged provision of notes from her meeting with the Secretary of State, *see id.* ¶ 64(j). |

[23] The only "high-end" meal that the government alleges occurred close in time to conduct relevant to a registrable activity is a January 10, 2023 "dinner at an expensive sushi restaurant in Washington, D.C.," Ind. ¶ 39, during which Dr. Terry allegedly provided information about her meeting with the U.S. Ambassador to Japan, *see id.* ¶ 64(*l* ). For the avoidance of doubt, Dr. Terry does not concede that the alleged provision of such information constitutes any activity within the scope of Section 611(c)(1).

| | | |
|---|---|---|
| Oct. 14, 2021 | Meal at a sushi restaurant in Washington, D.C. *See* Ind. ¶ 31. | **Ten months** after the virtual workshop, *see* Ind. ¶ 28, and **eight months** before Dr. Terry's alleged provision of notes, *see id.* ¶ 64(j). |
| Nov. 1, 2021 | Same. *See* Ind. ¶ 31. | **Eleven months** after the virtual workshop, *see* Ind. ¶ 28, and **seven and a half months** before Dr. Terry's alleged provision of notes, *see id.* ¶ 64(j). |
| Feb. 11, 2022 | "[L]unch at an upscale Italian seafood restaurant in Washington, D.C." Ind. ¶ 31. | **Fourteen months** after the virtual workshop, *see* Ind. ¶ 28, and **four months** before Dr. Terry's alleged provision of notes, *see id.* ¶ 64(j). |
| May 1, 2022 | Same. *See* Ind. ¶ 31. | **Seventeen months** after the virtual workshop, *see* Ind. ¶ 28, and **one and a half months** before Dr. Terry's alleged provision of notes, *see id.* ¶ 64(j). |
| Sept. 8, 2022 | "[D]inner in the private room of a high-end sushi restaurant in Washington, D.C." Ind. ¶ 38. | **Two months** after Dr. Terry allegedly hosted a happy hour for congressional staff, *see* Ind. ¶ 64(k), and **four months** before her alleged provision of information about a meeting with the U.S. Ambassador to Japan, *see id.* ¶ 64(*l*). |
| Oct. 6, 2022 | "[D]inner at a Michelin-star restaurant in Washington, D.C." Ind. ¶ 38. | **Three months** after the happy hour, *see* Ind. ¶ 64(k), and **three months** before Dr. Terry's alleged provision of information about the meeting with the Ambassador, *see id.* ¶ 64(*l*). |

These meals with foreign officials—the timing of which is attenuated from the alleged unlawful conduct, and which were consistent with Dr. Terry's line of work as a think-tanker—bear no resemblance to the close-in-time benefits at issue in *Menendez*. There, Senator Menendez and his family received substantial payments and salaries soon after he engaged in specific conduct benefiting Egypt—including just *five days* after he pressured the U.S. government to stop efforts that threatened an Egyptian-granted halal monopoly. *See* 759 F. Supp. 3d at 481-83; *supra* § V. Here, by contrast, the government alleges no comparable benefit or connection to any purported agency conduct. The mere fact that Dr. Terry shared meals or drinks with South Korean officials says nothing about whether she acted "at the order, request, or under the direction or control" of a

foreign principal or engaged in any of the activities specified in Section 611(c)(1), and the government's inflammatory characterizations of these meals as lavish or expensive cannot substitute for the missing temporal or factual nexus.

**2. If the Court Permits Evidence of the Meals and Drinks, It Should at a Minimum Exclude All References to Their Price or Prestige**

Even if the Court declines to exclude evidence of the meals and drinks entirely, it should preclude the government from identifying their prices, specific restaurants, or whether the establishment has a Michelin star. Those details have little, if any, probative value and pose a risk of class prejudice. *See supra* § V. As the Second Circuit has recognized, evidence of wealth or extravagant spending—including "evidence of lavish dinners"—carries a substantial risk of unfair prejudice because it may inflame class resentment or invite jurors to equate wealth with wrongdoing. *United States v. Delvecchio*, 816 F.2d 859, 863-64 (2d Cir. 1987) (holding that "testimony about … expensive dinners" which "took place several months before [the defendant's] participation in the conspiracy … should have been excluded as irrelevant and prejudicial"); *see Stahl*, 616 F.2d at 32-33. Evidence that Dr. Terry dined at establishments beyond most jurors' means risks inviting judgment based on perceived wealth, status, or taste—rather than on the basis of the narrow FARA charge. *See supra* § V. The Court should mitigate this prejudice by imposing "restrictions confining the government's references to that wealth." *Quattrone*, 441 F.3d at 187. Any conceivable probative value of this evidence lies in Dr. Terry's alleged meeting with South Korean officials—not in where they met, what they consumed, or how much it cost. Accordingly, if the Court admits evidence of these meals, it should preclude the government from introducing the prices of the meals and drinks, naming the establishments, or referencing their Michelin-star status.

