UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SUE MI TERRY,

*Defendant.*

24 Cr. 427 (LGS)

**Oral Argument Requested**

**DEFENDANT DR. SUE MI TERRY'S OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000

KKL LLP
350 Fifth Avenue, 77th Floor
New York, NY 10118
Telephone: (212) 390-9550

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000

JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: (212) 891-1600

*Attorneys for Dr. Sue Mi Terry*

# Table of Contents


Table of Contents ..... i

Table of Authorities ..... v

PRELIMINARY STATEMENT ..... 1

DISCUSSION ..... 5

I. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT BEARING ON THE CREDIBILITY, RELIABILITY, AND WEIGHT OF THE STATEMENTS THAT DR. TERRY PURPORTEDLY MADE TO THE FBI ..... 5

A. BACKGROUND ..... 5

B. ARGUMENT ..... 6

1. The Court Should Permit Evidence and Argument Bearing on the FBI Agents' Manufactured Urgency ..... 6

2. The Presence of Additional Officers During the Interview and Dr. Terry's Observation That Officers Were Armed Bears on the Psychological and Physical Environment ..... 7

3. Evidence of the FBI Agents' Interview Strategy Described in the "Ask Tell Make" Document Is Relevant to the Reliability of Dr. Terry's Statements ..... 8

4. The Government's Effort to Preclude All Evidence Concerning the Nature of the Investigation is Too Broad ..... 9

5. Exchanges Regarding Requests for Legal Representation Bear on Dr. Terry's State of Mind ..... 10

6. Any Evidence and Argument Regarding the 18 U.S.C. § 1001 Warning Should Be Precluded ..... 11

C. CONCLUSION ..... 12

II. DR. TERRY DOES NOT SEEK TO INTRODUCE PUNISHMENT EVIDENCE BUT SHOULD BE PERMITTED TO PRESENT EVIDENCE OF THE EFFECT OF THE CHARGES ON HER PERSONAL AND PROFESSIONAL LIFE ..... 13

III. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT ABOUT SOUTH KOREA'S STATUS AS A U.S. ALLY AND WHETHER DR. TERRY'S CONDUCT FURTHERED U.S. FOREIGN POLICY ..... 14

A. BACKGROUND ....14

B. ARGUMENT ....15

1. Evidence That South Korea is a Close U.S. Ally and That Dr. Terry's Conduct Furthered U.S. Foreign Policy Is Directly Probative of Her State of Mind....15

2. Evidence That South Korea is a Close U.S. Ally and That Dr. Terry's Conduct Furthered U.S. Foreign Policy Is Directly Probative of Agency and the Predominant Benefit Exemption....17

C. CONCLUSION....19

IV. THIS COURT SHOULD PERMIT EVIDENCE AND ARGUMENT CONCERNING THE NOVEL NATURE OF THE GOVERNMENT'S POSITION ON FARA-REGISTRABLE ACTIVITY ....19

A. BACKGROUND ....19

B. ARGUMENT....20

1. The Novelty of the Government's FARA Positions Is Relevant to Willfulness ....20

2. Preservation of Dr. Terry's As-Applied Vagueness Challenge Requires a Full Record Concerning the Nature of the Charged Conduct and the Novelty of the Government's Position ....22

C. CONCLUSION....24

V. THE COURT SHOULD DENY THE GOVERNMENT'S PREMATURE ATTEMPT TO PRECLUDE EVIDENCE AND ARGUMENT THAT OTHERS ENGAGED IN SIMILAR CONDUCT ....24

VI. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT CONCERNING CHANGES IN THE DOJ'S FARA ENFORCEMENT PRIORITIES OVER THE CHARGED PERIOD (2013–2023)....26

VII. IF JAMES OLSON IS ALLOWED TO TESTIFY AT ALL, THE COURT SHOULD PERMIT DR. TERRY TO CROSS-EXAMINE HIM ON EXCERPTS FROM HIS BOOKS AND WRITINGS TO SHOW BIAS ....28

A. BACKGROUND ....28

B. ARGUMENT....29

C. CONCLUSION....33

VIII. THE COURT SHOULD REQUIRE THE GOVERNMENT TO PROFFER EVIDENCE OF THE CHARGED CONSPIRACY BEFORE ADMITTING ANY PURPORTED CO-CONSPIRATOR STATEMENTS ........................................................33

A. BACKGROUND ..........................................................................................33

B. ARGUMENT ...............................................................................................34

1. The Government's Motion Reinforces Why a Factual Proffer of the Existence of the Conspiracy is Needed.....................................................34

2. The Court May Not Allow the Government to Introduce Dr. Terry's Statements For a Legally Impermissible Purpose.....................................37

C. CONCLUSION............................................................................................38

IX. DR. TERRY'S OWN STATEMENTS ARE ADMISSIBLE FOR ANY LEGALLY PERMISSIBLE PURPOSE ..............................................................................38

X. IF THE COURT ALLOWS THE GOVERNMENT TO INTRODUCE EVIDENCE OF THE GIFTS, IT SHOULD PERMIT EVIDENCE AND ARGUMENT REGARDING KOREAN GIFT-GIVING CULTURAL PRACTICES AND NORMS ..........................................................................................................39

XI. THE COURT SHOULD EXCLUDE EVIDENCE REGARDING DR. TERRY'S DEPARTURE FROM THE CIA.............................................................................43

A. BACKGROUND ..........................................................................................43

B. ARGUMENT ...............................................................................................43

1. Rule 404(b) ..........................................................................................43

2. Direct Evidence......................................................................................44

3. Rule 403 ...............................................................................................45

C. CONCLUSION............................................................................................47

XII. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT REGARDING DR. TERRY'S PUBLIC-ORIENTED ACTS ..................................................47

XIII. THE COURT SHOULD DENY THE GOVERNMENT'S PREMATURE ATTEMPT TO PRECLUDE EVIDENCE AND ARGUMENT THAT DR. TERRY NEVER RECEIVED A LETTER OF INQUIRY FROM THE DOJ'S FARA UNIT........51

XIV. IF THE COURT PRECLUDES DR. TERRY FROM REFERENCING FISA, IT MUST ALSO PRECLUDE THE GOVERNMENT FROM DOING SO..........................53

XV. ANY ORDER REGARDING INQUIRY INTO THE GOVERNMENT'S INVESTIGATION AND CLASSIFIED INFORMATION MUST APPLY EQUALLY TO BOTH PARTIES AND MAY NOT FORECLOSE CROSS-EXAMINATION ON MATTERS THE GOVERNMENT PLACES BEFORE THE JURY ..... 54

XVI. ANY ORDER REGARDING THE TYPE OR AMOUNT OF GOVERNMENT RESOURCES USED IN THE INVESTIGATION INTO DR. TERRY MUST APPLY EQUALLY TO BOTH PARTIES ..... 56

XVII. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT THAT THE INFORMATION DR. TERRY SHARED WAS UNCLASSIFIED AND THAT SHE BELIEVED SHE WAS ALLOWED TO SHARE IT ..... 57

A. BACKGROUND ..... 57

B. ARGUMENT ..... 58

C. CONCLUSION ..... 61

XVIII. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT REGARDING DR. TERRY'S BACKGROUND, FAMILY, OR OTHER PERSONAL CHARACTERISTICS ..... 62

PRAYER FOR RELIEF ..... 65

# **Table of Authorities**

**Page(s)**

## **Cases**

*Att'y Gen. v. Irish N. Aid Comm.*,
530 F. Supp. 241 (S.D.N.Y. 1981) ........................................ 18

*Ayala v. Ercole*,
2007 WL 1135560 (E.D.N.Y. Apr. 17, 2007)........................................ 55

*Block v. Meese*,
793 F.2d 1303 (D.C. Cir. 1986)........................................ 17

*Bourjaily v. United States*,
483 U.S. 171 (1987)........................................ 34

*Brinson v. Walker*,
547 F.3d 387 (2d Cir. 2008) ........................................ 30, 31

*Chatin v. Coombe*,
186 F.3d 82 (2d Cir. 1999) ........................................ 23

*Cheek v. United States*,
498 U.S. 192 (1991)........................................ 59

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991)........................................ 17

*Crane v. Kentucky*,
476 U.S. 683 (1986)........................................ passim

*Frazier v. Cupp*,
394 U.S. 731 (1969)........................................ 10

*Goldberg v. Nat'l Life Ins. Co. of Vt.*,
774 F.2d 559 (2d Cir. 1985) ........................................ 54, 56

*Jackson v. City of White Plains*,
2016 WL 234855 (S.D.N.Y. Jan. 19, 2016) ........................................ 44

*Meese v. Keene*,
481 U.S. 465 (1987)........................................ 14, 17

*Old Chief v. United States*,
519 U.S. 172 (1997)........................................ 12, 46, 53

*Sabratek Liquidating LLC v. KPMG LLP*,
2003 WL 22715820 (N.D. Ill. Nov. 18, 2003)........................................................ 54, 56

*Shannon v. United States*,
512 U.S. 573 (1994)........................................................................................... 13

*Smith v. Illinois*,
390 U.S. 129 (1968)........................................................................................... 55

*U.S. Bank, Nat'l Ass'n v. UBS Real Est. Sec. Inc.*,
205 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................. 38

*United States v. Abel*,
469 U.S. 45 (1984).......................................................................................... 30, 31

*United States v. Adelekan*,
567 F. Supp. 3d 459 (S.D.N.Y. 2021) ................................................................. 63

*United States v. Afjehei*,
869 F.2d 670 (2d Cir. 1989) ............................................................................... 45

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) ............................................................................... 36

*United States v. Angwang*,
2022 WL 3223187 (E.D.N.Y. Aug. 8, 2022)........................................................ 19

*United States v. Berg*,
710 F. Supp. 438 (E.D.N.Y. 1989) ...................................................................... 25

*United States v. Blackwell*,
853 F.2d 86 (2d Cir. 1988) ............................................................................ 62, 63

*United States v. Coonan*,
938 F.2d 1553 (2d Cir. 1991) ............................................................................. 45

*United States v. Dupree*,
870 F.3d 62 (2d Cir. 2017) ................................................................................. 45

*United States v. Díaz-Colón*,
651 F. Supp. 3d 468 (D.P.R. 2023) ..................................................................... 60

*United States v. Figueroa*,
548 F.3d 222 (2d Cir. 2008) ......................................................................... 30, 31, 32

*United States v. Fowler*,
932 F.2d 306 (4th Cir. 1991) ............................................................................... 41

*United States v. Gatto*,
986 F.3d 104 (2d Cir. 2021) ........................................................................................ 25

*United States v. Gigante*,
166 F.3d 75 (2d Cir. 1999) ........................................................................... 34, 36, 37

*United States v. Guan*,
2026 WL 1878118 (S.D.N.Y. June 30, 2026) ................................................................ 64

*United States v. Haak*,
884 F.3d 400 (2d Cir. 2018) ........................................................................................ 10

*United States v. Hashimi*,
2025 WL 1092862 (E.D.N.Y. Apr. 4, 2025) ................................................................. 47

*United States v. Howard*,
639 F. App'x 686 (2d Cir. Feb. 8, 2016) ............................................................... 14, 60

*United States v. James*,
607 F. Supp. 3d 246 (E.D.N.Y. 2022) .......................................................................... 63

*United States v. Johnson*,
507 F.3d 793 (2d Cir. 2007) ........................................................................................ 10

*United States v. Jones*,
2024 WL 2722307 (E.D.N.Y. May 28, 2024) ................................................................ 39

*United States v. Kaplan*,
490 F.3d 110 (2d Cir. 2007) ................................................................................... 25, 29

*United States v. Le*,
2009 WL 2947370 (E.D. Va. Sept. 14, 2009) ................................................................ 40

*United States v. Liu*,
2022 WL 773315 (S.D.N.Y. Mar. 14, 2022) ................................................................. 27

*United States v. Lumiere*,
249 F. Supp. 3d 748 (S.D.N.Y. 2017) .......................................................................... 12

*United States v. Mahaffy*,
2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) ................................................................ 41

*United States v. Manzano (In re United States)*,
945 F.3d 616 (2d Cir. 2019) ............................................................................ 13, 14, 60

*United States v. Mejia*,
2016 WL 6662265 (S.D.N.Y. Nov. 9, 2016) ................................................................. 64

*United States v. Michel*,
2023 WL 7140057 (D.D.C. March 30, 2023) ........ 16, 17, 43

*United States v. Morel*,
751 F. Supp. 2d 423 (E.D.N.Y. 2010) ........ 7

*United States v. Motovich*,
2024 WL 3303723 (E.D.N.Y. July 2, 2024) ........ 22, 23

*United States v. Oldbear*,
568 F.3d 814 (10th Cir. 2009) ........ 25, 41

*United States v. Orena*,
32 F.3d 704 (2d Cir. 1994) ........ 35

*United States v. Paccione*,
949 F.2d 1183 (2d Cir. 1991) ........ 64

*United States v. Pitt-Des Moines, Inc.*,
168 F.3d 976 (7th Cir. 1999) ........ 41

*United States v. Praddy*,
725 F.3d 147 (2d Cir. 2013) ........ 35

*United States v. Prince-Oyibo*,
320 F.3d 494 (4th Cir. 2003) ........ 40

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999) ........ 31

*United States v. Rea*,
958 F.2d 1206 (2d Cir. 1992) ........ 50

*United States v. Regan*,
103 F.3d 1072 (2d Cir. 1997) ........ 20

*United States v. Rivera*,
2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ........ 48, 49

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993) ........ 14, 60

*United States v. Sattar*,
272 F. Supp. 2d 348 (S.D.N.Y. 2003) ........ 23

*United States v. Sattar*,
314 F. Supp. 2d 279 (S.D.N.Y. 2004) ........ 24

*United States v. Schultz*,
333 F.3d 393 (2d Cir. 2003) ........ 25

*United States v. Skelos*,
2016 WL 1532253 (S.D.N.Y. 2016) ........ 17

*United States v. Smith*,
806 F. Supp. 3d 382 (S.D.N.Y. 2025) ........ 9

*United States v. St. Rose*,
2012 WL 1107659 (E.D.N.Y. Apr. 2, 2012) ........ 64

*United States v. Stewart*,
2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) ........ 22

*United States v. Tao*,
2022 WL 252019 (D. Kan. Jan. 27, 2022) ........ 63

*United States v. Thomas*,
116 F.3d 606 (2d Cir. 1997) ........ 60

*United States v. Ulbricht*,
79 F. Supp. 3d 466 (S.D.N.Y. 2015) ........ 44, 46

*United States v. Wertheimer*,
434 F.2d 1004 (2d Cir. 1970) ........ 60

*Viereck v. United States*,
318 U.S. 236 (1943) ........ 15

*Williams v. Lord*,
996 F.2d 1481 (2d Cir. 1993) ........ 9

**Statutes**

18 U.S.C. § 1001 ........ 5, 11, 12

22 U.S.C. § 611(c) ........ passim

22 U.S.C. § 613(d)(2) ........ passim

22 U.S.C. § 618(a) ........ 15, 59

U.S. Const. amend. VI ........ 4

**Rules**

Fed. R. Evid. 106 ........ 11, 39, 47

Fed. R. Evid. 402 .......... 30

Fed. R. Evid. 403 .......... 8, 42, 45

Fed. R. Evid. 404(b) .......... 48

Fed. R. Evid. 801(d) .......... passim

**<u>Other Authorities</u>**

Michael Schaffer, *Foreign 'Dark Money' Is Flooding Washington Think Tanks*, Politico (Jan. 3, 2025), https://perma.cc/SMW8-3R8C .......... 27

United States Congress Select Committee on the Chinese Communist Party, *Memorandum: United Front 101*, https://perma.cc/NNZ5-ZJNS .......... 16

United States-China Economic and Security Review Commission, *China 201: China's United Front Work*, https://perma.cc/WFR4-VDFL .......... 16

## PRELIMINARY STATEMENT

Across eighteen motions *in limine*, the government pursues two objectives in tandem.[1] First, it seeks to expand—at the very last minute—this prosecution of a private sector foreign-policy expert, think-tanker, and journalist under the Foreign Agents Registration Act ("FARA") into something it is not: an espionage and national-security case built on false and speculative insinuations concerning Dr. Terry's voluntary departure from the CIA, which occurred years before the charged period began. The result would be a trial laden with irrelevant, misleading, and inflammatory material that leaves the jury unable to discern which conduct it must evaluate and what questions it must answer. Second, the government seeks to exclude broad and indiscriminate swaths of admissible evidence, improperly foreclosing Dr. Terry's ability to defend against the government's misleading narratives and to keep the jury focused on what actually matters: which specific conduct allegedly required her to register under FARA, and whether she willfully failed to register or conspired to do the same.