### C. CONCLUSION

Dr. Terry respectfully requests that the Court preclude the government from introducing evidence of the luxury meals and drinks or, in the alternative, preclude the government from identifying their prices, the specific restaurants where they occurred, and whether the establishments have Michelin stars.

## VII. THE COURT SHOULD EXCLUDE EVIDENCE OF THE WILSON CENTER DONATIONS OR, IN THE ALTERNATIVE, PRECLUDE ANY SUGGESTION THAT THEY WERE PERSONAL GIFTS OR DIRECTED BY THE HIGHEST LEVELS OF THE SOUTH KOREAN GOVERNMENT

### A. BACKGROUND

Dr. Terry moves to exclude in its entirety evidence concerning approximately $37,000 in institutional donations facilitated by South Korean government officials to the Wilson Center, because those donations are irrelevant to the crimes charged in this case. The donations themselves do not constitute political activity or any other statutorily enumerated activity under 22 U.S.C. § 611(c)(1)(i) or (ii), *see supra* § IV, that could have required registration under FARA. Nor do they bear any meaningful connection to Dr. Terry's alleged performance of other Section 611(c)(1) activities on the South Korean government's behalf identified in the Indictment.

If the Court permits evidence of the donations, it should preclude the government from suggesting they were (i) personal gifts from the South Korean government to Dr. Terry or (ii) directed at the institutional level by the NIS or by the South Korean government absent admissible evidence establishing that claim. The Indictment alleges that these funds were "deposited … into an unrestricted 'gift' account that [Dr. Terry] controlled." Ind. ¶ 3. Left unqualified before a lay jury, that characterization is misleading and unfairly prejudicial. Permitting the government to blur the line between institutional program funding and personal compensation would invite the jury to infer that Dr. Terry personally received a financial benefit where the evidence establishes

none—precisely the kind of confusion and unfair prejudice that Rule 403 is designed to prevent. And improperly suggesting high-level NIS orchestration would inject unfairly prejudicial national-security overtones into this FARA case. *See supra* § I.

## B. ARGUMENT

### 1. The Irrelevant Donations to the Wilson Center Should Be Excluded Entirely

At the outset, the Court should exclude evidence of the alleged institutional donations to the Wilson Center entirely because the donations are not relevant, as they neither constitute Section 611(c)(1) activity themselves nor bear any meaningful nexus to other alleged Section 611(c)(1) activity. *See* Fed. R. Evid. 401, 402. *First*, the donations do not themselves constitute any activity enumerated in Section 611(c)(1)(i) or (ii). *See supra* § IV. The government must prove that Dr. Terry engaged in "political activities for or in the interests of a foreign principal" or served as its "public relations counsel," "publicity agent," or "political consultant," none of which encompasses a think tank's receipt of institutional donations. 22 U.S.C. § 611(c)(1)(i), (ii). Nor does Dr. Terry's alleged facilitation of such donations, without more, transform them into registrable "political activities," which require an "inten[t]" to "influence" a U.S. government agency or official or the U.S. public. *Id.* § 611(o). That is particularly true here, where the donations were made to an institutional gift account and the donor had no control over how the funds would be spent.

*Second*, the donations are not probative of any other alleged Section 611(c)(1) activity or of the existence of a FARA agency relationship. The Indictment does not allege any causal, temporal, or substantive connection between the donations and Section 611(c)(1) conduct by Dr. Terry that purportedly supports an agency relationship, and the government's discovery has disclosed no evidence of such a nexus. *See Sun* Motions *in Limine* Order at 10; *supra* § V. Absent

such a connection, the donations do not become relevant merely because they were made by South Korean officials or involved an institution with which Dr. Terry was affiliated. Nor can the government rescue their relevance by suggesting to the jury that the donations constituted a personal benefit to Dr. Terry. As discussed below, the funds were donated to the Wilson Center, not to Dr. Terry personally. *See infra* § VII.B.2.

**2. The Government Should Be Precluded from Suggesting the Donations Were Personal Gifts or Compensation to Dr. Terry**

If the Court permits evidence of the donations, it should preclude the government from mischaracterizing the donations as personal gifts or compensation to Dr. Terry. The Indictment alleges that the funds were deposited into "an unrestricted 'gift' account" that Dr. Terry "controlled." Ind. ¶ 3. But neither check was made payable to Dr. Terry nor deposited into a personal account. Both were payable to the Wilson Center, deposited into Wilson Center accounts, processed through the Wilson Center's financial systems, and subject to the Wilson Center's rules concerning the use of donations.