The government starts with Dr. Terry's own words. It intends to introduce statements she purportedly made to the FBI, while simultaneously asking the Court to bar the evidence that the jury needs to assess the meaning, credibility, reliability, and weight of those purported statements and to prevent Dr. Terry from offering her own statements for proper purposes. *See infra* §§ I, IX. That same one-sided approach shapes the government's treatment of Dr. Terry's personal and professional background. The government has built its case around a decade of Dr. Terry's personal and professional life, yet it seeks to prevent the jury from hearing the context necessary to understand that life, including her public record of policy positions relating to Korea, her credentials and public service, the impact these charges have had on her career, her Korean

[1] *See* ECF No. 125 ("Government's Motions *in Limine*" or "Gov't MIL").

upbringing and heritage, and the Korean cultural norms that informed her alleged interactions with South Korean officials. *See infra* §§ II, X, XII, XVIII. And while the government seeks to prevent her from discussing her Korean heritage, it would allow its proposed counterintelligence expert, James Olson,[2] to treat that heritage as a mark of suspicion, free from any scrutiny on cross-examination. *See infra* § VII.

The impermissible double standard is equally pronounced in the government's improper and evolving national-security framing of this case. The government seeks to inject espionage rhetoric and national-security terminology far afield from the specific charges returned by the grand jury,[3] and offers a former CIA counterintelligence chief as its lead expert. Yet it seeks to prevent Dr. Terry from showing that the information she allegedly shared with South Korean officials was entirely unclassified, that South Korea is a close U.S. ally rather than a hostile adversary, and that her conduct has always furthered U.S. foreign policy interests. *See infra* §§ III, XVII. The government cannot try to turn the charged registration case into a spy case, and it certainly cannot prevent Dr. Terry from presenting the jury with relevant information about the conduct that is actually charged. That is especially so when the government itself concedes that suggesting Dr. Terry is "a threat to national security" would be unfairly prejudicial. *See infra* § XIV.

Nowhere is this clearer than in the government's sudden effort to put Dr. Terry's voluntary departure from the CIA, years before the charged period began, at the center of this trial. After lifting years-old redactions from an FBI interview summary only hours before the defense filed its motions *in limine*, the government now invents a new motive for Dr. Terry's alleged misconduct:

---

[2] *See* ECF No. 121, Ex. A ("Olson Disclosure").

[3] *See* ECF No. 124 ("Dr. Terry's Motions *in Limine*" or "Def. MIL") at 3–13.

a "sense of betrayal by the CIA" that explains why she was allegedly willing to violate FARA years later.[4] *See infra* § XI. No evidence supports that newly spun-up revenge theory. The government may not cast Dr. Terry as some sort of disgraced double agent while it hides the CIA records that would refute that portrayal behind a shield of classification. *See infra* § XI.

Innuendo relating to Dr. Terry's CIA departure is not the only late addition. The government's motions also advance new allegations found nowhere in the Indictment: that a South Korean official photographed an email on Dr. Terry's phone inviting her to a roundtable with the Vice President, that the same official obtained in advance a speech she delivered at the Rayburn House Office Building, that Dr. Terry attended meetings with a different South Korean official the day before the alleged purchase of gifts in 2019 and 2021, and that Dr. Terry expressed in a recorded conversation a willingness to accept gifts and money from South Korea's National Intelligence Service ("NIS") while maintaining the appearance of objectivity.[5] With trial only weeks away, the government still has not identified which of Dr. Terry's conduct it contends required registration while continuing to add to the list of items that are far afield from activities encompassed by FARA.[6] That is the antithesis of fair play or fair notice.

The government's remaining motions follow the same playbook. The government seeks to bar evidence that its theory of registrable activity is unprecedented and that, for much of the charged period, the DOJ did almost nothing to enforce FARA with respect to *any* activities in the think-tank world. *See infra* §§ IV, VI. The government asks the Court to bar evidence that Dr. Terry's think-tank colleagues routinely engaged with foreign contacts in similar ways. *See infra*

---

[4] Gov't MIL at 50.

[5] *See* Gov't MIL at 2–3, 5–6; ECF No. 2 ("Indictment" or "Ind.").

[6] *See* Def. MIL at 17–22.

§ V. And the government seeks to preclude evidence that the DOJ's FARA Unit never sent Dr. Terry a Letter of Inquiry, despite the fact that federal agents met with Dr. Terry on multiple occasions and while conceding that such a letter "may help demonstrate willfulness."[7] *See infra* § XIII. All of this evidence bears directly on whether Dr. Terry knew she was required to register under FARA and willfully failed to do so.

Finally, the government seeks to put before the jury out-of-court statements of South Korean officials as statements of purported co-conspirators, even though it has offered zero evidence of any agreement to violate FARA. *See infra* § VIII. Dr. Terry would have no chance to confront or cross-examine any of those declarants, who are likely located in South Korea. Put simply, the defense has no idea, no information, not even any speculation as to whom Dr. Terry could have allegedly conspired with to avoid registration as a purported foreign agent.

Neither the Constitution nor the Federal Rules of Evidence permit such a one-sided trial. The Constitution guarantees Dr. Terry "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted). It also guarantees her the right "to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. Those guarantees, and every other assurance of fair process, mean nothing if the government can expand its case at will, pick and choose which parts of the story the jury hears, and deny Dr. Terry the information she needs to rebut its newly added allegations, including the identity of so-called co-conspirators. The grand jury charged Dr. Terry with nothing more and nothing less than a willful failure to register under FARA—a specific-intent regulatory crime—and with conspiring with unknown co-conspirators to avoid registering. The government wants to suggest by innuendo

---

[7] Gov't MIL at 54 (emphasis omitted).

and other impermissible strategies that the grand jury charged something it did not. This Court should draw the line.

## DISCUSSION[8]

### I. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT BEARING ON THE CREDIBILITY, RELIABILITY, AND WEIGHT OF THE STATEMENTS THAT DR. TERRY PURPORTEDLY MADE TO THE FBI

#### A. BACKGROUND

The Court should deny the government's first motion *in limine*, which seeks—in sweeping fashion—to prevent Dr. Terry from introducing relevant evidence and argument regarding the circumstances surrounding her statements to the FBI. *See* Gov't MIL at 10–20. Under *Crane*, criminal defendants have a constitutional right to contextualize their statements made to law enforcement by presenting evidence that bears on the reliability or credibility of those statements at trial—regardless of the trial court's prior ruling on whether those statements were made voluntarily.[9] 476 U.S. 683. The government seeks to deprive Dr. Terry of that constitutional right by precluding evidence and argument regarding (i) the law enforcement agents' intent and motivations; (ii) the presence of agents; (iii) whether the agents were armed; (iv) materials the FBI prepared for the interview; (v) the nature of the investigation and any deception tactics used by the agents; (vi) Dr. Terry's statements about needing counsel; and (vii) the agents' "candor warning" under 18 U.S.C. § 1001. But each of these categories of evidence is permissible under *Crane* and shows how Dr. Terry understood and responded to the agents' questioning—therefore bearing

---

[8] Dr. Terry disputes the government's characterization of the facts in the background section of its motions *in limine*. *See* Gov't MIL at 1–10.

[9] Dr. Terry does not ask the Court to revisit its suppression ruling, *see* ECF No. 117 ("Suppression Order"), and reserves further argument on that issue for appeal.

directly on the weight the jury should assign to any purported "confession."[10] Gov't MIL at 11 (internal quotation marks omitted). Dr. Terry must be permitted to introduce this evidence at trial to prevent the government from presenting a one-sided account of the FBI interview to the jury.

**B. ARGUMENT**

**1. The Court Should Permit Evidence and Argument Bearing on the FBI Agents' Manufactured Urgency**

The government first seeks to exclude "evidence or argument concerning the subjective intent or motivations of the FBI agents who participated in the Interview," appearing to refer to pre-interview communications between FBI agents bearing on how the agents conveyed urgency and pressure to Dr. Terry during the June 5, 2023, interview. Gov't MIL at 13–14.[11] Dr. Terry does not intend to introduce those communications at trial. But to the extent the government's motion seeks to exclude *any* evidence and argument that the agents manufactured a sense of urgency during the interview,[12] the Court should deny the motion.

Under *Crane*, the defendant must be allowed to introduce evidence of the circumstances surrounding the statements she made to law enforcement, which necessarily includes evidence that officers manufactured a pressured environment to elicit inculpatory statements from her. *See*

---

[10] To be clear, Dr. Terry does not intend to litigate facts wholly outside of her awareness or that could not have affected her perception of the questioning.

[11] The agents' pre-interview communications provide evidence of that interview strategy, referring to the promotion-driven "HQ timeline" and the sentiment that "aint [sic] nothing stopping this train." ECF No. 82 ("Suppression Hearing"), Tr. 144:3–145:7.

[12] In her declaration, Dr. Terry described the agents' sense of urgency and her feeling under pressure: (i) interpreting "[the agents'] words and tone to mean that it was urgent, and that they had authority over [her]," ECF No. 40-2 ("Dr. Terry Declaration" or "Dr. Terry Decl.") ¶ 4; (ii) the agents "indicated that other law enforcement officers were present outside the apartment and that they knew they had about an hour before [her] partner returned," *id.* ¶ 5; (iii) the agents "emphasize[d] that they had some questions they needed answered and that [she] needed to cooperate," *id.* ¶ 6; (iv) the agents "aggressively demand[ed] to speak with [Dr. Terry]" and she "did not feel free to refuse them," *id.* ¶ 7; and (v) feeling that she had "no choice but to follow the directives the FBI agents gave [her]," *id.* ¶ 9.

*Crane*, 476 U.S. at 690–91; *see also United States v. Morel*, 751 F. Supp. 2d 423, 430 (E.D.N.Y. 2010) (holding defendant could introduce specific "evidence of the circumstances surrounding the taking of [his admissible statements]," including "evidence of the duration of [his] detention" and "the number of agents present in the room" during the interrogation). Evidence that the agents conveyed urgency and that Dr. Terry experienced that pressure bears directly on the credibility and reliability of her statements—and the jury must be able to weigh them accordingly.

#### 2. The Presence of Additional Officers During the Interview and Dr. Terry's Observation That Officers Were Armed Bears on the Psychological and Physical Environment

The Court should also reject Sections I.C and I.D of the government's first motion *in limine*.[13] The government seeks to preclude evidence and argument that (i) Dr. Terry was aware of the additional officers in and around her home and (ii) observed that some of those officers were armed. *See* Gov't MIL at 14–16. But both categories of evidence bear directly on the physical and psychological environment of the interview—namely, they contributed to Dr. Terry's sense that she was "being taken prisoner in [her] own apartment." Dr. Terry Decl. ¶ 7.

*Morel* is instructive. *See* 751 F. Supp. 2d at 429–30. As discussed above, the court held that *Crane*'s guarantee includes "the right to challenge the probative weight of admitted statements," permitting the defendant to introduce evidence of "the duration of [his] detention and interrogation," the "number of agents present in the room," and "whether [he] was provided with food and water." *Id.* at 430. Similarly, here, Dr. Terry's observation of armed officers or the overall scope of law enforcement presence directly bear on the circumstances under which her statements were made.

---

[13] Dr. Terry addresses these sections of the government's first motion *in limine* together because both seek to exclude evidence concerning the law enforcement presence that shaped the interview environment. *See* Gov't MIL at 14–16.

Rule 403 does not warrant exclusion of this evidence. *See* Fed. R. Evid. 403. Indeed, the government itself acknowledges that armed law enforcement officers are "a *standard* FBI and NYPD safety precaution," thereby undermining its own claim that evidence of their presence would be inflammatory to the jury and unfairly prejudice the prosecution. Gov't MIL at 15 (emphasis added).

Moreover, should testimony at trial contradict the government's assertion that no weapons were visible during the interview, *see id.*, Dr. Terry reserves the right to examine those contradictions. The government may not present a sanitized account of the interview environment and then preclude Dr. Terry from challenging that account if the evidence adduced at trial proves otherwise.

**3. Evidence of the FBI Agents' Interview Strategy Described in the "Ask Tell Make" Document Is Relevant to the Reliability of Dr. Terry's Statements**

The government also contends that the "Ask Tell Make" document prepared by FBI agents in advance of the interview should be precluded because Dr. Terry never saw it. Gov't MIL at 16–17. But whether Dr. Terry saw that document is beside the point. Its relevance lies in what it reveals about the manner in which the agents secured Dr. Terry's statements. Under *Crane*, "evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess." 476 U.S. at 688.

The "Ask Tell Make" document was the FBI's own carefully devised blueprint for eliciting Dr. Terry's statements, and the hearing record establishes that the agents closely followed it. *See* Suppression Hearing, Tr. 131–34, 145–46. The document further corroborates the tactics the agents employed to communicate a false sense of urgency, each of which bears directly on the reliability and weight of any resulting admissions. *See id.*, Tr. 173:8–13 (agent admitting he discussed the plan to "convey a sense of urgency and immediacy" with other FBI personnel); *id.*,

Tr. 178:10–16 (agent admitting it's possible he used the "ask" section language, including "this must be addressed immediately"); ECF No. 85 at 23 (explaining that the agents' script included multiple examples of false urgency tactics).

The government concedes that Dr. Terry may present evidence of what the agents "actually communicated to her." Gov't MIL at 17. The Ask Tell Make document is the *source* of those communications—a script the agents drafted, carried into the interview, and executed. Thus, this document is relevant evidence that provides further insight into the circumstances under which Dr. Terry's statements were elicited and the reliability and credibility of those statements.

#### 4. The Government's Effort to Preclude All Evidence Concerning the Nature of the Investigation is Too Broad

The government's demand to preclude *all* evidence concerning the nature of the investigation, including any deception tactics used by the FBI, is impermissibly broad. *See* Gov't MIL at 17–18. The government argues that "whether [the agents'] statements ... were in fact true or false is entirely irrelevant," and that only what Dr. Terry knew during the interview matters. *Id.* at 18.

Although evidence of the overall nature and scope of the government's investigation is generally irrelevant to the elements of the charged offense, *see infra* § XVI; Def. MIL at 7–8, Dr. Terry must be permitted to offer evidence and argument regarding what the agents communicated to her about the investigation's nature and purpose and the manner in which they interacted with her. *See Crane*, 476 U.S. at 691 (explaining that "evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility"); *Williams v. Lord*, 996 F.2d 1481, 1483 (2d Cir. 1993) (explaining that restrictions on a defendant's right to present a defense "may not be arbitrary or disproportionate to the purposes they are designed to serve") (internal citation omitted); *United States v. Smith*, 806 F. Supp. 3d 382, 407 (S.D.N.Y. 2025) (finding that

"evidence that casts doubt on the truthfulness of a defendant's confession ... has long been held proper[.]"). Thus, whether the agents lied to her about the nature and scope of the investigation—*i.e.*, that it was a pure intelligence matter—is directly relevant to her perception of the interview and thus bears on the reliability, credibility, and weight of her alleged statements.[14] The government's reliance on *Frazier v. Cupp* and *United States v. Haak* does not support the blanket bar they seek. Both address whether police deception renders a confession involuntary—a question this Court has already resolved—not whether evidence of that deception is inadmissible for the jury's assessment of credibility under *Crane*. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (finding police misrepresentation of statements was "relevant" but "insufficient" to exclude voluntary confession); *United States v. Haak*, 884 F.3d 400, 416 (2d Cir. 2018) (finding no false promise of immunity made during non-custodial interview). Overall, evidence of the agents' misrepresentations and coercive conduct fits squarely within Dr. Terry's right to explain the circumstances surrounding her statements.

#### 5. Exchanges Regarding Requests for Legal Representation Bear on Dr. Terry's State of Mind

The Court should deny the government's efforts to preclude any evidence of exchanges in which Dr. Terry inquired about legal representation. *See* Gov't MIL at 18–19. The government's framing of these inquiries as relitigating custody or manufacturing the impression that Dr. Terry was denied counsel misses the point. *See id.* at 19. Rather, the government cannot introduce Dr. Terry's interview statements while excising the portions in which she expressed doubt about proceeding without a lawyer. *See United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007)

[14] FBI agents misleadingly told Dr. Terry they were conducting a "counterintelligence" operation, rather than a criminal investigation. Suppression Order at 2, 15; *see* ECF No. 40 ("Defense's Pretrial Motions" or "Def. Pretrial Mot.") at 40.