The Wilson Center's financial controls underscore that distinction. The Wilson Center is a congressionally chartered institution whose Development Office coordinates fundraising and whose funding agreements "must be reviewed by the Development Office and Financial Management Office [("FMO")] before they are executed/signed." Wilson Center New Employee Brief for Trust Funded Program/Department Activities ("New Employee Brief," attached hereto as Exhibit C), at 1. "Very few Wilson Center staff members are authorized Wilson Center (WC) representatives," and employees lacking formal contracting authority "may <u>NOT</u> sign any contract/agreement/grant on behalf of the Wilson Center." *Id.* Funds in the gift account were tracked and subject to oversight by the FMO. *See id.* at 1, 2, 4. And the Wilson Center's Trust Employee Handbook further provides that gifts from foreign governments exceeding a specified

threshold "are deemed to have been accepted on behalf of the Wilson Center, and upon acceptance shall become the property of the Wilson Center." Wilson Center Trust Employee Handbook ("Trust Employee Handbook," attached hereto as Exhibit D), at 14.

Against that backdrop, the government should not be permitted to incorrectly suggest that these institutional funds were personal gifts, compensation, or money available for Dr. Terry's personal use. The Indictment's allegation that the funds were deposited into "an unrestricted 'gift' account that [Dr. Terry] controlled," Ind. ¶ 3, is misleading to a lay jury without context. Dr. Terry's "control" was programmatic, not personal, and "unrestricted" means only that the donor did not impose a specific programmatic restriction or deliverable—not that the funds were free of Wilson Center financial controls or available for Dr. Terry to spend as she pleased. *See* Declaration of Peter Bergen ¶¶ 18-22. Allowing the government to blur that distinction would invite the jury to infer that Dr. Terry personally benefited from foreign-government money, creating precisely the sort of "undue tendency to suggest decision on an improper basis" that Rule 403 guards against. *Old Chief*, 519 U.S. at 180 (citation omitted).

Accordingly, if evidence of the donations is admitted, the government should be precluded from characterizing them as personal gifts, compensation, income, or funds available for Dr. Terry's personal use. Dr. Terry requests that the Court instruct the jury that the donations were made to the Wilson Center, not to Dr. Terry personally, and that "unrestricted" refers to the absence of donor-imposed programmatic restrictions, not the absence of institutional financial controls.

**3. The Government Should Also Be Precluded from Suggesting That the Donations Were Directed by the Highest Levels of the South Korean Government Absent Admissible Evidence Supporting That Claim**

The evidence shows that the donations at issue were funded with South Korean government money, routed through the South Korean Embassy, and facilitated by a single South Korean official. Dr. Terry, like any think-tank director, was actively seeking funding from a variety of

places—including foreign-government representatives—to support Wilson Center programming. Unless the government can present admissible evidence—testimony from a witness with personal knowledge, or authenticated documentary proof—that senior NIS leadership or high-ranking South Korean government officials instructed this particular official to fund the Wilson Center, the most the evidence supports is that Dr. Terry obtained funding from a South Korean government official and that this official facilitated the contribution.[24] That distinction matters because the government's characterization will determine whether the jury evaluates the donations as routine think-tank fundraising from a foreign government official or instead imagines them as the product of a top-down intelligence operation directed by the highest levels of a foreign government. Permitting the latter characterization without evidentiary support would violate Rule 602's requirement that testimony rest on personal knowledge, not speculation. *See* Fed. R. Evid. 602. And even if some foundation of personal knowledge could be laid, its marginal relevance is substantially outweighed by the prejudicial impact of suggesting high-level NIS orchestration—which improperly injects national-security overtones into this FARA case. *See supra* § I.

Accordingly, if the government introduces evidence of the donations, it should be precluded from asserting or insinuating that the donations were directed or orchestrated at the institutional level by the NIS or by the South Korean government, absent admissible evidence establishing that claim.

[24] The Indictment alleges that a South Korean official made a comment about a discussion with "Seoul"—*i.e.*, the South Korean government—regarding donations to the Wilson Center. Ind. ¶ 44. That statement is inadmissible hearsay and cannot be introduced unless the government proffers evidence sufficient to show the existence of a conspiracy to evade FARA's registration requirement. *See supra* § III.

### C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court exclude evidence of the Wilson Center donations or, in the alternative, preclude the government from suggesting that they were (i) personal gifts or compensation or (ii) directed by high-level South Korean officials absent admissible evidence supporting that claim.

## VIII. THE COURT SHOULD EXCLUDE UNFAIRLY PREJUDICIAL LANGUAGE FROM THE 2022 TRUTH IN TESTIMONY FORM

### A. BACKGROUND

The Indictment references "Truth in Testimony" disclosure forms wherein Dr. Terry truthfully disclosed to Congress that she was not "an active registrant under the Foreign Agents Registration Act (FARA)." Ind. ¶¶ 4, 11, 15, 19, 36, 61. One of these forms (the "2022 Form," attached hereto as Exhibit E) contains a "False Statements Certification" that states it is "a crime" to "[k]nowingly provid[e] material false information to" or "knowingly conceal[] material information from" a congressional "committee/subcommittee" under 18 U.S.C. § 1001. That warning, however, concerns a separate, uncharged offense and has no bearing on the narrow FARA violation alleged here. Displaying it to the jury would risk confusion by suggesting that Dr. Terry is accused of making false statements to Congress. Accordingly, if the government seeks to introduce the 2022 Form at trial, the Court should exclude page three of the Form, which contains the "False Statements Certification."