("[A]n omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." (internal citation omitted)); *see also* Fed. R. Evid. 106. Dr. Terry's questions reveal that, despite the agents' pre-determined replies,[15] she perceived the encounter as one carrying potential legal consequences—a perception that bears directly on the "psychological environment" in which she made her admissions and thus the credibility or reliability of her statements. *Crane*, 476 U.S. at 689. If the government offers her statements, Rule 106 requires admission of "any other part—or any other statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. In order for the jury to properly assess the credibility of the interview statements, the Court should allow Dr. Terry to explain the circumstances in which those admissions were made. To the extent any risk of confusion exists, a limiting instruction directing the jury to consider this evidence only as it bears on Dr. Terry's state of mind—not as any legal invocation of her right to counsel or an improper denial of that right—would adequately address the government's concern. *See* Gov't MIL at 19.

#### 6. Any Evidence and Argument Regarding the 18 U.S.C. § 1001 Warning Should Be Precluded

The government seeks to introduce evidence that agents warned Dr. Terry that providing false statements to federal agents may itself constitute a federal crime under 18 U.S.C. § 1001 if she "open[s] the door" by arguing that she misunderstood the nature of the interview, that her statements were involuntary or unreliable, or that she was misled or tricked. Gov't MIL at 20. The

[15] The suppression hearing established that the agents planned their responses to any mention of a lawyer in advance with prosecutors. *See* Suppression Hearing, Tr. 109:4–15 (The agents planned to "advise [Dr. Terry] that we could not give legal advice, and we can't answer that question."), 133:8–24 (As scripted in the "Ask Tell Make" document, the agents' prepared reply read: "I can't give you legal advice. We are here to gather information for our investigation, but there is no guarantee you'll have another opportunity before my supervisors decide where to take this investigation next."); *supra* § I.B.3.

government's request is legally impermissible and should be denied. Permitting the government to introduce the warning upon Dr. Terry "opening the door"—thereby injecting an uncharged false-statement offense into this case—would confuse the issues and create an undue risk of prejudice.

First, the door-opening doctrine is inapplicable because "properly admitted evidence does not open the door to inadmissible evidence." *United States v. Lumiere*, 249 F. Supp. 3d 748, 759 (S.D.N.Y. 2017) (brackets and internal quotation marks omitted). Here, as discussed, Dr. Terry's evidence of the circumstances surrounding her statements is plainly *admissible* under *Crane*, so it cannot "open the door." Indeed, the government's invocation of that doctrine is itself a concession that the Section 1001 warning is otherwise irrelevant and has no independent basis for admission.

And second, placing evidence of the Section 1001 warning before the jury invites it to "declar[e] guilt on a ground different from proof specific to the offense charged"—namely, that Dr. Terry made false statements to federal agents. *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also* Def. MIL at 36–37 (seeking to exclude language regarding Section 1001 from the 2022 Truth in Testimony Form for similar reasons). Evidence of the Section 1001 warning would also invite the inference that Dr. Terry's statements must have been true and reliable simply because the warning was administered and she presumably would have adhered to it. Those dangers substantially outweigh any probative value (which the government concedes is none).

Thus, the Court should under no circumstances permit the government to proffer evidence and argument concerning the Section 1001 warning.

## C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court deny the government's first motion *in limine* in full. The Court must protect Dr. Terry's constitutional right to present evidence and argument necessary to contextualize the statements she made to law

enforcement so that the jury may properly assess the accuracy, reliability, credibility, and weight of those statements.

## II. DR. TERRY DOES NOT SEEK TO INTRODUCE PUNISHMENT EVIDENCE BUT SHOULD BE PERMITTED TO PRESENT EVIDENCE OF THE EFFECT OF THE CHARGES ON HER PERSONAL AND PROFESSIONAL LIFE

The government's second motion *in limine* seeks to preclude evidence and argument regarding the punishment Dr. Terry would face if convicted or the consequences Dr. Terry has already faced from the charges brought. *See* Gov't MIL at 20–21. Dr. Terry does not intend to argue or present evidence concerning sentencing or other direct outcomes of a potential conviction. That evidence is properly excluded under *Shannon v. United States*, 512 U.S. 573 (1994).

But Dr. Terry should be allowed to offer evidence and argument of the consequences of the charges that she has already faced, including evidence of the effect of the charges on her personal and professional life, as there is no "absolute prohibition" on consequence evidence. *United States v. Manzano* (*In re United States*), 945 F.3d 616, 630–31 (2d Cir. 2019) (declining to categorically preclude consequence evidence and noting that *Shannon* does not establish an "absolute prohibition on exposing the jury" to such evidence, subject to Rule 403 balancing). The government should not be permitted to place Dr. Terry's professional life at the center of its prosecution while preventing the defense from explaining what has happened to that career since. Dr. Terry would offer that evidence not to encourage juror nullification, but rather to provide the jury with the context it needs to fully and fairly evaluate her conduct and—if she testifies—assess the credibility and reliability of her account of her professional life and the fact that she never under any circumstances acted as a foreign agent.

Similarly, if the government opens the door by suggesting that the charges have caused Dr. Terry no harm or have somehow benefited her, she must be free to introduce evidence regarding

the consequences of the charges for the limited purpose of rebutting that false impression. *See United States v. Howard*, 639 F. App'x 686, 689 (2d Cir. Feb. 8, 2016) (summary order) (recognizing that a party may "introduce otherwise inadmissible evidence on an issue (a) when the opposing party has opened the door by introducing inadmissible evidence on the same issue, and (b) when needed to rebut a false impression that may have resulted from the opposing party's evidence") (citing *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993)).

At a minimum, the Court should defer ruling on this issue until trial. The Second Circuit endorsed precisely that approach in *In re United States*, holding that "the district court's decision to defer ruling on the admissibility" of consequence evidence "until after the commencement of trial" was permissible where resolution "depend[ed] at least in part on events that [would] unfold at trial." 945 F.3d at 630–31.

For the foregoing reasons, the government's second motion *in limine* should be denied to the extent it sweeps beyond the established *Shannon* principle and forecloses any reference to the effect of the charges on Dr. Terry's personal and professional life.

## III. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT ABOUT SOUTH KOREA'S STATUS AS A U.S. ALLY AND WHETHER DR. TERRY'S CONDUCT FURTHERED U.S. FOREIGN POLICY

### A. BACKGROUND

The government's third motion *in limine* seeks to preclude all "evidence or argument about South Korea's status as an ally or that [Dr. Terry's] conduct furthered U.S. foreign policy." Gov't MIL at 21. In doing so, the government fundamentally misunderstands how Dr. Terry intends to use such evidence at trial. Dr. Terry does not contest the basic and well-established proposition that FARA's civil registration requirement applies regardless of whether the foreign principal is a U.S. ally or adversary. *See Meese v. Keene*, 481 U.S. 465, 469–70 (1987). But South Korea's status as a close U.S. ally and the alignment of Dr. Terry's activities with U.S. foreign policy

interests are directly relevant to two core legal issues in this case: (1) criminal willfulness, and (2) whether Dr. Terry was required to register under FARA, including both the 22 U.S.C. § 611(c)(1) agency inquiry and the predominant-benefit exemption under 22 U.S.C. § 613(d)(2). The government's motion *in limine* should be denied in full.

### B. ARGUMENT

#### 1. Evidence That South Korea is a Close U.S. Ally and that Dr. Terry's Conduct Furthered U.S. Foreign Policy Is Directly Probative of Her State of Mind

The government's request for a categorical exclusion of evidence and argument that South Korea is a close U.S. ally or that Dr. Terry's conduct furthered U.S. policy interests should be denied. Gov't MIL at 23–24. The United States' allyship with South Korea and consistency between Dr. Terry's work and longstanding U.S. policy are directly probative of context, her state of mind, and whether she acted as an agent of a foreign principal. The government concedes as much, acknowledging that "two courts have permitted FARA defendants to testify to their subjective understandings of their belief that they were furthering American interests as relevant to the defendant's intent." Gov't MIL at 24 n.7.[16] The government's concession that such evidence is relevant is fatal to its request for total exclusion.

To obtain a conviction under FARA, the government must prove beyond a reasonable doubt that Dr. Terry acted willfully. *See* 22 U.S.C. § 618(a). Whether the willfulness standard advocated by the defense applies (*i.e.*, the willful violation of a known duty to register) or the government's preferred standard ("consciousness of wrongdoing," *see* ECF No. 72 at 1 ("Gov't Supp. Auth. Letter") (internal quotation marks omitted)), South Korea's status as a close democratic ally of the

[16] Congress enacted FARA in 1938 to combat covert Nazi propaganda operations in the United States. *See Viereck v. United States*, 318 U.S. 236, 241, 244 (1943).

United States is highly probative of Dr. Terry's state of mind. Indeed, under the government's more relaxed standard of willfulness, a person who subjectively believes she is advancing U.S. interests by strengthening a critical alliance that serves, among other things, to deter North Korea's existential nuclear threat to the United States—and whose work in fact tracks longstanding U.S. foreign policy—is far less likely to have a "consciousness of wrongdoing" than someone working covertly for an adversary like Russia or Iran. That goes to the heart of willfulness, and the government has no response.

The Court need not look any further than *United States v. Sun*, which squarely addressed the admissibility of this evidence in a FARA case. Denying the government's motion to preclude precisely this type of evidence, Judge Cogan held that evidence regarding "conform[ity] with current federal foreign policy" is "relevant to whether Sun knew she had to register with the Attorney General." *United States v. Sun*, No. 24 Cr. 346, Dkt. 238, at 2 (E.D.N.Y. Nov. 3, 2025) (*Sun* Motions *in Limine* Order) (attached hereto as Exhibit A)[17] (citing *United States v. Michel*, 2023 WL 7140057, at *1 (D.D.C. March 30, 2023)). The *Michel* court likewise permitted "the defense to argue that [the defendant] did not act willfully or knowingly because he subjectively understood himself to be furthering American interests." 2023 WL 7140057 at *1.

---

[17] In its opposition to the defense's *Daubert* motion to preclude Mr. Olson from testifying, the government attempts to distinguish *Sun* on the ground that the foreign officials in that case "were PRC consular, diplomatic, and United Front Work Department officials—not intelligence officers." ECF No. 129 at 10. That distinction is factually inaccurate. According to the government's own reporting, the United Front Work Department ("UFWD") is widely known to engage in intelligence operations. *See* United States Congress Select Committee on the Chinese Communist Party, *Memorandum: United Front 101*, https://perma.cc/NNZ5-ZJNS, at 3 (explaining that "the UFWD collects intelligence, exerts control over overseas Chinese-language media outlets, seeks to influence Chinese diaspora groups, facilitates illicit technology transfer, and interferes in politics in other countries, including by co-opting and influencing foreign academic, political, and business elites"); United States-China Economic and Security Review Commission, *China 201: China's United Front Work*, https://perma.cc/WFR4-VDFL, at 4 (reporting that "China's intelligence services have recruited united front figures in foreign countries as clandestine assets or even posed as UFWD officials themselves to facilitate intelligence operations").

Tellingly, the government only acknowledges *Sun* and *Michel* in a footnote, attempting to minimize their holdings. Gov't MIL at 24–25 n.7. The government asserts that "the circumstances in which such an understanding operates as a defense … are narrow," *id.*, but the government cannot simultaneously ask this Court to preclude *all* such evidence while conceding that all other courts to have addressed this question have found it relevant. It is therefore unsurprising that the government's own principal FARA authorities cited in its motion *in limine*—*Meese v. Keene*, 481 U.S. 465 (1987), and *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986)—concern the civil registration obligation and have nothing to do with criminal willfulness.[18] What Dr. Terry contends, and what the government entirely misses in its motion, is that this evidence is relevant to whether she *willfully* failed to register under FARA such that she committed a federal crime.

### 2. Evidence That South Korea is a Close U.S. Ally and that Dr. Terry's Conduct Furthered U.S. Foreign Policy Is Directly Probative of Agency and the Predominant Benefit Exemption

Evidence about South Korea's ally status and the alignment of Dr. Terry's work with U.S. interests is also relevant to whether Dr. Terry's conduct served predominantly a foreign interest and whether she acted at the request or directive of a foreign agent. The predominant benefit exemption under 22 U.S.C. § 613(d)(2) provides that FARA's registration requirements "shall not apply" to an agent "engaging or agreeing to engage only … in other activities not serving predominantly a foreign interest." This is an *objective* standard. *See* ECF No. 72-1 ("Jury Charge in *Sun*") at 54. Therefore, if the jury finds that the defendant "engaged … in only activity that did

---

[18] The bribery cases the government cites, such as *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365 (1991), and *United States v. Skelos*, 2016 WL 1532253 (S.D.N.Y. 2016), are wholly inapposite. *See* Gov't MIL at 23. In bribery cases, the *quid pro quo* itself constitutes the offense regardless of whether the resulting official act was sound policy. Here, by contrast, the relevant question is whether Dr. Terry *knew* her conduct was unlawful, or at the very least, wrong—and her reasonable belief that she was doing nothing wrong because her work furthered one of the United States' closest allied relationships is directly probative of that inquiry.

not predominately serve a foreign interest, meaning that those activities were either equally or predominately serving a domestic interest, that is, the interests of the United States," then she would be entitled to that registration exemption and "her conduct wouldn't violate FARA." *Id.*

Whether Dr. Terry's activities furthered U.S. foreign policy more than South Korean interests is the *precise* factual inquiry that Section 613(d)(2) requires. If the primary beneficiary of her work was the United States—or at minimum her own domestic professional and scholarly interests—she had no duty to register in the first place. Evidence of South Korea's status as a close ally and the alignment of Dr. Terry's positions with U.S. policy is therefore *essential* to that objective determination. Precluding it would effectively nullify a statutory exemption that Congress created.

The government's suggestion that permitting this evidence amounts to an invitation for jury nullification is a total red herring. *See* Gov't MIL at 24. Introducing evidence that is squarely relevant to a statutory exemption is not nullification—it is the ordinary operation of the law Congress enacted. The defense is emphatically not asking the Court or the jury to evaluate the wisdom of U.S.-South Korea policy or to render a judgment on the merits of any particular foreign policy position. *See infra* § IX. The question is indeed a narrow and factual one: did Dr. Terry's activities predominantly serve a foreign interest, or did they equally or predominantly serve domestic interests?

The same evidence is also squarely relevant to the government's theory that Dr. Terry acted as an "agent of a foreign principal" within the meaning of 22 U.S.C. § 611(c). FARA "is not intended to cover persons … whose acts may incidentally be of benefit to foreign interests." *Att'y Gen. v. Irish N. Aid Comm.*, 530 F. Supp. 241, 256 (S.D.N.Y. 1981) (citation modified), *aff'd*, 668

F.2d 159 (2d Cir. 1982). And agency under FARA requires more than mere alignment—it requires an agreement with the foreign principal. *See* Jury Charge in *Sun* at 52–53.

Evidence that Dr. Terry's positions independently tracked longstanding U.S. foreign policy—positions she had held publicly and consistently for years—goes directly to this question, because it tends to show that she was, at most, working in parallel with South Korean interests at times, but never under South Korea's direction. *See United States v. Angwang*, 2022 WL 3223187, at *2 (E.D.N.Y. Aug. 8, 2022) (defendant's "contention that he was working in parallel with the PRC officials rather than at their direction presents a question for the jury"). That inference is all the more plausible here because the alleged foreign principal is a close democratic ally whose high-level policy objectives have long been substantially shared by the United States—a context materially different from cases involving adversarial foreign powers.

### C. CONCLUSION

For the foregoing reasons, the government's third motion *in limine*, which seeks to preclude evidence and argument about South Korea's status as an ally and the alignment of Dr. Terry's conduct with U.S. foreign policy, should be denied in full.