### B. ARGUMENT

The False Statements Certification on the 2022 Form presents dangers of unfair prejudice and confusion that substantially outweigh any marginal probative value it could have. *See* Fed. R. Evid. 403. Dr. Terry has not been accused of making any false statements under 18 U.S.C. § 1001, nor has the government provided Dr. Terry with notice under Rule 404(b) that it intends to

introduce evidence of "other crimes, wrongs, or acts" at trial. Fed. R. Evid. 404(b)(3). Yet the Certification's express warning that making false statements to Congress is a crime is unlikely to escape the jury's attention. The statute is well known—particularly in the context of congressional testimony—and has been a fixture of news cycles in recent years.[25] Placing this language before the jury would therefore invite the mistaken impression that this case is about lying to Congress and could "inappropriately lead the jury to convict on the basis of conduct not at issue in the trial." *Quattrone*, 441 F.3d at 186-87 (holding lower court erred in admitting evidence of "a bad act involving a violation of SEC regulations, neither established nor charged" because such evidence "created the prospect that the jury might view the ... evidence as further proof of [defendant's] desire to obstruct the SEC in the pursuit of its regulatory responsibilities"). Accordingly, if the government seeks to introduce the 2022 Form at trial, page three must be excluded.

### C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court exclude page three of the 2022 Form if the government seeks to introduce the Form at trial.

---

[25] *See, e.g.*, Jeremy Roebuck, *Key House Republican accuses Jack Smith of lying to Congress*, Wash. Post (July 23, 2026), https://archive.is/U3X3V; Eric Tucker, Alanna Richer, Michael Kunzelman, *Ex-FBI Director James Comey indicted after Trump pushes for prosecution of longtime foe*, AP News (Sept. 25, 2025), https://perma.cc/PSZ8-4PWE.

## PRAYER FOR RELIEF

For the foregoing reasons, Dr. Terry respectfully requests that the Court grant her motions *in limine* to:

a. Exclude espionage rhetoric, spycraft evidence, and references to counterintelligence operations and the scope of the government's investigation. *See supra* § I.

b. Preclude use of the phrase "nonpublic U.S. Government information" and improper argument regarding the phrase "off-the-record." *See supra* § II.

c. Require the government to proffer evidence of a conspiracy to prevent Dr. Terry from registering under FARA before admitting evidence for which admission at trial requires proof of the conspiracy. *See supra* § III.

d. Require the government to identify the specific conduct it contends constituted registrable activity under 22 U.S.C. § 611(c)(1), and to specify which statutory category applies to each. *See supra* § IV.

e. Exclude evidence of the gifts Dr. Terry allegedly received or, in the alternative, limit the form of this evidence to remove specific dollar amounts and luxury brand names. *See supra* § V.

f. Exclude evidence of meals and drinks or, in the alternative, preclude the government from identifying their prices, the specific restaurants where they occurred, or whether the establishment has a Michelin star. *See supra* § VI.

g. Exclude evidence of institutional donations to the Wilson Center or, in the alternative, preclude the government from suggesting that they were (i) personal gifts or compensation or (ii) directed by high-level South Korean officials absent admissible evidence supporting that claim. *See supra* § VII.

h. Require the government to exclude prejudicial language from the 2022 Truth in Testimony Form if it seeks to introduce the Form at trial. *See supra* § VIII.

Dated: September 14, 2026
New York, New York

Respectfully submitted,

By: /s/ *Faith E. Gay*
Faith E. Gay

SELENDY GAY PLLC
Faith E. Gay
Temidayo Aganga-Williams
Joshua W. Bean
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
fgay@selendygay.com
tagangawilliams@selendygay.com
jbean@selendygay.com

KKL LLP
Nicholas J. Lewin
Melissa C. Danzo
350 Fifth Avenue, 77th Floor
New York, NY 10118
Telephone: (212) 390-9550
nick.lewin@KKLllp.com
melissa.danzo@KKLllp.com

WILLKIE FARR & GALLAGHER LLP
Lee S. Wolosky
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
lwolosky@willkie.com

JENNER & BLOCK LLP
Anthony S. Barkow
Sophie A. Schuit
Sarah P. Geller
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: (212) 891-1600
abarkow@jenner.com
sschuit@jenner.com
sgeller@jenner.com

*Attorneys for Dr. Sue Mi Terry*