## IV. THIS COURT SHOULD PERMIT EVIDENCE AND ARGUMENT CONCERNING THE NOVEL NATURE OF THE GOVERNMENT'S POSITION ON FARA-REGISTRABLE ACTIVITY

### A. BACKGROUND

The government's fourth motion *in limine* seeks to preclude "any argument or attempt to elicit evidence that is intended: to place the Government's charging decision at issue; to suggest to the jury that the defendant should be acquitted because the case was brought for improper reasons or is novel; or to suggest some supposed impact the charges have had or will have on the defendant's or others' First Amendment rights." Gov't MIL at 29. That request is not only overbroad; it is also directed at a strawman. Dr. Terry does not intend to present a selective

prosecution defense to the jury, impugn the government's motives in bringing this case, or ask the jury to acquit her on First Amendment grounds. *See, e.g.*, *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997). The government's actual objective emerges midway through its motion: it asks the Court to preclude Dr. Terry from "advanc[ing] arguments or seek[ing] to introduce evidence *in aid of* substantially the same alleged points—even if [she does] not expressly argue that [she] has been selectively prosecuted," Gov't MIL at 27 (emphasis added), or that her First Amendment rights have been suppressed. In other words, the government does not merely seek to foreclose impermissible defenses; it seeks to exclude concededly admissible evidence because that evidence may also illuminate the novelty and breadth of the government's position on what conduct is registrable under FARA. That goes too far.

The novelty of the government's FARA positions as applied to Dr. Terry's conduct bears directly on whether she acted willfully—that is, whether she subjectively understood that her conduct required registration under FARA. It also bears on Dr. Terry's as-applied void-for-vagueness challenge, on which the Court deferred ruling at the motion-to-dismiss stage. *See* ECF No. 86 ("Pretrial Mot. Order") at 14. The government cannot transform the undisputed proposition that selective prosecution is not a jury issue into a basis for excluding evidence that is independently relevant to criminal willfulness and a live constitutional issue in this case. Accordingly, the motion should be denied insofar as it seeks to preclude evidence and argument relevant to those issues.

## B. ARGUMENT

### 1. The Novelty of the Government's FARA Positions Is Relevant to Willfulness

Dr. Terry agrees that she may not present a selective prosecution defense, question the government's motives in bringing this case, or argue that she should be acquitted simply because

this prosecution is "first-of-its kind." Gov't MIL at 27 (citation omitted). But the government's motion goes far beyond those uncontroversial propositions. It seeks a blanket prohibition on any evidence and argument concerning the novelty of its positions on what requires registration under FARA—even though that novelty bears directly on whether Dr. Terry willfully failed to register. Under either the defense's preferred willfulness standard (knowledge of her specific duty to register) or the government's (consciousness of wrongdoing), the novelty of the government's theory of registrable activity is directly probative of Dr. Terry's state of mind. If the conduct alleged here had not previously been understood to trigger a registration obligation—by the DOJ, practitioners, or the public—that is powerful circumstantial evidence that Dr. Terry did not understand, at the time, that failing to register on account of her conduct was unlawful or wrongful.

The FARA training slides that the government itself intends to introduce at trial illustrate this point precisely. On November 30, 2022—nine years since the beginning of the charged period—Dr. Terry attended a FARA training at the Wilson Center conducted by a DOJ FARA Unit lawyer. The government intends to use this training to prove her "knowledge and awareness of FARA." Gov't MIL at 39. But the training slides themselves list specific examples of "Conduct Requiring Registration"—and the activities Dr. Terry is alleged to have engaged in appear *nowhere* in those examples. 2022 FARA Training Slides (attached hereto as Exhibit B) at 7. The slides describe lobbying for sanctions relief, lobbying for alliance membership, perception management, promoting foreign economic zones, tourism campaigns, formally advising embassies, fundraising for foreign political parties, and informal diplomacy. *See id.* at 7–10. A private citizen networking with, and learning from, foreign government officials; writing op-eds on her consistently held views on U.S. foreign policy; sharing publicly available policy views; and organizing routine think-tank programming—the core of the government's case—are conspicuously absent. That

evidence is highly probative of willfulness. That the DOJ's own training materials did not describe Dr. Terry's alleged activities as requiring registration goes directly to whether that training put her on notice of a duty to register—or whether she instead understood FARA to apply to circumstances other than her own. *See id.* at 7–10. The government cannot introduce the FARA training to prove Dr. Terry's awareness of FARA while simultaneously precluding the defense from showing the jury *what those training materials actually said*—and what they did not say.

The financial-crime cases the government cites are totally inapposite. In *United States v. Stewart*, 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004), and *United States v. Motovich*, 2024 WL 3303723 (E.D.N.Y. July 2, 2024), the novelty of the legal theory was held to be irrelevant because the underlying conduct—lying, stealing, defrauding—is readily recognizable as wrongful regardless of whether the particular statute had been applied in that manner before. *See* Gov't MIL at 27. FARA is different. It is a registration statute that criminalizes a willful *omission*—the failure to file a registration statement—not inherently wrongful conduct. As this Court and the DOJ itself have acknowledged, "FARA … is a *malum prohibitum* enactment not well known outside the legal/lobbying community." Def. Pretrial Mot. at 25 (internal quotation marks omitted). The novelty of the government's application of this registration statute to Dr. Terry's activities is therefore uniquely probative of whether she had the requisite *mens rea*. The government's conclusory invocations of jury confusion and nullification cannot overcome the plain relevance of this evidence to willfulness.

### 2. Preservation of Dr. Terry's As-Applied Vagueness Challenge Requires a Full Record Concerning the Nature of the Charged Conduct and the Novelty of the Government's Position

The government asserts that "the Court already rejected the defendant's constitutional challenges in pretrial litigation." Gov't MIL at 29. That is only half true. Although the Court rejected Dr. Terry's First Amendment facial vagueness challenge, it *expressly reserved* her as-

applied void-for-vagueness challenge, deferring resolution "pending factual development at trial and renewal of the motion." Pretrial Mot. Order at 14. The Court explained that "[d]eferral is particularly appropriate here as Defendant disputes the truth of many allegations in the Indictment," *id.* at 23, and expressly contemplated resolving the challenge "after full factual development at trial," *id.*

That factual development necessarily includes both the nature of the conduct the government ultimately proves and the novelty of the government's position that conduct of that nature required registration under FARA. An as-applied vagueness challenge asks whether the law provided constitutionally adequate notice that the defendant's particular conduct fell within its prohibition and sufficiently definite standards governing that determination. *See, e.g.*, *United States v. Sattar*, 272 F. Supp. 2d 348, 355–60 (S.D.N.Y. 2003). The relevant question here is therefore not whether FARA is vague in the abstract, but whether FARA gave adequate notice that the particular activities proved at trial triggered a duty to register and supplied a sufficiently discernible line between those activities and conduct that did not.

That inquiry requires a record concerning what Dr. Terry actually did and whether the government's position that such conduct required registration was grounded in preexisting law. The novelty of that position is relevant not because novelty itself establishes unconstitutional vagueness, but because it bears on whether FARA supplied fair notice and a discernible boundary before Dr. Terry allegedly crossed it without registering. Indeed, the Second Circuit has sustained an as-applied vagueness challenge after trial in similar circumstances. *See Chatin v. Coombe*, 186 F.3d 82, 86–90 (2d Cir. 1999) (affirming as-applied vagueness challenge to a New York State Department of Corrections rule regarding religious prayer which was brought after a trial on separate claims "to conform to the evidence"). To be clear, Dr. Terry does not seek to have the

jury decide her constitutional challenge. But the defense must be permitted to develop the factual record the Court expressly deemed necessary to resolve it. That includes evidence concerning the nature of the charged conduct, such as whether it implicates "associational and expressive freedoms—including pure advocacy—protected by the First Amendment," *United States v. Sattar*, 314 F. Supp. 2d 279, 300 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), as well as evidence bearing on the novelty of the government's position that such conduct required FARA registration. A blanket prohibition would leave the Court to adjudicate the reserved as-applied challenge on the very incomplete record its prior ruling sought to avoid.

### C. CONCLUSION

The government's fourth motion *in limine* should be denied to the extent it seeks to preclude evidence and argument concerning the novelty of the government's FARA positions as relevant to willfulness, or evidence concerning the nature of the charged conduct and the novelty of the government's registration theory as necessary to preserve Dr. Terry's reserved as-applied vagueness challenge.

## V. THE COURT SHOULD DENY THE GOVERNMENT'S PREMATURE ATTEMPT TO PRECLUDE EVIDENCE AND ARGUMENT THAT OTHERS ENGAGED IN SIMILAR CONDUCT

The government's fifth motion *in limine*—which seeks to preclude Dr. Terry from "offering evidence or argument that others have engaged in similar conduct"—should be denied as premature. Gov't MIL at 29–31. The government seeks preclusion only where evidence of others' conduct lacks a "sufficient connection to the defendant's relevant contemporaneous knowledge or intent." *Id.* at 29. The defense agrees with that principle. Because the government identifies no specific evidence to exclude, and concedes that sufficiently connected evidence is admissible, *see id.* at 29–31, there is nothing for the Court to decide now.

To be clear, evidence that Dr. Terry's peers engaged in similar conduct is directly relevant to the element of willfulness. If think-tank scholars and foreign-policy experts routinely interacted with foreign officials in the manner alleged here without understanding that FARA registration was required, that bears directly on whether Dr. Terry understood she had a legal duty to register. The Second Circuit has held that evidence of others' conduct may be admitted to "explain the practice of the industry" and establish what a defendant with substantial experience in that industry likely knew. *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003). Such evidence is particularly admissible here, where Dr. Terry spent years at think tanks, like the Center for Strategic and International Studies ("CSIS") and the Woodrow Wilson International Center for Scholars ("Wilson Center"), and firms like Macro Advisory Partners, working alongside colleagues engaged in similar conduct. Evidence concerning those institutions' practices, policies, and understandings of FARA, therefore, bears directly on her own contemporaneous knowledge and intent.

The government's authorities do not alter the analysis. *See* Gov't MIL at 29–30 (collecting cases). Each involved inherently wrongful conduct—embezzlement, arms trafficking, insurance fraud—where evidence that "everybody does it" was offered to excuse obviously unlawful acts and was thus precluded. *See United States v. Gatto*, 986 F.3d 104, 109–10 (2d Cir. 2021) (wire fraud); *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (embezzlement); *United States v. Kaplan*, 490 F.3d 110, 121–22 (2d Cir. 2007) (insurance fraud); *United States v. Berg*, 710 F. Supp. 438, 445 (E.D.N.Y. 1989) (arms trafficking); *see also infra* § X. FARA is materially different. The underlying conduct alleged here—writing articles, meeting with foreign officials, organizing events, and sharing policy views—is indisputably lawful. The charged offense turns on whether Dr. Terry willfully and knowingly failed to register under FARA. *See* Jury Charge in

*Sun* at 53. Evidence of prevailing professional practices is therefore probative of whether she knew she had to register but willfully chose not to.

The government's fifth motion *in limine* should be denied as premature.

## VI. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT CONCERNING CHANGES IN THE DOJ'S FARA ENFORCEMENT PRIORITIES OVER THE CHARGED PERIOD (2013–2023)

The Court should deny the government's sixth motion *in limine*—which seeks to prevent Dr. Terry from offering evidence and argument concerning changes in the Justice Department's FARA enforcement priorities—because this evidence bears directly on her alleged willfulness. *See* Gov't MIL at 31–32.

As an initial matter, the defense does not intend to introduce the Attorney General's February 5, 2025 memorandum announcing a change in criminal FARA enforcement priorities. *See id.* at 31. That memorandum postdates the charged period and could not plausibly be connected to Dr. Terry's contemporaneous knowledge or intent.

The government's motion, however, reaches beyond the 2025 memorandum. The government seeks a blanket ruling that "[t]he DOJ's FARA enforcement priorities have no relevance to the issue of whether the defendant violated or conspired to violate FARA." *Id.* at 31. That proposition is not merely wrong, but it is also irreconcilable with the very discovery the government has produced in this case.

The government has indicated that it intends to introduce evidence that Dr. Terry attended a FARA training at the Wilson Center on November 30, 2022—nine years after the beginning of the charged period—conducted by Heather Hunt, the Senior Counsel for FARA Administration in the DOJ's FARA Unit. *See* 2022 FARA Training Slides. The government intends to offer the training slides as evidence of Dr. Terry's "knowledge and awareness of FARA." *Id.* at 39. If the government uses the Wilson Center training in an attempt to prove that Dr. Terry knew about

FARA's registration requirement, the defense must be permitted to contextualize that evidence. The jury is entitled to understand *why* the think tank at which Dr. Terry worked suddenly found itself receiving a FARA training that Dr. Terry attended in late 2022—namely, because this was a new period of intensified scrutiny of certain foreign influence at U.S. think tanks, in which the DOJ was increasingly using FARA itself as an enforcement tool to investigate those institutions and their personnel. *See* Michael Schaffer, *Foreign 'Dark Money' Is Flooding Washington Think Tanks*, Politico (Jan. 3, 2025), https://perma.cc/SMW8-3R8C. That context is not a collateral inquiry into enforcement policy, but rather it is essential to the jury's evaluation of the very evidence the government plans to introduce.

The government's primary authority is *United States v. Liu*, 2022 WL 773315, at *2 (S.D.N.Y. Mar. 14, 2022), where the court precluded evidence of DOJ's "China Initiative." But *Liu* involved a fundamentally different relevance problem that has no application here. There, the defense sought to infer that because certain government witnesses knew about that initiative, unrelated third parties whose recorded statements were at issue likely knew about it too. *See id.* at *2. The court rejected that theory because no evidence connected the government witnesses' knowledge to the recorded speakers: the government witnesses had not participated in the calls, and none of the speakers mentioned the China Initiative in them. *See id.* The government witnesses' knowledge therefore "reflect[ed] nothing about the knowledge or states of mind" of those speakers, and further inquiry into the China Initiative would risk devolving into an irrelevant "policy discussion." *Id.* (internal quotation marks omitted).

Here, there is no comparable inferential gap. Dr. Terry herself attended a FARA training led by DOJ's top FARA enforcement official, and the government specifically relies on that training as evidence of her willfulness. The defense therefore seeks to place that same training in

context, including what the DOJ was communicating about its FARA enforcement priorities at the time. That evidence bears directly—not through speculation about the knowledge of third parties—on the information presented to Dr. Terry, the regulatory environment she encountered, and the meaning the jury should attach to the Wilson Center training. *Liu* therefore does not support excluding it.

After all, the government's allegations in this case date back to 2013—three years before the DOJ's Inspector General issued a 2016 audit that prompted a renewed FARA enforcement push, *see* Def. Pretrial Mot. at 15 n.17, and nearly a decade before the DOJ set its FARA sights on the U.S. think-tank world, *see, e.g.*, Schaffer, Foreign 'Dark Money' Is Flooding Washington Think Tanks. For at least three years of the charged period, the DOJ's FARA enforcement priorities and messaging to the public on FARA was sparse. The jury is entitled to know these facts in assessing whether Dr. Terry—as a member of the public and the think-tank community—*willfully* and *knowingly* failed to register.

For the foregoing reasons, the government's sixth motion *in limine* should be denied.

## VII. IF JAMES OLSON IS ALLOWED TO TESTIFY AT ALL, THE COURT SHOULD PERMIT DR. TERRY TO CROSS-EXAMINE HIM ON EXCERPTS FROM HIS BOOKS AND WRITINGS TO SHOW BIAS

### A. BACKGROUND

The Court should deny the government's seventh motion *in limine*, which seeks to bar cross-examination of its proposed counterintelligence expert, James Olson, about a passage in his book in which he expresses skepticism of federal government efforts to hire "women and minorit[ies]." James M. Olson, *To Catch a Spy: The Art of Counterintelligence*, at 74 (2019) ("*To Catch a Spy*") (relevant passages attached hereto as Exhibit C); *see* Gov't MIL at 32–36. Dr. Terry maintains that Mr. Olson should be precluded from testifying entirely. *See* ECF No. 121 ("Olson *Daubert* Mot."). But if he is permitted to testify, the defense must be permitted to probe his

potential bias on cross-examination. The government's highlighted passage, along with several other passages in the book regarding Mr. Olson's views on race, is admissible bias evidence considering the defendant on trial is an Asian American woman and Mr. Olson's views directly relate to the counterintelligence topics on which the government expects him to testify.

Written by Mr. Olson in 2019, *To Catch a Spy* details his "thoughts and recommendations on how to improve the art of counterintelligence … as a practitioner and teacher of intelligence." Olson, *To Catch a Spy,* at xxii. The excerpt identified by the government concerns Mr. Olson's views on the CIA's hiring practices and the supposed negative consequences of hiring women and minorities in the intelligence community. *See id.* at 74; Gov't MIL at 32–33. Mr. Olson expresses additional views about race and ethnicity throughout the book. He implies that some Asians are culturally predisposed to lying and lack a sense of right and wrong, *see* Olson, *To Catch a Spy,* at 77; contends that Clayton Lonetree, a Native American, should never have been admitted into the Marine Security Guard program and was selected only because a U.S. Senator intervened on behalf of his tribe, *see id.* at 115; recounts his shock that naturalized citizens born in China were allowed to work as engineers at a California defense contractor, *see id.* at 133; and advocates profiling on the basis of family ties, ethnicity, or religion, arguing that intelligence professionals who share the ethnicity of a foreign power's targets should be scrutinized on the assumption that their loyalties may be "clouded," *see id.* at 171.

**B. ARGUMENT**

Mr. Olson's writings reveal biases that directly implicate the substance of his anticipated testimony. The government's disclosure anticipates that Mr. Olson will testify about "foreign intelligence services and their structure," "recruitment of sources and the recruitment cycle," "intelligence collection among allied nations," "recruitment incentives," and "use of diplomatic cover and handler relationships." Olson Disclosure at 2. Mr. Olson's book addresses each of these

subjects—and in doing so, reveals that his analytical framework treats race, ethnicity, and national origin as markers of counterintelligence risk. The jury should be able to consider whether those biases color his expert opinions as well as his assessment of Dr. Terry's conduct.

It is well-established that "the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness." *United States v. Abel*, 469 U.S. 45, 50 (1984). The admissibility of bias evidence is governed by Rule 402's broad mandate that all relevant evidence is admissible. *See id.* at 51–52; Fed. R. Evid. 402. "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Id.* at 52. Because "racial bias … can lead people to lie or distort their testimony, and therefore might bear on the accuracy and truth of a witness' testimony," courts routinely permit cross-examination regarding a witness's demonstrated racial bias against a class or group to which the defendant belongs, "even though the bias is directed generally against a class of persons and not specifically against the accused." *United States v. Figueroa*, 548 F.3d 222, 228 (2d Cir. 2008) (internal quotation marks omitted).

Accordingly, courts have repeatedly held that prohibiting cross-examination under these circumstances violates a defendant's Sixth Amendment right. *See, e.g.*, *id.* at 227–230 (holding that the district court abused its discretion and violated the defendant's confrontation rights in prohibiting the defendant, who was "a member of a racial or ethnic minority group," from cross-examining a witness bearing a swastika tattoo about his racial bias); *Brinson v. Walker*, 547 F.3d 387, 393–95 (2d Cir. 2008) (holding state trial court violated defendant's confrontation rights in prohibiting the defendant, who was black, from cross-examining witness about his alleged "refus[al] to serve his employer's black patrons"); *United States v. Rahman*, 189 F.3d 88, 132 (2d

Cir. 1999) (recognizing that the court could have erred by prohibiting racial bias cross-examination if the witness's demonstrated bias were "against the defendant or other members of the defendant's racial or ethnic groups," rather than "against third parties").

Mr. Olson's views expressed in his book directly relate to the topics on which the government expects him to testify. His views on recruitment of sources and the recruitment cycle are shaped by his belief that intelligence professionals "with ethnic … ties to a foreign government" should be scrutinized on the assumption that their loyalties may be "clouded." Olson, *To Catch a Spy,* at 171. When it comes to recruitment incentives, Mr. Olson writes that Asian cultures lack "a sense of right and wrong" and that Asians are culturally predisposed to lying. *Id.* at 77. His testimony on foreign intelligence services and their structure would likewise reflect his view that diversity hiring has "lowered standards" in the intelligence community, *id.* at 74, while his discussion of diplomatic cover and handler relationships draws on his advocacy for profiling individuals based on family ties, ethnicity, or religion, *see id.* at 171. Dr. Terry—a naturalized U.S. citizen born in South Korea—falls squarely within the groups Mr. Olson's framework singles out for suspicion. A juror could reasonably believe he would assess her conduct more harshly than he would assess that of someone who does not share her background, and Dr. Terry's confrontation rights require that she be permitted to probe that potential bias. *See Figueroa*, 548 F.3d at 227–30; *Brinson*, 547 F.3d at 393–95.

The government's arguments to the contrary are unavailing. The government first asserts that this evidence is not "admissible to impeach Olson's character for truthfulness" under Rule 608(b). Gov't MIL at 35. As discussed above, however, bias impeachment is governed by Rule 402, not Rule 608. *See Abel*, 469 U.S. at 51–52, 55–56 (holding that extrinsic evidence of specific conduct, barred under 608(b) to impeach for veracity, does not bar impeachment for bias);

*Figueroa*, 548 F.3d at 229–30. Indeed, the Second Circuit has held that a court commits legal error when it restricts bias-related cross-examination solely on Rule 608 grounds. *See id.* (holding that the district court "erred as a matter of law" by excluding cross-examination under Rule 608 because "the purpose of the proposed line of cross-examination was not to show the witness's 'character for truthfulness or untruthfulness,' it was to impeach the witness for bias" (internal citation omitted)).

Nor does Rule 403 warrant exclusion. The probative value of Mr. Olson's published views is substantial because they bear directly on the credibility and reliability of his expert opinions. And the risk of unfair prejudice to the government is minimal because the evidence consists of Mr. Olson's own published statements. The government's concern that this evidence "risks converting a portion of the trial into a referendum on affirmative action," Gov't MIL at 34, does not hold weight when considered against the full scope of Mr. Olson's statements. The defense would introduce those statements to show bias, *not* for the truth of the matter asserted.

Introducing Mr. Olson's written opinions will not mislead the jury about his role. The government seeks to call Mr. Olson to testify as an expert on foreign intelligence operations based on the "totality of his relevant education, training, skills, knowledge, and professional experience." Olson Disclosure at 2. His book is an education piece about foreign intelligence written on the basis of that same training, knowledge, and professional experience—and it addresses the very subjects on which the government has noticed him to testify. His proffered testimony and prior writings are therefore squarely aligned. And the government's final concern about undue delay and waste of time is overstated. The examination contemplated is narrow. After all, it is the government that has proposed Mr. Olson as an expert. Having done so, it cannot base its objection

on the fact that it would need to engage in redirect after any potential cross-examination that undermines his credibility.

Indeed, excluding this evidence would further prejudice Dr. Terry by impairing her ability to counter the government's attempt to portray her as a spy or double agent with dual loyalties. If the Court allows Mr. Olson to testify and the government to inject espionage and national-security rhetoric into this case (it should not),[19] Dr. Terry must be able to probe whether the government's expert harbors the very biases and prejudices that such rhetoric can serve to stoke, *see* Def. MIL at 6.

### C. CONCLUSION

The government's seventh motion *in limine* should be denied. If the Court permits Mr. Olson to testify at all, it should allow Dr. Terry to cross-examine him on his apparent racial biases demonstrated in *To Catch a Spy* or any of his other writings or works. In the alternative, the Court should defer ruling on this issue until Mr. Olson's testimony is presented at trial.

## VIII. THE COURT SHOULD REQUIRE THE GOVERNMENT TO PROFFER EVIDENCE OF THE CHARGED CONSPIRACY BEFORE ADMITTING ANY PURPORTED CO-CONSPIRATOR STATEMENTS

### A. BACKGROUND

As previewed in Dr. Terry's own motions *in limine*, *see* Def. MIL at 13–17, the government's eighth motion *in limine* seeks permission to admit purported co-conspirator statements—that is, statements by multiple out-of-court declarants who will not appear at trial, *see* Gov't MIL at 36–41. In most circumstances, such statements are inadmissible hearsay; but here, the government asks the Court to admit the statements under Rule 801(d)(2)(E), which permits the admission of such statements if the government can show that they were made "by the party's co-

---

[19] *See* Def. MIL at 3–13; Olson *Daubert* Mot.

conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To date, the government has produced no evidence of any agreement between Dr. Terry and others to violate FARA. Because the Court must find by a preponderance of the evidence that a conspiracy existed before permitting the jury to consider any alleged co-conspirator statements—and to avoid risking the integrity of the trial and deep unfairness to Dr. Terry—the Court should require the government to proffer its conspiracy evidence before trial. *See* Def. MIL at 13–17 (separately moving for such relief). In the absence of a sufficient proffer, the Court should deny the government's motion to admit the purported co-conspirator statements.

In the same motion, the government also seeks to introduce statements made by Dr. Terry. The Court should only admit these statements for a legally permissible purpose. In addition, Dr. Terry reserves all rights to admit her own statements for any legally permissible purpose and offer evidence and argument necessary to contextualize those statements.

**B. ARGUMENT**

**1. The Government's Motion Reinforces Why a Factual Proffer of the Existence of the Conspiracy is Needed**

The parties agree as to the general contours of the Rule 801(d)(2)(E) analysis. *See* Fed. R. Evid. 801(d)(2)(E). This exception to the general rule against hearsay requires two preliminary factual findings that must be established by a preponderance of the evidence: (1) that a conspiracy that included both the declarant and the defendant existed, and (2) that the statements were made in furtherance of that conspiracy. *See* Gov't MIL at 37 (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)); Def. MIL at 15. Under this standard, it is not enough for the Court to find "the general existence" of potentially criminal conduct; instead, the Court must find the existence of a "specific criminal conspiracy." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (holding district court erred in admitting statements under Rule 801(d)(2)(E) based only on a finding of "the

general existence of the Mafia" and not a "specific criminal conspiracy"). That is, the Court must find there existed an "*agreement* to commit one or more unlawful acts." *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (emphasis in original) (internal citation omitted).

The government adduces three statements that it asserts are "emblematic" of the statements it will seek to introduce under Rule 801(d)(2)(E): (1) messages between Dr. Terry and an NIS official in which they make plans to meet for dinner; (2) a discussion between Dr. Terry and an NIS official in which they discuss funding for her think tank;[20] and (3) messages between Dr. Terry and a Ministry of Foreign Affairs ("MFA") official discussing Dr. Terry writing an opinion piece for a South Korean newspaper and related compensation. *See* Gov't MIL at 39–40.

But the government does not (and cannot) articulate how these statements satisfy its burden of proving the existence of a conspiracy to violate FARA.[21] The cited discussions do not even pertain to conduct that would require registration under FARA. *See* Def. MIL at 17–22. Meeting a foreign official for a meal is not a FARA violation. Neither is receiving funding from a foreign government (if that were so, many leading think tanks in the U.S. would be required to register under FARA). Nor is writing an article for publication in a foreign newspaper for a foreign audience a FARA violation. Further, the government does not cite to any evidence outside of these statements that supports the existence of a conspiracy involving Dr. Terry, the South Korean NIS, and the South Korean MFA to violate FARA. Indeed, there is not one single piece of evidence—

---

[20] If the Court admits this statement at trial, the defense expects the evidence will show that the government's initial translation of this conversation from Korean to English is flawed, and that this discussion is about bureaucracy at the Wilson Center and the administrative hurdles in processing funding from new sources—not about any desire to conceal a funding source.

[21] Nor does the government argue these statements show the existence of any other conspiracy. *See United States v. Orena*, 32 F.3d 704, 713 (2d Cir. 1994) (explaining conspiracy that is the basis of statements admitted under Rule 801(d)(2)(E) need not be the same conspiracy charged). In any event, if the government contends that these statements relate to a separate, uncharged conspiracy, then it effectively concedes that the evidence is insufficient to support the FARA conspiracy charged in the Indictment.

circumstantial or direct—that supports the existence of an agreement between Dr. Terry and anyone (including these declarants) to violate FARA. Accordingly, because the government has failed to come forward with evidence of a "specific criminal conspiracy" involving Dr. Terry, the NIS, and the MFA to violate FARA, the statements are inadmissible. *See Gigante*, 166 F.3d at 82; *see also United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (holding district court clearly erred when it "made no findings, by a preponderance of the evidence or otherwise, about the existence of a conspiracy" prior to admitting statements under Rule 801(d)(2)(E)).

Recognizing this evidentiary gap, the government's motion focuses almost entirely on the second part of the Rule 801(d)(2)(E) analysis—whether a statement was made in furtherance of the conspiracy. *See* Gov't MIL at 40–41. But the government's "in furtherance" analysis is independently preclusive. Indeed, in searching for a conspiracy, the government has become a conspiracy theorist, conjuring "NIS's directions" that were never given, creating compensation schemes for Dr. Terry that do not exist, and otherwise attributing motivations that are detached from any evidence. *See id.* Importantly, in spinning its tale, the government does not reference Dr. Terry's purported registration obligations under FARA even once. That omission speaks volumes.

At bottom, admitting these co-conspirator statements without any pre-trial factual proffer would be fundamentally unfair to Dr. Terry. The declarants are all South Korean government officials likely located in South Korea and given their apparent status as "co-conspirators" in this criminal case, the idea that Dr. Terry could call any of these individuals to testify in her defense is illusory. The government is requesting that these statements be admitted knowing fully well that Dr. Terry will have no opportunity to examine or cross-examine the declarants at trial. Given the uniquely prejudicial nature of such statements, Rule 801(d)(2)(E) sets strict guardrails: they are

admissible *only* when the prosecution can make an initial showing that a conspiracy existed—that is, of a "unity of interests stemming from a specific shared criminal task." *Gigante*, 166 F.3d at 83. Without such a showing, the usual rules govern, and hearsay is not allowed.

**2. The Court May Not Allow the Government to Introduce Dr. Terry's Statements For a Legally Impermissible Purpose**

The government's motion also seeks to introduce statements made by Dr. Terry as opposing-party statements under Rule 801(d)(2)(A), and Dr. Terry generally takes no issue with this approach. *See* Gov't MIL at 38–41. She reserves all rights, however, to challenge such statements, including the government's Korean translations, under any Rule of Evidence or other applicable legal principle—especially with regard to the statements listed in the government's motion. *See id.* at 38–39. Dr. Terry also reserves all rights to introduce her own prior statements for any legally permissible purpose. *See supra* § I; *infra* § IX. And as to her statements to law enforcement, Dr. Terry reserves all rights to offer evidence and argument bearing on the credibility, reliability, and weight of those statements, as well as any other evidence necessary to place them in proper context. *See supra* § I.

Finally, unrelated to Dr. Terry's prior statements, the government seeks to admit "certain evidence solely for its effect on the listener." Gov't MIL at 39. Specifically, the government cites a May 31, 2021 email that the government asserts was sent to "many [CSIS] employees, including the defendant." *Id.*; *see* May 31, 2021 Email (attached hereto as Exhibit D). The government says that the May 31, 2021 email should be admitted because it is "relevant to the defendant's knowledge and awareness of FARA." Gov't MIL at 39. But there is no evidence on the face of this document that it was sent to Dr. Terry or that she otherwise saw it; thus, it could have had no effect on her. *See* May 31, 2021 Email. Nor does the government cite to any evidence that the "training" referenced in the email ever took place, or if it did, that Dr. Terry attended it. Indeed,

Dr. Terry left CSIS for the Wilson Center mere months after this email was sent. This email is therefore inadmissible to show its effect on Dr. Terry and should not be admitted on that basis at trial.

### C. CONCLUSION

For the foregoing reasons, the Court should hold the government's eighth motion *in limine* regarding Rule 801(d)(2)(E) statements in abeyance and require the government to proffer evidence of a conspiracy to prevent Dr. Terry from registering under FARA before admitting statements whose admissibility requires proof of the alleged conspiracy. The Court should also deny the government's motion to admit the May 31, 2021 email on the government's proffered basis.

## IX. DR. TERRY'S OWN STATEMENTS ARE ADMISSIBLE FOR ANY LEGALLY PERMISSIBLE PURPOSE

The Court should deny the government's ninth motion *in limine* to the extent it seeks to prevent Dr. Terry from introducing her own statements, including her prior writings, for any legally permissible purpose. The government does not seek to exclude or admit any specific evidence but rather requests that the Court "police" any anticipated "attempts" by Dr. Terry to "introduce her own self-serving hearsay statements." Gov't MIL at 41. The defense does not dispute that the Federal Rules of Evidence govern the admissibility of out-of-court statements and will abide by those rules at trial.

Dr. Terry is entitled to introduce her own statements, including any writings or publications, for any non-hearsay or other legally permissible purpose, such as to demonstrate the consistency of her stated positions over time or rehabilitate her credibility. *See U.S. Bank, Nat'l Ass'n v. UBS Real Est. Sec. Inc.*, 205 F. Supp. 3d 386, 454 (S.D.N.Y. 2016) (explaining that documents were not hearsay because they were not admitted "for the truth" of the statements made in them but rather

to show the statements "were made"); ECF No. 128 at 11 (explaining that Dr. Terry's "writings and public positions on Korean policy" are not hearsay because they "would not be offered for the truth of the matter asserted" and are "not self-serving" because they "are not her account of the facts alleged in the indictment"); Fed. R. Evid. 801(d)(1)(B).

Moreover, the government has made clear that it intends to introduce Dr. Terry's prior statements at trial, including statements that she made to FBI agents. *See* Gov't MIL at 42–43, 45–50. The rule of completeness under Federal Rule of Evidence 106 entitles Dr. Terry to introduce any additional portions of her written or recorded statements necessary for the jury to consider at the same time. *See United States v. Jones*, 2024 WL 2722307, at *8 (E.D.N.Y. May 28, 2024) (permitting defendant to introduce his own "denials" of involvement made to law enforcement under the rule of completeness as "crucial context" where, without them, "statements may implicitly be construed or understood as a confession."); Fed. R. Evid. 106.

Accordingly, the Court should deny the government's ninth motion *in limine* to the extent it seeks a categorical exclusion of Dr. Terry's own statements. The admissibility of any particular statement should instead be determined by reference to the statement offered, the purpose for which it is offered, and the applicable Rules of Evidence.

## X. IF THE COURT ALLOWS THE GOVERNMENT TO INTRODUCE EVIDENCE OF THE GIFTS, IT SHOULD PERMIT EVIDENCE AND ARGUMENT REGARDING KOREAN GIFT-GIVING CULTURAL PRACTICES AND NORMS

For the reasons set forth in her motions *in limine*, Dr. Terry maintains that the Court should exclude evidence of the three personal gifts alleged in the Indictment, which bear no nexus to any alleged conduct covered by 22 U.S.C. § 611(c)(1). *See* Def. MIL at 22–27. If the Court declines to exclude that evidence, it should deny the government's tenth motion *in limine* and permit the defense to introduce evidence and argument regarding Korean gift-giving customs. The government alleges that South Korean officials gave gifts to Dr. Terry, a Korean American, and it

has charged those exchanges as overt acts in the alleged conspiracy. *See* Ind. ¶¶ 64(e), (h). The shared cultural context in which the gifts were given and received therefore bears directly on how Dr. Terry understood and perceived the gifts, including whether she saw them as cultural courtesies or as conveying a request or directive.

Although the government concedes that Dr. Terry may testify as to her "own understanding of [Korean gift-giving] practices in explaining her state of mind," Gov't MIL at 44–45, it moves to broadly exclude all other evidence of the cultural norms and practices that shaped how Dr. Terry understood the gifts. This cultural context is relevant to whether Dr. Terry perceived the gifts as conveying a request or directive or creating any obligation to act that could establish an agency relationship under FARA. *See* 22 U.S.C. § 611(c)(1). And to the extent the government offers evidence and argument that the South Korean officials intended the gifts as "reward[]s," Ind. ¶ 3, requests, or directives, Dr. Terry must be allowed to respond with evidence of the cultural context in which the gifts were given and received. The same evidence is also relevant to Dr. Terry's mental state—*i.e.*, if Dr. Terry understood the gifts as customary cultural courtesies, she would have had no reason to believe that accepting them could somehow give rise to a registration obligation under FARA. *See United States v. Le*, 2009 WL 2947370, at *5 (E.D. Va. Sept. 14, 2009) (explaining that evidence of foreign cultural practices and customs may be "relevant to the issue of *mens rea* in a criminal proceeding"); *United States v. Prince-Oyibo*, 320 F.3d 494, 496 (4th Cir. 2003) (noting that the defendant was permitted to introduce evidence of Nigerian tipping culture to show that he lacked knowledge of fraudulent visa).

Thus, depending on the foundation laid at trial, admissible evidence may include: (i) communications reflecting Dr. Terry's understanding or knowledge of Korean gift-giving customs; (ii) testimony from individuals with personal knowledge of Dr. Terry's Korean

upbringing and cultural background; (iii) evidence of other gift exchanges of which Dr. Terry was aware; and (iv) evidence of how the South Korean officials understood gift-giving, to the extent the government places their intent surrounding the gifts at issue.

The government's arguments for exclusion fail on multiple fronts. First, the government mistakenly suggests that evidence that "Korean cultural practices required [Dr. Terry] to accept [the] gifts" would be akin to "[j]ustifying illegal conduct through cultural practices" by invoking an "everybody-is-doing-it defense." Gov't MIL at 43. But Dr. Terry's alleged acceptance of the gifts was not itself unlawful, nor was it a registrable activity under FARA. *See* Def. MIL at 17–22. Dr. Terry does not seek to explain her receipt of gifts by showing that similarly situated individuals also accepted gifts from foreign officials. Instead, she seeks to explain how the cultural context shared between her and the South Korean officials informed her understanding of what the gifts entailed. The government's cases—in which courts barred defendants from showing that others routinely engaged in the same criminal conduct—are therefore plainly inapposite. *See* Gov't MIL at 43–44; *Oldbear*, 568 F.3d at 821 (defendant charged with embezzling tribal funds was prohibited from offering evidence that others were allowed to embezzle tribal funds for personal expenses); *United States v. Fowler*, 932 F.2d 306, 311, 315–16 (4th Cir. 1991) (government contractor charged with "conveying secret documents without authority" was precluded from introducing evidence that "other defense contractors were trafficking in the [Defense Department's] classified documents"); *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 991 (7th Cir. 1999) (employer charged with violating workplace safety standards was barred from showing that its peers failed to comply with safety mandates); *United States v. Mahaffy*, 2007 WL 1213738, at *3 n.5 (E.D.N.Y. Apr. 24, 2007) (evidence that others in financial industry engaged in fraud was ruled inadmissible).

Nor does Rule 403 warrant exclusion. *See* Fed. R. Evid. 403. The government's sole Rule 403 argument is that admitting evidence of Korean gift-giving customs would "force[] [it] to offer its own evidence about Korean gift giving culture," wasting time, and confusing the jury. Gov't MIL at 44. That concern is overstated. Dr. Terry does not intend to make cultural evidence the focus of her defense or offer expert testimony on the subject. And any wasted time is of the government's own making. It is the government, not Dr. Terry, that has chosen to place the gifts at the center of its case, despite their lack of any nexus to allegedly registrable FARA activity. *See* Def. MIL at 22–27. If the Court permits the government to introduce evidence of the gifts (and it should not), any additional preparation the government requires to respond to Dr. Terry's defense is no basis to prevent her from explaining the cultural context in which the gifts were given and received. That cultural context will clarify, not confuse, the issues for the jury.

For the foregoing reasons, the Court should deny the government's tenth motion *in limine*. If the government is permitted to introduce evidence of the gifts, Dr. Terry must likewise be permitted to present evidence and argument concerning Korean gift-giving practices. In the alternative, the Court should defer its ruling until trial, where Dr. Terry will have the opportunity to connect this cultural-context evidence to her personal knowledge and state of mind and to any evidence the government offers regarding the South Korean officials' intent for the gifts. At a minimum, as the government has acknowledged, Dr. Terry must be permitted to testify about her own understanding of Korean gift-giving practices and norms and how they informed her perception of the gifts.

## XI. THE COURT SHOULD EXCLUDE EVIDENCE REGARDING DR. TERRY'S DEPARTURE FROM THE CIA

### A. BACKGROUND

The government's eleventh motion *in limine* suddenly seeks to make Dr. Terry's departure from the CIA a centerpiece of trial, relying on statements in an FBI Form 302 that it kept redacted until hours before the defense filed its motions *in limine*. *See* Gov't MIL at 45. Dr. Terry did not, as the government claims, "resign[] in lieu of termination" over "her contacts with NIS" (interactions with an allied counterpart which would have been quite natural), but rather left the agency voluntarily for personal and professional reasons. Gov't MIL at 45. This evidence should be excluded. It is irrelevant, serves no permissible purpose under Rule 404(b), and would invite unfair prejudice, confusion, and a trial within a trial over a collateral issue. Exclusion is further warranted because the government should not be permitted to advance its inaccurate account as a sword while it keeps Dr. Terry's CIA employment records, which would refute that account, behind a shield of classification.

### B. ARGUMENT

#### 1. Rule 404(b)

The government seeks to offer Dr. Terry's alleged statements to establish motive, knowledge, intent, and absence of mistake under Rule 404(b). *See* Gov't MIL at 49–50. None supplies a permissible basis for admission. First, the government speculates that a "sense of betrayal by the CIA" explains why Dr. Terry was later willing to "flout registration requirements." *Id.* at 50. But the government acknowledges elsewhere that "motive does not go to the conduct proscribed by FARA." *Id.* at 24 n.7 (brackets and ellipses omitted) (quoting *United States v. Michel*, 2023 WL 7140057, at *1 (D.D.C. Mar. 30, 2023)). The government's revenge theory is also unsupported by any evidentiary foundation and is directly contradicted by Dr. Terry's public

statements and conduct after leaving the CIA. She has repeatedly recommended the CIA as an employer, praised it publicly, and expressed her deep respect for the intelligence community.

The government also asserts that Dr. Terry's alleged prior statements are admissible to prove she "had knowledge of the impropriety of NIS contact and that she was dealing with NIS intelligence officers" and that she later "intended to operate at [their] direction." Gov't MIL at 49. Those arguments conflate two entirely different regimes. The relationships that a CIA analyst may have with foreign contacts are governed by the agency's bespoke policies concerning the protocol of government employees. How a private citizen working at a think tank may interact with wholly separate foreign contacts is governed by entirely different policies. Put differently, whatever the CIA expected of Dr. Terry as an employee says nothing about whether, years later and as a private citizen, she "knowingly and willfully failed" to register. Jury Charge in *Sun* at 53. Evidence under Rule 404(b) must still be relevant. *See United States v. Ulbricht*, 79 F. Supp. 3d 466, 480 (S.D.N.Y. 2015). And Dr. Terry does not dispute that she knew she was interacting with NIS officers or claim that she did so accidentally. *See* Gov't MIL at 49. Evidence offered to disprove a mistake she does not assert is likewise irrelevant. *See Jackson v. City of White Plains*, 2016 WL 234855, at *2 (S.D.N.Y. Jan. 19, 2016).

**2. Direct Evidence**

The government alternatively claims that Dr. Terry's departure from the CIA "put her on notice of her problematic contacts with NIS," thereby "contribut[ing] to th[e] conclusion" that "she knew her actions were unlawful" years later. Gov't MIL at 47. But notice that contacts might be improper under the CIA's employment policies (which Dr. Terry disputes) is not notice of a private citizen's FARA registration obligation, and calling the evidence "direct" does not supply the missing connection. The government also says these statements constitute "direct evidence of [Dr. Terry's] state of mind during the interviews she gave to [the] FBI in 2014" and are necessary to

contextualize the FBI's purported admonition in those interviews that she "be careful around NIS contacts." *Id.* at 48. But that theory of admissibility depends on a highly attenuated chain of inferences: (1) the circumstances of Dr. Terry's departure from the CIA explain her alleged nervousness during an FBI interview three years later when she was warned about her certain foreign contacts; (2) that nervousness proves she lied to the FBI about her relationships with South Korean officials during the interview; and (3) those alleged lies establish that she willfully failed to register under FARA. Evidence that depends on such an "unduly long" "chain of inferences"—in this case, at least three speculative leaps—is not admissible. *United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir. 1989).

The government further asserts that these statements provide background of how Dr. Terry's relationship with her alleged NIS co-conspirators developed. *See* Gov't MIL at 48. But it neither alleges—nor can it show—that the NIS officers with whom Dr. Terry interacted while at the CIA were the *same* officers with whom she later allegedly conspired to evade FARA's registration requirement. The government's cited cases are therefore inapposite, as each permitted the government to introduce background evidence of the prior conduct of the defendant's co-conspirators. *See United States v. Dupree*, 870 F.3d 62, 74 (2d Cir. 2017); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991); Gov't MIL at 48–49. Dr. Terry's alleged interactions with entirely different NIS officers years earlier shed no light on the charged conspiracy's formation.

**3. Rule 403**

Any conceivable probative value that this evidence might have is substantially outweighed by the dangers of unfair prejudice, misleading the jury, and wasting time. Asserting that the CIA forced Dr. Terry out for improper contacts with foreign intelligence officers invites jurors to view her as some sort of cold-blooded double agent—or to assume she engaged in serious misconduct while at the CIA—and convict her on that basis, rather than decide whether she violated FARA

years later. *See Old Chief*, 519 U.S. at 180.[22] In reality, during her time at the CIA, Dr. Terry worked as an analyst preparing reports for policymakers from a desk in Northern Virginia, not as a field officer conducting clandestine operations overseas. And each of these risks is especially acute considering the government's broader effort to "pepper[]" this FARA trial with "national security overtones." *Sun* Motions *in Limine* Order at 11 (internal quotation marks omitted).

Presenting evidence of Dr. Terry's CIA departure would also trigger a sprawling mini trial over this collateral issue. To assess whether Dr. Terry did anything "wrong" during her time at the CIA, the jury would first need to understand how the CIA's policies on foreign contacts applied to an active analyst during that period. During her tenure at the CIA, she engaged in secondments to the National Security Council, National Intelligence Council, and Council on Foreign Relations, each of which had their own separate policies governing foreign contacts, while she was still bound by the CIA's policies. Those same policies also applied when she was a fellow at the Council on Foreign Relations and had regular contact with journalists. Explaining how these overlapping regimes interacted and where they may have conflicted would require extensive testimony on matters far removed from the narrow FARA charge at issue. *See Ulbricht*, 79 F. Supp. 3d at 492–93. The jury would be presented with questions about intelligence-community employment standards that it does not need to answer, based on a record the defense cannot fully access, in a trial about whether Dr. Terry later failed to register as a private citizen.

Moreover, the government's late maneuver exposes a basic unfairness that independently warrants exclusion. It could have disclosed the relevant CIA personnel records that would show what actually transpired years ago, giving the parties and the Court time to address this issue in an

[22] The government responds that "the Court could provide limiting instructions to remind the jury that [Dr. Terry] is not on trial for any offense other than the crimes charged." Gov't MIL at 50. But jurors cannot reasonably be expected to disregard the unmistakable suggestion that Dr. Terry was a double agent or is on trial for alleged misconduct while at the CIA. A limiting instruction cannot unring the bell.

orderly way. The defense has no illusions that an order compelling production of these records could resolve this issue. The parties have already litigated classified discovery under the Classified Information Procedures Act ("CIPA") in this case, *see* ECF No. 118, and the defense expects the government to resist producing complete records of Dr. Terry's CIA employment. The core principles governing the CIPA process affirm the unfairness of such a result: "[c]oursing through the heart of the CIPA process is the fundamental understanding that where the classified materials at issue contain matter that is helpful or material to the defense, the government's privilege *must give way* to a defendant's right to present a meaningful defense." *United States v. Hashimi*, 2025 WL 1092862, at *2 (E.D.N.Y. Apr. 4, 2025) (emphasis added) (internal citation omitted). If the government is permitted to put Dr. Terry's CIA departure before the jury, her employment records would be both helpful and material to the defense. The appropriate remedy is therefore to exclude the evidence. If the Court nevertheless admits this evidence, it should, at a minimum, order the government to promptly produce Dr. Terry's CIA employment records, including any classified portions "in a form that will preserve [their] sensitivity." *Id.*[23]

### C. CONCLUSION

For the foregoing reasons, Dr. Terry respectfully requests that the Court deny the government's eleventh motion *in limine*.

## XII. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT REGARDING DR. TERRY'S PUBLIC-ORIENTED ACTS

The Court should deny the government's twelfth motion *in limine*—which seeks to preclude any evidence and argument concerning Dr. Terry's "public service," "charity, philanthropy, civic or political activism," or any other "prior alleged good or public-oriented

[23] Separately, the rule of completeness permits Dr. Terry to introduce all portions of her prior written or recorded statements from the FBI interview that are necessary to provide context and avoid misleading the jury. *See* Fed. R. Evid. 106.

acts"—because it is grossly overbroad, targets categories of evidence that are directly relevant to the charged offense and Dr. Terry's defenses, and mischaracterizes this evidence as propensity evidence. Gov't MIL at 51; *see id.* at 50–52. Dr. Terry does not seek to introduce this evidence to prove she is a "good person"; she seeks to introduce it because it bears directly on her policy views, expertise, career, and independence—all of which go to the heart of showing that she did not act at the direction of a foreign principal.

The government appears to argue that evidence of Dr. Terry's prior "public-oriented" conduct is not admissible to prove that "she is a good person" with a propensity for good conduct under Rule 404(b). Gov't MIL at 50–52; Fed. R. Evid. 404(b). But Dr. Terry does not dispute that uncontroversial legal principle—nor does she offer this evidence for that purpose. Instead, evidence of her prior public-oriented conduct is admissible as direct evidence bearing on the charged conduct itself. Given the nature of this FARA prosecution—which concerns Dr. Terry's alleged conduct over a decade of her professional and personal life—Dr. Terry's commitment to public service, record of civic engagement, and dedication to the United States are inseparable from her charged conduct and bear directly on whether she sought to act at the request or directive of a foreign principal. Evidence of Dr. Terry's prior public-oriented acts is also relevant to the predominant benefit exemption under 22 U.S.C. § 613(d)(2) by demonstrating that her activities were independently motivated by her own civic commitment and longstanding dedication to Korean issues—and therefore that her conduct did not "serv[e] predominantly a foreign interest" within the meaning of the statute. *See United States v. Rivera*, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding "unrelated prior good conduct, i.e., charitable giving or cooperation with law enforcement," but holding that "[t]o the extent that evidence of good conduct is relevant

to the charged conduct (i.e., to establish an alibi) or may be necessary to prevent misleading the jury, the court will consider its introduction at trial").

At bottom, the government's motion seeks to deprive Dr. Terry of her ability to present a meaningful defense by enabling the government to present a one-sided story of her life to the jury. Specifically, the government moves to preclude Dr. Terry from introducing evidence that she is a "proud American who has faithfully served her country." But this statement is not excludable as a "prior good act." As *Rivera* makes clear, excluding "specific acts of good conduct" is appropriate only where those acts are "unrelated prior good conduct"—such as "charitable giving or cooperation with law enforcement"—offered solely to show the defendant is a good person. 2015 WL 1725991, at *2. Dr. Terry's identity as a "proud American" who "faithfully served her country" is fundamentally different: it goes directly to whether she acted at the direction of a foreign principal—an element of the charged FARA offense—and whether her conduct was "independently motivated by her own civic commitment" under the predominant benefit exemption, 22 U.S.C. § 613(d)(2). Dr. Terry's "public-oriented" conduct began as a high school student in northern Virginia, where she volunteered on a U.S. Senate campaign and won an award for an essay entitled "Why Everyone Should Vote." She went on to serve at the CIA, National Security Council, and National Intelligence Council, devoting a decade of her life and career to the American people. Throughout her career, Dr. Terry has been an active participant in policy debates on Korean affairs and has contributed to public discourse through writing, speaking, and engagement with policymakers at every level of government. She has also produced film for public consumption, including her recent documentary *Beyond Utopia*, which was produced entirely pro bono and chronicles attempts by refugees to flee North Korea. The film is a key

example of Dr. Terry's consistent political opinions regarding the human rights abuses in North Korea.

The government's sweeping request to preclude Dr. Terry from introducing any evidence of her public service, activism, philanthropy, or any other "public-oriented acts" seeks to strip her of her identity as a patriot and former public servant with a natural disposition to serving her community. The government has put Dr. Terry's professional conduct on trial with its allegations that she acted as a foreign agent throughout her career, and her life story is inextricably linked to her professional career.

Nor should the Court entertain the government's alternative request—that it be allowed to introduce evidence regarding Dr. Terry's purportedly "awkward[]" departure from the CIA if she is permitted to introduce evidence of her public-oriented acts. Gov't MIL at 45; *see id.* at 52. The government's theory—that evidence of Dr. Terry's identity as a "proud American" who "faithfully served her country" would "open the door" to the circumstances of her departure from the CIA fifteen years ago—is untenable. Her departure from the CIA in 2011 has no connection to whether she knew of and willfully violated FARA's registration requirements between 2013 and 2023. As discussed, evidence of Dr. Terry's prior public-oriented acts is admissible direct evidence bearing on the charged conduct and her defenses, and, as discussed *supra* § XI, evidence of Dr. Terry's departure from the CIA is inadmissible, as it is both entirely irrelevant to the charged offense and highly prejudicial and misleading. While the door-opening doctrine gives trial courts discretion to admit one party's inadmissible evidence to rebut a "false impression" created by the other party's inadmissible evidence, "[p]roperly admitted evidence does not open the door to inadmissible evidence." *United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992) (internal quotation marks omitted). Thus, because evidence of Dr. Terry's prior public-oriented conduct is admissible direct

evidence, it cannot "open the door" for the government to introduce irrelevant and inflammatory evidence concerning the circumstances of her voluntary departure from the CIA fifteen years ago. *See supra* § XI. And even if this doctrine could apply, evidence of Dr. Terry's commitment to public service and civic engagement does not create any "false impression" that speculation about events from 2011 could serve to contradict. *See supra* § XI. The government's request to litigate Dr. Terry's CIA departure—rather than the registration offense it charged—underscores the attenuated connection between this evidence and any element of the FARA violation.

For the foregoing reasons, the Court should deny the government's twelfth motion *in limine*.

## XIII. THE COURT SHOULD DENY THE GOVERNMENT'S PREMATURE ATTEMPT TO PRECLUDE EVIDENCE AND ARGUMENT THAT DR. TERRY NEVER RECEIVED A LETTER OF INQUIRY FROM THE DOJ'S FARA UNIT

The Court should deny the government's thirteenth motion *in limine*—which seeks to preclude Dr. Terry from offering evidence and argument regarding the fact that she never received a Letter of Inquiry from the DOJ's FARA Unit—because it is nothing more than a premature effort to exclude evidence relevant to Dr. Terry's willfulness. *See* Gov't MIL at 52–55.

The government begins by inventing strawmen positions that the defense has never taken nor intends to advance, warning the Court that "[a]ny suggestion by the defendant that a FARA Letter of Inquiry should or must occur prior to a criminal prosecution is inaccurate and would needlessly mislead or confuse the jury." *Id.* at 53. But Dr. Terry has never suggested otherwise. She agrees that a Letter of Inquiry from the DOJ's FARA Unit is not a legal prerequisite or precondition to a criminal prosecution, and she will not tell the jury that it is.

The government then uses these strawmen to justify extraordinarily broad relief, asking the Court to preclude "[a]ny argument, questioning, or introduction of evidence relating to FARA Letters of Inquiry" because they are supposedly "irrelevant and would mislead and confuse the

jury." *Id.* at 55. That sweeping request is unjustified at this juncture, and the government's own brief reveals why. In the very same section, the government concedes the dispositive point: "a Letter of Inquiry and an individual's subsequent failure to register *may help demonstrate willfulness* in a FARA prosecution." *Id.* at 54–55 (emphasis added). If the *presence* of a Letter of Inquiry can help *prove* willfulness, it necessarily follows that the *absence* of such a letter could be relevant to the absence of that mental state. That is not a legal argument about formal prerequisites to prosecution. It is a factual argument about a defendant's subjective understanding of her registration obligations under FARA. Willfulness is a question for the jury, and if the evidence bears on that element—in either direction—the jury is entitled to hear it. The government has indicated that it seeks to rely on circumstantial evidence from a variety of channels to establish Dr. Terry's alleged knowledge of her FARA obligations, including her alleged attendance at a FARA training and her photographing of FARA slides. *See* Gov't MIL at 39. The defense must likewise be permitted to explore those channels.

Moreover, the government's attempt to reframe this evidence as a challenge to its "investigative and charging policies" misses the point entirely. Gov't MIL at 55. The defense does not contend that this case's origin in an FBI investigation, rather than a referral from the FARA Unit, has any bearing on whether Dr. Terry committed a crime, and it will not suggest otherwise to the jury. The Letter of Inquiry is relevant not to explain the government's process but rather to illuminate Dr. Terry's state of mind. Whether or not Dr. Terry received a Letter of Inquiry is just one relevant piece of the mosaic of evidence bearing on her subjective knowledge.

To be clear, the defense does not ask the Court to rule now that specific Letter of Inquiry evidence is admissible. But it would be wholly premature for the Court to categorically foreclose an entire category of potentially relevant evidence before trial, where its probative value can be

evaluated in context and with proper factual predicate. The defense therefore asks the Court to deny the government's overbroad motion and reserve ruling on specific objections for trial. The defense should be permitted to introduce evidence and argument regarding Dr. Terry's non-receipt of a Letter of Inquiry to the extent a sufficient foundation is established at trial connecting that fact to her subjective understanding of her obligations.

For the foregoing reasons, the government's thirteenth motion *in limine* should be denied.

## XIV. IF THE COURT PRECLUDES DR. TERRY FROM REFERENCING FISA, IT MUST ALSO PRECLUDE THE GOVERNMENT FROM DOING SO

The government's fourteenth motion *in limine* seeks to preclude the defense from referring to the fact that certain evidence it seeks to introduce at trial was obtained through Foreign Intelligence Surveillance Act of 1978 ("FISA") surveillance. *See* Gov't MIL at 56–60. Dr. Terry has separately moved to preclude the government from referring to FISA at trial, *see* Def. MIL at 7–8, and agrees with the government that any reference to FISA would be "wholly irrelevant," Gov't MIL at 56. The parties also agree that references to FISA would unfairly prejudice Dr. Terry by suggesting "that a court has already determined that [she] is a threat to national security." *Id.* at 58;[24] *see* Def. MIL at 8 (explaining that references to "'FISA'" would improperly "evoke

[24] If the government agrees that references to FISA, standing alone, carry an intolerable risk of misleading the jury into believing that Dr. Terry's alleged conduct implicated or harmed national security, then surely that risk is even greater if the government is permitted to deploy the full arsenal of national-security and espionage rhetoric it intends to introduce at trial: characterizing South Korean officials as Dr. Terry's "handlers" and Dr. Terry as their "source," Def. MIL at 3–6; describing alleged "spot and assess" recruitment methods and other spycraft tactics, *id.* at 6–7; calling its investigation a "counterintelligence" operation, *id.* at 7–8; and inaccurately using technical terms such as "nonpublic U.S. Government information" to suggest that Dr. Terry disclosed classified or restricted material she never possessed, *id.* at 8–13. Each of these categories of evidence carries the same capacity to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180; *see also Sun* Motions *in Limine* Order at 11 (excluding "national security rhetoric" from a FARA trial because "reference to espionage or spying would be inflammatory and unfairly prejudicial"). The government cannot credibly argue that references to FISA are unfairly prejudicial to Dr. Terry while also maintaining that it may freely "pepper[] the trial" with espionage rhetoric, spycraft evidence, and counterintelligence references that evoke even more inflammatory "national security overtones." *Id.* (internal quotation marks omitted).

espionage and threats to national security"). Because both parties seek to preclude references to FISA at trial, any ruling on this issue must apply equally to both parties. *See Goldberg v. Nat'l Life Ins. Co. of Vt.*, 774 F.2d 559, 565 (2d Cir. 1985) ("Rule 403 requires even-handedness."); *Sabratek Liquidating LLC v. KPMG LLP*, 2003 WL 22715820, at *2 (N.D. Ill. Nov. 18, 2003) (granting plaintiff's motion to exclude evidence "provided that [plaintiff] reciprocally refrains from introducing such evidence"). Thus, if the Court precludes the defense from referring to FISA or disclosing that certain evidence was obtained through FISA surveillance, it must likewise prohibit the government from doing the same.

## XV. ANY ORDER REGARDING INQUIRY INTO THE GOVERNMENT'S INVESTIGATION AND CLASSIFIED INFORMATION MUST APPLY EQUALLY TO BOTH PARTIES AND MAY NOT FORECLOSE CROSS-EXAMINATION ON MATTERS THE GOVERNMENT PLACES BEFORE THE JURY

In its fifteenth motion *in limine*, the government seeks to preclude the defense from (i) questioning FBI witnesses involved in the investigation into Dr. Terry "about their other work with FBI, other matters under investigation, irrelevant aspects of this investigation that remain classified, or any other topics that implicate the existence or non-existence of classified information"; and (ii) "asking general questions or making arguments about the existence or non-existence of classified information." Gov't MIL at 60–62.

Dr. Terry generally agrees that evidence of other FBI investigations and whether the government's investigative methods in this case involved the collection of classified or unclassified information are irrelevant.[25] Indeed, Dr. Terry has separately moved to preclude the government from calling the investigation into her a "counterintelligence operation" because this

[25] Nothing in this motion shall be construed to limit Dr. Terry's ability to address the unclassified nature of the information she allegedly shared with South Korean officials, which she separately addresses in her response to the government's seventeenth motion *in limine*. *See infra* § XVII.

characterization is irrelevant to the narrow FARA violation at issue and improperly "evoke[s] espionage and threats to national security." Def. MIL at 7–8. But if the Court denies Dr. Terry's motion *in limine* and the government chooses to elicit testimony about the counterintelligence or national-security dimensions of its investigation—including the agents' roles, their investigative techniques, and the origin of the investigation—then Dr. Terry must be permitted to cross-examine the agents on those topics. The Court should not enter a blanket order that effectively forecloses all cross-examination regarding the government's investigation into Dr. Terry to the extent the government offers this evidence on direct examination. *See Ayala v. Ercole*, 2007 WL 1135560, at *12 (E.D.N.Y. Apr. 17, 2007) (recognizing that "[r]estrictions on a criminal defendant's ability to cross examine the prosecution's witnesses may 'effectively emasculate the right of cross-examination itself.'" (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968) (ellipses omitted)).

There is a straightforward solution here. During its presentation of FBI agent witnesses, the government should be precluded from discussing the agents' counterintelligence roles, the counterintelligence techniques they used, or any other counterintelligence or national-security aspects of the investigation into Dr. Terry. In return, the defense will not cross-examine the FBI agents on those topics.

Overall, any order from the Court regarding inquiry into the government's investigation into Dr. Terry—and whether that investigation involved the collection of classified or unclassified information—must apply equally to both parties. The government's fifteenth motion *in limine* should be denied to the extent it forecloses the defense's ability to cross-examine the government's witnesses on topics and matters the government itself places before the jury.

## XVI. ANY ORDER REGARDING THE TYPE OR AMOUNT OF GOVERNMENT RESOURCES USED IN THE INVESTIGATION INTO DR. TERRY MUST APPLY EQUALLY TO BOTH PARTIES

Dr. Terry agrees that evidence and argument regarding the type or amount of resources used in the government's investigation into her should be precluded. The defense does not oppose the government's sixteenth motion *in limine,* but requests that any order on this issue bind both parties equally.

The government's motion seeks to preclude "[a]ny argument or evidence regarding the type or amount of federal resources used in the investigation" into Dr. Terry. Gov't MIL at 63; *see id.* at 62–64. Dr. Terry has separately moved to preclude the government from "discussing the investigation's scope and the extraordinary resources devoted to it." Def. MIL at 7. The parties agree that this evidence is "wholly irrelevant" to the narrow FARA violation charged. Gov't MIL at 63; *see* Def. MIL at 7 (explaining that "[n]either the nature nor extent of the government's operations and investigation proves any element of the offense charged"). The parties also agree that this evidence is highly prejudicial, albeit for different reasons. The government argues that this evidence will "invite the jury to improperly consider its opinion of the Government's use (and potential overuse) of surveillance," Gov't MIL at 63, while Dr. Terry contends that this evidence risks "suggest[ing] that she is charged with conduct far more concerning and fundamentally different than the narrow FARA violation at issue," Def. MIL at 8.

Because both parties seek to preclude evidence of the type or amount of government resources used in the investigation, any ruling on this issue must apply equally to both parties. *See supra* § XIV; *see generally Goldberg*, 774 F.2d at 565; *Sabratek*, 2003 WL 22715820, at *2. For such an order to be meaningful, the Court should preclude not only express references to the type or amount of government resources used in the investigation, but also efforts to emphasize or suggest the investigation's scope, scale, cost, or intensity—as opposed to the substance of the

evidence obtained in the investigation. This includes, but is not limited to, evidence and argument regarding: (a) the number of agents, personnel, or surveillance teams involved; (b) the duration, frequency, or geographic reach of surveillance; (c) the variety or sophistication of surveillance techniques and equipment used; (d) coordination among FBI field offices or government agencies; and (e) the volume of materials, records, or data collected.[26]

For the foregoing reasons, Dr. Terry does not oppose the government's sixteenth motion *in limine*, provided that any resulting order applies equally to both parties. If the Court precludes Dr. Terry from offering evidence and argument regarding the type or amount of government resources used in the investigation, it must likewise prohibit the government from doing so. Dr. Terry reserves the right to request a limiting instruction, if warranted at trial, directing the jury that it may not draw inferences about the seriousness of the charged offense based on the nature or extent of the government's investigation.

## XVII. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT THAT THE INFORMATION DR. TERRY SHARED WAS UNCLASSIFIED AND THAT SHE BELIEVED SHE WAS ALLOWED TO SHARE IT

### A. BACKGROUND

The Court should deny the government's seventeenth motion *in limine*, which seeks to preclude the defense from offering evidence and argument that Dr. Terry "provided only unclassified information" to South Korean officials. Gov't MIL at 64; *see id.* at 64–65. The defense is entitled to show Dr. Terry did not believe she was legally prohibited from disclosing any of the information she allegedly shared with South Korean officials—including information from meetings with the U.S. Secretary of State and the U.S. Ambassador to Japan—as that

[26] Nothing in this motion shall be construed as purporting to limit Dr. Terry's right to offer evidence and argument regarding her interactions with FBI agents, including evidence bearing on the credibility, reliability, or weight of her statements. Dr. Terry addresses that evidence separately in Section I.

evidence bears directly on her mental state. *See* Ind. ¶¶ 32–33, 56. The government's own approach confirms it agrees such evidence is relevant, as it seeks to misuse loaded technical terms such as "nonpublic U.S. Government information" and "off-the-record" to suggest that Dr. Terry shared information she was prohibited from disclosing. *See* Def. MIL at 8–13.

It necessarily follows that Dr. Terry must also be permitted to show that the information she shared with South Korean officials was in fact unrestricted and that she was under no legal obligation to not disclose it. That is where the information's unclassified status comes in. Dr. Terry does not seek to inject classified material or the information's classified status into this trial—indeed, the government does not allege and the discovery does not show that Dr. Terry ever disclosed classified information to South Korean officials. But the fact that nothing restricted Dr. Terry's disclosure of the information, including that it was not classified, is part and parcel to showing that Dr. Terry did not believe she was prohibited from sharing it.

Remarkably, the government wants it both ways, as it simultaneously seeks to invoke espionage rhetoric and misuse loaded technical terms such as "nonpublic U.S. Government information" to create the very impression that Dr. Terry disclosed classified information or violated a legal obligation not to disclose information. *See* Def. MIL at 4–8. If the government is permitted to introduce such evidence or otherwise suggest that Dr. Terry disclosed classified information (it should not be), then Dr. Terry should be permitted to argue or offer evidence that the information was not classified to rebut the government's false impression that it was.

**B. ARGUMENT**

The government's assertion that FARA's statutory language makes no express distinction based on "whether the defendant's conduct implicates classified as opposed to unclassified information" misses the point. Gov't MIL at 64. Dr. Terry does not contend that classification status is an element of the charged offense. Rather, evidence that she believed she could share this

information bears directly on willfulness—an element that the jury must find under either party's proposed standard. *See* 22 U.S.C. § 618(a)(1); Def. Pretrial Mot. at 21–25; ECF No. 52 at 8–10.[27] So does the logical extension of that evidence: that the information was unrestricted, carried no legal nondisclosure obligation, and was unclassified. Even under the government's more relaxed willfulness standard, a person who believes she is free to share information is less likely to have a "consciousness of wrongdoing" than one who believes she is violating a legal obligation not to disclose it. Gov't Supp. Auth. Letter at 1 (internal quotation marks omitted). If Dr. Terry believed that the information was unclassified or unrestricted and that sharing it was not unlawful, the jury could find that she understood her conduct as ordinary think-tank activity—not covert activity undertaken at a foreign principal's request or direction that could trigger a potential registration obligation under FARA. Indeed, the government's own reliance on—and misuse of—loaded technical terms such as "nonpublic U.S. Government information" or "off-the-record" to argue that Dr. Terry shared information that she was prohibited from sharing confirms that it agrees this question is relevant. *See* Def. MIL at 8–13.

The government's conclusory Rule 403 arguments have it backwards. *See* Gov't MIL at 64–65. Dr. Terry does not seek to offer this evidence to argue that her "conduct was acceptable because she was not charged with mishandling classified information." Gov't MIL at 64. Nor does she intend to argue that the absence of such a charge excuses a FARA violation, or that classification status matters for its own sake. Instead, the evidence goes to what Dr. Terry understood she was permitted to do. If anything, it guards against the real risk of confusion in this case: that jurors will mistakenly believe that Dr. Terry is accused of mishandling classified

[27] *See also* Jury Charge in *Sun* at 53 (instructing the jury that "[a] Defendant's conduct is not 'willful' if it was the result of negligence, inadvertence, mistake, or a good faith misunderstanding of the requirements of the law," referring to the standard set forth in *Cheek v. United States*, 498 U.S. 192, 201–04 (1991)).

information or that her conduct otherwise implicated or harmed national security. The government has recognized that danger elsewhere in its motions *in limine*. *See* Gov't MIL at 58 (acknowledging that references to FISA would unfairly prejudice Dr. Terry by suggesting "that a court has already determined that [she] is a threat to national security").

The government's invocation of "jury nullification" fares no better. Gov't MIL at 65 (internal quotation marks omitted). Its cited cases concern requests to argue for nullification, motions to preclude such arguments, or the dismissal of a juror for engaging in nullification. None involves evidence offered to contest an element of the charged offense. *See In re United States*, 945 F.3d at 621; *United States v. Díaz-Colón*, 651 F. Supp. 3d 468, 478 (D.P.R. 2023); *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997). Dr. Terry seeks to introduce this evidence to contest willfulness, which the government must prove. Allowing the jury to consider evidence bearing on that element would help it fulfill, not "subvert[]," its "solemn duty to … apply [the] law to the facts." *In re United States*, 945 F.3d at 627 (internal citation omitted).

At a minimum, if the Court permits the government to introduce espionage rhetoric and spycraft evidence, inaccurately characterize the information as "nonpublic U.S. Government information," or otherwise suggest that Dr. Terry disclosed classified information, Dr. Terry must be permitted to directly rebut that "false impression" with evidence that the information she allegedly shared with South Korean officials was unclassified, even if the Court would otherwise exclude it. *United States v. Howard*, 639 F. App'x 686, 689 (2d Cir. 2016) (summary order) (recognizing that a party may "introduce otherwise inadmissible evidence on an issue (a) when the opposing party has opened the door by introducing inadmissible evidence on the same issue, and (b) when needed to rebut a false impression that may have resulted from the opposing party's evidence" (quoting *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993))); *see United States v.*

*Wertheimer*, 434 F.2d 1004, 1006–07 (2d Cir. 1970) (reversing conviction where the defendant was barred from rebutting the government's irrelevant, prejudicial, and false suggestion that ordered materials were "never delivered" and that the government "was cheated out of its moneys" with evidence that the materials were "eventually delivered").

The Court could resolve this issue with an instruction to the jury. The government has stated that "whether information was or is classified" is "irrelevant to [Dr. Terry's] guilt." Gov't MIL at 62. If the government truly believes this, to prevent this trial from becoming a referendum on classification, the government should have no objection to an instruction that none of the information Dr. Terry allegedly shared with South Korean officials was classified. *See* Def. MIL at 13 (separately requesting "that the Court instruct the jury that none of the information that Dr. Terry allegedly received or shared was classified or restricted by a legal nondisclosure obligation").

**C. CONCLUSION**

For the foregoing reasons, the Court should deny the government's seventeenth motion *in limine*. Dr. Terry is entitled to offer evidence and argument that she believed she was not legally prohibited from sharing any of the information she allegedly shared with South Korean officials, as that bears directly on her alleged willfulness. Because the logical extension of that evidence is that the information was unrestricted, carried no legal nondisclosure obligation, and was unclassified, Dr. Terry must be permitted to present that evidence too. The government, which has argued that the information was "nonpublic U.S. government information" or "off-the-record," cannot credibly argue otherwise. And if the government suggests that Dr. Terry mishandled classified information, she must be permitted to rebut that false impression. The Court could also instruct the jury that the information Dr. Terry allegedly shared with South Korean officials was not classified—which the government should not dispute.

## XVIII. THE COURT SHOULD PERMIT EVIDENCE AND ARGUMENT REGARDING DR. TERRY'S BACKGROUND, FAMILY, OR OTHER PERSONAL CHARACTERISTICS

The Court should deny the government's eighteenth motion *in limine*—which seeks to categorically preclude the defense from introducing any evidence and argument regarding Dr. Terry's "family background, ethnicity, ancestry, upbringing, or any other similar factors"—because that sweeping request lacks the specificity required for pretrial exclusion and targets categories of evidence that are directly relevant to the charged offense and Dr. Terry's defense. Gov't MIL at 65.

In any criminal case, the defense is entitled to introduce reasonable background evidence about the defendant. "[I]t is customary for the defendant to introduce evidence concerning his background, such as information about his education and employment. Such evidence is routinely admitted without objection." *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988) (internal quotation marks omitted).

In this case, Dr. Terry's family background, ethnicity, ancestry, upbringing, and other personal characteristics are particularly relevant. The government's case centers on a decade of contacts with South Korean officials, communications with foreign-policy officials and experts, and publications on Korean affairs—activities made possible by the ties, access, and expertise rooted in her family background, ethnicity, ancestry, and upbringing. The jury cannot fully assess whether Dr. Terry's alleged conduct was independently motivated or undertaken at the direction of a foreign principal without understanding the personal history that informed that conduct—including her birth in South Korea, immigration to the United States at age twelve, upbringing by grandparents from North Korea, her divorce, and experiences as a Korean American woman navigating a male-dominated field. *See* 22 U.S.C. §§ 611(c)(1); 613(d). Dr. Terry's background also bears directly on her alleged willfulness. As a native Korean speaker, she was naturally

positioned to become a Korea expert; indeed, South Korean officials frequently reached out to her in part because they could communicate with her in Korean rather than in English. Having devoted her entire career to Korean affairs through decades of government service and scholarship, Dr. Terry had every reason to view those interactions as routine professional engagements rather than conduct undertaken for a foreign principal that could have triggered a registration obligation under FARA. And it is especially critical that the defense is allowed to present this necessary, humanizing evidence if the Court permits the government to portray Dr. Terry as some sort of cold-blooded double agent and stoke dual-loyalty stereotypes and anti-Asian biases in doing so. *See* Def. MIL at 4–6; *United States v. Tao*, 2022 WL 252019, at *6 (D. Kan. Jan. 27, 2022).

The government nevertheless asks the Court to exclude nearly every personal detail about Dr. Terry in a single motion. Such a ruling would prevent her from presenting a coherent account of the essential facts that have shaped her life and career and would deprive her of a meaningful opportunity to present herself as a person rather than merely as the accused. Courts have routinely rejected similarly overbroad and unparticularized requests by the government to exclude evidence of the defendant's personal background. *See, e.g.*, *United States v. Adelekan*, 567 F. Supp. 3d 459, 471 (S.D.N.Y. 2021) (denying the government's broad request to exclude background information about the defendant's profession because this information "'is universally offered and admitted as an aid to understanding ... the defendant as a person, and his experiences in life'") (quoting *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988)); *United States v. James*, 607 F. Supp. 3d 246, 256 (E.D.N.Y. 2022) (denying the government's motion *in limine* to preclude information about the defendant's background because such a motion is a "preemptive weapon[] with which [the government] endeavor[s] to strike in shotgun fashion at whole topics and sources of prospective

evidence, out of context and before any specific objection against its proper backdrop is raised" (internal citation omitted)).

And the government's cases do not support its request for categorical relief.[28] Each involved targeted, narrowly tailored requests to exclude specific traits or background details that were specifically offered to elicit jury sympathy. *See* Gov't MIL at 65–66; *United States v. Paccion*e, 949 F.2d 1183, 1203 (2d Cir. 1991) (affirming exclusion of evidence that defendant's son had cerebral palsy as improper sympathy evidence unrelated to the charged RICO offenses); *United States v. St. Ros*e, 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) (precluding defendant from referencing her immigration status and motherhood in currency-reporting case where defendant's status as a noncitizen would lead to collateral consequences if convicted); *United States v. Mejia*, 2016 WL 6662265, at *1 (S.D.N.Y. Nov. 9, 2016) (excluding evidence of defendant's health and family health in narcotics-conspiracy case). Here, by contrast, Dr. Terry does not seek to invoke her personal circumstances to generate sympathy. As discussed, given the nature of this FARA prosecution—which concerns Dr. Terry's alleged conduct over a decade of her professional and personal life—her family, ethnicity, ancestry, upbringing, and other similar characteristics are inherently relevant to both the charged violation and Dr. Terry's defense.

For the foregoing reasons, the Court should deny the government's eighteenth motion *in limine* and its sweeping request to preclude evidence and argument regarding Dr. Terry's background, family, or other personal characteristics.

---

[28] The government has not identified particular evidence it seeks to exclude, nor has it articulated any specific prejudice that would result from the admission of such evidence. In *United States v. Guan*, 2026 WL 1878118, at *7 (S.D.N.Y. June 30, 2026), the court confronted a similarly non-specific government motion *in limine* that sought to preclude "evidence or argument concerning his family background, ethnicity or nationality, immigration status, marital status, ancestry, health, age, or any other similar factors." The court denied the motion, holding that "[o]bjections to specific evidence may be raised at trial." *Id.*

## PRAYER FOR RELIEF

For the foregoing reasons, Dr. Terry respectfully requests that the Court:

a. Permit evidence bearing on the credibility, reliability, and weight of the statements that Dr. Terry purportedly made to the FBI. *See supra* § I.

b. Permit Dr. Terry to present evidence of the effect of the charges on her personal and professional life. *See supra* § II.

c. Permit evidence and argument about South Korea's status as an ally and whether Dr. Terry's conduct furthered U.S. foreign policy. *See supra* § III.

d. Permit evidence and argument concerning the novel nature of the government's position on FARA-registrable activity. *See supra* § IV.

e. Deny the government's premature attempt to preclude evidence that others engaged in similar conduct. *See supra* § V.

f. Permit evidence and argument concerning changes in the DOJ's FARA enforcement priorities. *See supra* § VI.

g. Permit Dr. Terry to cross-examine James Olson on excerpts from his books and writings to show bias, should he be allowed to testify. *See supra* § VII.

h. Require the government to proffer evidence of the charged conspiracy to violate FARA before admitting any purported co-conspirator statements and only allow the government to introduce Dr. Terry's statements for a legally permissible purpose. *See supra* § VIII.

i. Admit Dr. Terry's own statements for any legally permissible purpose. *See supra* § IX.

j. Permit evidence and argument regarding Korean gift-giving cultural practices and norms if the Court allows the government to introduce evidence of the gifts. *See supra* § X.

k. Preclude the government from introducing inaccurate, irrelevant, and highly prejudicial evidence regarding Dr. Terry's departure from the CIA. *See supra* § XI.

l. Permit evidence and argument regarding Dr. Terry's public-oriented acts. *See supra* § XII.

m. Deny the government's premature attempt to preclude evidence and argument that Dr. Terry never received a letter of inquiry from the DOJ's FARA unit. *See supra* § XIII.

n. Preclude the government from referencing FISA if it precludes Dr. Terry from referencing it. *See supra* § XIV.

o. Apply any order regarding inquiry into the government's investigation and classified information equally to both parties and ensure the order does not foreclose cross-examination on matters the government places before the jury. *See supra* § XV.

p. Apply any order regarding the type or amount of government resources used in the investigation into Dr. Terry equally to both parties. *See supra* § XVI.

q. Permit evidence and argument that the information Dr. Terry shared was unclassified and that she believed she was allowed to share it. *See supra* § XVII.

r. Permit evidence and argument regarding Dr. Terry's background, family, or other personal characteristics. *See supra* § XVIII.

Dated: September 28, 2026
New York, New York

Respectfully submitted,

By: /s/ *Faith E. Gay*
Faith E. Gay

SELENDY GAY PLLC
Faith E. Gay
Temidayo Aganga-Williams
Joshua W. Bean
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
fgay@selendygay.com
tagangawilliams@selendygay.com
jbean@selendygay.com

KKL LLP
Nicholas J. Lewin
Melissa C. Danzo
350 Fifth Avenue, 77th Floor
New York, NY 10118
Telephone: (212) 390-9550
nick.lewin@KKLllp.com
melissa.danzo@KKLllp.com

WILLKIE FARR & GALLAGHER LLP
Lee S. Wolosky
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
lwolosky@willkie.com

JENNER & BLOCK LLP
Anthony S. Barkow
Sophie A. Schuit
Sarah P. Geller
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: (212) 891-1600
abarkow@jenner.com
sschuit@jenner.com
sgeller@jenner.com

*Attorneys for Dr. Sue Mi Terry*